Miscellaneous Docket No. ___

IN THE
# United States Court of Appeals for the Federal Circuit

IN RE MICRON TECHNOLOGY, INC.;
MICRON CONSUMER PRODUCTS GROUP, LLC,

*Petitioners.*

On Petition for Writ of Mandamus to the
United States District Court for the
Northern District of California
No. 3:23-cv-05792-RFL, Hon. Rita F. Lin

## APPENDIX TO MICRON'S
## PETITION FOR WRIT OF MANDAMUS

Jonas Q. Wang
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
2100 Pennsylvania Avenue, NW
Washington, DC  20037

Jared Bobrow
Jeremy Jason Lang
Diana M. Rutowski
ORRICK, HERRINGTON &
  SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614-7400

*Counsel for Petitioners*

# TABLE OF CONTENTS

**Page**

Discovery Order,
    Dkt. No. 186, filed December 12, 2024 ......................................... Appx1

Docket for Northern District of California Case No.
    3:23-cv-05792-RFL ........................................................................ Appx6

Complaint for Patent Infringement,
    Dkt. No. 1, filed November 9, 2023 ............................................ Appx41

Defendants' Answer to First Amended Complaint and
    Counterclaims,
    Dkt. No. 35, filed February 16, 2024 ......................................... Appx74

Exhibit 11 to Defendants' Answer to First Amended
    Complaint: Micron Technology, Inc. Form 10-K,
    Dkt. No. 35-11, filed February 16, 2024 ................................. Appx104

Exhibit 12 to Defendants' Answer to First Amended
    Complaint: Idaho Department of Labor, State of
    Idaho Labor Force and Economic Profile,
    Dkt. No. 35-12, filed February 16, 2024 ................................. Appx247

Exhibit 15 to Defendants' Answer to First Amended
    Complaint: Micron Press Release, Micron and Intel
    Unveil New 3D NAND Flash Memory,
    Dkt. No. 35-15, filed February 16, 2024 ................................. Appx256

Joint Stipulation and Protective Order for Litigation
    Involving Patents, Highly Sensitive Confidential
    Information and/or Trade Secrets,
    Dkt. No. 81, filed July 19, 2024 ............................................... Appx259

Micron's Amended Answer to YMTC's Amended
    Consolidated Complaint and Amended
    Counterclaims,
    Dkt. No. 170, filed October 31, 2024 ....................................... Appx288

Joint Letter Brief Regarding Micron's Source Code,
     Dkt. No. 180, filed November 26, 2024 .................................... Appx332

Transcript of December 12, 2024 Discover Motion Hearing,
     Dkt. No. 190 ............................................................................. Appx340

Micron's Motion for Relief from Nondispositive Pretrial
     Order of Magistrate Judge,
     Dkt. No. 191, filed December 24, 2024.................................... Appx360

Declaration of W. David Westergard in Support of
     Micron's Motion for Relief from Nondispositive
     Pretrial Order of Magistrate Judge,
     Dkt. No. 192-1, filed December 24, 2024 ................................ Appx369

Order Denying Motion for Relief from Nondispositive
     Pretrial Order of Magistrate Judge,
     Dkt. No. 197, filed January 14, 2025 ...................................... Appx375

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YANGTZE MEMORY TECHNOLOGIES COMPANY, LTD., | Case No.  23-cv-05792-RFL   (TSH) |
| Plaintiff, | **DISCOVERY ORDER** |
| v. | Re: Dkt. Nos. 180, 181 |
| MICRON TECHNOLOGY, INC., et al., | |
| Defendants. | |

We are here on two discovery disputes.  ECF Nos. 180, 181.  The Court held a hearing on December 12, 2024 and now issues the following order.

**A.      ECF No. 180 (Source Code)**

YMTC has requested a print out of 73 pages of Micron's source code.  Micron argues this request is excessive and that 15 pages is reasonable instead.

The protective order has several provisions relating to source code.  ECF No. 81 ¶¶ 9(a)-9(p).  In general, "source code . . . produced in discovery shall be made available for inspection, in a format allowing it to be reasonably reviewed and searched, during normal business hours or at other mutually agreeable times, at an office of the Producing Party's counsel or another mutually agreed upon location.  The source code shall be made available for inspection on a Secure Computer in a secured room without Internet access or network access to other computers (except such network connections may be made by the Producing Party to provide access to the Producing Party's Source Code Material), and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device."  *Id.* ¶

9(c).

Paragraph 9(j) further provides that "[a]t the request of the Receiving Party, and subject to any export control restrictions, the Producing Party shall provide paper copies ('Original Printouts') of portions of the materials on the Secure Computer that is requested by the Receiving Party and is reasonably necessary to facilitate the Receiving Party's preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial.  The Producing Party shall Bates number, copy, and label 'HIGHLY CONFIDENTIAL – SOURCE CODE' material on any Original Printouts.  The receiving Party may print not more than 1500 pages—including no more than 30 consecutive pages.  If the Producing Party objects that the portions requested to be printed are excessive and/or not reasonably necessary to any case preparation activity, the Producing Party shall make such objection known to the Receiving Party within five (5) days."

Paragraph 9(j) continues:  "The Parties shall meet and confer within two (2) business days of any such objection.  If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, the objection may be jointly submitted to the Court for resolution within three (3) business days of the meet and confer.  The Producing Party may challenge the amount of source code requested in hard copy form pursuant to the dispute resolution procedure set forth in Paragraph 6.3 whereby the Producing Party is the 'Challenging Party' and the Receiving Party is the 'Designating Party' for purposes of dispute resolution."  Paragraph 6.3 says that "[t]he burden of persuasion in any such challenge proceeding shall be on the Designating Party."

Here, YMTC has requested 73 pages from the 150 Series Traveler.  Micron objects under paragraph 9(j) on the grounds that this request is excessive because the 150 Series Traveler is Micron's crown jewel material and because this many pages is not reasonably necessary for case preparation.  Between paragraphs 9(j) and 6.3, it appears that YMTC as the receiving party is deemed to be the designating party in the challenge provision in paragraph 6.3, so it bears the burden of persuasion.

YMTC's request is for pages 107, 115, 122-127, 130-131, 141-146, 153, 156, 160-163, 174, 189-197, 200-201, 206-207, 209-214, 221, 224-232, 234-239, 260, 264-267, 272-279, so it

Appx2

1 has not asked for more than 30 consecutive pages. Nor does Micron state that YMTC has in total

2 requested more than 1500 pages. Further, the parties are in agreement that the pages before and

3 after the requested pages relate to features not at issue in this case (such as title slides, summary

4 slides, and background information). This tends to demonstrate that YMTC's request is

5 thoughtful and focused on materials needed for case preparation.

6       As to the importance of this source code to Micron, YMTC points out that the protective

7 order has important protections applicable here. For example, paragraph 9(l) provides that "[t]he

8 Receiving Party shall maintain a record of any individual who has inspected any portion of the

9 source code in electronic or paper form. The Receiving Party's outside counsel of record and any

10 person receiving a copy of any HIGHLY CONFIDENTIAL – SOURCE CODE material

11 (excluding the Court and court personnel) shall maintain and store any paper copies of the material

12 at their offices in a manner that prevents duplication of or unauthorized access to the material,

13 including, without limitation, storing the material in a locked room or cabinet at all times when it

14 is not in use." And paragraph 9(m) provides that "[a]ll paper copies of HIGHLY

15 CONFIDENTIAL – SOURCE CODE material shall be securely destroyed in a timely manner if

16 they are no longer in use (e.g., at the conclusion of a deposition). Copies of any such material that

17 are marked as deposition exhibits shall not be provided to the court reporter or attached to

18 deposition transcripts; rather, the deposition record will identify the exhibit by its production

19 numbers. If the deposition exhibit has been marked up or altered in any way by the deponent, the

20 receiving Party shall store the exhibit in the same way paper copies of the HIGHLY

21 CONFIDENTIAL – SOURCE CODE material are stored."

22       Considering the volume of the requested source code, which is within the presumptive

23 limits of paragraph 9(j), and the care YMTC has taken to request pages that both sides agree are

24 relevant, and the strong protections in the protective order that will apply to the print outs, the

25 Court finds that YMTC has carried its burden of persuasion and **ORDERS** Micron to provide the

26 requested 73 pages of source code print outs.

27 **B.**     **ECF No. 181 (YMTC's Interrogatory 12)**

28       YMTC's interrogatory ("rog") 12 seeks the "factual and legal basis for [Micron's]

3

Appx3

United States District Court
Northern District of California

1    contention that [Micron] do[es] not infringe" the Asserted Patents. The dispute here is about the

2    timing of a response. YMTC argues that Micron should be compelled to respond right away. But

3    Micron argues that a response should be due after the claim construction order issues.

4        In the letter brief, YMTC asked the Court to order Micron to respond to rog 12 for all 228

5    claims from 19 patents that are currently asserted in the case. That would be wasteful, of course.

6    Judge Lin has ordered YMTC to narrow its case down to 70 claims by January 14, 2025, and to 40

7    claims after the claim construction order. ECF No. 141. If Micron had to respond to rog 12 now

8    as to all asserted claims, it would be providing non-infringement contentions for 188 claims that

9    will be dropped from the case.

10       At the hearing, YMTC backed down from that position and argued that Micron should be

11   ordered to answer rog 12 for the 39 independent claims it asserts. Micron disagreed. The Court

12   thinks that requiring Micron to answer rog 12 for the 39 independent claims after the January 14

13   narrowing makes sense. By January 14, YMTC will have done the vast bulk of the narrowing,

14   moving from 228 asserted claims to 70 of them. True, there will be additional narrowing (down to

15   40 claims) by seven days after the claim construction order, so it may be that if Micron answers

16   rog 12 for the 39 independent claims after January 14, some portion of its rog response will

17   become moot if those claims are dropped. That doesn't mean, however, that there is no value in

18   the mooted portions of the rog response because Micron's non-infringement contentions may

19   influence which claims YMTC later drops. Further, because the phase 3 and phase 4 narrowing

20   occur after the close of fact discovery, it is inevitable that some portion of Micron's rog 12

21   response will be mooted at some point, no matter when the deadline is to answer the rog. And as

22   noted, those non-infringement contentions may influence which claims get dropped. Requiring

23   Micron to answer rog 12 within 30 days after the January 14 narrowing strikes an appropriate

24   balance between waiting until most (but not all) of the narrowing has occurred, without letting

25   discovery get unnecessarily stalled, and giving Micron enough time after the January 14 narrowing

26   to draft a good rog response.

27       Accordingly, the Court **ORDERS** Micron to answer rog 12 for the 39 independent claims

28   YMTC asserts by 30 days after January 14, 2025. Of course, if YMTC drops any of the 39

4

independent claims by January 14, Micron's answer need not address any dropped claims.

**IT IS SO ORDERED.**

Dated: December 12, 2024

THOMAS S. HIXSON
United States Magistrate Judge

ADRMOP,AO279,CASREF,CONSOL,PROTO,PRVADR

**U.S. District Court**
**California Northern District (San Francisco)**
**CIVIL DOCKET FOR CASE #: 3:23–cv–05792–RFL**

Yangtze Memory Technologies Company, Ltd. v. Micron
Technology, Inc., et al
Assigned to: Judge Rita F. Lin
Referred to: Magistrate Judge Thomas S. Hixson
Cause: 35:271 Patent Infringement

Date Filed: 11/09/2023
Jury Demand: Both
Nature of Suit: 830 Patent
Jurisdiction: Federal Question

**Plaintiff**

**Yangtze Memory Technologies**
**Company, Ltd.**

represented by **Alexander E Middleton**
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
212–596–9680
Email: alexander.middleton@ropesgray.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Allen S. Cross**
Ropes & Gray LLP
2099 Pennsylvania Avenue NW
39 Floor
Washington D.C, DC 20006
202–508–4708
Fax: 202–383–7782
Email: allen.cross@ropesgray.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Joseph Behrendt**
Latham & Watkins
300 Colorado Street
Suite 2400
Austin, TX 78701
737–910–7300
Fax: 737–910–7301
Email: benjamin.behrendt@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brenda Lynn Danek**
Latham & Watkins
330 North Wabash Avenue
Ste 2800
Chicago, IL 60611
312–876–7700
Fax: 312–993–9767
Email: brenda.danek@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brent Thomas Watson**
Latham & Watkins LLP
12670 High Bluff Drive
San Diego, CA 92130
858–523–5400
Fax: 858–523–5450
Email: thomas.watson@lw.com
*ATTORNEY TO BE NOTICED*

**Brett Matthew Sandford**
Latham & Watkins
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
415–391–0600
Fax: 415–395–8095
Email: brett.sandford@lw.com
*ATTORNEY TO BE NOTICED*

**Clement Naples**
Latham & Watkins LLP
1271 Avenue of the Americas
New York, NY 10020
212–906–1200
Fax: 212–751–4864
Email: clement.naples@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Daniel Willis Richards**
Ropes & Gray LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303–2284
650–617–4000
Fax: 650–617–4090
Email: Daniel.Richards@ropesgray.com
*ATTORNEY TO BE NOTICED*

**Elliott Greb**
Latham & Watkins
12670 High Bluff Drive
San Diego, CA 92130
858–523–5400
Fax: 858–523–5450
Email: elliott.greb@lw.com
*ATTORNEY TO BE NOTICED*

**Hyun–Joong Kim**
Ropes & Gray LLP
1211 Avenue of the Americas
New York
New York, NY 10036
212–596–9000
Email: daniel.kim@ropesgray.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James R. Batchelder**
Ropes and Gray
1900 University Avenue
6th Floor
East Palo Alto, CA 94303
650.617.4018
Fax: 650.617.4090
Email: James.Batchelder@ropesgray.com
*ATTORNEY TO BE NOTICED*

**James Francis Mack**
Ropes and Gray LLP
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303
650–617–4797
Email: James.Mack@ropesgray.com
*ATTORNEY TO BE NOTICED*

**Kevin Christopher Wheeler**
Latham and Watkins LLP
555 Eleventh Street NW
Suite 1000
Washington DC, DC 20004–1304
202–637–2200
Fax: 202–637–2201
Email: kevin.wheeler@lw.com
*ATTORNEY TO BE NOTICED*

**Nancy Attalla**
Ropes & Gray
1900 University Avenue
Ste 6th Floor
East Palo Alto, CA 94303
650–617–4717
Email: nancy.attalla@ropesgray.com
*ATTORNEY TO BE NOTICED*

**Nicole S. L. Pobre**
Ropes & Gray LLP
2099 Pennsylvania Avenue, N.W.
Washington, DC 20006
202–508–4669
Email: nicole.pobre@ropesgray.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Rachael Bacha**
Rachael S. Bacha
1211 Avenue Of The Americas
New York, NY 10036
(212) 596–9062
Fax: (646) 728–2736
Email: rachael.bacha@ropesgray.com
*ATTORNEY TO BE NOTICED*

**Rachael S. Bacha**
Ropes & Gray LLP
1211 Avenue of the Americas
New York, NY 10036
212–596–9062
Email: rachael.bacha@ropesgray.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Richard A. Lowry**
Latham & Watkins LLP
555 Eleventh Street, NW
Suite 1000
Washington, DC 20004
202–637–2200
Email: richard.lowry@lw.com
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stepan Starchenko**
Ropes and Gray
1900 University Ave
6th Floor
East Palo Alto, CA 94303
(650) 617–4718
Email: stepan.starchenko@ropesgray.com
*ATTORNEY TO BE NOTICED*

**Thomas Yeh**
Latham & Watkins LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071–1560
213–485–1234
Fax: 213–891–8763
Email: thomas.yeh@lw.com
*ATTORNEY TO BE NOTICED*

**Andrew Radsch**
Ropes & Gray LLP
1900 University Avenue
East Palo Alto, CA 94303
650–617–4000
Email: andrew.radsch@ropesgray.com
*ATTORNEY TO BE NOTICED*

V.

**Defendant**

**Micron Technology, Inc.,**                 represented by  **Jared Bobrow**
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025
650–614–7400
Fax: 650–614–7401
Email: jbobrow@orrick.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Asim M. Bhansali**
Kwun Bhansali Lazarus LLP
555 Montgomery Street
Suite 750
San Francisco, CA 94111
(415) 630–2350
Fax: 415–367–1539
Email: abhansali@kblfirm.com
*ATTORNEY TO BE NOTICED*

**Diana Rutowski**
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025
(650) 614–7685
Fax: (650) 614–7401
Email: drutowski@orrick.com
*ATTORNEY TO BE NOTICED*

**Jeremy Jason Lang**
Orrick, Herrington & Sutcliffe LLP
1000 Marsh Road
Menlo Park, CA 94025
650–614–7400
Fax: 650–614–7401
Email: jlang@orrick.com
*ATTORNEY TO BE NOTICED*

**Nicholas Alan Roethlisberger**
Kwun Bhansali Lazarus LLP
555 Montgomery Street
Suite 750
San Francisco, CA 94111
415–630–2350

Email: nroethlisberger@kblfirm.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Micron Consumer Products, Group,**
**LLC.,**

represented by **Jared Bobrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Asim M. Bhansali**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Rutowski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Jason Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Alan Roethlisberger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter–claimant**

**Micron Consumer Products, Group,**
**LLC.,**

represented by **Jared Bobrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Asim M. Bhansali**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Rutowski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Jason Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Alan Roethlisberger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter–claimant**

**Micron Technology, Inc.,**

represented by **Jared Bobrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Asim M. Bhansali**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Rutowski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Jason Lang**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Nicholas Alan Roethlisberger**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter–defendant**

**Yangtze Memory Technologies, Inc.**     represented by     **Andrew Radsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Christopher Wheeler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Yeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter–defendant**

**Yangtze Memory Technologies Company, Ltd.**     represented by     **James R. Batchelder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Francis Mack**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Christopher Wheeler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nancy Attalla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael Bacha**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stepan Starchenko**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Yeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Radsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter–claimant**

**Micron Consumer Products, Group, LLC.,**     represented by     **Jared Bobrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Asim M. Bhansali**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Diana Rutowski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Jason Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Alan Roethlisberger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter–claimant**

**Micron Technology, Inc.,**                    represented by   **Jared Bobrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Asim M. Bhansali**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Rutowski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Jason Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Alan Roethlisberger**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter–defendant**

**Yangtze Memory Technologies**            represented by   **Alexander E Middleton**
**Company, Ltd.**                                                (See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Benjamin Joseph Behrendt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brenda Lynn Danek**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brent Thomas Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brett Matthew Sandford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Clement Naples**

(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elliott Greb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hyun–Joong Kim**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**James R. Batchelder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Francis Mack**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Christopher Wheeler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nancy Attalla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael Bacha**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Lowry**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Stepan Starchenko**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Yeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Radsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter–defendant**

**Yangtze Memory Technologies, Inc.**          represented by   **Andrew Radsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Benjamin Joseph Behrendt**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brenda Lynn Danek**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Brent Thomas Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brett Matthew Sandford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Clement Naples**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Elliott Greb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Christopher Wheeler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Lowry**
(See above for address)
*PRO HAC VICE*
*ATTORNEY TO BE NOTICED*

**Thomas Yeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter–claimant**

**Micron Consumer Products, Group, LLC.,**     represented by **Jared Bobrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Asim M. Bhansali**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Rutowski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Jason Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Alan Roethlisberger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter–claimant**

**Micron Technology, Inc.,**     represented by **Jared Bobrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Asim M. Bhansali**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Rutowski**

(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Jason Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Alan Roethlisberger**
(See above for address)
*ATTORNEY TO BE NOTICED*

V.

**Counter–defendant**

**Yangtze Memory Technologies Company, Ltd.**                represented by **Alexander E Middleton**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Allen S. Cross**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Benjamin Joseph Behrendt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brenda Lynn Danek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brent Thomas Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brett Matthew Sandford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Clement Naples**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elliott Greb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hyun–Joong Kim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James R. Batchelder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Francis Mack**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Christopher Wheeler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nancy Attalla**
(See above for address)

*ATTORNEY TO BE NOTICED*

**Rachael Bacha**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Lowry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stepan Starchenko**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Yeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Radsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter–claimant**

**Micron Consumer Products, Group, LLC.,**          represented by   **Jared Bobrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Asim M. Bhansali**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Rutowski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Jason Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Alan Roethlisberger**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter–claimant**

**Micron Technology, Inc.,**          represented by   **Jared Bobrow**
(See above for address)
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Asim M. Bhansali**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Diana Rutowski**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Jeremy Jason Lang**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicholas Alan Roethlisberger**
(See above for address)

*ATTORNEY TO BE NOTICED*

V.

**Counter–defendant**

| | | |
|---|---|---|
| **Yangtze Memory Technologies Company, Ltd.** | represented by | **Alexander E Middleton**<br>(See above for address)<br>*ATTORNEY TO BE NOTICED* |

**Allen S. Cross**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Benjamin Joseph Behrendt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brenda Lynn Danek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brent Thomas Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brett Matthew Sandford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Clement Naples**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elliott Greb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Hyun–Joong Kim**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James R. Batchelder**
(See above for address)
*ATTORNEY TO BE NOTICED*

**James Francis Mack**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Christopher Wheeler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nancy Attalla**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Nicole S. L. Pobre**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael Bacha**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Rachael S. Bacha**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Lowry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Stepan Starchenko**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Yeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Andrew Radsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Counter–defendant**

**Yangtze Memory Technologies, Inc.**        represented by   **Andrew Radsch**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Benjamin Joseph Behrendt**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brenda Lynn Danek**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brent Thomas Watson**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Brett Matthew Sandford**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Clement Naples**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Elliott Greb**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Kevin Christopher Wheeler**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Richard A. Lowry**
(See above for address)
*ATTORNEY TO BE NOTICED*

**Thomas Yeh**
(See above for address)
*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|

| 11/09/2023 | 1 | COMPLAINT against Micron Consumer Products, Group, LLC.,, Micron Technology, Inc., with jury demand ( Filing fee $ 402, receipt number ACANDC−18824245.). Filed by Yangtze Memory Technologies Company, Ltd.. (Attachments: # 1 Ex. 1 − US10950623, # 2 Ex. 2 − US11501822, # 3 Ex. 3 − US10658378, # 4 Ex. 4 − US10937806, # 5 Ex. 5 − US10861872, # 6 Ex. 6 − US11468957, # 7 Ex. 7 − US11600342, # 8 Ex. 8 − US_10868031_B2, # 9 Ex. 9 − Flash Memory Summit Announces 2022 Best of Show Award Winners, # 10 Ex. 10 − Flash Memory Summit Exhibitor Sponsor Prospectus, # 11 Ex. 11 − Tech Insights 3D NAND, # 12 Ex. 12 − Micron Solutions Mobile, # 13 Ex. 13 − Micron Solutions Client, # 14 Ex. 14 − Micron Solutions Server, # 15 Ex. 15 − Micron Solutions Industrial IOT, # 16 Ex. 16 − Crucial by Micron, # 17 Ex. 17 − Micron Client Memory and Storage, # 18 Ex. 18 − Micron Suppliers Commitment, # 19 Ex. 19 − Micron Products SSD, # 20 Ex. 20 − Micron com, # 21 Ex. 21 − Micron Authorized Distributors, # 22 Ex. 22 − Arrow Distributor of Micron, # 23 Ex. 23 − Dell Suppliers List, 2022, # 24 Ex. 24 − HP Suppliers List, 2021, # 25 Ex. 25 − Intel Suppliers List, 2020−2021, # 26 Ex. 26 − Techinsights disruptive event ymtc, # 27 Ex. 27 − Micron 10−K filing 2022, # 28 Ex. 28 − Micron San Jose Location Address, # 29 Ex. 29 − Micron Consumer Products Group LLC, SOI, # 30 Ex. 30 − Micron Products NAND Flash 176 Layer NAND, # 31 Ex. 31 − Semiengineering wepage, # 32 Ex. 32 − Micron 3D NAND Whitepaper, # 33 Ex. 33 − SJ Mercury News Article − Micron opens modern new north San Jose campus amid grow, # 34 Ex. 34 − Besang Inc v Micron Micron Motion to Change Venue, # 35 Ex. 35 − Yangtze Memory Technologies, Inc Statement of Information, # 36 Ex. 36 − YMTC California Office, # 37 Ex. 37 − Micron Press Release re 176 Layer QLC NAND, # 38 Ex. 38 − Flash Memory Summit Announces 2018 Best of Show Award Winners 2018, # 39 Ex. 39 − AP News article titled, Flash Memory Summit Announces 2018 Best of Show Award Winners, # 40 Civil Cover Sheet)(Radsch, Andrew) (Filed on 11/9/2023) Modified on 11/13/2023 (jml, COURT STAFF). (Entered: 11/09/2023) |
| 11/09/2023 | 2 | Case assigned to Magistrate Judge Virginia K. DeMarchi.<br><br>Counsel for plaintiff or the removing party is responsible for serving the Complaint or Notice of Removal, Summons and the assigned judge's standing orders and all other new case documents upon the opposing parties. For information, visit *E−Filing A New Civil Case* at http://cand.uscourts.gov/ecf/caseopening.<br><br>Standing orders can be downloaded from the court's web page at www.cand.uscourts.gov/judges. Upon receipt, the summons will be issued and returned electronically. A scheduling order will be sent by Notice of Electronic Filing (NEF) within two business days. Consent/Declination due by 11/24/2023. (bar, COURT STAFF) (Filed on 11/9/2023) (Entered: 11/09/2023) |
| 11/09/2023 | 3 | Certificate of Interested Entities by Yangtze Memory Technologies Company, Ltd. identifying Corporate Parent Yangtze Memory Technologies Company, Ltd. for Yangtze Memory Technologies Company, Ltd.. *Plaintiff Yangtze Memory Technologies Company, Ltd.' Rule 7.1 Corporate Disclosure and Certification of Conflicts and Interested Entities or Persons* (Radsch, Andrew) (Filed on 11/9/2023) (Entered: 11/09/2023) |
| 11/09/2023 | 4 | Proposed Summons. (Radsch, Andrew) (Filed on 11/9/2023) (Entered: 11/09/2023) |
| 11/09/2023 | 5 | REPORT on the filing or determination of an action regarding *a Patent or Trademark* (cc: form mailed to register). (Attachments: # 1 Reporting on Filing of an Action Re Patent−Trademark (NDCA) Attachment A)(Radsch, Andrew) (Filed on 11/9/2023) (Entered: 11/09/2023) |
| 11/13/2023 | 6 | Summons Issued as to Micron Consumer Products, Group, LLC, Micron Technology, Inc.. (jml, COURT STAFF) (Filed on 11/13/2023) (Entered: 11/13/2023) |
| 11/13/2023 | 7 | **Initial Case Management Scheduling Order with ADR Deadlines: Case Management Statement due by 2/6/2024. Initial Case Management Conference set for 2/13/2024 01:30 PM in San Jose, Courtroom 2, 5th Floor. (jml, COURT STAFF) (Filed on 11/13/2023) (Entered: 11/13/2023)** |
| 11/17/2023 | 8 | SUMMONS Returned Executed by Yangtze Memory Technologies Company, Ltd.. Micron Technology, Inc., served on 11/14/2023, answer due 12/5/2023. (Radsch, Andrew) (Filed on 11/17/2023) (Entered: 11/17/2023) |

| 11/17/2023 | 9 | SUMMONS Returned Executed by Yangtze Memory Technologies Company, Ltd.. Micron Consumer Products, Group, LLC., served on 11/14/2023, answer due 12/5/2023. (Radsch, Andrew) (Filed on 11/17/2023) (Entered: 11/17/2023) |
|---|---|---|
| 11/17/2023 | | Electronic filing error. This filing will not be processed by the clerks office. No title Page. Documents e–filed separately and not as an attachment, require a title page. Please refer to Civil Local Rules 3–4 re first page requirement. **Please re–file in its entirety.** Re: 9 Summons Returned Executed filed by Yangtze Memory Technologies Company, Ltd., 8 Summons Returned Executed filed by Yangtze Memory Technologies Company, Ltd. (jml, COURT STAFF) (Filed on 11/17/2023) (Entered: 11/17/2023) |
| 11/20/2023 | 10 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Yangtze Memory Technologies Company, Ltd... (Radsch, Andrew) (Filed on 11/20/2023) (Entered: 11/20/2023) |
| 11/20/2023 | 11 | CLERK'S NOTICE OF IMPENDING REASSIGNMENT TO A U.S. DISTRICT COURT JUDGE: The Clerk of this Court will now randomly reassign this case to a District Judge because either (1) a party has not consented to the jurisdiction of a Magistrate Judge, or (2) time is of the essence in deciding a pending judicial action for which the necessary consents to Magistrate Judge jurisdiction have not been secured. You will be informed by separate notice of the district judge to whom this case is reassigned.<br><br>ALL HEARING DATES PRESENTLY SCHEDULED BEFORE THE CURRENT MAGISTRATE JUDGE ARE VACATED AND SHOULD BE RE–NOTICED FOR HEARING BEFORE THE JUDGE TO WHOM THIS CASE IS REASSIGNED.<br><br>*This is a text only docket entry; there is no document associated with this notice.* (amk, COURT STAFF) (Filed on 11/20/2023) (Entered: 11/20/2023) |
| 11/20/2023 | 12 | **ORDER REASSIGNING CASE. Case reassigned using a proportionate, random, and blind system pursuant to General Order No. 44 to Judge Rita F. Lin for all further proceedings. Notice: The assigned judge participates in the Cameras in the Courtroom Pilot Project. See General Order No. 65 and http://cand.uscourts.gov/cameras. Magistrate Judge Virginia K. DeMarchi no longer assigned to case. Reassignment Order signed by Clerk Clerk on 11–20/2023. (Attachments: # 1 Notice of Eligibility for Video Recording)(bw, COURT STAFF) (Filed on 11/20/2023) (Entered: 11/20/2023)** |
| 11/20/2023 | 13 | SUMMONS Returned Executed by Yangtze Memory Technologies Company, Ltd.. (Radsch, Andrew) (Filed on 11/20/2023) (Entered: 11/20/2023) |
| 11/20/2023 | 14 | SUMMONS Returned Executed by Yangtze Memory Technologies Company, Ltd.. (Radsch, Andrew) (Filed on 11/20/2023) (Entered: 11/20/2023) |
| 11/21/2023 | 15 | CLERK'S NOTICE ON REASSIGNMENT. You are noticed that the Court has scheduled an Initial Case Management Conference before Judge Rita F. Lin upon reassignment. For a copy of Judge Lin's Standing Order and other information, please refer to the Court's website at https://www.cand.uscourts.gov/judges/lin–rita–f–rfl/.<br><br>Case Management Statement due by 2/14/2024. Initial Case Management Conference set for 2/21/2024 10:00 AM in San Francisco, – Videoconference Only. This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/judges/lin–rita–f–rfl/<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>*(This is a text–only entry generated by the court. There is no document associated with this entry.)* (tmi, COURT STAFF) (Filed on 11/21/2023) (Entered: 11/21/2023) |

| 11/29/2023 | 16 | NOTICE of Appearance by Jared Bobrow (Bobrow, Jared) (Filed on 11/29/2023) (Entered: 11/29/2023) |
|---|---|---|
| 11/29/2023 | 17 | NOTICE of Appearance by Jeremy Jason Lang (Lang, Jeremy) (Filed on 11/29/2023) (Entered: 11/29/2023) |
| 11/29/2023 | 18 | STIPULATION *to Enlarge Time to Answer or Otherwise Respond to Complaint* filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc. and Yangtze Memory Technologies Company, Ltd.. (Lang, Jeremy) (Filed on 11/29/2023) Modified on 11/30/2023 (jml, COURT STAFF). (Entered: 11/29/2023) |
| 11/29/2023 | | Electronic filing error. Incorrect event used. [err101] The correct event is Stipulation. **Corrected by Clerk's Office. No further action is necessary.** Re: 18 MOTION for Extension of Time to File Answer *[Stipulation to Enlarge Time to Answer or Otherwise Respond to Complaint]* filed by Micron Technology, Inc.,, Micron Consumer Products, Group, LLC., (jml, COURT STAFF) (Filed on 11/29/2023) (Entered: 11/30/2023) |
| 01/19/2024 | 19 | NOTICE of Appearance by Diana Rutowski (Rutowski, Diana) (Filed on 1/19/2024) (Entered: 01/19/2024) |
| 01/19/2024 | 20 | Corporate Disclosure Statement by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc., (Bobrow, Jared) (Filed on 1/19/2024) (Entered: 01/19/2024) |
| 01/19/2024 | 21 | MOTION to Dismiss the *Complaint for Failure to State a Claim Upon Which Relief Can Be Granted (Fed. R. Civ. P. 12 (B)(6))* filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. Motion to Dismiss Hearing set for 2/27/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor. Responses due by 2/2/2024. Replies due by 2/9/2024. (Attachments: # 1 Declaration of Jason Lang in Support of Motion of Defendants Micron Technology, Inc. and Micron Consumer Products Group, LLC to Dismiss the Complaint for Failure to State a Claim Upon Which Relief Can Be Granted (Fed. R. Civ. P. 12(B)(6)), # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22)(Bobrow, Jared) (Filed on 1/19/2024) (Entered: 01/19/2024) |
| 01/26/2024 | 22 | MOTION to Continue the Case Management Conference Until 15 Days After the Hearing on Defendants' Motion to Dismiss (Dkt. 21) and the Parties' Corresponding Obligations filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Attachments: # 1 Declaration of Diana M. Rutowski in Support of Defendants' Motion for Administrative Relief Continuing the Case Management Conference Until 15 Days After the Hearing on Defendants' Motion to Dismiss (Dkt. 21) and the Parties' Corresponding Obligations, # 2 Exhibit A, # 3 Proposed Order)(Bobrow, Jared) (Filed on 1/26/2024) Modified on 1/26/2024 (anj, COURT STAFF). (Entered: 01/26/2024) |
| 01/29/2024 | 23 | OPPOSITION/RESPONSE (re 22 MOTION to Continue the Case Management Conference Until 15 Days After the Hearing on Defendants' Motion to Dismiss (Dkt. 21) and the Parties' Corresponding Obligations ) filed byYangtze Memory Technologies Company, Ltd.. (Attachments: # 1 Proposed Order)(Radsch, Andrew) (Filed on 1/29/2024) (Entered: 01/29/2024) |
| 01/30/2024 | 24 | **ORDER by Judge Rita F. Lin denying 22 Motion to Continue the Case Management Conference. The initial case management conference scheduled for February 21, 2024, at 10:00 AM, remains as set. *(This is a text−only entry generated by the court. There is no document associated with this entry.)* (rfllc1, COURT STAFF) (Filed on 1/30/2024) (Entered: 01/30/2024)** |
| 01/31/2024 | 25 | ADR Certification (ADR L.R. 3−5 b) of discussion of ADR options (Radsch, Andrew) (Filed on 1/31/2024) (Entered: 01/31/2024) |
| 01/31/2024 | 26 | ADR Certification (ADR L.R. 3−5 b) of discussion of ADR options (Lang, Jeremy) (Filed on 1/31/2024) (Entered: 01/31/2024) |
| 02/02/2024 | 27 | Administrative Motion to File Under Seal *Certain Exhibits to the First Amended Complaint for Patent Infringement* filed by Yangtze Memory Technologies Company, Ltd.. (Attachments: # 1 Declaration of Andrew T. Radsch in Support, # 2 Proposed |

| | | |
|---|---|---|
| | | Order, # 3 Exhibit 40, # 4 Exhibit 41, # 5 Exhibit 42, # 6 Exhibit 43, # 7 Exhibit 44, # 8 Exhibit 45, # 9 Exhibit 46, # 10 Exhibit 47, # 11 Exhibit 48, # 12 Exhibit 49, # 13 Exhibit 50, # 14 Exhibit 51, # 15 Exhibit 52, # 16 Exhibit 53, # 17 Exhibit 54, # 18 Exhibit 55, # 19 Exhibit 56)(Radsch, Andrew) (Filed on 2/2/2024) (Entered: 02/02/2024) |
| 02/02/2024 | 28 | CERTIFICATE OF SERVICE by Yangtze Memory Technologies Company, Ltd. re 27 Administrative Motion to File Under Seal *Certain Exhibits to the First Amended Complaint for Patent Infringement* (Radsch, Andrew) (Filed on 2/2/2024) (Entered: 02/02/2024) |
| 02/02/2024 | 29 | AMENDED COMPLAINT *for Patent Infringement (First)* against Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. Filed by Yangtze Memory Technologies Company, Ltd.. (Attachments: # 1 Redline, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26, # 28 Exhibit 27, # 29 Exhibit 28, # 30 Exhibit 29, # 31 Exhibit 30, # 32 Exhibit 31, # 33 Exhibit 32, # 34 Exhibit 33, # 35 Exhibit 34, # 36 Exhibit 35, # 37 Exhibit 36, # 38 Exhibit 37, # 39 Exhibit 38, # 40 Exhibit 39, # 41 Exhibit 40 (public version), # 42 Exhibit 41 (public version), # 43 Exhibit 42 (public version), # 44 Exhibit 43 (public version), # 45 Exhibit 44 (public version), # 46 Exhibit 45 (public version), # 47 Exhibit 46 (public version), # 48 Exhibit 47 (public version), # 49 Exhibit 48 (public version), # 50 Exhibit 49 (public version), # 51 Exhibit 50 (public version), # 52 Exhibit 51 (public version), # 53 Exhibit 52 (public version), # 54 Exhibit 53 (public version), # 55 Exhibit 54 (public version), # 56 Exhibit 55 (public version), # 57 Exhibit 56 (public version))(Radsch, Andrew) (Filed on 2/2/2024) (Entered: 02/02/2024) |
| 02/05/2024 | 30 | CLERK'S NOTICE Regarding 21 Defendants' Motion to Dismiss: <br><br> Given that Plaintiff has filed an Amended Complaint (docket no. 29 ), Defendants' Motion to Dismiss is terminated as moot and the hearing set for 2/27/2024 at 10:00 AM is vacated. <br><br> *(This is a text−only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Filed on 2/5/2024) (Entered: 02/05/2024) |
| 02/07/2024 | 31 | **ORDER AS MODIFIED by Judge Rita F. Lin granting 27 Administrative Motion to File Under Seal. (mkl, COURT STAFF) (Filed on 2/7/2024) (Entered: 02/07/2024)** |
| 02/14/2024 | 32 | JOINT CASE MANAGEMENT STATEMENT filed by Yangtze Memory Technologies Company, Ltd., Micron Technology, Inc., Micron Consumer Products, Group, LLC. (Radsch, Andrew) (Filed on 2/14/2024) Modified on 2/15/2024 (jml, COURT STAFF). (Entered: 02/14/2024) |
| 02/16/2024 | 33 | Proposed Summons. (Bobrow, Jared) (Filed on 2/16/2024) (Entered: 02/16/2024) |
| 02/16/2024 | 34 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. **\*\*Exhibits 2, 4, 6, 8, and 10 unsealed per Order at Dkt. No. 45.\*\*** (Attachments: # 1 Proposed Order Granting Counterclaim Plaintiff's Administrative Motion to Consider Whether Another Party's Materials Should Be Sealed, # 2 Exhibit 2 [Filed Under Seal], # 3 Exhibit 4 [Filed Under Seal], # 4 Exhibit 6 [Filed Under Seal], # 5 Exhibit 8 [Filed Under Seal], # 6 Exhibit 10 [Filed Under Seal])(Bobrow, Jared) (Filed on 2/16/2024) Modified on 2/20/2024 (jml, COURT STAFF). Modified on 2/26/2024 (mkl, COURT STAFF). (Entered: 02/16/2024) |
| 02/16/2024 | 35 | *Defendants'* ANSWER to Amended Complaint , COUNTERCLAIM *[Demand for Jury Trial]* against Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc. by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2 [Redacted], # 3 Exhibit 3, # 4 Exhibit 4 [Redacted], # 5 Exhibit 5, # 6 Exhibit 6 [Redacted], # 7 Exhibit 7, # 8 Exhibit 8 [Redacted], # 9 Exhibit 9, # 10 Exhibit 10 [Redacted], # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, |

| | | |
|---|---|---|
| | | # <u>18</u> Exhibit 18, # <u>19</u> Exhibit 19, # <u>20</u> Exhibit 20, # <u>21</u> Exhibit 21, # <u>22</u> Exhibit 22, # <u>23</u> Exhibit 23, # <u>24</u> Exhibit 24, # <u>25</u> Exhibit 25, # <u>26</u> Exhibit 26, # <u>27</u> Exhibit 27, # <u>28</u> Exhibit 28, # <u>29</u> Exhibit 29, # <u>30</u> Exhibit 30, # <u>31</u> Exhibit 31, # <u>32</u> Exhibit 32, # <u>33</u> Exhibit 33, # <u>34</u> Exhibit 34, # <u>35</u> Exhibit 35, # <u>36</u> Exhibit 36, # <u>37</u> Exhibit 37, # <u>38</u> Exhibit 38)(Bobrow, Jared) (Filed on 2/16/2024) (Entered: 02/16/2024) |
| 02/16/2024 | <u>36</u> | CERTIFICATE OF SERVICE by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc., re <u>34</u> Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *[Counterclaim Plaintiff's Administrative Motion to Consider Whether Another Party's Materials Should Be Sealed]* (Bobrow, Jared) (Filed on 2/16/2024) (Entered: 02/16/2024) |
| 02/20/2024 | | **\*\*\*DISREGARD. FILED IN ERROR BY CLERK.\*\*\***<br><br>Electronic filing error. This filing will not be processed by the clerks office. Re: <u>33</u> Proposed Summons filed by Micron Technology, Inc., Micron Consumer Products, Group, LLC. (jml, COURT STAFF) (Filed on 2/20/2024) Modified on 2/20/2024 (jml, COURT STAFF). (Entered: 02/20/2024) |
| 02/20/2024 | <u>37</u> | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC−19138129.) filed by Yangtze Memory Technologies Company, Ltd.. (Cross, Allen) (Filed on 2/20/2024) (Entered: 02/20/2024) |
| 02/20/2024 | <u>38</u> | Summons Issued as to Yangtze Memory Technologies, Inc.. (jml, COURT STAFF) (Filed on 2/20/2024) (Entered: 02/20/2024) |
| 02/20/2024 | | Electronic filing error. Local counsel Andrew Radsch, please update your profile on ECF. The address does not match what is on the document Re: <u>37</u> MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC−19138129.) filed by Yangtze Memory Technologies Company, Ltd.<br>This filing will not be processed by the clerks office until local counsel updates his address.<br><br>(klh, COURT STAFF) (Filed on 2/20/2024) (Entered: 02/20/2024) |
| 02/20/2024 | <u>39</u> | SUMMONS Returned Executed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. Yangtze Memory Technologies, Inc. served on 2/20/2024, answer due 3/12/2024. (Bobrow, Jared) (Filed on 2/20/2024) (Entered: 02/20/2024) |
| 02/20/2024 | <u>40</u> | CERTIFICATE OF SERVICE by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc., (Bobrow, Jared) (Filed on 2/20/2024) (Entered: 02/20/2024) |
| 02/20/2024 | <u>41</u> | **ORDER by Judge Rita F. Lin granting <u>37</u> Motion for Pro Hac Vice as to Allen Cross. (mkl, COURT STAFF) (Filed on 2/20/2024) (Entered: 02/20/2024)** |
| 02/22/2024 | <u>42</u> | **Minute Entry for ZOOM proceedings held before Judge Rita F. Lin:**<br><br>Initial Case Management Conference held on 2/21/2024. Court set the following case schedule:<br><br>Amended Pleadings due by 4/22/2024.<br>Claims Construction Pre−Hearing set for 9/4/2024 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin.<br>Opening Claims Construction Briefs due by 10/4/2024.<br>Responsive Claim Construction Briefs due by 10/18/2024.<br>Replies to Claim Construction Briefs due by 10/25/2024.<br>Tutorial Hearing set for 11/12/2024 02:30 PM in San Francisco, − Videoconference Only. This proceeding will be held via a Zoom webinar.<br>Claims Construction Hearing set for 11/19/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin.<br>Upon stipulation of the parties, this case is referred to private mediation. By 1/6/2025 the parties shall e−file a joint letter with the name of the mediator and mediation date. Close of Fact Discovery due by 3/8/2025.<br>Designation of Experts due by 4/18/2025.<br>Rebuttal Reports due by 6/3/2025.<br>Close of Expert Discovery due by 6/24/2025.<br>Last day to hear dispositive motions & Daubert Hearing set for 8/26/2025 10:00 AM |

| | | |
|---|---|---|
| | | in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Final Pretrial Conference set for 11/4/2025 02:30 PM in San Francisco, Courtroom 15, 18th Floor. Jury Selection/ Jury Trial set for 12/1/2025 09:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/judges/lin−rita−f−rfl/<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>**Digital Recording Time: Not Reported.**<br>**Attorney for Plaintiff: Andrew Radsch, James Mack, Nancy Attalla.**<br>**Attorney for Defendant: Diana Rutowski, Jared Bobrow, J. Jason Lang.**<br><br>(klh, COURT STAFF) (Date Filed: 2/22/2024) (Entered: 02/22/2024) |
| 02/23/2024 | 43 | CASE REFERRED to Private ADR. See Minute Order 42 (klh, COURT STAFF) (Filed on 2/23/2024) (Entered: 02/23/2024) |
| 02/23/2024 | 44 | Response re 34 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Radsch, Andrew) (Filed on 2/23/2024) (Entered: 02/23/2024) |
| 02/26/2024 | 45 | **ORDER by Judge Rita F. Lin terminating 34 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed. As the Yangtze Memory entities do not request that any of the identified exhibits be sealed (*see* Dkt. No. 34 ), the Clerk of the Court is directed to unseal the filing at Dkt. No. 34 and its attachments. *(This is a text−only entry generated by the court. There is no document associated with this entry.)* (rfllc1, COURT STAFF) (Filed on 2/26/2024) (Entered: 02/26/2024)** |
| 02/28/2024 | 46 | STIPULATION WITH PROPOSED ORDER for Enlargement of Time Pursuant to Civil Local Rule 6−1(a) filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc., Micron Technology, Inc., Micron Consumer Products, Group, LLC. (Attachments: # 1 Declaration of Andrew T. Radsch in Support, # 2 Proposed Order)(Radsch, Andrew) (Filed on 2/28/2024) Modified on 2/28/2024 (kmm2, COURT STAFF). (Entered: 02/28/2024) |
| 02/29/2024 | 47 | **ORDER by Judge Rita F. Lin granting 46 Stipulation to Extend Time to Respond to Counterclaims. (mkl, COURT STAFF) (Filed on 2/29/2024) (Entered: 02/29/2024)** |
| 03/12/2024 | 48 | CONSENT/DECLINATION to Proceed Before a US Magistrate Judge by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc... (Radsch, Andrew) (Filed on 3/12/2024) (Entered: 03/12/2024) |
| 03/12/2024 | 49 | Counterclaim Defendants Notice of Motion and Motion to Dismiss Counterclaims Pursuant to Federal Rules of Civil Procedure 12(b)(6); Memorandum of Points and Authorities n Support Thereof filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. Motion to Dismiss Hearing set for 4/23/2024 10:00 AM. Responses due by 3/26/2024. Replies due by 4/2/2024. (Radsch, Andrew) (Filed on 3/12/2024) Modified on 3/13/2024 (kmm2, COURT STAFF). (Entered: 03/12/2024) |
| 03/26/2024 | 50 | OPPOSITION/RESPONSE (re 49 Counterclaim Defendants' MOTION to Dismiss Counterclaims ) filed byMicron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Bobrow, Jared) (Filed on 3/26/2024) (Entered: 03/26/2024) |
| 03/26/2024 | 51 | STIPULATION WITH PROPOSED ORDER Changing Hearing Date on ( 49 Motion to Dismiss Counterclaims) by One Week Pursuant to Local Rule 6−2 filed by Micron |

| | | |
|---|---|---|
| | | Consumer Products, Group, LLC., Micron Technology, Inc., Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc. (Attachments: # 1 Declaration of Jared Bobrow (Bobrow, Jared) (Filed on 3/26/2024 Modified on 3/27/2024 (kmm2, COURT STAFF). (Entered: 03/26/2024) |
| 03/27/2024 | 52 | **ORDER by Judge Rita F. Lin granting 51 Stipulation to Continue Hearing Date. (mkl, COURT STAFF) (Filed on 3/27/2024) (Entered: 03/27/2024)** |
| 03/27/2024 | | Set/Reset Deadlines as to 49 Counterclaim Defendants' MOTION to Dismiss Counterclaims. Motion Hearing reset for 4/30/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. (mkl, COURT STAFF) (Filed on 3/27/2024) (Entered: 03/27/2024) |
| 04/02/2024 | 53 | REPLY in Support of 49 Counterclaim Defendants' MOTION to Dismiss Counterclaims filed byYangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc. (Attachments: # 1 Exhibit A, # 2 Exhibit B)(Radsch, Andrew) (Filed on 4/2/2024) Modified on 4/3/2024 (kmm2, COURT STAFF). (Entered: 04/02/2024) |
| 04/24/2024 | 54 | CLERK'S NOTICE Vacating Hearing: |
| | | Notice is hereby given that the 49 Motion to Dismiss Counterclaims is submitted without oral argument pursuant to Civil Local Rule 7–1(b). The hearing set for 4/30/2024 is VACATED. The Court will issue a written order on the motion. |
| | | *(This is a text–only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Filed on 4/24/2024) (Entered: 04/24/2024) |
| 05/07/2024 | 55 | MOTION for Protective Order filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. Motion Hearing set for 6/25/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 5/21/2024. Replies due by 5/28/2024. (Attachments: # 1 Proposed Order Granting Micron Technology, Inc. and Micron Consumer Products Group, LLC's Motion for Protective Order)(Bobrow, Jared) (Filed on 5/7/2024) (Entered: 05/07/2024) |
| 05/07/2024 | 56 | Declaration of Jason Lang in Support of 55 MOTION for Protective Order filed byMicron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11)(Related document(s) 55 ) (Lang, Jeremy) (Filed on 5/7/2024) (Entered: 05/07/2024) |
| 05/10/2024 | 57 | MOTION to Shorten Time for Hearing on Motion for Protective Order 55 Pursuant to Civil Local Rule 6–3 filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Attachments: # 1 Proposed Order (Bobrow, Jared) (Filed on 5/10/2024) Modified on 5/10/2024 (kmm2, COURT STAFF). (Entered: 05/10/2024) |
| 05/10/2024 | 58 | Declaration of Diana M. Rutowski in Support of 57 MOTION to Shorten Time for Hearing on Motion for Protective Order 55 Pursuant to Civil Local Rule 6–3 filed byMicron Consumer Products, Group, LLC., Micron Technology, Inc. (Attachments: # 1 Exhibit A)(Rutowski, Diana) (Filed on 5/10/2024) Modified on 5/10/2024 (kmm2, COURT STAFF). (Entered: 05/10/2024) |
| 05/10/2024 | 59 | **ORDER REFERRING CASE to Magistrate Judge for Determination of 55 Motion for Protective Order. Signed by Judge Rita F. Lin on 5/10/2024. (rfllc1, COURT STAFF) (Filed on 5/10/2024) (Entered: 05/10/2024)** |
| 05/14/2024 | 60 | OPPOSITION/RESPONSE (re 57 MOTION to Shorten Time for Hearing on Motion for Protective Order ) filed byYangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Attachments: # 1 Declaration of Andrew T. Radsch in Support, # 2 Exhibit 1, # 3 Exhibit 2)(Radsch, Andrew) (Filed on 5/14/2024) (Entered: 05/14/2024) |
| 05/15/2024 | | CASE REFERRED to Magistrate Judge Thomas S. Hixson for determination on Defendants' motion for protective order and motion to shorten time. (shy, COURT STAFF) (Filed on 5/15/2024) (Entered: 05/15/2024) |
| 05/15/2024 | 61 | **ORDER DENYING 57 Motion to Shorten Time. Hearing re 55 Motion for Protective Order set for 6/13/2024 09:00 AM. Signed by Judge Thomas S. Hixson** |

| | | |
|---|---|---|
| | | on 5/15/2024. (tshlc1, COURT STAFF) (Filed on 5/15/2024) (Entered: 05/15/2024) |
| 05/16/2024 | 62 | MOTION for Extension of Time for Patent Local Rule 3–3 & 3–4 Disclosures & Production Pursuant to Civil Local Rule 6–3 filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Attachments: # 1 Declaration of James F. Mack in Support, # 2 Exhibit 1 to Mack Declaration)(Radsch, Andrew) (Filed on 5/16/2024) Modified on 5/17/2024 (kmm2, COURT STAFF). (Entered: 05/16/2024) |
| 05/20/2024 | 63 | OPPOSITION/RESPONSE (re 62 MOTION for Extension of Time for Patent Local Rule 3–3 & 3–4 Disclosures & Production Pursuant to Civil Local Rule 6–3 ) filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Bobrow, Jared) (Filed on 5/20/2024) (Entered: 05/20/2024) |
| 05/21/2024 | 64 | **ORDER by Judge Rita F. Lin denying without prejudice 62 Motion for Extension of Time to Complete Discovery.**<br><br>Yangtze Memory Technologies Company, Ltd. and Yangtze Memory Technologies, Inc. may move to amend their invalidity contentions under Patent Local Rules 3–3 and 3–4 if late–produced documents provide good cause for such amendment. *See* Patent L.R. 3–6.<br><br>*(This is a text–only entry generated by the court. There is no document associated with this entry.)* (rfllc1, COURT STAFF) (Filed on 5/21/2024) (Entered: 05/21/2024) |
| 05/21/2024 | 65 | OPPOSITION/RESPONSE to ( 55 MOTION for Protective Order ) filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Attachments: # 1 Proposed Order, # 2 Declaration of Allen S. Cross in Support, # 3 Exhibit 1 to Cross Declaration, # 4 Exhibit 2 to Cross Declaration, # 5 Exhibit 3 to Cross Declaration, # 6 Exhibit 4 to Cross Declaration, # 7 Exhibit 5 to Cross Declaration, # 8 Exhibit 6 to Cross Declaration, # 9 Exhibit 7 to Cross Declaration, # 10 Declaration of Menghao Dai in Support, # 11 Exhibit 1 to Dai Declaration, # 12 Exhibit 2 to Dai Declaration, # 13 Exhibit 3 to Dai Declaration, # 14 Exhibit 4 to Dai Declaration, # 15 Exhibit 5 to Dai Declaration, # 16 Exhibit 6 to Dai Declaration, # 17 Exhibit 7 to Dai Declaration)(Radsch, Andrew) (Filed on 5/21/2024) Modified on 5/22/2024 (kmm2, COURT STAFF). (Entered: 05/21/2024) |
| 05/28/2024 | 66 | REPLY (re 55 MOTION for Protective Order ) filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Bobrow, Jared) (Filed on 5/28/2024) (Entered: 05/28/2024) |
| 05/28/2024 | 67 | Declaration of Diana M. Rutowski in Support of 66 Reply to Opposition/Response filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D)(Related document(s) 66 ) (Rutowski, Diana) (Filed on 5/28/2024) (Entered: 05/28/2024) |
| 06/04/2024 | 68 | MOTION for Leave to File a Sur–reply to Micron's Reply in Support of Motion for Protective Order filed by Yangtze Memory Technologies Company, Ltd.. (Attachments: # 1 Declaration of Andrew Radsch in Support, # 2 Exhibit 1 to Radsch Declaration, # 3 Exhibit 2 to Radsch Declaration, # 4 Proposed Order)(Radsch, Andrew) (Filed on 6/4/2024) Modified on 6/5/2024 (kmm2, COURT STAFF). (Entered: 06/04/2024) |
| 06/10/2024 | 69 | OPPOSITION/RESPONSE (re 68 MOTION for Leave to File a Sur–reply to Micron's Reply in Support of Motion for Protective Order ) filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Bobrow, Jared) (Filed on 6/10/2024) (Entered: 06/10/2024) |
| 06/10/2024 | 70 | Declaration of Diana M. Rutowski in Support of 69 Opposition/Response to Motion, filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Attachments: # 1 Exhibit A)(Related document(s) 69 ) (Rutowski, Diana) (Filed on 6/10/2024) (Entered: 06/10/2024) |
| 06/13/2024 | 71 | **Minute Entry for proceedings held before Magistrate Judge Thomas S. Hixson:**<br><br>**Motion Hearing held on 6/13/2024. re 55 MOTION for Protective Order filed by Micron Technology, Inc., Micron Consumer Products, Group, LLC.** |

| | | |
|---|---|---|
| | | **Digital Recording Time: Liberty: 9:26–10:02.** |
| | | **Plaintiff Attorney: Andrew T. Radsch/Nancy Attalla.** |
| | | **Defendant Attorney: Jared Bobrow.** |
| | | **Proceedings:** |
| | | **Motion hearing held. Argument heard, matter submitted. Court to issue Order.** |
| | | *(This is a text–only entry generated by the court. There is no document associated with this entry.)* **(rmm2, COURT STAFF) (Date Filed: 6/13/2024) (Entered: 06/13/2024)** |
| 06/13/2024 | | Set/Reset Hearing (tshlc1, COURT STAFF) (Filed on 6/13/2024) (Entered: 06/13/2024) |
| 06/14/2024 | 72 | STIPULATION to Extend Time to Serve Invalidity Contentions Pursuant to Civil Local Rule 6–1(a) filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Lang, Jeremy) (Filed on 6/14/2024) Modified on 6/17/2024 (kmm2, COURT STAFF). (Entered: 06/14/2024) |
| 06/14/2024 | 73 | **Discovery Order re: 55 MOTION for Protective Order, 68 MOTION for Leave to File a Sur–reply. The parties shall file a stipulated protective order or competing proposed orders and a joint letter brief by 6/21/2024. Signed by Judge Thomas S. Hixson on 6/14/2024. (tshlc1, COURT STAFF) (Filed on 6/14/2024) (Entered: 06/14/2024)** |
| 06/21/2024 | 74 | Letter Brief re 73 Discovery Order,, Terminate Motions, *Joint Letter Brief* filed byMicron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Related document(s) 73 ) (Bobrow, Jared) (Filed on 6/21/2024) (Entered: 06/21/2024) |
| 07/10/2024 | 75 | CLERK'S NOTICE: Setting Discovery Hearing by Zoom re ECF Docket no. 74: |
| | | A Discovery hearing is scheduled by Zoom for: 7/15/2024 at 1:00 PM, in San Francisco, before Magistrate Judge Thomas S. Hixson. |
| | | By COB 7/14/2024, counsel shall email the Courtroom Deputy, Rose Maher, letting her know their appearances for the 7/15/2024 at 1:00 PM Zoom Discovery Hearing before Magistrate Judge Thomas S. Hixson. |
| | | Courtroom Deputy Contact Email: Rose_Maher@cand.uscourts.gov |
| | | *(This is a text–only entry generated by the court. There is no document associated with this entry.)* (rmm2, COURT STAFF) (Filed on 7/10/2024) (Entered: 07/10/2024) |
| 07/11/2024 | 76 | CLERK'S NOTICE Continuing Hearing: |
| | | Due to the Court's unavailability, the Claims Construction Hearing set for 11/19/2024 is continued to **12/6/2024** 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. |
| | | *(This is a text–only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Filed on 7/11/2024) (Entered: 07/11/2024) |
| 07/15/2024 | 77 | **Minute Entry for proceedings held before Magistrate Judge Thomas S. Hixson:** |
| | | **Discovery Hearing held on 7/15/2024 at 1:00 PM by Zoom Video Conference.** |
| | | **Digital Recording Time: 1:00–1:18 by Zoom.** |
| | | **Plaintiff Attorney: Andrew Radsch/James Mack.** |
| | | **Defendant Attorney: Jared Bobrow/Diana Rutowski.** |

| | | |
|---|---|---|
| | | **Proceedings: Parties shall file a Stipulation and Proposed Protective Order.**<br><br>*(This is a text–only entry generated by the court. There is no document associated with this entry.)* (rmm2, COURT STAFF) (Date Filed: 7/15/2024) (Entered: 07/15/2024) |
| 07/16/2024 | <u>78</u> | **ORDER by Judge Rita F. Lin granting <u>49</u> Motion to Dismiss Counterclaims. Amended Counterclaims due by 8/6/2024. (mkl, COURT STAFF) (Filed on 7/16/2024) (Entered: 07/16/2024)** |
| 07/16/2024 | <u>79</u> | Joint MOTION for Entry of [Proposed] Stipulated Protective Order for Litigation Involving Patents, Highly Sensitive Confidential Information and/or Trade Secrets) filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. Responses due by 7/30/2024. Replies due by 8/6/2024. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B)(Radsch, Andrew) (Filed on 7/16/2024) Modified on 7/16/2024 (kmm2, COURT STAFF). Modified on 7/17/2024 (mkl, COURT STAFF). (Entered: 07/16/2024) |
| 07/17/2024 | <u>80</u> | **\*\*Filed in error. Please disregard.\*\***<br>**STIPULATED PROTECTIVE ORDER (granting <u>79</u> Stipulation) by Judge Rita F. Lin. (mkl, COURT STAFF) (Filed on 7/17/2024) Modified on 7/17/2024 (mkl, COURT STAFF). (Entered: 07/17/2024)** |
| 07/19/2024 | <u>81</u> | **ORDER by Magistrate Judge Thomas S. Hixson granting <u>79</u> Motion for Protective Order. (rmm2, COURT STAFF) (Filed on 7/19/2024) (Entered: 07/20/2024)** |
| 07/22/2024 | <u>82</u> | \*\*\* DISREGARD, per Docket <u>83</u> \*\*\*<br>**Judicial Referral for Purpose of Determining Relationship of Cases re C–24–4223 JCS. Signed by Judge Joseph C. Spero on July 22, 2024. (jcslc1, COURT STAFF) (Filed on 7/22/2024) Modified on 7/23/2024 (kmm2, COURT STAFF). (Entered: 07/22/2024)** |
| 07/22/2024 | <u>83</u> | **ORDER WITHDRAWING SUA SPONTE REFERRAL FOR RELATED CASE DETERMINATION. Signed by Judge Joseph C. Spero on July 22, 2024. (jcslc1, COURT STAFF) (Filed on 7/22/2024) (Entered: 07/22/2024)** |
| 07/24/2024 | <u>84</u> | STIPULATION WITH PROPOSED ORDER for Order Changing Time filed by Yangtze Memory Technologies Company, Ltd.. (Attachments: # <u>1</u> Declaration in Support, # <u>2</u> Proposed Order)(Radsch, Andrew) (Filed on 7/24/2024) Modified on 7/25/2024 (kmm2, COURT STAFF). (Entered: 07/24/2024) |
| 07/25/2024 | <u>85</u> | **ORDER by Judge Rita F. Lin granting <u>84</u> Stipulation Extend Certain Deadlines. (mkl, COURT STAFF) (Filed on 7/25/2024) (Entered: 07/25/2024)** |
| 07/25/2024 | <u>86</u> | **Judicial Referral for Purpose of Determining Relationship of Cases re 24–cv–4223 RS. Signed by Chief Judge Richard Seeborg on 7/25/2024. (cl, COURT STAFF) (Filed on 7/25/2024) (Entered: 07/25/2024)** |
| 07/29/2024 | <u>87</u> | RESPONSE re <u>86</u> Judicial Referral for Purpose of Determining Relationship of Cases by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Attachments: # <u>1</u> Declaration of Jason Lang ISO Micron's Response ISO Relating Cases Pursuant to Civil L.R. 3–12(c), # <u>2</u> Exhibit 1 to J. Lang Decl., # <u>3</u> Exhibit 2 to J. Lang Decl., # <u>4</u> Exhibit 3 to J. Lang Decl., # <u>5</u> Exhibit 4 to J. Lang Decl., # <u>6</u> Exhibit 5 to J. Lang Decl., # <u>7</u> Exhibit 6 to J. Lang Decl., # <u>8</u> Exhibit 7 to J. Lang Decl., # <u>9</u> Exhibit 8 to J. Lang Decl., # <u>10</u> Proposed Order)(Bobrow, Jared) (Filed on 7/29/2024) (Entered: 07/29/2024) |
| 07/29/2024 | <u>88</u> | MOTION to Consolidate Cases filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. Motion Hearing set for 9/17/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 8/12/2024. Replies due by 8/19/2024. (Attachments: # <u>1</u> Declaration of Jason Lang ISO Micron's Motion to Consolidate, # <u>2</u> Exhibit 1 to J. Lang Decl., # <u>3</u> Exhibit 2 to J. Lang Decl., # <u>4</u> Exhibit 3 to J. Lang Decl., # <u>5</u> Exhibit 4 to J. Lang Decl.)(Bobrow, Jared) (Filed on 7/29/2024) (Entered: 07/29/2024) |
| 07/30/2024 | <u>89</u> | Response in Opposition to <u>86</u> Judicial Referral for Purpose of Determining Relationship of Cases Pursuant to 3–12(b)) by Yangtze Memory Technologies |

| | | |
|---|---|---|
| | | Company, Ltd. (Radsch, Andrew) (Filed on 7/30/2024) Modified on 7/31/2024 (kmm2, COURT STAFF). (Entered: 07/30/2024) |
| 07/31/2024 | 90 | STIPULATION WITH PROPOSED ORDER for Order Changing Time per Civil Local Rule 6–1(b) filed by Micron Consumer Products, Group, LLC., Micron Technology, Inc. (Attachments: # 1 Declaration of Jason Lang, # 2 Proposed Order)(Lang, Jeremy) (Filed on 7/31/2024) Modified on 8/1/2024 (kmm2, COURT STAFF). (Entered: 07/31/2024) |
| 08/01/2024 | 91 | Administrative Motion to File Under Seal filed by Micron Consumer Products, Group, LLC.,,, Micron Technology, Inc.,,. (Attachments: # 1 Proposed Order, # 2 Unredacted Version of First Amended Counterclaims, # 3 Unredacted–Redline – Original and Micron's First Amended Counterclaims)(Bobrow, Jared) (Filed on 8/1/2024) (Entered: 08/01/2024) |
| 08/01/2024 | 92 | CERTIFICATE OF SERVICE by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc., re 91 Administrative Motion to File Under Seal (Bobrow, Jared) (Filed on 8/1/2024) (Entered: 08/01/2024) |
| 08/01/2024 | 93 | First Amended COUNTERCLAIM with Demand for Jury Trial *(Public Redacted Version)* against Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc. filed by Micron Consumer Products, Group, LLC.,Micron Technology, Inc. (Attachments: # 1 Exhibit 1 to Micron's First Amended Counterclaims, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Redline – Original and Micron's First Amended Counterclaims Modified on 8/2/2024 (kmm2, COURT STAFF). (Entered: 08/01/2024) |
| 08/01/2024 | 94 | **ORDER by Judge Rita F. Lin granting 90 Stipulation. The deadline for the exchange of preliminary claim constructions and extrinsic evidence under Patent L.R. 4–2 is extended to August 5, 2024. *(This is a text–only entry generated by the court. There is no document associated with this entry.)* (rfllc1, COURT STAFF) (Filed on 8/1/2024) (Entered: 08/01/2024)** |
| 08/02/2024 | 95 | **ORDER RELATING CASE to 24–cv–04223–RS. Signed by Judge Rita F. Lin on 8/2/2024. (mkl, COURT STAFF) (Filed on 8/2/2024) (Entered: 08/02/2024)** |
| 08/09/2024 | 96 | CLERK'S NOTICE Continuing Claims Construction Pre–Hearing Conference: Notice is hereby given that the Claims Construction Pre–Hearing Conference set for 9/4/2024 is continued to 11/12/2024 02:30 PM to be held with the Tech Tutorial in San Francisco – Videoconference Only before Judge Rita F. Lin. This proceeding will be held via a Zoom webinar. **Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/judges/lin–rita–f–rfl/ **General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited. **Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/. *(This is a text–only entry generated by the court. There is no document associated with this entry.)* (mkl, COURT STAFF) (Filed on 8/9/2024) (Entered: 08/09/2024) |
| 08/09/2024 | 97 | **ORDER TO SHOW CAUSE WHY MICRON TECHNOLOGY, INC.'S FIRST AMENDED COUNTERCLAIMS SHOULD NOT BE UNSEALED. Show Cause Response due by 8/16/2024. Signed by Judge Rita F. Lin on 8/9/2024. (mkl, COURT STAFF) (Filed on 8/9/2024) (Entered: 08/09/2024)** |
| 08/12/2024 | 98 | OPPOSITION/RESPONSE (re 88 MOTION to Consolidate Cases ) filed byYangtze Memory Technologies Company, Ltd.. (Radsch, Andrew) (Filed on 8/12/2024) |

| | | |
|---|---|---|
| | | Modified on 8/13/2024 (kmm2, COURT STAFF). (Entered: 08/12/2024) |
| 08/14/2024 | 99 | STIPULATION WITH PROPOSED ORDER *to Enlarge time to Respond to the First Amended Counterclaim per Local Rule 6−3(b) (Joint)* filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Attachments: # 1 Declaration of Andrew T. Radsch in Support, # 2 Proposed Order)(Radsch, Andrew) (Filed on 8/14/2024) (Entered: 08/14/2024) |
| 08/15/2024 | 100 | Statement in Response to 91 Administrative Motion to File Under Seal Pursuant to 97 Order to Show Cause, by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Radsch, Andrew) (Filed on 8/15/2024) Modified on 8/15/2024 (kmm2, COURT STAFF). (Entered: 08/15/2024) |
| 08/15/2024 | 101 | **ORDER by Judge Rita F. Lin granting 99 Stipulation to Enlarge time to Respond to the First Amended Counterclaim. (mkl, COURT STAFF) (Filed on 8/15/2024) (Entered: 08/15/2024)** |
| 08/16/2024 | 102 | **ORDER by Judge Rita F. Lin terminating 91 Administrative Motion to File Under Seal and discharging 97 Order to Show Cause. As the YMTC entities do not object (*see* Dkt. No. 100 ), the Clerk of Court is directed to unseal the filing at Dkt. No. 91 and its attachments. *(This is a text−only entry generated by the court. There is no document associated with this entry.)* (rfllc1, COURT STAFF) (Filed on 8/16/2024) (Entered: 08/16/2024)** |
| 08/19/2024 | 103 | REPLY (re 88 MOTION to Consolidate Cases ) filed byMicron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Bobrow, Jared) (Filed on 8/19/2024) (Entered: 08/19/2024) |
| 08/19/2024 | 104 | Declaration of Jason Lang in Support of 103 Reply in Support of Motion to Consolidate filed byMicron Consumer Products, Group, LLC.,, Micron Technology, Inc. (Attachments: # 1 Exhibit 5, # 2 Exhibit 6, # 3 Exhibit 7, # 4 Exhibit 8)(Related document(s) 103 ) (Lang, Jeremy) (Filed on 8/19/2024) Modified on 8/20/2024 (kmm2, COURT STAFF). (Entered: 08/19/2024) |
| 08/19/2024 | 105 | Joint Claim Construction and Prehearing Statement (Patent Local Rule 4−3) filed by Yangtze Memory Technologies Company, Ltd.. (Attachments: # 1 Appendices A and B)(Radsch, Andrew) (Filed on 8/19/2024) Modified on 8/21/2024 (kmm2, COURT STAFF). (Entered: 08/19/2024) |
| 08/21/2024 | 106 | **ORDER by Judge Rita F. Lin granting (88) Motion to Consolidate Cases in case 3:23−cv−05792−RFL. Case No. 3:23−cv−05792−RFL and Case No. 3:24−cv−04223−RFL are consolidated. The Clerk of the Court is directed to close Case No. 3:24−cv−04223−RFL. All future submissions shall be filed only in Case No. 3:23−cv−05792−RFL. (mkl, COURT STAFF) (Filed on 8/21/2024) (Entered: 08/21/2024)** |
| 08/21/2024 | 107 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC−19752084.) filed by Yangtze Memory Technologies Company, Ltd.. (Middleton, Alexander) (Filed on 8/21/2024) (Entered: 08/21/2024) |
| 08/21/2024 | 108 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC−19752557.) filed by Yangtze Memory Technologies Company, Ltd.. (Kim, Hyun−Joong) (Filed on 8/21/2024) (Entered: 08/21/2024) |
| 08/22/2024 | | Electronic filing error Re: 107 MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC−19752084.) filed by Yangtze Memory Technologies Company, Ltd. and 108 MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC−19752557.) filed by Yangtze Memory Technologies Company, Ltd. **Pursuant to Civil Local Rule 11−3(a), a pro hac vice application must be accompanied by a certificate of good standing or other similar official document issued by the appropriate authority governing attorney admissions for the relevant bar.** Please re−file the applications with the required certificate of good standing. (mkl, COURT STAFF) (Filed on 8/22/2024) (Entered: 08/22/2024) |
| 08/22/2024 | 109 | Amended MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC−19752084.) Filing fee previously paid on 08/21/2024 filed by Yangtze Memory Technologies Company, Ltd.. (Middleton, Alexander) (Filed on |

| | | |
|---|---|---|
| | | 8/22/2024) (Entered: 08/22/2024) |
| 08/22/2024 | 110 | ANSWER TO FIRST AMENDED COUNTERCLAIM 93 with Demand for Jury Trial Counterclaim,,, by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Radsch, Andrew) (Filed on 8/22/2024) Modified on 8/23/2024 (kmm2, COURT STAFF). Modified on 8/23/2024 (kmm2, COURT STAFF). (Entered: 08/22/2024) |
| 08/22/2024 | 111 | **ORDER by Judge Rita F. Lin granting 109 Motion for Pro Hac Vice as to Alexander Middleton. (mkl, COURT STAFF) (Filed on 8/22/2024) (Entered: 08/22/2024)** |
| 08/23/2024 | 112 | Amended MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC–19752557.) Filing fee previously paid on 08/21/2024 filed by Yangtze Memory Technologies Company, Ltd.. (Kim, Hyun–Joong) (Filed on 8/23/2024) (Entered: 08/23/2024) |
| 08/23/2024 | 113 | **ORDER by Judge Rita F. Lin granting 112 Amended Motion for Pro Hac Vice as to Hyun–Joong Kim. (mkl, COURT STAFF) (Filed on 8/23/2024) (Entered: 08/23/2024)** |
| 08/28/2024 | 114 | NOTICE of Appearance filed by Thomas Yeh on behalf of Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc. (Yeh, Thomas) (Filed on 8/28/2024) (Entered: 08/28/2024) |
| 08/28/2024 | 115 | NOTICE of Appearance filed by Brett Matthew Sandford on behalf of Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc. (Sandford, Brett) (Filed on 8/28/2024) (Entered: 08/28/2024) |
| 08/28/2024 | 116 | NOTICE of Appearance filed by Brent Thomas Watson on behalf of Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc. (Watson, Brent) (Filed on 8/28/2024) (Entered: 08/28/2024) |
| 08/28/2024 | 117 | MOTION for leave to appear in Pro Hac Vice *of Benjamin J. Behrendt* ( Filing fee $ 328, receipt number ACANDC–19786445.) filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing)(Behrendt, Benjamin) (Filed on 8/28/2024) (Entered: 08/28/2024) |
| 08/28/2024 | 118 | MOTION for leave to appear in Pro Hac Vice *of Brenda L. Danek* ( Filing fee $ 328, receipt number ACANDC–19786524.) filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing)(Danek, Brenda) (Filed on 8/28/2024) (Entered: 08/28/2024) |
| 08/28/2024 | 119 | NOTICE of Appearance filed by Kevin Christopher Wheeler on behalf of Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc. (Wheeler, Kevin) (Filed on 8/28/2024) (Entered: 08/28/2024) |
| 08/28/2024 | 120 | MOTION for leave to appear in Pro Hac Vice *of Clement Naples* ( Filing fee $ 328, receipt number ACANDC–19786646.) filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing)(Naples, Clement) (Filed on 8/28/2024) (Entered: 08/28/2024) |
| 08/28/2024 | 121 | MOTION for leave to appear in Pro Hac Vice *of Richard A. Lowry* ( Filing fee $ 328, receipt number ACANDC–19786706.) filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Attachments: # 1 Certificate of Good Standing)(Lowry, Richard) (Filed on 8/28/2024) (Entered: 08/28/2024) |
| 08/28/2024 | 122 | NOTICE of Appearance filed by Elliott Greb on behalf of Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc. (Greb, Elliott) (Filed on 8/28/2024) (Entered: 08/28/2024) |
| 08/29/2024 | 123 | **ORDER by Judge Rita F. Lin granting 117 Motion for Pro Hac Vice as to Benjamin Behrendt. (mkl, COURT STAFF) (Filed on 8/29/2024) (Entered: 08/29/2024)** |
| 08/29/2024 | 124 | **ORDER by Judge Rita F. Lin granting 118 Motion for Pro Hac Vice as to Brenda Danek. (mkl, COURT STAFF) (Filed on 8/29/2024) (Entered: 08/29/2024)** |

| | | |
|---|---|---|
| 08/29/2024 | 125 | **ORDER by Judge Rita F. Lin granting 120 Motion for Pro Hac Vice as to Clement Naples. (mkl, COURT STAFF) (Filed on 8/29/2024) (Entered: 08/29/2024)** |
| 08/29/2024 | 126 | **ORDER by Judge Rita F. Lin granting 121 Motion for Pro Hac Vice as to Richard Lowry. (mkl, COURT STAFF) (Filed on 8/29/2024) (Entered: 08/29/2024)** |
| 09/03/2024 | 127 | Administrative Motion to File Under Seal *Certain Exhibits to the Consolidated Complaint* filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Attachments: # 1 Declaration of Andrew Radsch in Support, # 2 Proposed Order, # 3 Sealed Exhibit 46 to the Consolidated Complaint, # 4 Sealed Exhibit 47 to the Consolidated Complaint, # 5 Sealed Exhibit 48 to the Consolidated Complaint, # 6 Sealed Exhibit 49 to the Consolidated Complaint, # 7 Sealed Exhibit 50 to the Consolidated Complaint, # 8 Sealed Exhibit 51 to the Consolidated Complaint, # 9 Sealed Exhibit 52 to the Consolidated Complaint, # 10 Sealed Exhibit 53 to the Consolidated Complaint, # 11 Sealed Exhibit 54 to the Consolidated Complaint, # 12 Sealed Exhibit 55 to the Consolidated Complaint, # 13 Sealed Exhibit 56 to the Consolidated Complaint, # 14 Sealed Exhibit 57 to the Consolidated Complaint, # 15 Sealed Exhibit 58 to the Consolidated Complaint, # 16 Sealed Exhibit 59 to the Consolidated Complaint, # 17 Sealed Exhibit 60 to the Consolidated Complaint, # 18 Sealed Exhibit 61 to the Consolidated Complaint, # 19 Sealed Exhibit 62 to the Consolidated Complaint, # 20 Sealed Exhibit 63 to the Consolidated Complaint, # 21 Sealed Exhibit 64 to the Consolidated Complaint, # 22 Sealed Exhibit 65 to the Consolidated Complaint, # 23 Sealed Exhibit 66 to the Consolidated Complaint, # 24 Sealed Exhibit 67 to the Consolidated Complaint, # 25 Sealed Exhibit 68 to the Consolidated Complaint, # 26 Sealed Exhibit 69 to the Consolidated Complaint, # 27 Sealed Exhibit 70 to the Consolidated Complaint, # 28 Sealed Exhibit 71 to the Consolidated Complaint, # 29 Sealed Exhibit 72 to the Consolidated Complaint, # 30 Sealed Exhibit 73 to the Consolidated Complaint, # 31 Sealed Exhibit 74 to the Consolidated Complaint, # 32 Sealed Exhibit 75 to the Consolidated Complaint, # 33 Sealed Exhibit 76 to the Consolidated Complaint, # 34 Sealed Exhibit 77 to the Consolidated Complaint, # 35 Sealed Exhibit 78 to the Consolidated Complaint)(Radsch, Andrew) (Filed on 9/3/2024) (Entered: 09/03/2024) |
| 09/03/2024 | 128 | Consolidated COMPLAINT with Demand for Jury Trial against Micron Consumer Products, Group, LLC., Micron Technology, Inc., Filed by Yangtze Memory Technologies Company, Ltd.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26, # 27 Exhibit 27, # 28 Exhibit 28, # 29 Exhibit 29, # 30 Exhibit 30, # 31 Exhibit 31, # 32 Exhibit 32, # 33 Exhibit 33, # 34 Exhibit 34, # 35 Exhibit 35, # 36 Exhibit 36, # 37 Exhibit 37, # 38 Exhibit 38, # 39 Exhibit 39, # 40 Exhibit 40, # 41 Exhibit 41, # 42 Exhibit 42, # 43 Exhibit 43, # 44 Exhibit 44, # 45 Exhibit 45, # 46 Exhibit 46, # 47 Exhibit 47, # 48 Exhibit 48, # 49 Exhibit 49, # 50 Exhibit 50, # 51 Exhibit 51, # 52 Exhibit 52, # 53 Exhibit 53, # 54 Exhibit 54, # 55 Exhibit 55, # 56 Exhibit 56, # 57 Exhibit 57, # 58 Exhibit 58, # 59 Exhibit 59, # 60 Exhibit 60, # 61 Exhibit 61, # 62 Exhibit 62, # 63 Exhibit 63, # 64 Exhibit 64, # 65 Exhibit 65, # 66 Exhibit 66, # 67 Exhibit 67, # 68 Exhibit 68, # 69 Exhibit 69, # 70 Exhibit 70, # 71 Exhibit 71, # 72 Exhibit 72, # 73 Exhibit 73, # 74 Exhibit 74, # 75 Exhibit 75, # 76 Exhibit 76, # 77 Exhibit 77, # 78 Exhibit 78, # 79 Exhibit 79)(Radsch, Andrew) (Filed on 9/3/2024) Modified on 9/4/2024 (kmm2, COURT STAFF). (Entered: 09/03/2024) |
| 09/03/2024 | 129 | Administrative Motion to File Under Seal *the Motion to Sever Counterclaim−Plaintiff Micron Technology, Inc.'s Patent Infringement Counterclaims and Certain ExhibitsThereto* filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Attachments: # 1 Declaration of Andrew Radsch in Support, # 2 Proposed Order, # 3 Exhibit A − Sealed Exhibit A to the Declaration of James Mack in support of the Motion to Sever, # 4 Exhibit B − unredacted version of the Motion to Sever.)(Radsch, Andrew) (Filed on 9/3/2024) (Entered: 09/03/2024) |
| 09/03/2024 | 130 | MOTION to Sever *Counterclaim −Plaintiff Micron Technology, Inc.'s Patent Infringement Counterclaims* filed by Yangtze Memory Technologies Company, Ltd., |

| | | |
|---|---|---|
| | | Yangtze Memory Technologies, Inc.. Motion Hearing set for 10/8/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 9/17/2024. Replies due by 9/24/2024. (Attachments: # 1 Declaration of James Mack in Support, # 2 Exhibit A to Mack Declaration, # 3 Proposed Order)(Radsch, Andrew) (Filed on 9/3/2024) (Entered: 09/03/2024) |
| 09/10/2024 | 131 | **ORDER AS MODIFIED by Judge Rita F. Lin granting 127 Administrative Motion to File Certain Exhibits to the Consolidated Complaint Under Seal. (mkl, COURT STAFF) (Filed on 9/10/2024) (Entered: 09/10/2024)** |
| 09/10/2024 | 132 | **ORDER AS MODIFIED by Judge Rita F. Lin granting 129 Administrative Motion to File the Motion to Sever Counterclaim–Plaintiff Micron Technology, Inc.'s Patent Infringement Counterclaims and Certain Exhibits Thereto Under Seal. (mkl, COURT STAFF) (Filed on 9/10/2024) (Entered: 09/10/2024)** |
| 09/11/2024 | | Set Deadlines/Hearings: Case Management Statement due by 9/11/2024. Further Case Management Conference set for 9/18/2024 10:00 AM in San Francisco – Videoconference Only.<br><br>This proceeding will be held via a Zoom webinar.<br><br>**Webinar Access:** All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/judges/lin–rita–f–rfl/<br><br>**General Order 58.** Persons granted access to court proceedings held by telephone or videoconference are reminded that photographing, recording, and rebroadcasting of court proceedings, including screenshots or other visual copying of a hearing, is absolutely prohibited.<br><br>**Zoom Guidance and Setup:** https://www.cand.uscourts.gov/zoom/.<br><br>(mkl, COURT STAFF) (Filed on 9/11/2024) (Entered: 09/11/2024) |
| 09/11/2024 | 133 | JOINT CASE MANAGEMENT STATEMENT filed by Yangtze Memory Technologies Company, Ltd. (Radsch, Andrew) (Filed on 9/11/2024) Modified on 9/12/2024 (kmm2, COURT STAFF). (Entered: 09/11/2024) |
| 09/16/2024 | 134 | STIPULATION to Enlarge Time to Answer or Otherwise Respond to Consolidated Complaint re 128 Complaint filed by Micron Consumer Products, Group, LLC., Micron Technology, Inc. (Lang, Jeremy) (Filed on 9/16/2024) Modified on 9/18/2024 (kmm2, COURT STAFF). (Entered: 09/16/2024) |
| 09/17/2024 | 135 | **ORDER. The 134 Stipulation to extend Defendants' deadline to answer the consolidated complaint to September 20, 2024, is hereby GRANTED. Signed by Judge Rita F. Lin on 9/17/2024. (*This is a text–only entry generated by the court. There is no document associated with this entry.*) (rfllc1, COURT STAFF) (Filed on 9/17/2024) (Entered: 09/17/2024)** |
| 09/17/2024 | 136 | Administrative Motion to Consider Whether Another Party's Material Should Be Sealed filed by Micron Consumer Products, Group, LLC., Micron Technology, Inc. (Attachments: # 1 Proposed Order, # 2 Exhibit 2 [Filed Under Seal])(Bobrow, Jared) (Filed on 9/17/2024) Modified on 9/18/2024 (kmm2, COURT STAFF). (Entered: 09/17/2024) |
| 09/17/2024 | 137 | OPPOSITION/RESPONSE (re 130 MOTION to Sever *Counterclaim –Plaintiff Micron Technology, Inc.'s Patent Infringement Counterclaims* ) filed byMicron Consumer Products, Group, LLC., Micron Technology, Inc. (Bobrow, Jared) (Filed on 9/17/2024) Modified on 9/18/2024 (kmm2, COURT STAFF). (Entered: 09/17/2024) |
| 09/17/2024 | 138 | Declaration of Diana M. Rutowski in Support of 137 Opposition/Response to Motion, filed byMicron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2 [Filed Under Seal], # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9)(Related document(s) 137 ) (Rutowski, Diana) (Filed on 9/17/2024) (Entered: 09/17/2024) |

| 09/17/2024 | 139 | ANSWER to Consolidated Complaint with Jury Demand and COUNTERCLAIM against Yangtze Memory Technologies Company, Ltd. by Micron Consumer Products, Group, LLC., Micron Technology, Inc. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22)(Bobrow, Jared) (Filed on 9/17/2024) Modified on 9/18/2024 (kmm2, COURT STAFF). (Entered: 09/17/2024) |
| --- | --- | --- |
| 09/18/2024 | 140 | CERTIFICATE OF SERVICE by Micron Consumer Products, Group, LLC.,,, Micron Technology, Inc., re 138 Declaration in Support, (Rutowski, Diana) (Filed on 9/18/2024) (Entered: 09/18/2024) |
| 09/18/2024 | 141 | **Minute Entry for proceedings held by Zoom before Judge Rita F. Lin: Further Case Management Conference held on 9/18/2024.**<br><br>The Court set a case schedule (see attachment for additional details and complete list of deadlines).<br><br>Last day to amend the pleadings is 10/31/2024.<br>Tutorial Hearing set for 4/15/2025 01:30 PM in San Francisco – Videoconference Only.<br>Claims Construction Hearing set for 4/24/2025 10:00 AM.<br>Close of Fact Discovery is 8/26/2025.<br>Initial Expert Reports due by 10/24/2025.<br>Rebuttal Expert Reports due by 12/5/2025.<br>Close of Expert Discovery is 12/22/2025.<br>Dispositive and Daubert Motion Hearing set for 2/26/2026 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin.<br>Pretrial Conference set for 5/19/2026 02:30 PM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin.<br>Jury Selection/Jury Trial set for 6/15/2026 09:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin.<br><br>Case referred to private mediation. A Joint Letter with the name of the mediator and date for the mediation is due by 8/1/2025. The deadline to complete ADR is 8/29/2025.<br><br>Digital Recording Time: 10:28–10:55.<br>Attorneys for Plaintiff: Andrew Radsch, Clement Naples, and Thomas Yeh.<br>Attorneys for Defendants: Jared Bobrow and Jason Lang.<br><br>(mkl, COURT STAFF) (Date Filed: 9/18/2024) (Entered: 09/18/2024) |
| 09/20/2024 | 142 | Response re 136 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed *(Plaintiff and Counterclaim Defendant Yangtze Memory Technologies Company, Ltd.s Statement in Response to Defendant and Counterclaim Plaintiffs Administrative Motion to Consider Whether Another Partys Materials Should be Sealed)* by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Radsch, Andrew) (Filed on 9/20/2024) (Entered: 09/20/2024) |
| 09/24/2024 | 143 | REPLY in Support of ( 130 MOTION to Sever *Counterclaim −Plaintiff Micron Technology, Inc.'s Patent Infringement Counterclaims* ) filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc.. (Radsch, Andrew) (Filed on 9/24/2024) Modified on 9/24/2024 (kmm2, COURT STAFF). (Entered: 09/24/2024) |
| 09/25/2024 | 144 | **ORDER by Judge Rita F. Lin denying 136 Administrative Motion to Consider Whether Another Party's Material Should Be Sealed. In view of Yangtze Memory Technologies Company, Ltd.'s statement that the exhibit does not contain information that needs to be sealed, the 136 motion is DENIED. Accordingly, Defendant Micron Technology, Inc. is ORDERED to file an unredacted version of Exhibit 2 to Micron's Opposition. The effective filing date of the Opposition shall be set to 9/17/2024. (*This is a text−only entry generated by the court. There is no** |

| | | |
|---|---|---|
| | | *document associated with this entry.)* (rfllc1, COURT STAFF) (Filed on 9/25/2024) (Entered: 09/25/2024) |
| 09/25/2024 | <u>145</u> | Micron's Refiling of Document Re Dkt. No. 138 Pursuant to Order Re Motion to Seal (Dkt. No. 144); RESPONSE re 144 Order on Administrative Motion to Consider Whether Another Partys Material Should Be Sealed, by Micron Consumer Products, Group, LLC.,Micron Technology, Inc. (Attachments: # <u>1</u> Exhibit 2)(Bobrow, Jared) (Filed on 9/25/2024) Modified on 9/26/2024 (kmm2, COURT STAFF). (Entered: 09/25/2024) |
| 09/27/2024 | <u>146</u> | **ORDER by Judge Rita F. Lin denying <u>130</u> Motion to Sever Counterclaims. (mkl, COURT STAFF) (Filed on 9/27/2024) (Entered: 09/27/2024)** |
| 10/04/2024 | <u>147</u> | Joint Discovery Letter Brief filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. (Attachments: # <u>1</u> Exhibit A, # <u>2</u> Exhibit B, # <u>3</u> Proposed Order Granting Micron's Motion to Compel Responses and Production in Response to Micron's ROG Nos. 12–15, 22, and RFP Nos. 15, 41–45, 48–51, 53, 73–78, # <u>4</u> Proposed Order Denying Micron's Motion to Compel Responses and Production in Response to Micron's ROG Nos. 12–15, 22 and RFP Nos. 15, 41–45, 48–51, 53, 73–78)(Rutowski, Diana) (Filed on 10/04/2024) (Entered: 10/04/2024) |
| 10/07/2024 | <u>148</u> | **ORDER REFERRING CASE to Magistrate Judge Thomas S. Hixson for Discovery Purposes. Signed by Judge Rita F. Lin on 10/7/2024. (mkl, COURT STAFF) (Filed on 10/7/2024) (Entered: 10/07/2024)** |
| 10/07/2024 | <u>149</u> | **NOTICE OF REFERRAL FOR DISCOVERY. Signed by Judge Thomas S. Hixson on 10/7/2024. (tshlc1, COURT STAFF) (Filed on 10/7/2024) (Entered: 10/07/2024)** |
| 10/08/2024 | <u>150</u> | Administrative Motion to File Under Seal *Certain Exhibits to the First Amended Consolidated Complaint* filed by Yangtze Memory Technologies Company, Ltd.. (Attachments: # <u>1</u> Declaration of Andrew T. Radsch in Support, # <u>2</u> Proposed Order, # <u>3</u> Exhibit 46, # <u>4</u> Exhibit 47, # <u>5</u> Exhibit 48, # <u>6</u> Exhibit 49, # <u>7</u> Exhibit 50, # <u>8</u> Exhibit 51, # <u>9</u> Exhibit 52, # <u>10</u> Exhibit 53, # <u>11</u> Exhibit 54, # <u>12</u> Exhibit 55, # <u>13</u> Exhibit 56, # <u>14</u> Exhibit 57, # <u>15</u> Exhibit 58, # <u>16</u> Exhibit 59, # <u>17</u> Exhibit 60, # <u>18</u> Exhibit 61, # <u>19</u> Exhibit 62, # <u>20</u> Exhibit 63, # <u>21</u> Exhibit 64, # <u>22</u> Exhibit 65, # <u>23</u> Exhibit 66, # <u>24</u> Exhibit 67, # <u>25</u> Exhibit 68, # <u>26</u> Exhibit 69, # <u>27</u> Exhibit 70, # <u>28</u> Exhibit 71, # <u>29</u> Exhibit 72, # <u>30</u> Exhibit 73, # <u>31</u> Exhibit 74, # <u>32</u> Exhibit 75, # <u>33</u> Exhibit 76, # <u>34</u> Exhibit 77, # <u>35</u> Exhibit 78)(Radsch, Andrew) (Filed on 10/8/2024) (Entered: 10/08/2024) |
| 10/08/2024 | | CASE REFERRED to Magistrate Judge Thomas S. Hixson for Discovery. (shy, COURT STAFF) (Filed on 10/8/2024) (Entered: 10/08/2024) |
| 10/08/2024 | <u>151</u> | AMENDED COMPLAINT */ First Amended Consolidated Complaint /* against Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,. Filed by Yangtze Memory Technologies Company, Ltd.. (Attachments: # <u>1</u> Exhibit 1, # <u>2</u> Exhibit 2, # <u>3</u> Exhibit 3, # <u>4</u> Exhibit 4, # <u>5</u> Exhibit 5, # <u>6</u> Exhibit 6, # <u>7</u> Exhibit 7, # <u>8</u> Exhibit 8, # <u>9</u> Exhibit 9, # <u>10</u> Exhibit 10, # <u>11</u> Exhibit 11, # <u>12</u> Exhibit 12, # <u>13</u> Exhibit 13, # <u>14</u> Exhibit 14, # <u>15</u> Exhibit 15, # <u>16</u> Exhibit 16, # <u>17</u> Exhibit 17, # <u>18</u> Exhibit 18, # <u>19</u> Exhibit 19, # <u>20</u> Exhibit 20, # <u>21</u> Exhibit 21, # <u>22</u> Exhibit 22, # <u>23</u> Exhibit 23, # <u>24</u> Exhibit 24, # <u>25</u> Exhibit 25, # <u>26</u> Exhibit 26, # <u>27</u> Exhibit 27, # <u>28</u> Exhibit 28, # <u>29</u> Exhibit 29, # <u>30</u> Exhibit 30, # <u>31</u> Exhibit 31, # <u>32</u> Exhibit 32, # <u>33</u> Exhibit 33, # <u>34</u> Exhibit 34, # <u>35</u> Exhibit 35, # <u>36</u> Exhibit 36, # <u>37</u> Exhibit 37, # <u>38</u> Exhibit 38, # <u>39</u> Exhibit 39, # <u>40</u> Exhibit 40, # <u>41</u> Exhibit 41, # <u>42</u> Exhibit 42, # <u>43</u> Exhibit 43, # <u>44</u> Exhibit 44, # <u>45</u> Exhibit 45, # <u>46</u> Exhibit 46 (Public Version), # <u>47</u> Exhibit 47 (Public Version), # <u>48</u> Exhibit 48 (Public Version), # <u>49</u> Exhibit 49 (Public Version), # <u>50</u> Exhibit 50 (Public Version), # <u>51</u> Exhibit 51 (Public Version), # <u>52</u> Exhibit 52 (Public Version), # <u>53</u> Exhibit 53 (Public Version), # <u>54</u> Exhibit 54 (Public Version), # <u>55</u> Exhibit 55 (Public Version), # <u>56</u> Exhibit 56 (Public Version), # <u>57</u> Exhibit 57 (Public Version), # <u>58</u> Exhibit 58 (Public Version), # <u>59</u> Exhibit 59 (Public Version), # <u>60</u> Exhibit 60 (Public Version), # <u>61</u> Exhibit 61 (Public Version), # <u>62</u> Exhibit 62 (Public Version), # <u>63</u> Exhibit 63 (Public Version), # <u>64</u> Exhibit 64 (Public Version), # <u>65</u> Exhibit 65 (Public Version), # <u>66</u> Exhibit 66 (Public Version), # <u>67</u> Exhibit 67 (Public Version), # <u>68</u> Exhibit 68 (Public Version), # <u>69</u> Exhibit 69 (Public Version), # <u>70</u> Exhibit 70 (Public Version), # <u>71</u> Exhibit 71 (Public Version), # <u>72</u> Exhibit 72 (Public Version), # <u>73</u> Exhibit 73 (Public Version), # <u>74</u> Exhibit 74 (Public Version), # <u>75</u> |

| | | |
|---|---|---|
| | | Exhibit 75 (Public Version), # 76 Exhibit 76 (Public Version), # 77 Exhibit 77 (Public Version), # 78 Exhibit 78 (Public Version), # 79 Exhibit 79)(Radsch, Andrew) (Filed on 10/8/2024) (Entered: 10/08/2024) |
| 10/08/2024 | 152 | MOTION to Dismiss *Micron's Counterclaims for Failure to State a Claim Upon Which Relief Can Be Granted (Fed. R. Civ. P. 12(b)(6))* filed by Yangtze Memory Technologies Company, Ltd.. Motion to Dismiss Hearing set for 11/12/2024 10:00 AM in San Francisco, Courtroom 15, 18th Floor. Responses due by 10/22/2024. Replies due by 10/29/2024. (Wheeler, Kevin) (Filed on 10/8/2024) (Entered: 10/08/2024) |
| 10/09/2024 | 153 | AMENDED COMPLAINT *, redline version of First Amended Consolidated Complaint (Dkt No. 151)* against Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,,. Filed by Yangtze Memory Technologies Company, Ltd.. (Radsch, Andrew) (Filed on 10/9/2024) (Entered: 10/09/2024) |
| 10/09/2024 | 154 | CERTIFICATE OF SERVICE by Yangtze Memory Technologies Company, Ltd. re 150 Administrative Motion to File Under Seal *Certain Exhibits to the First Amended Consolidated Complaint* (Radsch, Andrew) (Filed on 10/9/2024) (Entered: 10/09/2024) |
| 10/10/2024 | 155 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC–19939983.) filed by Yangtze Memory Technologies Company, Ltd.. (Attachments: # 1 Exhibit 1. Certificate of Good Standing)(Bacha, Rachael) (Filed on 10/10/2024) (Entered: 10/10/2024) |
| 10/10/2024 | 156 | **ORDER by Judge Rita F. Lin granting 155 Motion for Pro Hac Vice as to Rachael Bacha. (mkl, COURT STAFF) (Filed on 10/10/2024) (Entered: 10/10/2024)** |
| 10/10/2024 | 157 | CLERK'S NOTICE SCHEDULING DISCOVERY HEARING BY ZOOM:<br><br>A Discovery Hearing is scheduled for: 10/17/2024 at 10:00 AM in San Francisco – Zoom Video Conference Only, re ECF Docket No. 147 before Magistrate Judge Thomas S. Hixson.<br><br>On 10/16/2024 counsel shall email the Courtroom Deputy, Rose Maher, by COB, the names of who will be appearing for the Discovery hearing.<br><br>Courtroom Deputy's email: Rose_Maher@cand.uscourts.gov<br><br>*(This is a text–only entry generated by the court. There is no document associated with this entry.)* Discovery Hearing set for 10/17/2024 10:00 AM in San Francisco, – Videoconference Only before Magistrate Judge Thomas S. Hixson. (rmm2, COURT STAFF) (Filed on 10/10/2024) (Entered: 10/10/2024) |
| 10/11/2024 | 158 | MOTION for leave to appear in Pro Hac Vice ( Filing fee $ 328, receipt number ACANDC–19943077.) filed by Yangtze Memory Technologies Company, Ltd.. (Attachments: # 1 Certificate of Good Standing)(Pobre, Nicole) (Filed on 10/11/2024) (Entered: 10/11/2024) |
| 10/11/2024 | 159 | **ORDER by Judge Rita F. Lin granting 158 Motion for Pro Hac Vice as to Nicole Pobre. (mkl, COURT STAFF) (Filed on 10/11/2024) (Entered: 10/11/2024)** |
| 10/15/2024 | 160 | **ORDER AS MODIFIED by Judge Rita F. Lin granting 150 Administrative Motion to File Under Seal. (mkl, COURT STAFF) (Filed on 10/15/2024) (Entered: 10/15/2024)** |
| 10/17/2024 | 161 | **Minute Entry for proceedings held before Magistrate Judge Thomas S. Hixson:**<br><br>**Discovery Hearing held on 10/17/2024 at 10:00 a.m. by Zoom.**<br><br>**Digital Recording Time: By Zoom: 10:17–11:55.**<br><br>**Plaintiff Attorney: Andrew Radsch.**<br><br>**Defendant Attorney: Diana Rutowski.** |

| | | |
|---|---|---|
| | | **Proceedings:**<br><br>**Discovery Hearing held; argument heard; matter submitted. Court to issue Order.**<br><br>**Counsel may order a transcript of this hearing on ECF.**<br><br>*(This is a text–only entry generated by the court. There is no document associated with this entry.)* **(rmm2, COURT STAFF) (Date Filed: 10/17/2024) Transcriber – Tara Jauregui, email: echoreporting@yahoo.com. Modified on 10/18/2024 (jlg, COURT STAFF). (Entered: 10/17/2024)** |
| 10/18/2024 | 162 | TRANSCRIPT ORDER for proceedings held on 10/17/2024 before Magistrate Judge Thomas S. Hixson by Yangtze Memory Technologies Company, Ltd., for Recorded Proceeding – Oakland. (Radsch, Andrew) (Filed on 10/18/2024) (Entered: 10/18/2024) |
| 10/18/2024 | 163 | **Discovery Order re 147 Joint Discovery Letter Brief. Signed by Judge Thomas S. Hixson on 10/18/2024. (tshlc2, COURT STAFF) (Filed on 10/18/2024) (Entered: 10/18/2024)** |
| 10/22/2024 | 164 | Answer to Amended Complaint 151 Amended Complaint,, Amended COUNTERCLAIM against Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc. by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc. (Attachments: # 1 Redline of Micron's Answer to YMTC's Amended Consolidated Complaint and Amended Counterclaims, # 2 Exhibit 1, # 3 Exhibit 2, # 4 Exhibit 3, # 5 Exhibit 4, # 6 Exhibit 5, # 7 Exhibit 6, # 8 Exhibit 7, # 9 Exhibit 8, # 10 Exhibit 9, # 11 Exhibit 10, # 12 Exhibit 11, # 13 Exhibit 12, # 14 Exhibit 13, # 15 Exhibit 14, # 16 Exhibit 15, # 17 Exhibit 16, # 18 Exhibit 17, # 19 Exhibit 18, # 20 Exhibit 19, # 21 Exhibit 20, # 22 Exhibit 21, # 23 Exhibit 22, # 24 Exhibit 23, # 25 Exhibit 24, # 26 Exhibit 25, # 27 Exhibit 26)(Bobrow, Jared) (Filed on 10/22/2024) Modified on 10/23/2024 (kmm2, COURT STAFF). (Entered: 10/22/2024) |
| 10/22/2024 | 165 | OPPOSITION/RESPONSE (re 152 MOTION to Dismiss *Micron's Counterclaims for Failure to State a Claim Upon Which Relief Can Be Granted (Fed. R. Civ. P. 12(b)(6))* ) filed byMicron Consumer Products, Group, LLC., Micron Technology, Inc., (Attachments: # 1 Declaration of Jared Bobrow, # 2 Exhibit 1)(Bobrow, Jared) (Filed on 10/22/2024) Modified on 10/23/2024 (kmm2, COURT STAFF). (Entered: 10/22/2024) |
| 10/28/2024 | 166 | STIPULATION WITH PROPOSED ORDER to Take Off Calendar the Hearing re 152 MOTION to Dismiss *Micron's Counterclaims for Failure to State a Claim Upon Which Relief Can Be Granted (Fed. R. Civ. P. 12(b)(6))* filed by Yangtze Memory Technologies Company, Ltd., Yangtze Memory Technologies, Inc. (Attachments: # 1 Proposed Order)(Wheeler, Kevin) (Filed on 10/28/2024) Modified on 10/29/2024 (kmm2, COURT STAFF). (Entered: 10/28/2024) |
| 10/31/2024 | 167 | **ORDER by Judge Rita F. Lin granting 166 Stipulation to Vacate Hearing Re: 152 Motion to Dismiss. (mkl, COURT STAFF) (Filed on 10/31/2024) (Entered: 10/31/2024)** |
| 10/31/2024 | 168 | STIPULATION *Allowing Micron to File Amended Answer to YMTCs Amended Consolidated Complaint and Amended Counterclaims* filed by Micron Consumer Products, Group, LLC.,, Micron Technology, Inc.,, (Lang, Jeremy) (Filed on 10/31/2024) (Entered: 10/31/2024) |
| 10/31/2024 | 169 | Administrative Motion to File Under Seal Re Micron's Amended Answer to YMTC's Amended Consolidated Complaint and Amended Counterclaims filed by Micron Consumer Products, Group, LLC., Micron Technology, Inc. (Attachments: # 1 Declaration of Jason Lang, # 2 Proposed Order, # 3 Exhibit, # 4 Exhibit)(Lang, Jeremy) (Filed on 10/31/2024) Modified on 11/1/2024 (kmm2, COURT STAFF). (Entered: 10/31/2024) |
| 10/31/2024 | 170 | AMENDED ANSWER to Amended Consolidated Complaint and Amended Counterclaims by Micron Consumer Products, Group, LLC., Micron Technology, Inc. (with Jury Demand) (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3, # 4 |

| | | Exhibit 4, # 5 Exhibit 5, # 6 Exhibit 6, # 7 Exhibit 7, # 8 Exhibit 8, # 9 Exhibit 9, # 10 Exhibit 10, # 11 Exhibit 11, # 12 Exhibit 12, # 13 Exhibit 13, # 14 Exhibit 14, # 15 Exhibit 15, # 16 Exhibit 16, # 17 Exhibit 17, # 18 Exhibit 18, # 19 Exhibit 19, # 20 Exhibit 20, # 21 Exhibit 21, # 22 Exhibit 22, # 23 Exhibit 23, # 24 Exhibit 24, # 25 Exhibit 25, # 26 Exhibit 26)(Lang, Jeremy) (Filed on 10/31/2024) Modified on 11/1/2024 (kmm2, COURT STAFF). (Entered: 10/31/2024) |
|---|---|---|
| 10/31/2024 | 171 | *Redline Version of* 170 AMENDED ANSWER to Amended Consolidated Complaint and Amended Counterclaims by Micron Consumer Products, Group, LLC., Micron Technology, Inc. (Lang, Jeremy) (Filed on 10/31/2024) Modified on 11/1/2024 (kmm2, COURT STAFF). (Entered: 10/31/2024) |
| 10/31/2024 | 172 | PROOF OF SERVICE Re Documents Filed Under Seal by Micron Consumer Products, Group, LLC., Micron Technology, Inc. (Lang, Jeremy) (Filed on 10/31/2024) Modified on 11/1/2024 (kmm2, COURT STAFF). (Entered: 10/31/2024) |
| 11/05/2024 | 173 | Transcript of Proceedings held on 10/17/24, before Judge THOMAS S. HIXSON. Court Reporter/Transcriber Echo Reporting, Inc., telephone number echoreporting@yahoo.com. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 162 Transcript Order ) Redaction Request due 11/26/2024. Redacted Transcript Deadline set for 12/6/2024. Release of Transcript Restriction set for 2/3/2025. (Related documents(s) 162 ) (Jauregui, Tara) (Filed on 11/5/2024) (Entered: 11/05/2024) |
| 11/06/2024 | 174 | NOTICE of Appearance filed by Asim M. Bhansali on behalf of Micron Consumer Products, Group, LLC.,, Micron Technology, Inc., (Bhansali, Asim) (Filed on 11/6/2024) (Entered: 11/06/2024) |
| 11/06/2024 | 175 | NOTICE of Appearance filed by Nicholas Alan Roethlisberger on behalf of Micron Consumer Products, Group, LLC.,, Micron Technology, Inc., (Roethlisberger, Nicholas) (Filed on 11/6/2024) (Entered: 11/06/2024) |
| 11/13/2024 | 176 | STIPULATION *to Extend Certain Deadlines Pursuant to Patent L.R. 3–3, 3–4(b)–(e), and 4–1 Pursuant to Civil Local Rule 6–1(A)* filed by Micron Technology, Inc.,, Micron Consumer Products, Group, LLC.,. (Lang, Jeremy) (Filed on 11/13/2024) (Entered: 11/13/2024) |
| 11/14/2024 | 177 | MOTION to Dismiss *and Strike Micron's Amended Counterclaims* filed by Yangtze Memory Technologies Company, Ltd.. Motion to Dismiss Hearing set for 1/7/2025 10:00 AM in San Francisco, Courtroom 15, 18th Floor. Responses due by 11/29/2024. Replies due by 12/6/2024. (Wheeler, Kevin) (Filed on 11/14/2024) (Entered: 11/14/2024) |
| 11/19/2024 | 178 | STIPULATION WITH PROPOSED ORDER to Extend Briefing Deadlines re Motion to Dismiss and Strike Pursuant to Civil Local Rule 6–1(A)] filed by Micron Technology, Inc., Micron Consumer Products, Group, LLC. (Attachments: # 1 Proposed Order)(Lang, Jeremy) (Filed on 11/19/2024) Modified on 11/19/2024 (kmm2, COURT STAFF). (Entered: 11/19/2024) |
| 11/20/2024 | 179 | **ORDER GRANTING STIPULATION AS MODIFIED TO EXTEND BRIEFING DEADLINES RE: MOTION TO DISMISS AND STRIKE PURSUANT TO CIVIL LOCAL RULE 6–1(A) re** 178 **Stipulation. Signed by Judge Rita F. Lin on 11/20/2024.** Responses due by 12/6/2024. Replies due by 12/20/2024. Motion to Dismiss Hearing set for 1/21/2025 at 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. (jlg, COURT STAFF) (Filed on 11/20/2024) (Entered: 11/20/2024) |
| 11/26/2024 | 180 | Joint Discovery Letter Brief *regarding Micron's Source Code* filed by Micron Technology, Inc.,, Micron Consumer Products, Group, LLC.,. (Lang, Jeremy) (Filed |

| | | |
|---|---|---|
| | | on 11/26/2024) (Entered: 11/26/2024) |
| 11/27/2024 | 181 | Joint Discovery Letter Brief Regarding Discovery Dispute filed by Yangtze Memory Technologies, Inc., Yangtze Memory Technologies Company, Ltd. (Wheeler, Kevin) (Filed on 11/27/2024) Modified on 12/2/2024 (kmm2, COURT STAFF). (Entered: 11/27/2024) |
| 12/03/2024 | 182 | Plaintiff's Notice of Motion and Unopposed Motion for Leave to Amend Invalidity Contentions filed by Yangtze Memory Technologies, Inc., Yangtze Memory Technologies Company, Ltd. Motion Hearing set for 2/4/2025 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. Responses due by 12/17/2024. Replies due by 12/24/2024. (Attachments: # 1 Declaration of Andrew T. Radsch in Support, # 2 Exhibit A to Radsch Declaration, # 3 Exhibit B to Radsch Declaration, # 4 Exhibit C to Radsch Declaration, # 5 Exhibit D to Radsch Declaration, # 6 Proposed Order)(Radsch, Andrew) (Filed on 12/3/2024) Modified on 12/4/2024 (kmm2, COURT STAFF). (Entered: 12/03/2024) |
| 12/04/2024 | | CLERK'S NOTICE: Setting Discovery Hearing by Zoom Video Conference concerning ECF No. 180 and 181.<br><br>A Discovery hearing by Zoom Video Conference is scheduled for: 12/12/2024 at 11:00 a.m., by Zoom Video Conference before Magistrate Judge Thomas S. Hixson.<br><br>By COB 12/11/2024, counsel shall email the Courtroom Deputy, Rose Maher, letting her know their appearances for the 12/12/2024 at 11:00 a.m., Zoom Video Conference Discovery Hearing before Magistrate Judge Thomas S. Hixson.<br><br>The Courtroom Deputy will email the direct Zoom Link to counsel who will be appearing upon receiving their emails.<br><br>Courtroom Deputy Contact Email: Rose_Maher@cand.uscourts.gov<br><br>(rmm2, COURT STAFF) (Filed on 12/4/2024) (Entered: 12/04/2024) |
| 12/06/2024 | 183 | OPPOSITION/RESPONSE (re 177 MOTION to Dismiss *and Strike Micron's Amended Counterclaims* ) filed byMicron Technology, Inc., Micron Consumer Products, Group, LLC. (Attachments: # 1 Declaration of Diana M. Rutowski with Exhibit 1)(Bobrow, Jared) (Filed on 12/6/2024) Modified on 12/6/2024 (kmm2, COURT STAFF). (Entered: 12/06/2024) |
| 12/09/2024 | 184 | NOTICE of Appearance filed by Daniel Willis Richards on behalf of Yangtze Memory Technologies Company, Ltd. (Richards, Daniel) (Filed on 12/9/2024) (Entered: 12/09/2024) |
| 12/12/2024 | 185 | **Minute Entry for proceedings held before Magistrate Judge Thomas S. Hixson:**<br><br>**Discovery Hearing held re ECF Docket Nos. 180–181 on 12/12/2024 at 11:00 a.m.by Zoom Video Conference.**<br><br>**Digital Recording Time: Zoom: 11:00 – 11:30.**<br><br>**Plaintiff Attorney: Brett Sandford/Thomas Yeh.**<br><br>**Defendant Attorney: Jason Lang/Diane Rutowski.**<br><br>**Proceedings: Discovery hearing held; Proffer heard from both sides; matter submitted; Court to issue order.**<br><br>***(This is a text–only entry generated by the court. There is no document associated with this entry.)* (rmm2, COURT STAFF) (Date Filed: 12/12/2024) Transcriber – Tara Jauregui, email: echoreporting@yahoo.com 12/16/2024 (bns, COURT STAFF). (Entered: 12/12/2024)** |
| 12/12/2024 | 186 | **Discovery Order re 180 , 181 Joint Discovery Letter Briefs. Signed by Magistrate Judge Thomas S. Hixson on 12/12/2024. (tshlc2, COURT STAFF) (Filed on 12/12/2024) (Entered: 12/12/2024)** |

| 12/14/2024 | 187 | TRANSCRIPT ORDER for proceedings held on 12/12/2024 before Magistrate Judge Thomas S. Hixson by Yangtze Memory Technologies, Inc., Yangtze Memory Technologies Company, Ltd., for Recorded Proceeding – San Francisco. (Yeh, Thomas) (Filed on 12/14/2024) (Entered: 12/14/2024) |
|---|---|---|
| 12/16/2024 | 188 | TRANSCRIPT ORDER for proceedings held on 12/12/2024 before Magistrate Judge Thomas S. Hixson by Micron Technology, Inc.,, Micron Consumer Products, Group, LLC.,,, for Recorded Proceeding – San Francisco. (Lang, Jeremy) (Filed on 12/16/2024) (Entered: 12/16/2024) |
| 12/20/2024 | 189 | REPLY (re 177 MOTION to Dismiss *and Strike Micron's Amended Counterclaims* ) filed byYangtze Memory Technologies Company, Ltd.. (Wheeler, Kevin) (Filed on 12/20/2024) (Entered: 12/20/2024) |
| 12/23/2024 | 190 | Transcript of Proceedings held on 12/12/24, before Judge Thomas S. Hixson. Court Reporter/Transcriber Echo Reporting, Inc., telephone number echoreporting@yahoo.com. Tape Number: 11:00 – 11:30. Per General Order No. 59 and Judicial Conference policy, this transcript may be viewed only at the Clerk's Office public terminal or may be purchased through the Court Reporter/Transcriber until the deadline for the Release of Transcript Restriction. After that date it may be obtained through PACER. Any Notice of Intent to Request Redaction, if required, is due no later than 5 business days from date of this filing. (Re 187 Transcript Order, 188 Transcript Order ) Redaction Request due 1/13/2025. Redacted Transcript Deadline set for 1/23/2025. Release of Transcript Restriction set for 3/24/2025. (Related documents(s) 187 , 188 ) (Jauregui, Tara) (Filed on 12/23/2024) (Entered: 12/23/2024) |
| 12/24/2024 | 191 | MOTION for Relief from Nondispositive Pretrial Order of Magistrate Judge filed by Micron Technology, Inc.,, Micron Consumer Products, Group, LLC., Responses due by 1/7/2025. Replies due by 1/14/2025. (Attachments: # 1 Proposed Order)(Bobrow, Jared) (Filed on 12/24/2024) Modified on 12/26/2024 (kmm2, COURT STAFF). (Entered: 12/24/2024) |
| 12/24/2024 | 192 | Declaration of Jason Lang in Support of 191 MOTION for Relief from Nondispositive Pretrial Order of Magistrate Judge filed byMicron Technology, Inc., Micron Consumer Products, Group, LLC., (Attachments: # 1 Exhibit 1, # 2 Exhibit 2)(Related document(s) 191 ) (Lang, Jeremy) (Filed on 12/24/2024) (Entered: 12/24/2024) |
| 01/06/2025 | 193 | STIPULATION WITH PROPOSED ORDER *to Extend Certain Deadlines Pursuant to Patent L.R. 4–2 and the Scheduling Order (ECF No. 141) Pursuant to Civil Local Rule 6–1(B)* filed by Micron Technology, Inc., Micron Consumer Products, Group, LLC., (Attachments: # 1 Declaration of Jason Lang, # 2 Proposed Order)(Lang, Jeremy) (Filed on 1/6/2025) Modified on 1/7/2025 (kmm2, COURT STAFF). (Entered: 01/06/2025) |
| 01/08/2025 | 194 | **ORDER by Judge Rita F. Lin granting 193 Stipulation to Extend Certain Deadlines Pursuant to Patent L.R. 4–2 and the Scheduling Order. (mkl, COURT STAFF) (Filed on 1/8/2025) (Entered: 01/08/2025)** |
| 01/09/2025 | 195 | STIPULATION WITH PROPOSED ORDER *to Continue the Hearing on Motion to Dismiss and Strike Counterclaims* filed by Yangtze Memory Technologies, Inc., Yangtze Memory Technologies Company, Ltd.. (Attachments: # 1 Declaration of Kevin C. Wheeler, # 2 Proposed Order)(Wheeler, Kevin) (Filed on 1/9/2025) (Entered: 01/09/2025) |
| 01/10/2025 | 196 | **ORDER by Judge Rita F. Lin granting 195 Stipulation. The hearing on Yangtze's 177 motion to dismiss and strike Micron's counterclaims is CONTINUED to March 4, 2025. *(This is a text–only entry generated by the court. There is no document associated with this entry.)* (rfllc1, COURT STAFF) (Filed on 1/10/2025) (Entered: 01/10/2025)** |
| 01/10/2025 | | Set/Reset Deadlines as to 177 MOTION to Dismiss *and Strike Micron's Amended Counterclaims*. Motion Hearing reset for 3/4/2025 10:00 AM in San Francisco, Courtroom 15, 18th Floor before Judge Rita F. Lin. (mkl, COURT STAFF) (Filed on 1/10/2025) (Entered: 01/10/2025) |

1   James R. Batchelder (CSB # 136347)
2   Andrew T. Radsch (CSB # 303665)
    Stepan Starchenko (CSB #318606)
3   James F. Mack (CSB # 322056)
    Nancy N. Attalla (CSB # 341070)
4   **ROPES & GRAY LLP**
    1900 University Avenue, 6th Floor
5   East Palo Alto, CA 94303-2284
6   Telephone: (650) 617-4000
    james.batchelder@ropesgray.com
7   andrew.radsch@ropesgray.com
    stepan.starchenko@ropesgray.com
8   james.mack@ropesgray.com
    nancy.attalla@ropesgray.com
9
    Rachael Bacha (NYB # 4817938)
10  1211 Avenue of the America
    New York, NY 10036
11  Telephone: (212) 596-9062
    rachael.bacha@ropesgray.com
12
    Nicole S. L. Pobre (DCB # 1735421)
13  2099 Pennsylvania Avenue,
    N.W. Washington, D.C. 20006
14  Telephone: (202) 508-4600
    nicole.pobre@ropesgray.com
15
    Attorneys for Plaintiff
16  YANGTZE MEMORY TECHNOLOGIES
    COMPANY, LTD.
17

18                  **UNITED STATES DISTRICT COURT**

19                  **NORTHERN DISTRICT OF CALIFORNIA**

20

21  YANGTZE MEMORY TECHNOLOGIES )
    COMPANY, LTD.,                )
22                               )
                Plaintiff,       )
23                               )       Case No. _____
          v.                     )
24                               )       **COMPLAINT FOR PATENT**
    MICRON TECHNOLOGY, INC., and  )      **INFRINGEMENT**
25  MICRON CONSUMER PRODUCTS      )
    GROUP, LLC.,                  )      DEMAND FOR JURY TRIAL
26                               )
                Defendants.      )
27

28

---

Appx41

1    Plaintiff Yangtze Memory Technologies Company, Ltd. ("YMTC" or "Plaintiff"), by its
2  attorneys Ropes & Gray LLP, as and for its complaint against Defendants Micron Technology, Inc.
3  and Micron Consumer Products Group, LLC, (collectively, "Micron" or "Defendants"), on personal
4  knowledge as to its own actions, and upon information and belief as to all others, alleges as follows:

5

6                                **NATURE OF THE ACTION**

7    1.    YMTC is one of the world's most innovative developers and manufacturers of 3D
8  NAND flash memory chips.  Although a relative newcomer, YMTC has developed and patented
9  technologies that enable the production of better flash memory chips, having more capacity and a
10 lower per-bit cost.  YMTC's innovations have not gone unnoticed.  In 2018, for example, YMTC
11 received the award for the Most Innovative Flash Memory Start-up Company from the Flash Memory
12 Summit in Santa Clara, CA, which award "recognizes the most creative and ambitious startup
13 companies and applauds their entrepreneurial journey to becoming a market disruptor and champion
14 of the storage industry."[1]  YMTC has continued to innovate and has continued to receive important
15 patents as a result.  In 2022, YMTC received the award for Most Innovative Memory Technology for
16 YMTC's Xtacking® 3.0 3D NAND Architecture from the Flash Memory Summit in Santa Clara, CA.[2]

17   2.    No longer an upstart, YMTC has become a key player in the global 3D NAND market.
18 Just the past November, TechInsights Inc., which analyzes and tracks the flash memory market,
19 concluded that "[w]hat YMTC has accomplished has been nothing short of amazing"—YMTC "is
20 now the leader in 3D NAND flash," having "leap-frogged Micron," another major player in the 3D
21 NAND space.[3]  Micron is threatened by YMTC's ascension.

22   3.    3D NAND flash memory is vital technology for many of the digital products that
23 consumers have come to depend upon and enjoy, such as smartphones, laptops, and tablet computers,

24

25 [1] *See* Ex. 38 ("Flash Memory Summit 2018 Award Winners")

26 [2] *See* Ex. 9 ("Flash Memory Summit Announces 2022 Best of Show Award Winners")

27 [3] *See* Ex. 26 (https://www.techinsights.com/disruptive-event/ymtc-232l-tlc-3d-nand.)

28

YMTC'S COMPLAINT FOR PATENT INFRINGEMENT                    CASE NO._____

Appx42

as well as for the data centers and enterprise storage solutions in which 3D NAND is used. Competition and innovation in the NAND memory space inure to the benefit of consumers, as competition and innovation lead to better products at better prices.  Attempts to stifle competition and hinder innovation do neither.

4.      This action seeks to address one facet of Micron's attempts to hinder competition and innovation via its attempts to force YMTC out of the 3D NAND flash memory market.   More specifically, this is an action to put an end to Micron's widespread and unauthorized use of YMTC's patented innovations.  Micron has turned to use of YMTC's patented technologies in an effort to fend off competition from YMTC, and to gain and protect market share.  And by Micron not paying its fair share to use YMTC's patented inventions, and instead freeriding on YMTC's innovations, Micron robs from the incentive to innovate.

5.      In particular, this is an action brought by YMTC against Micron for infringement of United States Patent Nos. 10,950,623 (the "'623 Patent"), 11,501,822 (the "'822 Patent"), 10,658,378 (the "'378 Patent"), 10,937,806 (the "'806 Patent"), 10,861,872 (the "'872 Patent"), 11,468,957 (the "'957 Patent"),  11,600,342 (the "'342 Patent"), and 10,868,031 (the "'031 Patent") (collectively, the "Asserted Patents").

## **THE PARTIES**

6.      Plaintiff YMTC is headquartered in China and maintains a principal place of business in Wuhan, China.  YMTC maintains a wholly-owned subsidiary, Yangtze Memory Technologies, Inc., which has its principal place of business in Santa Clara, CA, in this judicial District.

7.      Upon information and belief, Micron Technology, Inc. is a publicly traded corporation organized under the laws of the State of Delaware, with its principal place of business at 8000 S. Federal Way, Boise, Idaho, 83716.  Micron Technology, Inc. may be served with process through its registered agent, CSC – Lawyers Incorporating Service, at 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, CA 95833.

8.      Upon information and belief, Micron Consumer Products Group, LLC, is a wholly-owned subsidiary of Micron Technology, Inc., is directed and controlled by Micron Technology, Inc., and is organized under the laws of the State of Delaware, with its principal place of business at 110 Holger Way, San Jose, California, 95134.  Micron Consumer Products Group, LLC may be served with process through its registered agent, CSC – Lawyers Incorporating Service, at 2710 Gateway Oaks Dr., Ste. 150N, Sacramento, CA 95833.

9.      Defendants have been and are acting in concert, and are otherwise liable jointly, severally, or otherwise for relief related to or arising out of the same transaction, occurrence, or series of transactions or occurrences related to the making, using, selling, offering for sale, or otherwise distributing the Accused Memory Products (as defined below) in this District and elsewhere.

10.     In addition, this action involves questions of law and fact that are common to both Defendants.  For example, Defendants are making, using, offering for sale, selling, or otherwise distributing at least some of the same Accused Memory Products (as defined below) in this District and elsewhere.

**JURISDICTION AND VENUE**

11.     This action arises under the patent laws of the United States, Title 35 of the United States Code.  This Court has original subject matter jurisdiction under 28 U.S.C. §§ 1331 (federal question), and 1338(a) (action arising under an Act of Congress relating to patents).

12.     This Court has personal jurisdiction over Micron because, upon information and belief, Micron, directly or through its agents, has regularly conducted business activities in this judicial District and throughout California and this action arises out of and relates to activities that Micron has purposefully directed at this judicial District and California.  Micron Technology, Inc., maintains an office at 110 Holger Way, San Jose, California, 95134, within this judicial District.[4]  Micron Consumer Products Group, Inc. is a resident of this State and maintains a headquarters office at 110 Holger Way,

---

[4] Ex. 28 (https://www.micron.com/about/locations?country=USA&city=San%20Jose) ("Micron San Jose").

YMTC'S COMPLAINT FOR PATENT INFRINGEMENT                    CASE NO._____

Appx44

San Jose, California, 95134.[5]

13.     Upon information and belief, Micron has committed acts of infringement within this judicial District and California by, *inter alia,* directly and/or indirectly making, selling, offering for sale, importing, and/or using products that practice (or are made in a manner that practices) one or more claims of the Asserted Patents.  Micron, directly and/or through intermediaries, uses, sells, ships, distributes, imports, offers for sale, and/or advertises or otherwise promotes its products throughout the United States, including in this judicial District and California.[6]

14.     Micron maintains highly interactive and commercial websites, accessible to residents of this judicial District and California, through which Micron promotes and facilitates sales and use of its products and services, including products that infringe the Asserted Patents.[6]

15.     Venue is proper in this judicial District pursuant to 28 U.S.C. §§ 1391 and 1400(b), because Micron has a regular and established place of business in this judicial District, and has committed and continues to commit acts of patent infringement in this judicial District, by, among other things, directly and/or indirectly making, using, selling, offering to sell, or importing products that practice (or are made in a manner that practices) one or more claims of the Asserted Patents.

16.     This is an action concerning infringement by Micron with respect to its 3D NAND technologies and products incorporating the same.  According to Micron, "Micron's 3D NAND-related design and product engineering occurs . . . in Micron's San Jose and Folsom, California facilities . . . ."[7]

---

[5] *See* Ex. 29 (Micron Consumer Products Group, Inc., Statement of Information filed with the California Secretary of State); *see also* Ex. 33 (San Jose Mercury news article titled, "Micron opens modern new north San Jose campus amid growth spurt").

[6] *See, e.g.,* Ex. 20 (https://www.micron.com).

[7] Ex. 34 at 2.

Appx45

**DIVISIONAL ASSIGNMENT**

17.    This case is an Intellectual Property Action under Civil Local Rule 3-2(c) and, pursuant to Civil Local Rule 3-5(b), shall be assigned on a district-wide basis.

**YMTC'S INNOVATIONS AND PATENTS**

18.    YMTC is an integrated device manufacturer (IDM) dedicated to the development of memory products for the global market.  With a focus on the design of superior 3D NAND flash memory, YMTC's innovations have gained significant recognition in a short amount of time.  YMTC has succeeded in designing and manufacturing 3D NAND flash memory chips with bit densities, I/O speeds, and capacities that are highly praised in the industry.  YMTC maintains ties to Silicon Valley through a wholly-owned subsidiary, Yangtze Memory Technologies, Inc., incorporated in California.[8]

19.    YMTC's 3D NAND Chips have been recognized as the "Best of Show" for "Most Innovative Flash Memory Start-up Company."[9]  In 2018, the Flash Memory Summit held in Santa Clara, CA, recognized YMTC as among "the most creative and ambitious startup companies and applaud[ed] their entrepreneurial journey to becoming a market disruptor and champion of the storage industry."[9]  In 2022, the Flash Memory Summit recognized YMTC's Xtacking® 3.0 3D NAND Architecture as the "Most Innovative Memory Technology."[10]  The Flash Memory Summit hosts up to 6,000 individuals and companies, including on average 100 global sponsors, and is the largest collection of flash memory experts.[11]  YMTC innovations have resulted in "the world's most advanced

---

[8] *See* Ex. 35 (Yangtze Memory Technologies, Inc. Statement of Information filed with the California Secretary of State); *see also,* Ex. 36 (https://www.ymtc.com/en/contact.html).

[9] Ex. 38; *see also*, Ex. 39 (https://apnews.com/press-release/globe-newswire/technology-business-472edca95b4b227a486f5f8c4750cbb3).

[10] Ex. 9.

[11] *See* Ex. 10 (Flash Memory Summit Sponsor Prospectus); *see also* Ex. 9 (The Flash Memory Summit is "the world's largest event featuring the trends, innovations, and influencers driving the adoption of flash memory in demanding enterprise storage applications, as well as in smartphones, tablets, and mobile and embedded systems.").

6

3D NAND memory chip in a consumer device," having "the highest bit density seen in a commercially available NAND product."[12]

20.    To promote the progress of science and useful arts, and protect its investments in research and development to facilitate further research and development efforts, YMTC has applied for and received numerous patents for its innovations, including many United States patents.

21.    YMTC's patented innovations increase the speed, performance, density, reliability, and yield of 3D NAND chips, which in turn facilitate technological improvements in a wide variety of products including not just mobile phones, data centers, and personal computers, but also many types of products requiring memory, such as portable electronic devices and automotive infotainment systems.    YMTC's innovations make possible, or improve, many of the electronic devices that consumers depend upon and enjoy.

## MICRON'S ACCUSED PRODUCTS AND INFRINGING ACTIVITIES

22.    Micron is a global manufacturer and supplier of memory components and devices for use in consumer and enterprise products, systems, and services.

23.    Micron designs, makes, uses, sells, offers for sale, imports, supplies, or otherwise distributes into the United States, and provides support for, 96-Layer NAND memory chips and Micron products containing the same (collectively, the "96L Accused Products"), including products with the part or die name or number B27A, and other memory chips (and memory products containing the same) that have the same or similar structures, features, or functionalities, and/or are made by the same or similar manufacturing processes, as the aforementioned exemplary product.    An exemplary technical analysis of the B27A is available for purchase at https://www.techinsights.com/products/car-1906-202 and https://www.techinsights.com/products/war-1912-801.

24.    Micron designs, makes, uses, sells, offers for sale, imports, supplies, or otherwise distributes into the United States, and provides support for, 128-Layer NAND memory chips and

---

[12] Ex. 11 (https://www.techinsights.com/blog/china-does-it-again-nand-memory-market-first).

Appx47

Micron products containing the same (collectively, the "128L Accused Products"), including products with the part or die name or number B37R and other memory chips (and memory products containing the same) that have the same or similar structures, features, or functionalities, and/or are made by the same or similar manufacturing processes, as the aforementioned exemplary product. An exemplary technical analysis of the B37R is available for purchase at https://www.techinsights.com/products/tcr-2104-805.

25. Micron designs, makes, uses, sells, offers for sale, imports, supplies, or otherwise distributes into the United States, and provides support for, 176-Layer NAND memory chips and Micron products containing the same, (collectively, the "176L Accused Products"), including products with the part or die name or number N48R or B47R, and other memory chips (and memory products containing the same) that have the same or similar structures, features, or functionalities, and/or are made by the same or similar manufacturing processes, as the aforementioned exemplary products. An exemplary technical analysis of the N48R is available for purchase at https://www.techinsights.com/products/mfr-2207-801. An exemplary technical analysis of the B47R is available for purchase at https://www.techinsights.com/blog/memory/micron-176l-3d-nand.

26. Micron designs, makes, uses, sells, offers for sale, imports, supplies, or otherwise distributes into the United States, and provides support for, 232-Layer NAND memory chips and Micron products containing the same (collectively, the "232L Accused Products"), including products with the part or die name or number B58R and other memory chips (and memory products containing the same) that have the same or similar structures, features, or functionalities, and/or are made by the same or similar manufacturing processes, as the aforementioned exemplary product. An exemplary technical analysis of the B58R is available for purchase at https://www.techinsights.com/products/tcr-2303-802.

27. The 96L Accused Products, 128L Accused Products, 176L Accused Products, and 232L Accused Products are collectively referred to as the "Accused Memory Products."

28. The Accused Memory Products are, or are integrated into, devices made, used, sold, offered for sale, imported, supplied, or otherwise distributed in the United States by among others,

Appx48

Micron, Micron's customers, original equipment manufacturers ("OEMs"), original design manufacturers ("ODMs"), distributors, resellers, and other third parties, including under Micron's own brand name and under the Crucial brand name.[13]

29.     Upon information and belief, Micron also conducts research, development, and testing of Accused Memory Products in the United States, including in this judicial District and in California.

30.     Upon information and belief, Micron actively encourages others, such as its customers and distributors, to make, use, offer to sell, import, supply, or otherwise distribute into the United States the Accused Memory Products, and products containing the Accused Memory Products.[14] Micron maintains a website that advertises the Accused Memory Products, including identifying the applications for which they can be used, along with specifications for the Accused Memory Products.[15] Micron specifically intends for its customers and end-users to use the Accused Memory Products in such applications and provides instructions and encouragement for its customers and end-users to do so.[16]

31.     Micron sells and offers to sell in the United States, and imports into the United States, the Accused Memory Products, which are essential, non-trivial components of the products into which they are integrated, constituting a material part of the claimed inventions of the Asserted Patents, and are not a staple article or commodity of commerce suitable for substantial non-infringing use.

32.     Micron knows that the Accused Memory Products and products incorporating the same are used, marketed, sold, offered for sale in, and imported into, the United States.  For example, Micron's website identifies distributors of the Accused Memory Products.[17]  The website includes a

---

[13] See, e.g., Exs. 12-16.

[14] See e.g., Ex. 17 ("We are dedicated to collaborating with you, our customers and partners…"); see also, Ex. 18.

[15] See, e.g., Ex. 19.

[16] See, e.g., Ex. 27 (Micron Form 10-K (FY 2023) at 10, available at https://investors.micron.com/static-files/25afc2b7-1b51-4f33-9d3b-9d1620fafa30.)

[17] See, e.g., Ex. 21.

YMTC'S COMPLAINT FOR PATENT INFRINGEMENT                    CASE NO._____

Appx49

1   list of United States "authorized distributors" for purchasing the Accused Memory Products, including

2   Arrow Electronics, Inc., ASI, Avnet, D&H, Digi-Key, Edge Electronics, Inc., MA Labs, Mouser

3   Electronics, Phoenics Electronics, TD Synnex, and WPG Americas, Inc.[18]

4          33.     Micron also has imported into the United States, and offered to sell, sold, and used

5   within the United States, the Accused Memory Products, which are made by a process patented in the

6   United States during the term of the Asserted Patents.  Micron practices the patented processes, or

7   owns or controls, or is owned or controlled by, the person who practices the patented processes.

8   Micron sells its products to customers, including customers in this District, in the computer,

9   networking, storage, consumer electronics, solid-state drive, and mobile telecommunications markets.

10  Micron encourages its customers to import, sell, resell, and/or offer to sell the Accused Memory

11  Products in the United States.[19]

12         34.     Upon information and belief, Micron knew and knows that YMTC has patents in the

13  3D NAND technology space that are relevant to Micron's own 3D NAND products.  There are a

14  limited number of companies competing to make advanced generation 3D NAND products; Micron

15  knows that YMTC is one of them; and Micron knows that YMTC actively patents in that area.  Many

16  YMTC-owned patents are cited on the face of Micron's own patents, demonstrating Micron's

17  knowledge of YMTC's patent portfolio that is highly relevant to Micron's own 3D NAND products.

18  Micron has actual knowledge of YMTC's patents in the 3D NAND space, and yet Micron has not

19  sought or received authorization to use those patents.

20         35.     Upon information and belief, Micron's development, sales, marketing, and

21  manufacturing activities in the United States, including within this judicial District, directly

22  contributed to over $8 billion of Micron's net revenue in the United States for the year of 2022 as of

23

24

25  [18]  *See, e.g.*, Ex. 21; *see also, e,g.*, Ex. 22.

26  [19]  *See e.g.*, Ex. 23 at 18-19 (Micron listed as a supplier for Dell Technologies, 2022); Ex. 24 at 5
27  (Micron listed as a supplier for HP, 2021); Ex. 25 at 16 (Micron listed as a "Top 100 Production and
    Service Suppliers" of Intel, 2020-2021)

28

YMTC'S COMPLAINT FOR PATENT INFRINGEMENT                          CASE NO._____

September 1, 2022.[20]

## <u>COUNT I: INFRINGEMENT OF U.S. PATENT NO. 10,950,623</u>

36.     YMTC incorporates by reference and re-alleges all the foregoing paragraphs of this Complaint as if fully set forth herein.

37.     YMTC owns by assignment all rights, title, and interest, including the right to recover damages for past, present, and future infringement, in and to U.S. Patent No. 10,950,623, entitled "3D NAND Memory Device and Method of Forming the Same."  A true and correct copy of the '623 Patent is attached as Exhibit 1.

38.     The '623 Patent was duly and legally issued by the United States Patent and Trademark Office on March 16, 2021.

39.     Upon information and belief, Micron infringes under 35 U.S.C. § 271(a) at least claim 1 of the '623 Patent, literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing into the United States, without authorization, at least Micron's 96L Accused Products (for example, the Micron SSD model 1300 SATA, and the Micron SSD model c200) ("the '623 Accused Products").  Further identification of the '623 Accused Products will be provided in YMTC's infringement contentions disclosed pursuant to the Court's scheduling order, and/or as discovery progresses.

40.     Upon information and belief, the '623 Accused Products embody and/or are made using each and every limitation of at least claim 1 of the '623 Patent.  For example, the '623 Accused Products are memory devices comprising a substrate and a bottom select gate (a polysilicon source gate) disposed over the substrate.

41.     Upon information and belief, the '623 Accused Products further comprise a plurality of word lines (layers of polysilicon) positioned over the bottom select gate (a polysilicon source gate)

---

[20] Ex. 27 at 43 (Micron's 10-K filing, 2022).

Appx51

1  with a staircase configuration (a staircase shape at an edge of the of the layers of polysilicon to access

2  the plurality of word lines).

3     42. Upon information and belief, the '623 Accused Products further comprise a plurality

4  of silicon oxide (SiO) insulating layers disposed between the substrate, the bottom select gate, and the

5  plurality of word lines.

6     43. Upon information and belief, the '623 Accused Products further comprise one or more

7  first dielectric trenches formed in the bottom select gate extending in a length direction of the substrate

8  to separate the bottom select gate into a plurality of sub-bottom select gates.  For example, the '623

9  Accused Products include trenches formed in the polysilicon source gate and filled with silicon oxide

10  (SiO) that extend in a first direction of the substrate, separating the polysilicon source gate into a

11  plurality of sub-polysilicon source gates.

12     44. Upon information and belief, the '623 Accused Products further comprise one or more

13  common source regions formed over the substrate and extending in the length direction of the

14  substrate, wherein the one or more common source regions extend through the bottom select gate, the

15  plurality of word lines, and the plurality of insulating layers.  For example, the '623 Accused Products

16  include one or more tungsten (W) common source lines formed in the memory device that extend in

17  the first direction of the substrate, where the tungsten (W) common source lines extend through the

18  polysilicon source gate, the plurality of word lines (layers of polysilicon) and the plurality of silicon

19  oxide (SiO) insulating layers.

20     45. As a result of Micron's infringement of the '623 Patent, YMTC is entitled to monetary

21  damages in an amount adequate to compensate for Micron's infringement, but in no event less than a

22  reasonable royalty for the use made of the invention by Micron, together with interest and costs as

23  fixed by the Court.

24

25        **COUNT II: INFRINGEMENT OF U.S. PATENT NO. 11,501,822**

26     46. YMTC incorporates by reference and re-alleges all the foregoing paragraphs of this

27  Complaint as if fully set forth herein.

28

YMTC'S COMPLAINT FOR PATENT INFRINGEMENT      CASE NO._____

47.     YMTC owns by assignment all rights, title, and interest, including the right to recover damages for past, present, and future infringement, in and to U.S. Patent No. 11,501,822, entitled "Non-Volatile Memory Device and Control Method." A true and correct copy of the '822 Patent is attached as Exhibit 2.

48.     The '822 Patent was duly and legally issued by the United States Patent and Trademark Office on November 15, 2022.

49.     Upon information and belief, Micron infringes under 35 U.S.C. § 271(a) at least claim 1 of the '822 Patent, literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing into the United States, without authorization, at least Micron's 176L Accused Products (for example, the Micron SSD model 3400 NVMe), and 232L Accused Products (for example, the Micron SSD model 2250) (collectively, "the '822 Accused Products"). Further identification of the '822 Accused Products will be provided in YMTC's infringement contentions disclosed pursuant to the Court's scheduling order, and/or as discovery progresses.

50.     Upon information and belief, the '822 Accused Products embody and/or are made using each and every limitation of at least claim 1 of the '822 Patent. For example, the '822 Accused Products are 3D NAND flash memory devices.

51.     Upon information and belief, the '822 Accused Products comprise a plurality of memory strings. For example, the '822 Accused Products include a plurality of vertical channels, each respectively part of a plurality of memory cells, each memory cell having channel films, tunnel dielectric films, charge trap films, and blocking dielectric films intersecting with a gate.

52.     Upon information and belief, the '822 Accused Products further comprise a bit line connected to a first memory string of the plurality of memory strings. For example, the '822 Accused Products include a metal layer that is a bit line that is connected to memory strings through respective plugs, plug contacts, and bit line contacts. When the '822 Accused Products undergo a program operation, a memory string that is not selected for programming functions as the first memory string.

53.     Upon information and belief, the '822 Accused Products further comprise a select gate line connected to the first memory string of the plurality of memory strings. For example, when the

---

13

'822 Accused Products undergo a program operation, the memory string that is not selected for programming has gates that are selected by respective select gate lines.

54. Upon information and belief, the '822 Accused Products further comprise a selected word line of a plurality of word lines, wherein the plurality of word lines is connected to the first memory string. For example, when the '822 Accused Products undergo a program operation, a word line that is selected for programming and that is connected to the memory string that is not selected for programming functions as the selected word line.

55. Upon information and belief, the '822 Accused Products further comprise a control circuit. For example, the '822 Accused Products have a CMOS-under-Array ("CuA") structure, where the complementary metal-oxide-semiconductor ("CMOS") structure is the control circuit and underlies the array of memory cells.[21, 22]

56. Upon information and belief, the '822 Accused Products further comprise a control circuit configured to apply a first word line pre-pulse signal of a plurality of word line pre-pulse signals to a first group of the plurality of word lines during a pre-charge period, apply a second word line pre-pulse signal of the plurality of word line pre-pulse signals to a second group of the plurality of word lines during the pre-charge period, and apply a third word line pre-pulse signal of the plurality of word lines pre-pulse signals to a third group of the plurality of word lines during the pre-charge period. For example, in the B47R die, transistors of the CMOS structure are electrically connected to respective word line contacts by "[i]nterconnection metals and contacts/vias for BEOL and CuA," and are configured to apply electrical signals to the respective word lines.[23] The B47R die is programmed by

---

[21] Ex. 30 (https://www.micron.com/products/nand-flash/176-layer-nand ("Replacement-gate architecture combines charge traps with CMOS-under-array (CuA) design")).

[22] Ex. 31 (https://semiengineering.com/micron-b47r-3d-ctf-cua-nand-die-worlds-first-176l-195t/).

[23] Ex. 32 (https://media-www.micron.com/-/media/client/global/documents/products/white-paper/micron_rg_3d_nand_whitepaper.pdf?la=en&rev=315635e4acb04255a9009c0ad9300cc7) ("The cells have wordlines connected to allow the application of a voltage. Applying voltage to a cell creates operations known as the NAND read-and-write-program functions."); Ex. 30.

Appx54

a program pulse voltage on the selected word line.[24]  When the B47R die undergoes a program operation, a first group of word lines, a second group of word lines, and a third group of word lines other than the word line selected for programming each experience respective electrical signals (pre-pulse signals) at respective voltage levels during a period prior to programming (pre-charge period). Micron's website "176-Layer Flash Memory" refers to Micron's whitepaper "Micron Transitions to Next-Generation Replacement Gate NAND Technology" to describe operation of its 176-layer 3D NAND products.  In that whitepaper, Micron describes that different word lines experience different voltages during operation.[25]



Figure 1[25]

57.     Upon information and belief, the '822 Accused Products further comprise the voltage level of the second word line pre-pulse signal being greater than that of the first word line pre-pulse signal and a voltage level of the third word line pre-pulse signal being greater than that of the second

---

[24] Ex. 32 ("Reducing resistance by using a metal control gate allows the program pulse to ramp up quickly and enables further overhead reductions in complexities of the program and the read algorithms.").

[25] *See* Ex. 32.

word line pre-pulse signal. For example, Micron's whitepaper "Micron Transitions to Next-Generation Replacement Gate NAND Technology" discloses that during programming, different wordlines experience different voltages.[26] Upon information and belief, during the pre-charge period, the first, second, and third groups of word lines also experience pre-pulse signals with different voltages, such that the voltage of the second word line pre-pulse signal is greater than that of the first word line pre-pulse signal, and a voltage level of the third word line pre-pulse signal is greater than that of the second word line pre-pulse signal. *See* Figure 1, *supra*.[25]

58. As a result of Micron's infringement of the '822 Patent, YMTC is entitled to monetary damages in an amount adequate to compensate for Micron's infringement, but in no event less than a reasonable royalty for the use made of the invention by Micron, together with interest and costs as fixed by the Court.

## **COUNT III: INFRINGEMENT OF U.S. PATENT NO. 10,658,378**

59. YMTC incorporates by reference and re-alleges all the foregoing paragraphs of this Complaint as if fully set forth herein.

60. YMTC owns by assignment all rights, title, and interest, including the right to recover damages for past, present, and future infringement, in and to U.S. Patent No. 10,658,378, entitled "Through Array Contract (TAC) for Three-Dimensional Memory Devices." A true and correct copy of the '378 Patent is attached as Exhibit 3.

61. The '378 Patent was duly and legally issued by the United States Patent and Trademark Office on May 19, 2020.

62. Upon information and belief, Micron infringes under 35 U.S.C. § 271(a) at least claim 15 of the '378 Patent, literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing into the United States, without authorization, at least Micron's 128L Accused Products (for example, Micron BX500 2.5 480GB SSD), 176L Accused Products (for

---

[26] *See* Ex. 32.

YMTC'S COMPLAINT FOR PATENT INFRINGEMENT                    CASE NO._____

example, the Micron SSD model 3400 NVMe and the Micron SSD model 2400 PCIe Gen 4), and 232L Accused Products (for example, the Micron SSD model 2250) (collectively, "the '378 Accused Products"). Further identification of the '378 Accused Products will be provided in YMTC's infringement contentions disclosed pursuant to the Court's scheduling order, and/or as discovery progresses.

63. Upon information and belief, the '378 Accused Products meet each and every limitation of at least claim 15 of the '378 Patent. For example, the '378 Accused Products are three-dimensional (3D) memory devices comprising a semiconductor substrate with an isolation structure of silicon oxide (SiO) dielectric material on a top portion of the semiconductor substrate.

64. Upon information and belief, the '378 Accused Products further comprise an alternating layer stack disposed on the semiconductor substrate. For example, the '378 Accused Products include a stack of alternating tungsten (W) conductor layers and silicon oxide (SiO) dielectric layers on the semiconductor substrate.

65. Upon information and belief, the '378 Accused Products further comprise a dielectric structure on the isolation structure and extending vertically through the alternating conductor/dielectric layer stack, wherein the alternating conductor/dielectric layer stack abuts a sidewall surface of the dielectric structure, and the dielectric structure is formed of a dielectric material. For example, the '378 Accused Products include a silicon oxide (SiO) dielectric structure on the silicon oxide (SiO) isolation structure extending through the stack of alternating tungsten (W) conductor layers and silicon oxide (SiO) dielectric layers where the stack of alternating tungsten (W) conductor layers and silicon oxide (SiO) dielectric layers abuts a sidewall of the dielectric structure formed of dielectric material silicon oxide (SiO).

66. Upon information and belief, the '378 Accused Products further comprise channel structures and slit structures extending vertically through the alternating conductor/dielectric layer stack. For example, the '378 Accused Products include channel structures having polysilicon within a dielectric layer and slit structures having silicon oxide (SiO) and germanium (Ge), where the channel

YMTC'S COMPLAINT FOR PATENT INFRINGEMENT                    CASE NO._____

1  structures and slit structures extend through the stack of alternating tungsten (W) conductor layers and
2  silicon oxide (SiO) dielectric layers.

3  67.  Upon information and belief, the '378 Accused Products further comprise a staircase
4  structure disposed in the alternating conductor/dielectric layer stack, wherein the staircase structure
5  comprises levels with each level having a conductor layer thereon, and a word line contact disposed
6  on the conductor layer of each level.  For example, the '378 Accused Products include a staircase
7  shape formed in the stack of alternating tungsten (W) conductor layers and silicon oxide (SiO)
8  dielectric layers, where each level of the staircase structure includes a tungsten (W) word line contact
9  disposed on a titanium nitride (TiN) conductor layer of each level of the staircase structure.

10  68.  Upon information and belief, the '378 Accused Products further comprise local
11  contacts disposed on the channel structures and the slit structures.  For example, the '378 Accused
12  Products include local contacts disposed on the channel structures having polysilicon within a
13  dielectric layer and slit structures having silicon oxide (SiO) and germanium (Ge).

14  69.  Upon information and belief, the '378 Accused Products further comprise through
15  array contacts (TACs) extending vertically through the dielectric and the isolation structures.  For
16  example, the '378 Accused Products include through array tungsten (W) contacts that extend vertically
17  through the silicon oxide (SiO) dielectric structure and the silicon oxide (SiO) isolation structure.

18  70.  Upon information and belief, Micron has infringed and continues to infringe under 35
19  U.S.C. § 271(g) by importing into the United States or offering to sell, selling, or using within the
20  United States a product which is made by a process patented in the United States during the term of
21  the '378 Patent.  Micron has practiced the patented process; or owns or controls, or is owned or
22  controlled by the person who has practiced the patented process.  Micron sells its products to
23  customers, including customers in this District, in the computer, networking, storage, consumer
24  electronics, solid-state drive, and mobile telecommunications markets.  Micron encourages its
25  customers to import, sell, resell, offer to sell, and/or resell the '378 Accused Products.

26  71.  As a result of Micron's infringement of the '378 Patent, YMTC is entitled to monetary
27  damages in an amount adequate to compensate for Micron's infringement, but in no event less than a

28

18

1    reasonable royalty for the use made of the invention by Micron, together with interest and costs as

2    fixed by the Court.

3

4                    **COUNT IV: INFRINGEMENT OF U.S. PATENT NO. 10,937,806**

5            72.     YMTC incorporates by reference and re-alleges all the foregoing paragraphs of this

6    Complaint as if fully set forth herein.

7            73.     YMTC owns by assignment all rights, title, and interest, including the right to recover

8    damages for past, present, and future infringement, in and to U.S. Patent No. 10,937,806, entitled

9    "Through Array Contact (TAC) for Three-Dimensional Memory Devices."  A true and correct copy

10   of the '806 Patent is attached as Exhibit 4.

11           74.     The '806 Patent was duly and legally issued by the United States Patent and Trademark

12   Office on March 2, 2021.

13           75.     Upon information and belief, Micron infringes under 35 U.S.C. § 271(a) at least claim

14   8 of the '806 Patent, literally and/or under the doctrine of equivalents, by making, using, offering for

15   sale, selling, and/or importing into the United States, without authorization, at least Micron's 128L

16   Accused Products (for example, Micron BX500 2.5 480GB SSD), 176L Accused Products (for

17   example, the Micron SSD model 3400 NVMe and the Micron SSD model 2400 PCIe Gen 4), and

18   232L Accused Products  (for example, the Micron SSD model 2250) (collectively, "the '806 Accused

19   Products").   Further identification of the '806 Accused Products will be provided in YMTC's

20   infringement contentions disclosed pursuant to the Court's scheduling order, and/or as discovery

21   progresses.

22           76.     Upon information and belief, the '806 Accused Products meet each and every limitation

23   of at least claim 8 of the '806 Patent.  For example, the '806 Accused Products are three-dimensional

24   (3D) memory devices comprising an alternating conductor/dielectric layer stack (alternating tungsten

25   (W) conductor layers and silicon oxide (SiO) dielectric layers).

26           77.     Upon information and belief, the '806 Accused Products further comprise a dielectric

27   structure extending vertically through the alternating conductor/dielectric layer stack.  For example,

28

                                                    19

the '806 Accused Products include a silicon oxide (SiO) dielectric structure extending vertically through the alternating tungsten (W) conductor layers and silicon oxide (SiO) dielectric layers.

78.     Upon information and belief, the '806 Accused Products further comprise first and second channel regions comprising first and second pluralities of channel structures, respectively.  For example, the '806 Accused Products include a first channel region comprising a first plurality of channel structures having polysilicon within a dielectric layer, and a second channel region comprising a second plurality of channel structures having polysilicon within a dielectric layer.

79.     Upon information and belief, the '806 Accused Products further comprise slit structures extending vertically through the alternating conductor/dielectric layer stack.  For example, the '806 Accused Products include slit structures having silicon oxide (SiO) and germanium (Ge) extend through the stack of alternating tungsten (W) conductor layers and silicon oxide (SiO) dielectric layers.

80.     Upon information and belief, the '806 Accused Products further comprise a staircase structure disposed in the alternating conductor/dielectric layer stack, wherein the staircase structure comprises levels with each level having a conductor layer thereon.  For example, the '806 Accused Products include a staircase shape formed in the stack of alternating tungsten (W) conductor layers and silicon oxide (SiO) dielectric layers, where the staircase structure includes levels having a tungsten (W) and titanium nitride (TiN) conductor layer.

81.     Upon information and belief, the '806 Accused Products further comprise local contacts disposed on the first and second channel structures and the slit structures.  For example, the '806 Accused Products include local contacts disposed on the first and second channel structures having polysilicon within a dielectric layer and slit structures having silicon oxide (SiO) and germanium (Ge).

82.     Upon information and belief, the '806 Accused Products further comprise a through array contact (TAC) region formed between the first and second channel regions, wherein the TAC region comprises a plurality of through array contacts (TACs) extending vertically through the dielectric structure. For example, the '806 Accused Products include a through array contact region

Appx60

comprising a plurality of through array tungsten (W) contacts that extend vertically through the silicon oxide (SiO) dielectric structure.

83.     Upon information and belief, the '806 Accused Products further comprise a plurality of non-electrically functional channel structures surrounding the TAC region and between the first and second channel regions.  For example, the '806 Accused Products include a plurality of dummy channel structures surrounding the through array contact region having the plurality of through array tungsten (W) contacts, and the dummy channel structures are between first and second regions of first and second channel structures having polysilicon within a dielectric layer.

84.     Upon information and belief, Micron has infringed and continues to infringe under 35 U.S.C. § 271(g) by importing into the United States or offering to sell, selling, or using within the United States a product which is made by a process patented in the United States during the term of the '806 Patent.  Micron has practiced the patented process; or owns or controls, or is owned or controlled by the person who has practiced the patented process.  Micron sells its products to customers, including customers in this District, in the computer, networking, storage, consumer electronics, solid-state drive, and mobile telecommunications markets.  Micron encourages its customers to import, sell, resell, offer to sell, and/or resell the '806 Accused Products.

85.     As a result of Micron's infringement of the '806 Patent, YMTC is entitled to monetary damages in an amount adequate to compensate for Micron's infringement, but in no event less than a reasonable royalty for the use made of the invention by Micron, together with interest and costs as fixed by the Court.

## COUNT V: INFRINGEMENT OF U.S. PATENT NO. 10,861,872

86.     YMTC incorporates by reference and re-alleges all the foregoing paragraphs of this Complaint as if fully set forth herein.

87.     YMTC owns by assignment all rights, title, and interest, including the right to recover damages for past, present, and future infringement, in and to U.S. Patent No. 10,861,872, entitled

YMTC'S COMPLAINT FOR PATENT INFRINGEMENT                    CASE NO._____

Appx61

"Three Dimensional Memory Device and Methods for Forming the Same." A true and correct copy of the '872 Patent is attached as Exhibit 5.

88. The '872 Patent was duly and legally issued by the United States Patent and Trademark Office on December 8, 2020.

89. Upon information and belief, Micron infringes under 35 U.S.C. § 271(a) at least claim 1 of the '872 Patent, literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing into the United States, without authorization, at least Micron's 128L Accused Products (for example, Micron BX500 2.5 480GB SSD), 176L Accused Products (for example, the Micron SSD model 3400 NVMe and the Micron SSD model 2400 PCIe Gen 4), and 232L Accused Products (for example, the Micron SSD model 2250) (collectively, "the '872 Accused Products"). Further identification of the '872 Accused Products will be provided in YMTC's infringement contentions disclosed pursuant to the Court's scheduling order, and/or as discovery progresses.

90. Upon information and belief, the '872 Accused Products meet each and every limitation of at least claim 1 of the '872 Patent. For example, the '872 Accused Products are three-dimensional (3D) memory devices comprising a substrate and a memory stack comprising interleaved conductive layers and dielectric layers on the substrate (alternating tungsten (W) conductor layers and silicon oxide (SiO) dielectric layers).

91. Upon information and belief, the '872 Accused Products further comprise a staircase structure on one side of the memory stack and a staircase contact in the staircase structure. For example, the '872 Accused Products include a staircase shape formed in the stack of alternating tungsten (W) conductor layers and silicon oxide (SiO) dielectric layers and a contact that extends to the word line contact in staircase structure.

92. Upon information and belief, the '872 Accused Products further comprise a plurality of dummy source structures each extending vertically through the staircase structure, the plurality of dummy source structures surrounding the staircase contact, wherein each of the dummy source structures comprises a conductive contact. For example, the '872 Accused Products include a plurality

22

1    of non-electrically functional dummy structures that extend vertically through the staircase shape

2    formed in the stack of alternating tungsten (W) conductor layers and silicon oxide (SiO) dielectric

3    layers and surrounding the staircase contact that extends to the word line contact in staircase structure.

4        93.    As a result of Micron's infringement of the '872 Patent, Plaintiff is entitled to monetary

5    damages in an amount adequate to compensate for Micron's infringement, but in no event less than a

6    reasonable royalty for the use made of the invention by Micron, together with interest and costs as

7    fixed by the Court.

8

9                    **COUNT VI: INFRINGEMENT OF U.S. PATENT NO. 11,468,957**

10       94.    YMTC incorporates by reference and re-alleges all the foregoing paragraphs of this

11   Complaint as if fully set forth herein.

12       95.    YMTC owns by assignment all rights, title, and interest, including the right to recover

13   damages for past, present, and future infringement, in and to U.S. Patent No. 11,468,957, entitled

14   "Architecture and Method for NAND Memory Operation."  A true and correct copy of the '957 Patent

15   is attached as Exhibit 6.

16       96.    The '957 Patent was duly and legally issued by the United States Patent and Trademark

17   Office on October 11, 2022.

18       97.    Upon information and belief, Micron infringes under 35 U.S.C. § 271(a) at least claim

19   1 of the '957 Patent, literally and/or under the doctrine of equivalents, by making, using, offering for

20   sale, selling, and/or importing into the United States, without authorization, at least Micron's 176L

21   Accused Products (for example, the Micron SSD model 2400 PCIe Gen4) ("the '957 Accused

22   Products").  Further identification of the '957 Accused Products will be provided in Plaintiff's

23   infringement contentions disclosed pursuant to the Court's scheduling order, and/or as discovery

24   progresses.

25       98.    Upon information and belief, the '957 Accused Products embody and/or are made using

26   each and every limitation of at least claim 1 of the '957 Patent.  Upon information and belief, the '957

27   Accused Products are apparatuses for reading a memory device.  For example, the '957 Accused

28

Products are 176-layer 3D NAND memory devices that include a "24% lower read latency than Micron's prior generation solution."[27]

99.     Upon information and belief, the '957 Accused Products include a first memory cell string and a second memory cell string, the first memory cell string including a bottom-select-gate transistor, memory cells, and a top-select-gate transistor that are connected in series, the second memory cells string including a bottom-select-gate transistor, memory cells, and a top-select-gate transistor that are connected in series.  For example, the '957 Accused Products are "charge trap" 176-layer NAND memory devices and have a plurality of memory cell strings, each of which include select-gate transistors at the top (top-select-gate transistors) and at the bottom (bottom-select-gate transistors) connected in series with memory cells arranged in between, and the top-select-gate and bottom-select-gate transistors of a memory cell string are used to turn on the memory cell string in the "charge trap" flash configuration. [27, 28]

100.     Upon information and belief, the '957 Accused Products further comprise processing circuitry configured to apply, in a pre-verify stage, a first verify voltage on a gate terminal of a selected memory cell of the first memory cell string, the selected memory cell being programmed and arranged between a first adjacent memory cell and a second adjacent memory cell.  For example, the '957 Accused Products contain processing circuitry for processing read and write commands including applying verify voltages and is programmed using a "charge trap" process that involves applying voltages to gate terminals of memory cells through wordlines.[27]   For example, the '957 Accused Products include a "24% lower read latency than Micron's prior generation solution."[27]   On information and belief, the '957 Accused Products' CMOS transistors are electrically connected to respective word line contacts by "[i]nterconnection metals and contacts/vias for BEOL and CuA," and are configured to apply electrical signals to the respective word lines, and therefore gate terminals of

---

[27] Ex. 37 (https://investors.micron.com/news-releases/news-release-details/micron-ships-industrys-first-176-layer-qlc-nand-volume-and).

[28] Ex. 31.

Appx64

the memory cell strings.[29] The '957 Accused Products are programmed, read, and verified by voltages on the respective word lines.[30] In the '957 Accused Products, the memory cell strings include multiple memory cells that can be programmed; thus, the selected memory cell of a string that is programmed has first and second memory cells adjacent to it. In the '957 Accused Products, individual memory cells of the memory cell strings include respective gate terminals having a "replacement-gate architecture."[31]

101.    Upon information and belief, the '957 Accused Products further comprise a processing circuitry configured to apply, in the pre-verify stage, a first bias voltage on a gate terminal of at least one memory cell of the first memory cell string that is not programmed. For example, in the '957 Accused Products, prior to verification, a memory cell that is not programmed experiences a voltage on its gate terminal, which is a first bias voltage.

102.    Upon information and belief, the '957 Accused Products further comprise a processing circuitry configured to apply, in a verify stage, a second verify voltage on the gate terminal of the selected memory cell of the first memory cell string. For example, in the '957 Accused Products, during verification, the memory cell that is being programmed (the selected memory cell) experiences a voltage on its gate terminal, which is a second verify voltage.

103.    Upon information and belief, the '957 Accused Products further comprise a processing circuitry configured to apply, in the verify stage, a second bias voltage on the gate terminal of the at least one memory cell of the first memory cell string that is not programmed, wherein the second bias voltage is smaller than the first bias voltage. For example, in '957 Accused Products, the memory cell that is not programmed (which experienced the first bias voltage) subsequently during verification experiences a voltage on its gate terminal that is smaller than the first bias voltage (the second bias voltage). Micron's website "176-Layer Flash Memory" refers to Micron's whitepaper "Micron

---

[29] Exs. 32 ("The cells have wordlines connected to allow the application of a voltage. Applying voltage to a cell creates operations known as the NAND read-and-write-program functions."); 30.

[30] Ex. 32.

[31] Ex. 37.

Transitions to Next-Generation Replacement Gate NAND Technology" to describe operation of its 176-layer 3D NAND products.  In that whitepaper, Micron describes that different word lines experience different voltages during operation.[32]



Figure 2[32]

104.    As a result of Micron's infringement of the '957 Patent, Plaintiff is entitled to monetary damages in an amount adequate to compensate for Micron's infringement, but in no event less than a reasonable royalty for the use made of the invention by Micron, together with interest and costs as fixed by the Court.

**COUNT VII: INFRINGEMENT OF U.S. PATENT NO. 11,600,342**

105.    YMTC incorporates by reference and re-alleges all the foregoing paragraphs of this Complaint as if fully set forth herein.

---

[32] Ex. 32.

Appx66

106.     YMTC owns by assignment all rights, title, and interest, including the right to recover damages for past, present, and future infringement, in and to U.S. Patent No. 11,600,342, entitled "Method for Reading Three-Dimensional Flash Memory."  A true and correct copy of the '342 Patent is attached as Exhibit 7.

107.     The '342 Patent was duly and legally issued by the United States Patent and Trademark Office on March 7, 2023.

108.     Upon information and belief, Micron infringes under 35 U.S.C. § 271(a) at least claim 1 of the '342 Patent, literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing into the United States, without authorization, at least Micron's 176L Accused Products (for example, Micron SSD model 2400 PCIe Gen 4) and 232L Accused Products (for example, the Micron SSD model 2250) (collectively, "the '342 Accused Products").

109.     Upon information and belief, the '342 Accused Products are used to perform and/or practice each and every limitation of at least claim 1 of the '342 Patent.  For example, the '342 Accused Products are three-dimensional (3D) memory devices on which read-verification operations are conducted.  For example, the '342 Accused Products include a "24% lower read latency than Micron's prior generation solution."[33] Further identification of the '342 Accused Products will be provided in YMTC's infringement contentions disclosed pursuant to the Court's scheduling order, and/or as discovery progresses.

110.     Upon information and belief, the '342 Accused Products conduct a read-verification operation by a method comprising the steps of applying, on an unselected top select gate of an unselected memory string, a prepare voltage during a first time period and an off voltage during a second time period.  For example, the '342 Accused Products are a "charge trap" 3D NAND devices and have a plurality of memory cell strings, each of which include select-gate transistors at the top (top-select-gate transistors) and at the bottom (bottom-select-gate transistors) connected in series with memory cells arranged in between, and the top-select-gate and bottom-select-gate transistors of a

---

[33] Ex. 37.

YMTC'S COMPLAINT FOR PATENT INFRINGEMENT                    CASE NO._____

memory cell string are used to turn on the memory cell string in the "charge trap" flash configuration.[35] The '342 Accused Products are programmed, verified, and read using a "charge trap" process which involves applying voltages to gate terminals of memory cells through wordlines.[34] The '342 Accused Products include a "24% lower read latency than Micron's prior generation solution."[34] On information and belief, the '342 Accused Products' CMOS transistors are electrically connected to respective word line contacts by "[i]nterconnection metals and contacts/vias for BEOL and CuA," and are configured to apply electrical signals to the respective word lines, and therefore gate terminals of the memory cell strings.[35] On information and belief, the '342 Accused Products are read and verified, as they are programmed, by varying voltages on the respective word lines.[36]



Figure 2: Comparison of Voltage Pulse Widths and Pulse Counts

Figure 3[36]

111. During verification, the top select gate of a memory string that is not selected experiences voltage during a first time period to turn on the top-select-gate transistor that is a prepare

---

[34] Ex. 37.

[35] Exs. 31; 37.

[36] Ex. 32.

1  voltage and subsequently experiences a different voltage to turn off the transistor during a second time
2  period that is an off voltage.

3  112.    Upon information and belief, the '342 Accused Products further conduct a read-
4  verification operation by a method comprising the step of applying, on a selected word line associated
5  with the target memory cell, the off voltage during the first time period and a read voltage during the
6  second time period.  On information and belief, the '342 Accused Products are read and verified, as
7  they are programmed, by varying voltages on the respective word lines.[37]  On information and belief,
8  during verification, the word line of the memory cell that is selected for programming (selected word
9  line) experiences a voltage (off voltage) during the first time period to turn off the selected word line
10  and subsequently experiences a different voltage (read voltage) to turn on the selected word line for
11  reading of the selected memory cell.

12  113.    Upon information and belief, the '342 Accused Products further conduct a read-
13  verification operation by a method comprising the step of applying, on an unselected word line, a pass
14  voltage during the first time period and the second time period.  On information and belief, the '342
15  Accused Products are read and verified, as they are programmed, by varying voltages on the respective
16  word lines.[37]  On information and belief, during verification, a word line that is not selected for
17  programming experiences a non-zero voltage (pass voltage) to turn on its constituent memory cells
18  during the first and second time periods.

19  114.    Upon information and belief, the '342 Accused Products further conduct a read-
20  verification operation by a method comprising the step of the read-verification operation removing
21  fast charges of the target memory cell during the first time period.  For example, when memory cells
22  of the '342 Accused Products are programmed, fast charges accumulate in shallow traps in the charge
23  trap layer which is a "nonconductive layer of silicon nitride (SiN)," and the read-verification operation
24  removes these charges to result in an accurate and reliable threshold voltage for the programmed
25  memory cell.[37]

26

27  [37] Ex. 32.

28

115.     As a result of Micron's infringement of the '342 Patent, Plaintiff is entitled to monetary damages in an amount adequate to compensate for Micron's infringement, but in no event less than a reasonable royalty for the use made of the invention by Micron, together with interest and costs as fixed by the Court.

### **COUNT VIII: INFRINGEMENT OF U.S. PATENT NO. 10,868,031**

116.     YMTC incorporates by reference and re-alleges all the foregoing paragraphs of this Complaint as if fully set forth herein.

117.     YMTC owns by assignment all rights, title, and interest, including the right to recover damages for past, present, and future infringement, in and to U.S. Patent No. 10,868,031, entitled "Multiple-Stack Three-Dimensional Memory Device And Fabrication Method Thereof."  A true and correct copy of the '031 Patent is attached as Exhibit 8.

118.     The '031 Patent was duly and legally issued by the United States Patent and Trademark Office on December 15, 2020.

119.     Upon information and belief, Micron infringes under 35 U.S.C. § 271(a) at least claim 1 of the '031 Patent, literally and/or under the doctrine of equivalents, by making, using, offering for sale, selling, and/or importing into the United States, without authorization, at least Micron's 128L Accused Products (for example, Micron BX500 2.5 480GB SSD), and Micron's 176L Accused Products (for example, the Micron SSD model 3400 NVMe and the Micron SSD model 2400 PCIe Gen 4) (collectively, "the '031 Accused Products").  Further identification of the '031 Accused Products will be provided in YMTC's infringement contentions disclosed pursuant to the Court's scheduling order, and/or as discovery progresses.

120.     Upon information and belief, the '031 Accused Products meet each and every limitation of at least claim 1 of the '031 Patent.  For example, the '031 Accused Products are three-dimensional (3D) memory devices comprising a substrate, including polysilicon.

121.     Upon information and belief, the '031 Accused Products further comprise a multiple-stack staircase structure comprising a plurality of staircase structures stacked over the substrate,

wherein each of the plurality of staircase structures comprises a plurality of conductor layers, and wherein each of the plurality of conductor layers is located between two insulating layers (silicon oxide (SiO). For example, the '031 Accused Products include a lower deck and upper deck stair case structure forming a multi-stack staircase shape having a stack of alternating tungsten (W) and/or titanium nitride (TiN)) conductor layers and silicon oxide (SiO) dielectric layers, where each staircase structure includes levels having a tungsten (W) and titanium nitride (TiN) conductor layer between two insulating layers of silicon oxide (SiO).

122.     Upon information and belief, the '031 Accused Products further comprise a filling structure surrounding the multiple-stack staircase structure. For example, the '031 Accused Products include a filling structure (silicon dioxide (SiO2)) that surrounds the multiple-stack staircase structure.

123.     Upon information and belief, the '031 Accused Products further comprise a semiconductor channel extending through the multiple-stack staircase structure, wherein the semiconductor channel comprises unaligned sidewall surfaces. For example, the '031 Accused Products include a semiconductor channel having a silicon nitride (SiN) charge trap film, polysilicon channel and silicon oxide (SiO) core extending through the stack of alternating tungsten (W) conductor layers and silicon oxide (SiO) dielectric layers where the semiconductor channel comprises unaligned sidewall surfaces that are not contiguous along a substantially straight line.

124.     Upon information and belief, the '031 Accused Products further comprise a supporting pillar extending through at least one of the multiple-stack staircase structure and the filling structure, wherein the supporting pillar comprises aligned sidewall surfaces. For example, the '031 Accused Products include a silicon oxide (SiO) dielectric structure comprising titanium nitride (TiN) and tungsten (W) surrounded by an insulating material (silicon oxide (SiO)) extending through the stack of alternating conductor layers and silicon oxide (SiO) dielectric layers, wherein the supporting pillar comprises aligned sidewall surfaces that are contiguous along a substantially straight line.

125.     As a result of Micron's infringement of the '031 Patent, Plaintiff is entitled to monetary damages in an amount adequate to compensate for Micron's infringement, but in no event less than a

reasonable royalty for the use made of the invention by Micron, together with interest and costs as fixed by the Court.

## **PRAYER FOR RELIEF**

WHEREFORE, YMTC respectfully requests judgment in its favor and against Micron, and respectfully requests the following relief:

1.    A judgment in favor of YMTC that Micron has infringed and is infringing, either literally and/or under the doctrine of equivalents, one or more claims of the Asserted Patents;

2.    An order pursuant to 35 U.S.C. § 283 enjoining Micron and its subsidiaries, parents, divisions, affiliates, successors, assigns, transferees, officers, directors, attorneys, agents, servants, employees, parties in privity with, and all other persons in active concert or participation with any of the foregoing, from continued acts of infringement of any claim of the Asserted Patents;

3.    A judgment and order requiring Micron to pay YMTC its damages, costs, expenses, and pre-judgment and post-judgment interest for Micron's infringement;

4.    If a permanent injunction is not granted, then a judicial determination of the conditions for Micron's future infringement, such as an ongoing royalty;

5.    A judgment and order finding that this is an exceptional case within the meaning of 35 U.S.C. § 285 and awarding to YMTC its reasonable attorneys' fees against Micron; and

6.    All other relief that the Court deems just and proper.

## **JURY TRIAL DEMAND**

YMTC respectfully demands a jury trial pursuant to Rule 38(b) of the Federal Rules of Civil Procedure on all claims and issues so triable.

YMTC'S COMPLAINT FOR PATENT INFRINGEMENT                                      CASE NO._____

Dated: November 9, 2023

By:  /s/ Andrew T. Radsch
     James R. Batchelder (CSB # 136347)
     Andrew T. Radsch (CSB # 303665)
     Stepan Starchenko (CSB #318606)
     James F. Mack (CSB # 322056)
     Nancy N. Attalla (CSB # 341070)
     **ROPES & GRAY LLP**
     1900 University Avenue, 6th Floor
     East Palo Alto, CA 94303-2284
     Telephone: (650) 617-4000
     james.batchelder@ropesgray.com
     andrew.radsch@ropesgray.com
     stepan.starchenko@ropesgray.com
     james.mack@ropesgray.com
     nancy.attalla@ropesgray.com

     Rachael Bacha (NYB # 4817938)
     1211 Avenue of the America
     New York, NY 10036
     Telephone: (212) 596-9062
     rachael.bacha@ropesgray.com

     Nicole S. L. Pobre (DCB # 1735421)
     2099 Pennsylvania Avenue,
     N.W. Washington, D.C. 20006
     Telephone: (202) 508-4600
     nicole.pobre@ropesgray.com

     *Attorneys for Plaintiff*
     YANGTZE MEMORY TECHNOLOGIES
     COMPANY, LTD.

1   JARED BOBROW (STATE BAR NO. 133712)
    jbobrow@orrick.com
2   JASON LANG (STATE BAR NO. 255642)
    jlang@orrick.com
3   DIANA M. RUTOWSKI (STATE BAR NO. 233878)
    drutowski@orrick.com
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1000 Marsh Road
5   Menlo Park, CA  94025-1015
    Telephone:    +1 650 614 7400
6   Facsimile:    +1 650 614 7401

7   *Attorneys for Defendants*
    *Micron Technology, Inc., and*
8   *Micron Consumer Products Group LLC*

9
                        UNITED STATES DISTRICT COURT
10
                     NORTHERN DISTRICT OF CALIFORNIA
11
                          SAN FRANCISCO DIVISION
12

13
    YANGTZE MEMORY TECHNOLOGIES          Case No. 3:23-cv-05792-RFL
14  COMPANY, LTD.,
                                         **DEFENDANTS' ANSWER TO FIRST**
15              Plaintiff,               **AMENDED COMPLAINT AND**
                                         **COUNTERCLAIMS**
16         v.
                                         **DEMAND FOR JURY TRIAL**
17  MICRON TECHNOLOGY, INC., et al.,

18              Defendants.              Judge:  Hon. Rita F. Lin

19

20

21  MICRON TECHNOLOGY, INC.,

22              Counterclaim Plaintiff,

23
           v.
24
    YANGTZE MEMORY TECHNOLOGIES
25  COMPANY, LTD., and YANGTZE
    MEMORY TECHNOLOGIES, INC.,
26
                Counterclaim Defendants.
27

28

ORRICK, HERRINGTON &                          DEFS' ANSWER TO 1ST AMENDED
  SUTCLIFFE LLP                             COMPLAINT AND COUNTERCLAIMS
 ATTORNEYS AT LAW                                CASE NO. 3:23-CV-05792-RFL
 SILICON VALLEY

Defendants Micron Technology, Inc. ("Micron Technology" or "MTI") and Micron Consumer Products Group LLC ("MCPG") (collectively "Defendants" or "Micron"), by and through their undersigned counsel, hereby submit this answer to the First Amended Complaint ("FAC") filed by Yangtze Memory Technologies Company, Ltd. ("YMTC") on February 2, 2024, and hereby assert counterclaims against YMTC and Yangtze Memory Technologies, Inc. ("YMTC Inc.") (YMTC and YMTC Inc. collectively, "the YMTC Entities"). To the extent not expressly admitted below, Defendants deny each and every allegation of the FAC.

## PRELIMINARY STATEMENT

1. Micron admits that YMTC filed its original complaint in this action on November 9, 2023. Micron avers that the original complaint was so deficient and conclusory that Micron moved to dismiss it for failure to state a claim – a motion that YMTC did not oppose. Micron further avers that the original complaint was so deficient and conclusory, and Micron's motion to dismiss was so meritorious, that YMTC abandoned its original complaint and filed an amended complaint that includes claim charts and other allegations that were not part of the original complaint. Except as so admitted and averred, Micron denies the allegations of paragraph 1 of the FAC.

2. Micron admits that it requested, and YMTC agreed to, a 45-day extension to respond to the original complaint. Micron further admits that the agreed extension is documented in a stipulation between the parties filed on November 29, 2023. Except as so admitted, Micron denies the allegations of paragraph 2 of the FAC.

3. Micron admits that MTI and/or one or more of its subsidiaries design and manufacture 3D NAND products, including the products accused of infringement in this action, and that MTI and/or one or more of its subsidiaries has information about the structure, layout, and fabrication of those 3D NAND products. Micron further avers that YMTC's original complaint was so deficient and conclusory that it did not put Micron on notice of YMTC's infringement claims. Micron further avers that, if YMTC's original complaint had put Micron on notice of YMTC's claims in compliance with the law, YMTC would have opposed Micron's motion to dismiss the complaint for failure to state a claim, which it did not. Micron further avers that the

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 1 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx75

failure of YMTC to oppose Micron's motion to dismiss, its abandonment of its original complaint, and the extensive differences between the original complaint and the FAC demonstrate that the original complaint failed to meet the requirements of Rules 8 and 12 of the Federal Rules of Civil Procedure and failed to put Micron on notice of YMTC's infringement claims.  Except as so admitted and averred, Micron denies the allegations of paragraph 3 of the FAC.

4.     Micron denies the allegations of paragraph 4 of the FAC.

5.     Micron denies the allegations of paragraph 5 of the FAC.

6.     Micron denies the allegations of paragraph 6 of the FAC.

### NATURE OF THE ACTION

7.     Micron is without knowledge or information sufficient to form a belief as to the truth of the allegations in the fourth and sixth sentences of paragraph 7 of the FAC and, on that basis, denies them.  Micron denies the remaining allegations of paragraph 7 of the FAC.

8.     Micron is without knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence paragraph 8 of the FAC and, on that basis, denies them. Micron denies the remaining allegations of paragraph 8 of the FAC.

9.     Micron admits that 3D NAND flash memory is a widely used form of memory, that it is used in a variety of products and solutions, and that competition and innovation are beneficial to society.  Except as so admitted, Micron denies the allegations of paragraph 9 of the FAC.

10.    Micron denies the allegations of paragraph 10 of the FAC.

11.    Micron admits that YMTC is asserting the "Asserted Patents" against Micron in this lawsuit.  Except as so admitted, Micron denies the allegations of paragraph 11 of the FAC.

### THE PARTIES

12.    Admitted.

13.    Micron admits the first sentence of paragraph 13 of the FAC.  Micron further admits that it does not contest the propriety of service of process in this action through CSC in Sacramento, California.  Except as so admitted, Micron denies the allegations of paragraph 14 of the FAC.

14.    Micron admits that MCPG is a wholly-owned subsidiary of MTI, that it is organized under the laws of the State of Delaware, and that it has a principal place of business at 110 Holger

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 2 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

Appx76

Way, San Jose, California 95134. MCPG further admits that it does not contest the propriety of service of process in this action through CSC in Sacramento, California. Except as so admitted, Micron denies the allegations of paragraph 14 of the FAC.

15.     Micron denies the allegations of paragraph 15 of the FAC.

16.     Micron denies the allegations of paragraph 16 of the FAC.

**JURISDICTION AND VENUE**

17.     Without admitting that YMTC has standing to maintain this lawsuit, Micron admits the allegations of paragraph 17 of the FAC.

18.     Micron admits that the Court has personal jurisdiction over Micron for purposes of this action. Except as so admitted, Micron denies the allegations of paragraph 18 of the FAC.

19.     Micron denies the allegations of paragraph 19 of the FAC.

20.     Micron denies the allegations of paragraph 20 of the FAC.

21.     Micron admits that venue for this action is proper in this judicial district. Except as so admitted, Micron denies the allegations of paragraph 21 of the FAC.

22.     Micron denies the allegations of paragraph 22 of the FAC.

**DIVISIONAL ASSIGNMENT**

23.     Micron admits that, under General Order No. 44, this district maintains a district-wide system of assignment for "intellectual property rights" actions. Except as so admitted, Micron denies the allegations of paragraph 23 of the FAC.

**YMTC'S ALLEGED INNOVATIONS AND PATENTS**

24.     Micron admits that YMTC has a wholly-owned subsidiary, YMTC Inc., in this judicial district. Micron further admits that YMTC supplies 3D NAND products on a global basis, including in the United States. Micron denies the second sentence of paragraph 24 of the FAC. Except as so admitted and denied, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 24 of the FAC and, on that basis, denies them.

25.     Micron denies the last sentence of paragraph 25 of the FAC. Except as so denied, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 25 of the FAC and, on that basis, denies them.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 3 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx77

26.     Micron denies the allegations of paragraph 26 of the FAC.

27.     Micron denies the allegations of paragraph 27 of the FAC.

**MICRON'S ACCUSED PRODUCTS AND ACTIVITIES**

28.     Micron admits that MTI is an industry leader in innovative computer-memory and data-storage solutions, including 3D NAND.  Except as so admitted, Micron denies the allegations of paragraph 28 of the FAC.

29.     Micron admits that MTI and/or one or more of its subsidiaries has designed, made, used, sold, and/or offered for sale 96-Layer 3D NAND memory products, including products with the B27A design ID.  Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 29 of the FAC and, on that basis, denies them.  Except as so admitted and denied, Micron denies the allegations of paragraph 29 of the FAC.

30.      Micron admits that  MTI and/or one or more of its subsidiaries has designed, made, used, sold, and/or offered for sale 128-Layer 3D NAND memory products, including products with the B37R design ID.  Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 30 of the FAC and, on that basis, denies them.  Except as so admitted and denied, Micron denies the allegations of paragraph 30 of the FAC.

31.     Micron admits that MTI and/or one or more of its subsidiaries has designed, made, used, sold, and/or offered for sale 176-Layer 3D NAND memory products, including products with the N48R and B47R design IDs.  Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second and third sentences of paragraph 31 of the FAC and, on that basis, denies them.  Except as so admitted and denied, Micron denies the allegations of paragraph 31 of the FAC.

32.     Micron admits that MTI and/or one or more of its subsidiaries has designed, made, used, sold, and/or offered for sale 232-Layer 3D NAND memory products, including products with the B58R design ID.  Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in the second sentence of paragraph 32 of the FAC and, on that basis, denies them.  Except as so admitted and denied, Micron denies the allegations of paragraph 32 of the FAC.

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 4 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx78

33.     Micron admits that YMTC purports to call certain 3D NAND products the "Accused Memory Products."  Except as so admitted, Micron denies the allegations of paragraph 33 of the FAC.

34.     Micron admits that MTI and/or one or more of its subsidiaries has made, used, sold, and/or offered for sale the "Accused Memory Products."  Micron further admits that various third parties may use one or more of the "Accused Memory Products" in their own products and solutions.  Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 34 of the FAC and, on that basis, denies them.

35.     Micron admits that MTI and/or one or more of its subsidiaries has conducted research, development, and testing of the "Accused Memory Products."  Except as so admitted, Micron denies the allegations of paragraph 35 of the FAC.

36.     Micron denies the allegations of paragraph 36 of the FAC.

37.     Micron admits that MTI and/or one or more of its subsidiaries sells and/or offers to sell the Accused Memory Products.  Except as so admitted, Micron denies the allegations of paragraph 37 of the FAC.

38.     Micron admits that the micron.com website lists one or more distributors.  Except as so admitted, Micron denies the allegations of paragraph 38 of the FAC.

39.     Micron admits that MTI and/or one or more of its subsidiaries has used the Accused Memory Products and has sold and/or offered to sell the Accused Memory Products to one or more customers in a number of sectors.  Except as so admitted, Micron denies the allegations of paragraph 39 of the FAC.

40.     Micron denies the allegations of paragraph 40 of the FAC.

41.     Micron denies the allegations of paragraph 41 of the FAC.

42.     Micron denies the allegations of paragraph 42 of the FAC.

**COUNT I**

43.     Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 5 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

Appx79

44.     Micron admits that YMTC filed as Exhibit 1 what appears to be a copy of the '623 patent, which is entitled "3D NAND Memory Device and Method of Forming the Same."  Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 44 of the FAC and, on that basis, denies them.

45.     Micron denies the allegations of paragraph 45 of the FAC.

46.     Micron denies the allegations of paragraph 46 of the FAC.

47.     Micron denies the allegations of paragraph 47 of the FAC.

48.     Micron admits that it identified numerous deficiencies in YMTC's original complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products include or practice one or more claim limitations of the '623 patent.  Micron's motion to dismiss is on file with the Court and speaks for itself.  Except as so admitted, Micron denies the allegations of paragraph 48 of the FAC.

49.     Micron denies the allegations of paragraph 49 of the FAC.

50.     Micron denies the allegations of paragraph 50 of the FAC.

51.     Micron denies the allegations of paragraph 51 of the FAC.

52.     Micron denies the allegations of paragraph 52 of the FAC.

**COUNT II**

53.     Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

54.     Micron admits that YMTC filed as Exhibit 2 what appears to be a copy of the '822 patent, which is entitled "Non-Volatile Memory Device and Control Method."  Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 54 of the FAC and, on that basis, denies them.

55.     Micron denies the allegations of paragraph 55 of the FAC.

56.     Micron denies the allegations of paragraph 56 of the FAC.

57.     Micron denies the allegations of paragraph 57 of the FAC.

58.     Micron admits that it identified numerous deficiencies in YMTC's original complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 6 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

include or practice one or more claim limitations of the '822 patent. Micron's motion to dismiss is on file with the Court and speaks for itself. Except as so admitted, Micron denies the allegations of paragraph 58 of the FAC.

59.     Micron denies the allegations of paragraph 59 of the FAC.

60.      Micron denies the allegations of paragraph 60 of the FAC.

61.     Micron denies the allegations of paragraph 61 of the FAC.

62.     Micron denies the allegations of paragraph 62 of the FAC.

**COUNT III**

63.     Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

64.     Micron admits that YMTC filed as Exhibit 3 what appears to be a copy of the '378 patent, which is entitled "Through Array Contact (TAC) for Three-Dimensional Memory Devices." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 64 of the FAC and, on that basis, denies them.

65.     Micron denies the allegations of paragraph 65 of the FAC.

66.     Micron denies the allegations of paragraph 66 of the FAC.

67.     Micron denies the allegations of paragraph 67 of the FAC.

68.     Micron admits that it identified numerous deficiencies in YMTC's original complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products include or practice one or more claim limitations of the '378 patent. Micron's motion to dismiss is on file with the Court and speaks for itself. Except as so admitted, Micron denies the allegations of paragraph 68 of the FAC.

69.     Micron denies the allegations of paragraph 69 of the FAC.

70.     Micron denies the allegations of paragraph 70 of the FAC.

71.     Micron denies the allegations of paragraph 71 of the FAC.

72.     Micron denies the allegations of paragraph 72 of the FAC.

73.     Micron denies the allegations of paragraph 73 of the FAC.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 7 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx81

**COUNT IV**

74.     Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

75.     Micron admits that YMTC filed as Exhibit 4 what appears to be a copy of the '806 patent, which is entitled "Through Array Contact (TAC) for Three-Dimensional Memory Devices." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75 of the FAC and, on that basis, denies them.

76.     Micron denies the allegations of paragraph 76 of the FAC.

77.     Micron denies the allegations of paragraph 77 of the FAC.

78.     Micron denies the allegations of paragraph 78 of the FAC.

79.     Micron admits that it identified numerous deficiencies in YMTC's original complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products include or practice one or more claim limitations of the '806 patent.  Micron's motion to dismiss is on file with the Court and speaks for itself.  Except as so admitted, Micron denies the allegations of paragraph 79 of the FAC.

80.     Micron denies the allegations of paragraph 80 of the FAC.

81.     Micron denies the allegations of paragraph 81 of the FAC.

82.     Micron denies the allegations of paragraph 82 of the FAC.

83.     Micron denies the allegations of paragraph 83 of the FAC.

84.     Micron denies the allegations of paragraph 84 of the FAC.

**COUNT V**

85.     Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

86.     Micron admits that YMTC filed as Exhibit 5 what appears to be a copy of the '872 patent, which is entitled "Three-Dimensional Memory Device and Method for Forming the Same." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 86 of the FAC and, on that basis, denies them.

87.     Micron denies the allegations of paragraph 87 of the FAC.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 8 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

Appx82

88.     Micron denies the allegations of paragraph 88 of the FAC.

89.     Micron denies the allegations of paragraph 89 of the FAC.

90.     Micron admits that it identified numerous deficiencies in YMTC's original complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products include or practice one or more claim limitations of the '872 patent.  Micron's motion to dismiss is on file with the Court and speaks for itself.  Except as so admitted, Micron denies the allegations of paragraph 90 of the FAC.

91.     Micron denies the allegations of paragraph 91 of the FAC.

92.     Micron denies the allegations of paragraph 92 of the FAC.

93.     Micron denies the allegations of paragraph 93 of the FAC.

94.     Micron denies the allegations of paragraph 94 of the FAC.

**COUNT VI**

95.     Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

96.     Micron admits that YMTC filed as Exhibit 6 what appears to be a copy of the '957 patent, which is entitled "Architecture and Method for NAND Memory Operation."  Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 96 of the FAC and, on that basis, denies them.

97.     Micron denies the allegations of paragraph 97 of the FAC.

98.     Micron denies the allegations of paragraph 98 of the FAC.

99.     Micron denies the allegations of paragraph 99 of the FAC.

100.    Micron admits that it identified numerous deficiencies in YMTC's original complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products include or practice one or more claim limitations of the '957 patent.  Micron's motion to dismiss is on file with the Court and speaks for itself.  Except as so admitted, Micron denies the allegations of paragraph 100 of the FAC.

101.    Micron denies the allegations of paragraph 101 of the FAC.

102.    Micron denies the allegations of paragraph 102 of the FAC.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 9 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx83

103. Micron denies the allegations of paragraph 103 of the FAC.

104. Micron denies the allegations of paragraph 104 of the FAC.

**COUNT VII**

105. Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

106. Micron admits that YMTC filed as Exhibit 7 what appears to be a copy of the '342 patent, which is entitled "Method for Reading Three-Dimensional Flash Memory." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 106 of the FAC and, on that basis, denies them.

107. Micron denies the allegations of paragraph 107 of the FAC.

108. Micron denies the allegations of paragraph 108 of the FAC.

109. Micron denies the allegations of paragraph 109 of the FAC.

110. Micron admits that it identified numerous deficiencies in YMTC's original complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products include or practice one or more claim limitations of the '342 patent. Micron's motion to dismiss is on file with the Court and speaks for itself. Except as so admitted, Micron denies the allegations of paragraph 110 of the FAC.

111. Micron denies the allegations of paragraph 111 of the FAC.

112. Micron denies the allegations of paragraph 112 of the FAC.

113. Micron denies the allegations of paragraph 113 of the FAC.

114. Micron denies the allegations of paragraph 114 of the FAC.

**COUNT VIII**

115. Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

116. Micron admits that YMTC filed as Exhibit 8 what appears to be a copy of the '031 patent, which is entitled "Multiple-Stack Three-Dimensional Memory Device and Fabrication Method Thereof." Except as so admitted, Micron lacks knowledge or information sufficient to

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 10 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx84

1   form a belief as to the truth of the allegations in paragraph 116 of the FAC and, on that basis, denies

2   them.

3   117.   Micron denies the allegations of paragraph 117 of the FAC.

4   118.   Micron denies the allegations of paragraph 118 of the FAC.

5   119.   Micron denies the allegations of paragraph 119 of the FAC.

6   120.   Micron admits that it identified numerous deficiencies in YMTC's original
7   complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products
8   include or practice one or more claim limitations of the '031 patent.  Micron's motion to dismiss is
9   on file with the Court and speaks for itself.  Except as so admitted, Micron denies the allegations
10  of paragraph 120 of the FAC.

11  121.   Micron denies the allegations of paragraph 121 of the FAC.

12  122.   Micron denies the allegations of paragraph 122 of the FAC.

13  123.   Micron denies the allegations of paragraph 123 of the FAC.

14  124.   Micron denies the allegations of paragraph 124 of the FAC.

15  **PLAINTIFF'S PRAYER FOR RELIEF**

16  Micron denies that YMTC is entitled to any relief whatsoever in this action, either as prayed
17  for in the amended complaint or otherwise.

18  **DEFENSES**

19  Without assuming any burden other than that imposed by law, Micron asserts the following
20  defenses in response to the allegations in the FAC.  Micron reserves the right to assert additional
21  defenses as they become known throughout the course of discovery in this action, including any
22  defenses currently unknown to Micron.  The assertion of a defense below is not a concession that
23  Micron bears the burden of proving the matter asserted.

24  **First Defense: Failure to State a Claim**

25  1.   The FAC fails to state a claim upon which relief can be granted.

26  **Second Defense: Noninfringement**

27  2.   Micron has not infringed and does not infringe, directly or indirectly, any claim of
28  the Asserted Patents.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 11 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

Appx85

**Third Defense: Invalidity**

3.      One or more of the claims of the Asserted Patents are invalid for failure to satisfy the conditions for patentability set forth in 35 U.S.C. § 1 et seq., including 35 U.S.C. §§ 101, 102, 103, and/or 112.

**Fourth Defense: Prosecution History Estoppel and/or Disclaimer**

4.      Based on proceedings before the U.S. Patent and Trademark Office during the prosecution of the applications that led to or resulted in the Asserted Patents, YMTC is precluded or otherwise estopped from asserting that any claim of the Asserted Patents covers, either literally or under the doctrine of equivalents, any product or method made, performed, used, sold, offered for sale, or imported by Micron.

**Fifth Defense: Limitation on Damages and Costs**

5.      YMTC's claims and prayer for relief are barred in whole or in part by 35 U.S.C. §§ 286, 287, and/or 288, including without limitation based on failure to mark and lack of notice.

**Sixth Defense: Government Sales**

6.      YMTC's claims are barred in whole or in part by 28 U.S.C. § 1498 to the extent they relate to use or manufacture of the alleged inventions of the Asserted Patents by or for the United States.

**MTI'S COUNTERCLAIMS**

MTI incorporates herein by reference the admissions, allegations, denials, and defenses contained in its answer above as if fully set forth herein. For its counterclaims against the YMTC Entities, MTI states as follows:

**Nature of the Action**

1.      MTI asserts these patent infringement claims against the YMTC Entities arising from their infringement of U.S. Patent Nos. 10,475,737 (the "'737 patent"), 8,945,996 (the "'996 patent"), 8,803,214 (the "'214 patent"), 10,872,903 (the "'903 patent"), and 10,373,974 (the "'974 patent") (collectively, the "MTI Asserted Patents"). On information and belief, each of the YMTC Entities commits the acts of infringement described herein individually and together as one enterprise.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 12 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

Appx86

**The Parties**

2.      MTI is a Delaware corporation with its principal place of business at 8000 South Federal Way, Boise, Idaho 83716.

3.      On information and belief, YMTC is a Chinese company with its principal place of business at No.88 Weilai 3rd Road, East Lake High-tech Development Zone, Wuhan, Hubei, China.

4.      On information and belief, YMTC Inc. is a California corporation with its principal place of business at 2953 Bunker Hill Lane, Ste. 206, Santa Clara, California 95054.

**Jurisdiction and Venue**

5.      MTI brings these counterclaims under the Patent Laws of the United States, 35 U.S.C. §§ 1 et seq., against the YMTC Entities for their infringement of the MTI Asserted Patents.

6.      This Court has subject matter jurisdiction over MTI's counterclaims pursuant to 28 U.S.C. §§ 1331 and 1338(a).

7.      This Court has personal jurisdiction over YMTC, which is the plaintiff in this action. Further, YMTC commits acts of infringement in this District through its business and sales activities in the Northern District of California, including directly and/or indirectly selling, offering for sale, importing, and/or using products that practice (or are made in a manner that practices) one or more claims of the MTI Asserted Patents.

8.      This Court has personal jurisdiction over YMTC Inc., which has its principal place of business in Santa Clara, California, in this judicial District.  Further, YMTC Inc. commits acts of infringement in this District through its business and sales activities in the Northern District of California, including directly and/or indirectly selling, offering for sale, importing, and/or using products that practice (or are made in a manner that practices) one or more claims of the MTI Asserted Patents.

**MTI's Innovations and Patents**

9.      MTI was founded in 1978 and is headquartered in Boise, Idaho. Since that time, MTI has become a world leader in innovative computer-memory and data-storage solutions, employing more than 43,000 employees worldwide with more than 5,000 employees in Idaho. Ex. 11 at 2; Ex. 12 at 5.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 13 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

10.     MTI is the only U.S.-based manufacturer of semiconductor memory devices, and its presence in the U.S. is growing.  MTI recently announced plans to invest approximately $15 billion through the end of the decade to construct a new memory manufacturing plant in Boise and up to $100 billion over the next 20-plus years to build a fab near Syracuse, New York.  Exs. 13-14. MTI's commitment to innovation is evident from its expansive patent portfolio that includes over 54,000 patents.  Ex 11 at 2.

11.     For over a decade, MTI has been at the forefront of developing new and innovative 3D NAND memory products. In March 2015, MTI launched its first 3D NAND product, a 32-layer high density memory chip.  Ex. 15.  Doing so required years of research and development before the product launch.  These efforts led MTI to file dozens of patents on 3D NAND technology long before the product launch. Indeed, MTI described innovative 3D NAND arrays in patents it filed well before 2015.  Exs. 16-17.

12.     Since its initial 3D NAND product launch in 2015, MTI has continued to lead the world in 3D NAND innovation by developing and offering chips with greater memory capacity and capabilities.  In early 2018, MTI doubled the number of layers in its 3D NAND products, releasing its 64-layer 3D NAND.  Ex. 18.  Thereafter, in 2019, MTI sampled its 128-layer 3D NAND (Ex. 19 at 7) and, in 2020, MTI was the first company in the world to launch 176-layer 3D NAND. Ex. 20.  In July 2022, MTI became the first company to scale its 3D NAND technology to 232-layers in production. Ex 21. MTI has received numerous awards for and widespread recognition of its innovative 3D NAND technology. *See, e.g.*, Exs. 22-24.

**The Accused YMTC Products and the YMTC Entities' Infringing Activities**

13.     YMTC is a global manufacturer and supplier of 3D NAND memory products. YMTC was founded in 2016 and is majority-owned by the Chinese government. Ex. 25. YMTC's founding followed the 2015 announcement of the Made in China 2025 initiative by Chinese President Xi Jinping. Ex. 26. The Made in China 2025 Initiative positioned semiconductors as a critical growth industry for the Chinese economy. *Id.*  The Chinese Government's investment platform for funding the expansion of its semiconductor industry is the National Integrated Circuit Industry Investment Fund, more commonly known as the "Big Fund." *Id.*

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 14 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx88

14.     Latecomer YMTC has developed four generations of NAND storage devices since its founding in 2016: a first-generation 3D NAND storage technology incorporating a 32-layer 3D NAND memory array, a second-generation 3D NAND storage technology incorporating at least a 64-layer 3D NAND memory array, a third-generation 3D NAND storage technology incorporating at least a 128-layer 3D NAND memory array, and a fourth generation 3D NAND storage technology incorporating at least a 232-layer 3D NAND memory array. Ex. 27.

15.     Unsurprisingly, given MTI's nearly decade long head start over YMTC into 3D NAND memory development, YMTC Entities began to hire NAND engineers from MTI or its affiliates and has hired at least 20 such engineers to date. Indeed, at least five of the named inventors on the YMTC Asserted Patents previously worked as engineers on 3D NAND R&D at Micron before they filed the YMTC Asserted Patents.

16.     The YMTC Entities have in the past and continue to directly and/or indirectly use, sell, offer for sale, import, supply, or otherwise distribute into the United States, and provide support for, their 64-layer 3D NAND storage technology and products containing the same (collectively, the "YMTC 64L Accused Products"), including the X1-9050 and X2-9060 and other memory chips (and memory products containing the same) that have the same or similar structures, features, or functionalities, and/or are made by the same or similar Xtacking® 1.0 technology manufacturing processes, as the aforementioned exemplary products.

17.     The YMTC Entities have in the past and continue to directly and/or indirectly use, sell, offer for sale, import, supply, or otherwise distribute into the United States, and provide support for, their 128-layer 3D NAND storage technology and products containing the same (collectively, the "YMTC 128L Accused Products"), including the X2-6070 and other memory chips (and memory products containing the same) that have the same or similar structures, features, or functionalities, and/or are made by the same or similar Xtacking® 2.0 technology manufacturing processes, as the aforementioned exemplary product.

18.     The YMTC Entities have in the past and continue to directly and/or indirectly use, sell, offer for sale, import, supply, or otherwise distribute into the United States, and provide support for, their 232-layer 3D NAND storage technology and products containing the same

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 15 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx89

(collectively, the "YMTC 232L Accused Products"), including the X3-9060, X3-9070, and X3-6070 and other memory chips (and memory products containing the same) that have the same or similar structures, features, or functionalities, and/or are made by the same or similar Xtacking® 3.0 technology manufacturing processes, as the aforementioned exemplary product.

19.    Upon information and belief, each of the YMTC 64L Accused Products, YMTC 128L Accused Products, and YMTC 232L Accused Products have the same or similar structures, features, or functionalities, and/or are made by the same or similar manufacturing processes insofar as the structures, features, functionalities, and/or manufacturing processes of the Accused Products relate to the MTI Asserted Patents. Claim charts mapping the YMTC 232L Accused Products to the MTI Asserted Patents are provided as Exhibits 2, 4, 6, 8, 10.

20.    The YMTC 64L Accused Products, YMTC 128L Accused Products, and YMTC 232L Accused Products are collectively referred to as the "YMTC Accused Storage Products."

21.    The YMTC Accused Storage Products are, or are integrated into, devices made, used, sold, offered for sale, imported, supplied, or otherwise distributed in the United States by among others, YMTC, YMTC Inc., YMTC's customers, original equipment manufacturers ("OEMs"), original design manufacturers ("ODMs"), distributors, resellers, and other third parties, including under YMTC's own brand name and under the Lexar brand name. For example, the Lexar NM800 contains or contained one or more of the YMTC 64L Accused Products, the Lexar NM710 contains or contained one or more of the YMTC 128L Accused Products, and the Lexar NM790 contains YMTC 232L Accused Products. Exs. 28-30. Further, in connection with trademark application Serial Number 88496703 filed with the United States Patent and Trademark Office, YMTC submitted a statement of use on May 22, 2020, in which it declared that it first used the YMTC mark in U.S. commerce at least as early as September 9, 2016 in connection with integrated circuits and various other products. YMTC submitted images of integrated circuits bearing the markings "YMTC3GSQDPPKG0" and "PL385008 AAX 1822" as well as images of a YMTC NAND memory solid-state drive identifiable as such by its marking "M.2 NVMe PCIe Gen3.0x4" and its markings "YMTC" and "Xtacking" as specimens showing its use in commerce on chips and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 16 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx90

integrated circuits.  Ex. 36.  Xtacking is described by YMTC as its "innovative 3D NAND technology."  Ex. 37.

22.    The YMTC Entities actively encourage others, such as their customers and distributors, to make, use, offer to sell, import, supply, or otherwise distribute into the United States the YMTC Accused Storage Products and products containing the YMTC Accused Storage Products.  The YMTC Entities maintain a website that advertises the YMTC Accused Storage Products, including identifying the applications for which they can be used, along with specifications for the YMTC Accused Storage Products.  *See* Ex. 38 (https://www.ymtc.com/en/buslist.html?cat=35).  The YMTC Entities specifically intend for their customers and end-users to use the YMTC Accused Storage Products in such applications and provide instructions and encouragement for their customers and end-users to do so.

23.    On information and belief, the YMTC Accused Storage Products are designed to comply with safety standards required for sale or import into the U.S. market and the YMTC Entities make their website and other materials available in the English language.

24.    The YMTC Entities know that the YMTC Accused Storage Products and products incorporating the same are used, made, designed, marketed, sold, offered for sale in, and/or imported into, the United States. For example, David Duffin, the US General Manager and Head of International Customer Sales at YMTC is, on information and belief, based in and works out of San Jose, California. Ex. 31. Mr. Duffin advertises that he is "used to regularly and directly interacting with customers." *Id.*

25.    From 2016-2019, Mr. Duffin was YMTC's Vice President of Product & Test Engineering and, on information and belief, worked out of San Jose, California.  Ex. 31.  During this period from 2016-2019, Mr. Duffin was "[l]eading all Product, Test and Assembly Engineering for YMTC." *Id.*

26.    Mr. Duffin is listed as the CEO and Secretary of Yangtze Memory Technologies, Inc.  Ex. 32.  Mr. Duffin apparently has no prior executive-level experience and does not publicly advertise on his LinkedIn profile that he is the CEO of the U.S. arm of YMTC.  Ex. 31.

27.     Daesik Song, a former MTI Principal Design Engineer, with apparently no former management experience, was hired by YMTC Inc. as a "Director" in 2017 and has, on information and belief, worked from YMTC Inc.'s San Jose offices since that time. Ex. 33. Mr. Song has been and is listed as a YMTC Inc.'s Statement of Information filed with the California Secretary of State. Ex. 32.

28.     On information and belief, YMTC controls and has controlled YMTC Inc.

29.     YMTC admits that it is "dedicated to the development of memory products for the global market" and that it "maintains ties to Silicon Valley through a wholly-owned subsidiary, Yangtze Memory Technologies, Inc." ECF No. 29 ¶ 24. YMTC Inc. Director Daniel (Tuenlap) Chan recently stated that YMTC's "patent portfolio is designed to protect our innovations in markets that matter to YMTC and its partners." Ex. 34. Thus, YMTC's filing of U.S. patents demonstrates that YMTC considers the United States to be an important market for its products.

30.     The YMTC Entities have also directly and/or indirectly imported into the United States, and offered to sell, sold, and used within the United States, the YMTC Accused Storage Products, which are made by a Micron process patented in the United States during the term of the MTI Asserted Patents. YMTC practices the patented processes, or owns or controls, or is owned or controlled by, the person who practices the patented processes. On information and belief, the YMTC Entities directly and/or indirectly sell their products to customers, including customers in this District, in the computer, networking, storage, consumer electronics, solid-state drive, and mobile telecommunications markets. The YMTC Entities encourage their customers to import, sell, resell, and/or offer to sell the YMTC Accused Storage Products in the United States. Exs. 28-30.

31.     The YMTC Entities knew and know that MTI has patents in the 3D NAND technology space that are relevant to YMTC's own 3D NAND products. For example, YMTC Inc. Director and former MTI Principal Design Engineer Daesik Song is a named inventor of approximately seven of YMTC's patents or patent applications related to NAND power systems applicable to 3D NAND memory devices, four of which cite MTI prior art patents. YMTC has been issued at least 255 U.S. Patents that cite MTI prior art patents. These YMTC patents include,

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 18 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

Appx92

for example, U.S. Patent Nos. 10,529,732 titled "Method for forming staircase structure of three-dimensional memory device," 10,658,378 titled "Through array contact (TAC) for three-dimensional memory devices," 10,680,009 titled "Method for forming gate structure of three-dimensional memory device," and 10,727,245 titled "Staircase etch control in forming three-dimensional memory device." Indeed, nearly all, if not all, of these 255 patents relate to 3D NAND memory devices. YMTC Inc. Director Daniel (Tuenlap) Chan is a Deputy General Counsel and the head of YMTC's intellectual property department. Ex. 35, Ex. 32. On information and belief, as head of IP for YMTC, Mr. Chan is and has been well aware of MTI and its patents in the field of 3D NAND technology.

32. Given the large number of former Micron NAND engineers now working at the YMTC Entities, the YMTC Entities have direct knowledge of the MTI Asserted Patents and MTI's underlying technology.

## Counterclaim I
### (Infringement of U.S. Patent No. 10,475,737)

33. MTI restates and incorporates by reference its allegations in Paragraphs 1 through 32 of its Counterclaims.

34. MTI, owns all right, title, and interest, including the right to recover damages for past, present, and future infringement, in and to U.S. Patent No. 10,475,737, entitled "Stack of horizontally extending and vertically overlapping features, methods of forming circuitry components, and methods of forming an array of memory cells." A true and correct copy of the '737 patent is attached as Exhibit 1.

35. The '737 patent was duly and legally issued by the United States Patent and Trademark Office on Nov. 12, 2019.

36. The YMTC Entities infringe at least claim 1 of the '737 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by using, offering for sale, selling, and/or importing into the United States, without authorization, the YMTC Accused Storage Products.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 19 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx93

37.     The YMTC Accused Storage Products are used to perform and/or practice each and every limitation of at least claim 11 of the '737 patent. A claim chart providing examples of how the YMTC Accused Storage Products practice each limitation of at least claim 11 of the '737 patent is attached as Exhibit 2 hereto and is incorporated by reference herein.

38.     The YMTC Entities also actively induce infringement of at least claim 11 of the '737 patent under 35 U.S.C. § 271(b), and have done so since at least the filing of these counterclaims, by actively encouraging others to infringe (such infringement by others being by way of using, selling, offering to sell, or importing into the United States the YMTC Accused Storage Products).

39.     Since at least the filing of these counterclaims, the YMTC Entities have known of the '737 patent and their infringement thereof. Since before the filing of these counterclaims, the YMTC Entities have had knowledge of MTI's patent portfolio with respect to 3D NAND technology and that portfolio's relevance and application to the YMTC Entities' own products. Accordingly, discovery may reveal the YMTC Entities knew of the '737 patent and the YMTC Entities unauthorized use thereof before the filing of these counterclaims.

40.     The YMTC Entities know (or believe that there is a high probability) that their actions are inducing infringement and are intended to induce infringement. For example, the YMTC Entities encourage, train, instruct, and provide support and technical assistance to others to directly infringe the '737 patent by contracting with, encouraging, and instructing third parties, including equipment and design manufacturers, device manufacturers, distributors, customers, and other third parties to use, sell, offer for sale, and/or import into the United States, the YMTC Accused Storage Products and products that incorporate the YMTC Accused Storage Products. For instance, the YMTC Entities publish and provide technical materials, product specifications, and promotional literature for the YMTC Accused Storage Products that instruct and encourage the YMTC Entities' customers and other third parties to integrate the YMTC Accused Storage Products into products made, used, sold, offered for sale, and/or imported into the United States, and work with customers and potential customers to design their products using the YMTC Accused Storage Products with knowledge that those products will be used and sold in the United States.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 20 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx94

41.     Since at least the filing of these counterclaims, the YMTC Entities' infringement has been willful.

42.     As a result of YMTC Entities' infringement of the '737 patent, MTI is entitled to monetary damages in an amount adequate to compensate for YMTC Entities' infringement, but in no event less than a reasonable royalty for the use made of the invention by the YMTC Entities, together with interest and costs as fixed by the Court.

**Counterclaim II**
**(Infringement of U.S. Patent No. 8,945,996)**

43.     MTI restates and incorporates by reference its allegations in Paragraphs 1 through 42 of its Counterclaims.

44.     MTI, owns all right, title, and interest, including the right to recover damages for past, present, and future infringement, in and to U.S. Patent No. 8,945,996, entitled "Methods of forming circuitry components and methods of forming an array of memory cells." A true and correct copy of the '996 patent is attached as Exhibit 3.

45.     The '996 patent was duly and legally issued by the United States Patent and Trademark Office on Feb. 3, 2015.

46.     The YMTC Entities infringe at least claim 1 of the '996 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by using, offering for sale, selling, and/or importing into the United States, without authorization, the YMTC Accused Storage Products.

47.     The YMTC Entities infringe at least claim 1 of the '996 patent under 35 U.S.C. § 271(g), literally and/or under the doctrine of equivalents, by directly or indirectly importing into the United States the YMTC Accused Storage Products, which Products are made outside the United States using the patented process of at least claim 1 of the '996 patent, are not materially changed by subsequent processes, and are not a trivial and nonessential component of another product.

48.     The YMTC Accused Storage Products are made with, used to perform, and/or practice each and every limitation of at least claim 1 of the '996 patent. A claim chart providing

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 21 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx95

examples of how the YMTC Accused Storage Products practice each limitation of at least claim 1 of the '996 patent is attached as Exhibit 4 hereto and is incorporated by reference herein.

49.     The YMTC Entities also actively induce infringement of at least claim 1 of the '996 patent under 35 U.S.C. § 271(b), and have done so since at least the filing of these counterclaims, by actively encouraging others to infringe (such infringement by others being by way of using, selling, offering to sell, or importing into the United States the YMTC Accused Storage Products).

50.     Since at least the filing of these counterclaims, the YMTC Entities have known of the '996 patent and their infringement thereof. Since before the filing of these counterclaims, the YMTC Entities have had knowledge of MTI's patent portfolio with respect to 3D NAND technology and that portfolio's relevance and application to YMTC Entities' own products. Accordingly, discovery may reveal the YMTC Entities knew of the '996 patent and the YMTC Entities' unauthorized use thereof before the filing of these counterclaims.

51.     The YMTC Entities know (or believe that there is a high probability) that their actions are inducing infringement and are intended to induce infringement.  For example, the YMTC Entities encourage, train, instruct, and provide support and technical assistance to others to directly infringe the '996 patent by contracting with, encouraging, and instructing third parties, including equipment and design manufacturers, device manufacturers, distributors, customers, and other third parties to use, sell, offer for sale, and/or import into the United States, the YMTC Accused Storage Products and products that incorporate the YMTC Accused Storage Products. For instance, the YMTC Entities publish and provide technical materials, product specifications, and promotional literature for the YMTC Accused Storage Products that instruct and encourage the YMTC Entities' customers and other third parties to integrate the YMTC Accused Storage Products into products made, used, sold, offered for sale, and/or imported into the United States, and work with customers and potential customers to design their products using the YMTC Accused Storage Products with knowledge that those products will be used and sold in the United States.

52.     Since at least the filing of these counterclaims, the YMTC Entities' infringement has been willful.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 22 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx96

53.     As a result of YMTC Entities' infringement of the '996 patent, MTI is entitled to monetary damages in an amount adequate to compensate for YMTC Entities' infringement, but in no event less than a reasonable royalty for the use made of the invention by the YMTC Entities, together with interest and costs as fixed by the Court.

### Counterclaim III
### (Infringement of U.S. Patent No. 8,803,214)

54.     MTI restates and incorporates by reference its allegations in Paragraphs 1 through 53 of its Counterclaims.

55.     MTI, owns all right, title, and interest, including the right to recover damages for past, present, and future infringement, in and to U.S. Patent No. 8,803,214, entitled "Three dimensional memory and methods of forming the same." A true and correct copy of the '214 patent is attached as Exhibit 5.

56.     The '214 patent was duly and legally issued by the United States Patent and Trademark Office on Aug. 12, 2014.

57.     The YMTC Entities infringe at least claim 1 of the '214 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by using, offering for sale, selling, and/or importing into the United States, without authorization, the YMTC Accused Storage Products.

58.     The YMTC Accused Storage Products are used to perform and/or practice each and every limitation of at least claim 1 of the '214 patent.  A claim chart providing examples of how the YMTC Accused Storage Products practice each limitation of at least claim 1 of the '214 patent is attached as Exhibit 6 hereto and is incorporated by reference herein.

59.     The YMTC Entities also actively induce infringement of at least claim 1 of the '214 patent under 35 U.S.C. § 271(b), and have done so since at least the filing of these counterclaims, by actively encouraging others to infringe (such infringement by others being by way of using, selling, offering to sell, or importing into the United States the YMTC Accused Storage Products).

60.     Since at least the filing of these counterclaims, the YMTC Entities have known of the '214 patent and its infringement thereof.  Since before the filing of these counterclaims, the

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 23 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx97

YMTC Entities have had knowledge of MTI's patent portfolio with respect to 3D NAND technology and that portfolio's relevance and application to the YMTC Entities' own products. Accordingly, discovery may reveal the YMTC Entities knew of the '214 patent and the YMTC Entities' unauthorized use thereof before the filing of these counterclaims.

61. The YMTC Entities know (or believe that there is a high probability) that their actions are inducing infringement and are intended to induce infringement. For example, the YMTC Entities encourage, train, instruct, and provide support and technical assistance to others to directly infringe the '214 patent by contracting with, encouraging, and instructing third parties, including equipment and design manufacturers, device manufacturers, distributors, customers, and other third parties to use, sell, offer for sale, and/or import into the United States, the YMTC Accused Storage Products and products that incorporate the YMTC Accused Storage Products. For instance, the YMTC Entities publish and provide technical materials, product specifications, and promotional literature for the YMTC Accused Storage Products that instruct and encourage the YMTC Entities' customers and other third parties to integrate the YMTC Accused Storage Products into products made, used, sold, offered for sale, and/or imported into the United States, and works with customers and potential customers to design their products using the YMTC Accused Storage Products with knowledge that those products will be used and sold in the United States.

62. Since at least the filing of these counterclaims, the YMTC Entities' infringement has been willful.

63. As a result of YMTC Entities' infringement of the '214 patent, MTI is entitled to monetary damages in an amount adequate to compensate for YMTC Entities' infringement, but in no event less than a reasonable royalty for the use made of the invention by the YMTC Entities, together with interest and costs as fixed by the Court.

**Counterclaim IV**
**(Infringement of U.S. Patent No. 10,872,903)**

64. MTI restates and incorporates by reference its allegations in Paragraphs 1 through 63 of its Counterclaims.

- 24 -

Appx98

65.     MTI, owns all right, title, and interest, including the right to recover damages for past, present, and future infringement, in and to U.S. Patent No. 10,872,903, entitled "Three dimensional memory and methods of forming the same." A true and correct copy of the '903 patent is attached as Exhibit 7.

66.     The '903 patent was duly and legally issued by the United States Patent and Trademark Office on Dec. 22, 2020.

67.     The YMTC Entities infringe at least claim 1 of the '903 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by using, offering for sale, selling, and/or importing into the United States, without authorization, the YMTC Accused Storage Products.

68.     The YMTC Accused Storage Products are used to perform and/or practice each and every limitation of at least claim 1 of the '903 patent.  A claim chart providing examples of how the YMTC Accused Storage Products practice each limitation of at least claim 1 of the '903 patent is attached as Exhibit 8 hereto and is incorporated by reference herein.

69.     The YMTC Entities also actively induce infringement of at least claim 1 of the '903 patent under 35 U.S.C. § 271(b) and have done so since at least the filing of these counterclaims, by actively encouraging others to infringe (such infringement by others being by way of using, selling, offering to sell, or importing into the United States the YMTC Accused Storage Products).

70.     Since at least the filing of these counterclaims, the YMTC Entities have known of the '903 patent and their infringement thereof. Since before the filing of these counterclaims, the YMTC Entities have had knowledge of MTI's patent portfolio with respect to 3D NAND technology and that portfolio's relevance and application to the YMTC Entities' own products. Accordingly, discovery may reveal the YMTC Entities knew of the '903 patent and the YMTC Entities' unauthorized use thereof before the filing of these counterclaims.

71.     The YMTC Entities know (or believe that there is a high probability) that their actions are inducing infringement and are intended to induce infringement.  For example, the YMTC Entities encourage, train, instruct, and provide support and technical assistance to others to directly infringe the '903 patent by contracting with, encouraging, and instructing third parties,

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 25 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

Appx99

1   including equipment and design manufacturers, device manufacturers, distributors, customers, and

2   other third parties to use, sell, offer for sale, and/or import into the United States, the YMTC

3   Accused Storage Products and products that incorporate the YMTC Accused Storage Products.  For

4   instance, the YMTC Entities publish and provide technical materials, product specifications, and

5   promotional literature for the YMTC Accused Storage Products that instruct and encourage the

6   YMTC Entities' customers and other third parties to integrate the YMTC Accused Storage Products

7   into products made, used, sold, offered for sale, and/or imported into the United States, and works

8   with customers and potential customers to design their products using the YMTC Accused Storage

9   Products with knowledge that those products will be used and sold in the United States.

10      72.     Since at least the filing of these counterclaims, the YMTC Entities' infringement

11  has been willful.

12      73.     As a result of YMTC Entities' infringement of the '903 patent, MTI is entitled to

13  monetary damages in an amount adequate to compensate for YMTC Entities' infringement, but in

14  no event less than a reasonable royalty for the use made of the invention by the YMTC Entities,

15  together with interest and costs as fixed by the Court.

16                          **Counterclaim V**
17              **(Infringement of U.S. Patent No. 10,373,974)**

18      74.     MTI restates and incorporates by reference its allegations in Paragraphs 1 through

19  73 of its Counterclaims.

20      75.     MTI, owns all right, title, and interest, including the right to recover damages for

21  past, present, and future infringement, in and to U.S. Patent No. 10,373,974, entitled

22  "Microelectronic devices and related methods."  A true and correct copy of the '974 patent is

23  attached as Exhibit 9.

24      76.     The '974 patent was duly and legally issued by the United States Patent and

25  Trademark Office on Aug. 6, 2019.

26      77.     The YMTC Entities infringe at least claim 1 of the '974 patent under 35 U.S.C.

27  § 271(a), literally and/or under the doctrine of equivalents, by using, offering for sale, selling,

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 26 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx100

1    and/or importing into the United States, without authorization, the YMTC Accused Storage

2    Products.

3        78.    The YMTC Accused Storage Products are used to perform and/or practice each and

4    every limitation of at least claim 1 of the '974 patent.  A claim chart providing examples of how

5    the YMTC Accused Storage Products practice each limitation of at least claim 1 of the '974 patent

6    is attached as Exhibit 10 hereto and is incorporated by reference herein.

7        79.    The YMTC Entities also actively induce infringement of at least claim 1 of the '974

8    patent under 35 U.S.C. § 271(b), and have done so since at least the filing of these counterclaims,

9    by actively encouraging others to infringe (such infringement by others being by way of using,

10   selling, offering to sell, or importing into the United States the YMTC Accused Storage Products).

11       80.    Since at least the filing of these counterclaims, the YMTC Entities have known of

12   the '974 patent and their infringement thereof.  Since before the filing of these counterclaims, the

13   YMTC Entities have had knowledge of MTI's patent portfolio with respect to 3D NAND

14   technology and that portfolio's relevance and application to the YMTC Entities' own products.

15   Accordingly, discovery may reveal the YMTC Entities knew of the '974 patent and the YMTC

16   Entities' unauthorized use thereof before the filing of these counterclaims.

17       81.    The YMTC Entities know (or believe that there is a high probability) that their

18   actions are inducing infringement and are intended to induce infringement.  For example, the

19   YMTC Entities encourage, train, instruct, and provide support and technical assistance to others to

20   directly infringe the '974 patent by contracting with, encouraging, and instructing third parties,

21   including equipment and design manufacturers, device manufacturers, distributors, customers, and

22   other third parties to use, sell, offer for sale, and/or import into the United States, the YMTC

23   Accused Storage Products and products that incorporate the YMTC Accused Storage Products.  For

24   instance, the YMTC Entities publish and provide technical materials, product specifications, and

25   promotional literature for the YMTC Accused Storage Products that instruct and encourage the

26   YMTC Entities' customers and other third parties to integrate the YMTC Accused Storage Products

27   into products made, used, sold, offered for sale, and/or imported into the United States, and works

28

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 27 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx101

with customers and potential customers to design their products using the YMTC Accused Storage Products with knowledge that those products will be used and sold in the United States.

82.     Since at least the filing of these counterclaims, the YMTC Entities' infringement has been willful.

83.     As a result of YMTC Entities' infringement of the '974 patent, MTI is entitled to monetary damages in an amount adequate to compensate for YMTC Entities' infringement, but in no event less than a reasonable royalty for the use made of the invention by the YMTC Entities, together with interest and costs as fixed by the Court.

## DEMAND FOR A JURY TRIAL

Defendants and counterclaim plaintiff request a jury trial on all issues related to YMTC's claims and MTI's counterclaims that are so triable.

## PRAYER FOR RELIEF OF DEFENDANTS AND COUNTERCLAIM PLAINTIFF

WHEREFORE, having fully answered, defendants and counterclaim plaintiff pray that the Court enter judgment as follows:

A.     A judgment in favor of Micron and against YMTC on all of YMTC's claims, including a dismissal with prejudice of all of YMTC's claims;

B.     A judgment declaring that Micron has not infringed, contributed to the infringement of, or induced others to infringe, either directly or indirectly, literally or under the doctrine of equivalents, any valid claims of the YMTC Asserted Patents;

C.     A judgment declaring that the YMTC Asserted Patents are invalid;

D.     A judgment declaring that this YMTC's case against Micron is exceptional and an award to Micron of its reasonable costs and expenses of litigation, including attorneys' fees and expert witness fees;

E.     A judgment in favor of MTI and against the YMTC Entities on all of its Counterclaims;

F.     A judgment in favor of MTI that the YMTC Entities have infringed and are infringing, either literally and/or under the doctrine of equivalents, one or more claims of each of the MTI Asserted Patents;

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 28 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

Appx102

G.      An order pursuant to 35 U.S.C. § 283 enjoining the YMTC Entities and their subsidiaries, parents, divisions, affiliates, successors, assigns, transferees, officers, directors, attorneys, agents, servants, employees, privies, and all other persons in active concert or participation with any of the foregoing, from continued acts of infringement of the claims of the MTI Asserted Patents;

H.      A judgment and order requiring the YMTC Entities to pay Micron its damages, costs, expenses, and pre-judgment and post-judgment interest for the YMTC Entities' infringement;

I.      If a permanent injunction is not granted, then a judicial determination of the conditions for the YMTC Entities future infringement, such as an ongoing royalty;

J.      A determination that the YMTC Entities infringement has been willful;

K.      A determination that the damages award against the YMTC Entities be increased pursuant to 35 U.S.C. § 284 because of the willful and deliberate nature of the YMTC Entities' conduct;

L.      A judgment declaring that MTI's case against the YMTC Entities is exceptional and an award to MTI of its reasonable costs and expenses of litigation, including attorneys' fees and expert witness fees;

M.      All other relief that the Court deems just and proper.


Dated: February 16, 2024                    ORRICK, HERRINGTON & SUTCLIFFE LLP


By: _____ */s/ Jared Bobrow*
                    Jared Bobrow

*Attorneys for Defendants*
*Micron Technology, Inc., and*
*Micron Consumer Products Group LLC*

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 29 -

DEFS' ANSWER TO 1ST AMENDED
COMPLAINT AND COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

Appx103

# Exhibit 11

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, D.C. 20549

# FORM 10-K

**(Mark One)**

☒   **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended August 31, 2023**
OR

☐   **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the transition period from           to**
**Commission file number 1-10658**

# Micron Technology, Inc.

(Exact name of registrant as specified in its charter)

| **Delaware** | | **75-1618004** |
|---|---|---|
| (State or other jurisdiction of incorporation or organization) | | (IRS Employer Identification No.) |
| Address of principal executive offices, including zip code | | **8000 S. Federal Way, Boise, Idaho 83716-9632** |
| Registrant's telephone number, including area code | | **(208) 368-4000** |

Securities registered pursuant to Section 12(b) of the Act:

| **Title of each class** | **Trading Symbol** | **Name of each exchange on which registered** |
|---|---|---|
| Common Stock, par value $0.10 per share | MU | Nasdaq Global Select Market |

Securities registered pursuant to Section 12(g) of the Act: **None**

| | | |
|---|---|---|
| Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. | Yes ☒ | No ☐ |
| Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. | Yes ☐ | No ☒ |
| Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. | Yes ☒ | No ☐ |
| Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§ 232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). | Yes ☒ | No ☐ |

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large Accelerated Filer | Accelerated Filer | Non-Accelerated Filer | Smaller Reporting Company | Emerging Growth Company |
|---|---|---|---|---|
| ☒ | ☐ | ☐ | ☐ | ☐ |

| | |
|---|---|
| If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. | ☐ |
| Indicate by check mark whether the registrant has filed a report on and attestation to its management's assessment of the effectiveness of its internal control over financial reporting under Section 404(b) of the Sarbanes-Oxley Act (15 U.S.C. 7262(b)) by the registered public accounting firm that prepared or issued its audit report. | ☒ |
| If securities are registered pursuant to Section 12(b) of the Act, indicate by check mark whether the financial statements of the registrant included in the filing reflect the correction of an error to previously issued financial statements. | ☐ |
| Indicate by check mark whether any of those error corrections are restatements that required a recovery analysis of incentive-based compensation received by any of the registrant's executive officers during the relevant recovery period pursuant to §240.10D-1(b). | ☐ |
| Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). | Yes ☐   No ☒ |

The aggregate market value of the voting and non-voting common equity held by non-affiliates was $47.9 billion based on the closing price reported on the Nasdaq Global Select Market on March 2, 2023. Shares of common stock held by each executive officer and director and by each person who owns 5% or more of the outstanding common stock were excluded as they may be deemed to be affiliates. This determination of affiliate status is not necessarily a conclusive determination for other purposes.

The number of outstanding shares of the registrant's common stock as of September 29, 2023 was 1,098,034,471.

**DOCUMENTS INCORPORATED BY REFERENCE**

Portions of the Proxy Statement for the registrant's Fiscal 2023 Annual Meeting of Shareholders to be held on January 18, 2024 are incorporated by reference into Part II and Part III of this Annual Report on Form 10-K.

# Micron corporate profile

## It's all about data

Data is today's new business currency, and memory and storage are a critical foundation for the data economy. Memory and storage innovations will help transform society and enable significant value *for all.*

### Who we are

Micron designs, develops and manufactures industry-leading memory and storage products. By providing foundational capability for AI and 5G across data center, the intelligent edge, and consumer devices, we unlock innovation across industries including healthcare, automotive and communications. Our technology and expertise are central to maximizing value from cutting-edge computing applications and new business models which disrupt and advance the industry.

### Our vision

As a global leader in memory and storage solutions, we are transforming how the world uses information to enrich life *for all.* By advancing technologies to collect, store and manage data with unprecedented speed and efficiency, we lead the transformation of data to intelligence. In a world of change, we remain nimble, delivering products that help inspire the world to learn, communicate and advance faster than ever.

### Our commitment

Our customers depend on our innovative solutions every day. We dedicate ourselves to demonstrating our environmental conscience, an inclusive team culture where all voices are heard and respected, and engaging in our communities to enrich life *for all.*

### Global product portfolio

DRAM | NAND | NOR | Solid-State Drives | Graphics and High Bandwidth Memory (HBM) | Managed NAND and Multichip Packages

Founded on October 5, 1978

Headquartered in
Boise, Idaho, USA

## $15.5B
FY23 annual revenue

## 5th
Largest semiconductor company in the world*

## 136
On the 2023 Fortune 500

## ~54,000
Patents granted and growing**

## 17
Countries**

## 11
Manufacturing sites and 15 customer labs**

## ~43,000
Team members**

*Based on Gartner Market Share:
Semiconductors by End Market, Worldwide, 2022
(April 2023), excluding IP/software revenue.
**Micron data as of August 31, 2023

**Media inquiries**
mediarelations@micron.com

**Government inquiries**
govaffairs@micron.com

**Investor inquiries**
investorrelations@micron.com

---

**Connect with us on micron.com**

© 2023 Micron Technology, Inc. Micron, the Micron logo, the M logo, Intelligence Accelerated™, and other Micron trademarks are the property of Micron Technology, Inc. All other trademarks are the property of their respective owners.



# Micron's Global Presence



Micron's global presence map highlights locations that include our manufacturing sites, centers of excellence, customer labs, and large offices. Not all Micron locations are represented on this map.



# Table of Contents

| | | |
|---|---|---|
| Introduction | | 5 |
| **PART I** | | |
| Item 1. | Business | 7 |
| Item 1A. | Risk Factors | 21 |
| Item 1B. | Unresolved Staff Comments | 40 |
| Item 2. | Properties | 40 |
| Item 3. | Legal Proceedings | 41 |
| Item 4. | Mine Safety Disclosures | 41 |
| **PART II** | | |
| Item 5. | Market for Registrant's Common Equity, Related Stockholder Matters, and Issuer Purchases of Equity Securities | 41 |
| Item 6. | [Reserved] | 43 |
| Item 7. | Management's Discussion and Analysis of Financial Condition and Results of Operations | 44 |
| Item 7A. | Quantitative and Qualitative Disclosures About Market Risk | 54 |
| Item 8. | Financial Statements and Supplementary Data | 56 |
| Item 9. | Changes in and Disagreements With Accountants on Accounting and Financial Disclosure | 94 |
| Item 9A. | Controls and Procedures | 94 |
| Item 9B. | Other Information | 95 |
| Item 9C. | Disclosure Regarding Foreign Jurisdictions that Prevent Inspections | 95 |
| **PART III** | | |
| Item 10. | Directors, Executive Officers, and Corporate Governance | 95 |
| Item 11. | Executive Compensation | 95 |
| Item 12. | Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters | 95 |
| Item 13. | Certain Relationships and Related Transactions, and Director Independence | 95 |
| Item 14. | Principal Accountant Fees and Services | 95 |
| **PART IV** | | |
| Item 15. | Exhibits and Financial Statement Schedule | 96 |
| Item 16. | Form 10-K Summary | 100 |
| Signatures | | 101 |

 4

Table of Contents

# Definitions of Commonly Used Terms

As used herein, "we," "our," "us," and similar terms include Micron Technology, Inc. and its consolidated subsidiaries, unless the context indicates otherwise. Abbreviations, terms, or acronyms are commonly used or found in multiple locations throughout this report and include the following:

| Term | Definition | Term | Definition |
| --- | --- | --- | --- |
| 2023 Notes | 2.497% Senior Notes due April 2023, repaid November 2021 | GDDR | Graphics double data rate |
| 2024 Notes | 4.640% Senior Notes due February 2024, repaid November 2021 | HBM | High-bandwidth memory, a stacked DRAM technology optimized for memory-bandwidth intensive applications |
| 2024 Term Loan A | Senior Term Loan A due October 2024 | Inotera | Inotera Memories, Inc. |
| 2025 Term Loan A | Senior Term Loan A due November 2025 | LIBOR | London Interbank Offered Rate |
| 2026 Term Loan A | Senior Term Loan A due November 2026 | LPDDR | Low-power double data rate DRAM |
| 2027 Term Loan A | Senior Term Loan A due November 2027 | LPDRAM | Low-power DRAM |
| 2026 Notes | 4.975% Senior Notes due February 2026 | MCP | Multichip packaged solutions with managed NAND and LPDRAM |
| 2027 Notes | 4.185% Senior Notes due February 2027 | Micron | Micron Technology, Inc. (Parent Company) |
| 2028 Notes | 5.375% Senior Notes due April 2028 | MTU | Micron Technology Utah, LLC |
| 2029 A Notes | 5.327% Senior Notes due February 2029 | Multi-Tranche Term Loan Agreement | Borrowing agreement executed November 3, 2022 that governs the 2025 Term Loan A, 2026 Term Loan A, and 2027 Term Loan A |
| 2029 B Notes | 6.750% Senior Notes due November 2029 | NRV | Net realizable value |
| 2030 Notes | 4.663% Senior Notes due February 2030 | OEM | Original equipment manufacturer |
| 2032 Green Bonds | 2.703% Senior Notes due April 2032 | PCIe | High-speed motherboard connection for peripheral devices such as storage drives |
| 2032D Notes | 3.125% Convertible Senior Notes due May 2032, settled August 2021 | Qimonda | Qimonda AG |
| 2033 A Notes | 5.875% Senior Notes due February 2033 | QLC | Quad-level cell (four bits per cell) |
| 2033 B Notes | 5.875% Senior Notes due September 2033 | Revolving Credit Facility | $2.5 billion Revolving Credit Facility due May 2026 |
| 2041 Notes | 3.366% Senior Notes due November 2041 | SATA | Hardware interface for connecting to storage devices such as hard disk drives and SSDs |
| 2051 Notes | 3.477% Senior Notes due November 2051 | SLC | Single-level cell (one bit per cell) |
| AI | Artificial intelligence | SOFR | Secured Overnight Financing Rate |
| CAC | China's Cyberspace Administration | SSD | Solid state drive |
| DDR | Double data rate DRAM | TI | Texas Instruments Incorporated |
| EBITDA | Earnings before interest, taxes, depreciation, and amortization | TLC | Triple-level cell (three bits per cell) |
| eMCP | Embedded multichip packaged solutions with embedded multimedia card storage and LPDDR | UFS | Universal flash storage |
| EUV | Extreme ultraviolet lithography | uMCP | UFS-based MCP |
| Extinguished 2024 Term Loan A | Senior Term Loan A due October 2024, repaid May 2021 | | |

Micron, Crucial, any associated logos, and all other Micron trademarks are the property of Micron. 3D XPoint is a trademark of Intel Corporation or its subsidiaries. Other product names or trademarks that are not owned by Micron are for identification purposes only and may be the trademarks of their respective owners.

All period references are to our fiscal periods unless otherwise indicated. Our fiscal year is the 52 or 53-week period ending on the Thursday closest to August 31. Fiscal 2023, 2022, and 2021 each contained 52 weeks.

# Forward-Looking Statements

This Form 10-K contains trend information and other forward-looking statements that involve a number of risks and uncertainties. Such forward-looking statements may be identified by words such as "anticipate," "expect," "intend," "pledge," "committed," "plan," "opportunities," "future," "believe," "target," "on track," "estimate," "continue," "likely," "may," "will," "would," "should," "could," and variations of such words and similar expressions. However, the absence of these words or similar expressions does not mean that a statement is not forward-looking. Specific forward-looking statements include, but are not limited to, statements such as those made regarding expected production ramp of certain products; plans to implement EUV lithography; restructure plans and expected related savings; potential increases in our effective tax rate; the timing for construction and ramping of production for new memory manufacturing fabs in the United States; intent to make investments at our backend facility in Xi'an, China and build a new assembly and test facility in Gujarat, India; the receipt of government grants and investment tax credits; estimates of tax expense for 2024; the payment of future cash dividends; market conditions and profitability in our industry; potential write-downs of inventories in future quarters; the impact of the Cyberspace Administration of China decision; capital spending in 2024; the sufficiency of our cash and investments; allocation and dispersal of the net proceeds of our 2032 Green Bonds; and results of tax return examinations. Our actual results could differ materially from our historical results and those discussed in the forward-looking statements. Factors that could cause actual results to differ materially include, but are not limited to, those identified in "Part I – Item 1A. Risk Factors."

 6

# PART I
## ITEM 1. BUSINESS

# Overview

We are an industry leader in innovative memory and storage solutions transforming how the world uses information to enrich life *for all*. With a relentless focus on our customers, technology leadership, and manufacturing and operational excellence, Micron delivers a rich portfolio of high-performance DRAM, NAND, and NOR memory and storage products through our Micron® and Crucial® brands. Every day, the innovations that our people create fuel the data economy, enabling advances in artificial intelligence and 5G applications that unleash opportunities — from the data center to the intelligent edge and across the client and mobile user experience.

We manufacture our products at wholly-owned facilities and also utilize subcontractors for certain manufacturing processes. Our global network of manufacturing centers of excellence not only allows us to benefit from scale while streamlining processes and operations, but it also brings together some of the world's brightest talent to work on the most advanced memory technology. Centers of excellence bring expertise together in one location, providing an efficient support structure for end-to-end manufacturing, with quicker cycle times, in partnership with teams such as research and development ("R&D"), product engineering, human resources, procurement, and supply chain. For our locations in Singapore and Taiwan, this is also a combination of bringing fabrication and back-end manufacturing together. We make significant investments to develop proprietary product and process technology, which generally increases bit density per wafer and reduces per-bit manufacturing costs of each generation of product. We continue to introduce new generations of products that offer improved performance characteristics, including higher data transfer rates, advanced packaging solutions, lower power consumption, improved read/write reliability, and increased memory density.

We face intense competition in the semiconductor memory and storage markets and to remain competitive we must continuously develop and implement new products and technologies and decrease manufacturing costs in spite of ongoing inflationary cost pressures. Our success is largely dependent on obtaining returns on our R&D investments, efficient utilization of our manufacturing infrastructure, development and integration of advanced product and process technologies, market acceptance of our diversified portfolio of semiconductor-based memory and storage solutions, and efficient capital spending.

# Sales, Markets, and Products

### Product Technologies

Our product portfolio of memory and storage solutions, advanced solutions, and storage platforms is based on our high-performance semiconductor memory and storage technologies, including DRAM, NAND, and NOR. We sell our products into various markets through our business units in numerous forms, including components, modules, SSDs, managed NAND, MCPs, and wafers. Our system-level solutions, including SSDs and managed NAND, combine NAND, a controller, firmware, and in some cases DRAM.

***DRAM***: DRAM products are dynamic random access memory semiconductor devices with low latency that provide high-speed data retrieval with a variety of performance characteristics. DRAM products lose content when power is turned off ("volatile") and are most commonly used in client, cloud server, enterprise, networking, graphics, industrial, and automotive markets. LPDRAM products, which are engineered to meet standards for performance and power consumption, are sold into smartphone and other mobile-device markets (including client markets for Chromebooks and notebook PCs), as well as into the automotive, industrial, and consumer markets.

**7 | 2023 10-K**

Table of Contents

**NAND**: NAND products are non-volatile, re-writeable semiconductor storage devices that provide high-capacity, low-cost storage with a variety of performance characteristics. NAND is used in SSDs for the enterprise and cloud, client, and consumer markets and in removable storage markets. Managed NAND is used in smartphones and other mobile devices, and in consumer, automotive, and embedded markets. Low-density NAND is ideal for applications like automotive, surveillance, machine-to-machine, automation, printer, and home networking.

**NOR**: NOR products are non-volatile re-writable semiconductor memory devices that provide fast read speeds. NOR is most commonly used for reliable code storage (e.g., boot, application, operating system, and execute-in-place code in an embedded system) and for frequently changing small data storage and is ideal for automotive, industrial, and consumer applications.

## Products by Business Unit and Market

### *Compute and Networking Business Unit ("CNBU")*

CNBU includes memory products and solutions sold into client, cloud server, enterprise, graphics, and networking markets. CNBU reported revenue of $5.71 billion in 2023, $13.69 billion in 2022, and $12.28 billion in 2021. CNBU sales in 2023 consisted primarily of DRAM products produced on 1x, 1y, 1z, and 1α (1-alpha) technology nodes. In 2023, we achieved several important product qualifications on our industry-leading 1ß (1-beta) DRAM node and are well positioned to ramp manufacturing of CNBU products in 2024.

*Client:* CNBU sales to the client market in 2023 consisted primarily of DDR4, DDR5, LPDDR5, and LPDDR4 DRAM products. Our products sold to the client market support both commercial and consumer PC unit growth.

*Cloud Server:* CNBU sales to the cloud market in 2023 consisted primarily of our DDR4 and DDR5 DRAM products. Overall cloud growth continues to be driven by the shift of both infrastructure and workloads from on-premises to the cloud. Cloud-native workloads are drivers of growth through use-cases like intelligent edge devices capable of AI and augmented reality that store and access data in the cloud or rely on the cloud for compute capability. Cloud servers supporting AI and data-centric workloads require significantly increasing quantities of DRAM, HBM, and NAND as the task of turning data into insight becomes increasingly memory-centric. As modern servers pack more processing cores into CPUs, the memory bandwidth per CPU core has been decreasing. Our DDR5 alleviates this bottleneck by providing higher bandwidth compared to previous generations, enabling improved performance and scaling. We expect that our new server DDR5 memory will be a key enabler of CPU core count growth and the bandwidth that DDR5 delivers will be central to unlocking overall server system performance gains for data-intensive workloads like AI and high-performance computing. HBM, used in high performance computing, had very strong demand this year, driven by demand for generative AI. We are working closely with our customers and have begun sampling our industry-leading HBM3E product offering. We expect to begin a mass production ramp for HBM3E in early calendar 2024. In 2023, we announced the introduction of 128GB and 256GB Compute Express Link ("CXL") 2.0 memory expansion modules. By leveraging a unique dual-channel memory architecture, we are able to deliver higher module capacity and increased bandwidth.

*Enterprise:* CNBU sales to the enterprise market in 2023 consisted primarily of our DDR4 and DDR5 DRAM products. In 2023, we announced volume shipments of our 96GB DDR5 high-density module built on 1α technology, using 24Gb die, which delivers equivalent performance for the majority of workloads versus the more expensive through-silicon via ("TSV") dual-die package-based 128GB modules. The enterprise market continues to grow beyond the mature OEM-sourced server consumption model with the further maturing of hybrid cloud and edge solutions as part of the digital transformation.

*Graphics:* CNBU sales to the graphics market in 2023 consisted primarily of GDDR6 graphics products. The graphics market is driven by the need for high-performance and HBM solutions. Our GDDR6 and GDDR6X DRAM graphics products are incorporated into gaming consoles, PC graphics cards, and graphics processing unit-based data center solutions, which are the driving force behind applications such as AI, virtual and augmented reality, 4K and 8K gaming, and professional design.

*Networking:* CNBU sales to the networking market in 2023 consisted primarily of our DDR4 and DDR5 DRAM products. In 2023, demand was driven by 5G infrastructure deployments, data center networking growth, and increasing data transfer requirements across multiple industries.


8

Table of Contents

*Mobile Business Unit ("MBU")*

MBU includes memory and storage products sold into the mobile market including discrete NAND, DRAM, and managed NAND products. MBU managed NAND includes embedded multi-media controller ("e.MMC") and universal flash storage ("UFS") solutions, each of which combine high-capacity NAND with a high-speed controller and firmware, and eMCP/uMCP products, which combine an e.MMC/UFS solution with LPDRAM. MBU reported revenue of $3.63 billion in 2023, $7.26 billion in 2022, and $7.20 billion in 2021. In 2023, we achieved key mobile customer qualifications on our 1ß based LPDDR5X and started high-volume revenue shipments to tier-1 OEMs. In addition, we achieved significant milestones in UFS with the qualification and ramp of a high-capacity uMCP5 featuring 16GB of DRAM and 512GB of NAND. We also started to sample a new UFS 4.0 product based on our latest 232-layer NAND technology, which enables industry-leading performance for flagship handsets.

*Mobile:* MBU sales to the mobile market in 2023 consisted primarily of LPDDR4 and LPDDR5 DRAM and managed NAND solutions. 5G-enabled products require higher DRAM and NAND content per device and the market penetration rate for 5G continued to increase. Our smartphone, tablet, and mobile PC products are utilized by OEMs to enable AI, augmented reality, and life-like virtual reality capabilities into high-end phones, including facial and voice recognition, real-time translation, fast image search, and scene detection.

*Embedded Business Unit ("EBU")*

EBU includes memory and storage products and solutions sold into automotive, industrial, and consumer markets and includes discrete and module DRAM, discrete NAND, managed NAND, SSDs, and NOR. EBU reported revenue of $3.64 billion in 2023, $5.24 billion in 2022, and $4.21 billion in 2021. The embedded market has traditionally been characterized by long life-cycle DRAM and non-volatile products manufactured on mature process technologies. Strong trends of digitization, connectivity, and intelligence in every device, are driving increasing demand in embedded markets for memory and storage products that incorporate leading process technologies. Our embedded products enable edge devices to store, connect, and transform information in the internet of things ("IoT") market and are utilized in a diverse set of applications in the automotive, industrial, and consumer markets.

*Automotive:* EBU sales to the automotive market in 2023 consisted primarily of LPDDR4 and LPDDR5 DRAM, DDR3 and DDR4 DRAM, and e.MMC managed NAND. Advancements in autonomous driving, advanced driver-assistance systems, and in-vehicle infotainment systems continue to increase the requirements for high-performing memory and storage products, with higher reliability requirements for leading-edge products. Automotive memory and storage products enable connected, advanced infotainment systems with increasingly larger and higher definition displays and support improved voice and gesture control. In addition, our products enable increasingly advanced vision and sensor based automated systems to support driver assistance solutions and vehicle safety. Our comprehensive and expanding portfolio of DRAM, NAND, and NOR solutions to the automotive market, as well as our extensive customer support network, enable us to maintain our strong leadership position in this market.

*Industrial:* EBU sales to the industrial market in 2023 consisted primarily of DDR3 and DDR4 DRAM, LPDDR4 DRAM, NAND MCPs, and SLC NAND. Our products enable applications in the growing industrial IoT market, including machine-to-machine communication, factory automation, transportation, surveillance, retail, and smart infrastructure.

*Consumer:* EBU sales to the consumer market in 2023 consisted primarily of our LPDDR4 and LPDDR5 DRAM, DDR4 and DDR3 DRAM, and SLC NAND. These embedded memory and storage solutions are used in a diverse set of consumer products, including service provider and IP set-top boxes, digital home assistants, digital still and video cameras, home networking, ultra-high definition televisions, augmented reality and virtual reality ("AR/VR") headsets, and many more applications. Our embedded memory and storage solutions enable edge devices in the consumer products market to store, connect, and transform information in the IoT.

***Storage Business Unit ("SBU")***

SBU includes SSDs and component-level solutions sold into enterprise and cloud, client, and consumer storage markets. SBU reported revenue of $2.55 billion in 2023, $4.55 billion in 2022, and $3.97 billion in 2021. In 2023, 176-layer NAND comprised the largest portion of SBU's NAND bit shipments. In 2023, we also began shipping client, consumer, and data center SSDs featuring 232-layer NAND technology. It features higher areal density and delivers higher capacity and improved energy efficiency over previous generations of our NAND, to enable best-in-class support of the most data-intensive use cases from client to cloud.

<u>*SSDs*</u>*:* SSD storage products incorporate NAND, a controller, and firmware and offer significant performance and features over hard disk drives, including smaller form factors, faster read and write speeds, higher reliability, and lower power consumption. We offer SSD solutions utilizing our NAND technology to the enterprise and cloud, client, and consumer markets.

*Enterprise and Cloud SSDs:* SBU sales to the enterprise and cloud SSD markets in 2023 consisted primarily of our 5300, 7450, 5400, 9400, and 6500 series SSDs. In data center SSDs, our entire portfolio is now on 176-layer or 232-layer NAND, demonstrating our product and technology leadership. We are in a strong position to serve AI demand for fast storage as these data-intensive applications proliferate. In 2023, we launched our first 200+ layer NAND data center SSD, and qualification has completed at some customers and is in progress at other customers largely to support AI cluster installations. The enterprise and cloud storage markets are driven by the growth of applications that store, access, and analyze data in the cloud. Applications such as machine learning servers require fast access to data with low latency, predictable performance, and high storage capacities.

*Client SSDs:* SBU sales to the client SSD market in 2023 consisted primarily of our 2450, 2400, and 3400 series client SSDs. Our client SSDs, targeted for leading personal computer OEMs, have mostly replaced hard disk drives used in notebooks, desktops, workstations, and other consumer applications, and deliver high performance, power efficiency, security, and capacity.

*Consumer SSDs:* SBU sales to the consumer SSD market in 2023 consisted primarily of our Crucial-branded MX500 and BX500 SATA SSDs and our P3, P3 Plus, and P5 Plus PCIe SSDs, which utilize our NAND QLC and TLC technologies. In 2023, we began production shipments of Crucial T700, a Gen5 PCIe consumer SSD built with our 232-layer NAND. Our consumer SSD solutions have mostly replaced hard disk drives as end users and system builders and integrators seek the higher performance, power savings, and reliability of SSDs.

<u>*Components*</u>*:* SBU sales of components in 2023 consisted primarily of our 96-layer, 176-layer, and 232-layer TLC and QLC NAND products.

## Marketing and Customers

We seek to build collaborative relationships with our customers to understand their unique opportunities and challenges. By engaging with our customers early in the product life-cycle to identify and design features and performance characteristics into our products, we are able to manufacture products that anticipate and address our customers' changing needs. Collaborating with our customers on their design needs in changing end markets and meeting their timelines for qualifying new products allows us to differentiate our memory and storage solutions, which provides greater value to our customers.

Our semiconductor memory and storage products are offered under our Micron and Crucial brand names and through private labels. We market our semiconductor memory and storage products primarily through our own direct sales force and maintain sales or representative offices to support our worldwide customer base. Our products are also offered through distributors, retailers, and independent sales representatives. Our distributors carry our products in inventory and typically sell a variety of other semiconductor products, including our competitors' products. Our independent sales representatives obtain orders, subject to final acceptance by us, and we then make shipments against these orders directly to customers or through our distributors. We sell our Crucial-branded products through a web-based customer-direct sales channel as well as through channel and distribution partners. We maintain inventory at locations in close proximity to certain key customers to facilitate rapid delivery of products.

*Micron* **10**

Due to volatile industry conditions, our customers are generally reluctant to enter into long-term, fixed-price purchase contracts. We typically enter into long-term agreements with our customers with acknowledgment that pricing, quantity, and other terms will be periodically negotiated to reflect market conditions and our customer's demand for our products.

In each of the last three years, approximately one-half of our total revenue was from our top ten customers. For other information regarding our concentrations and customers, see "Part II – Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Certain Concentrations."

## Competitive Conditions

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Kioxia Holdings Corporation; Samsung Electronics Co., Ltd.; SK hynix Inc.; and Western Digital Corporation. Our competitors may use aggressive pricing to obtain market share. Some of our competitors are large corporations or conglomerates that may have a larger market share and greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage as our competitors may benefit from increased manufacturing scale and a stronger product portfolio. We operate in different jurisdictions than our competitors and may be impacted by unfavorable changes in currency exchange rates.

In addition, some governments may provide, or have provided and may continue to provide, significant assistance, financial or otherwise, to some of our competitors or to new entrants and may intervene in support of national industries and/or competitors. In particular, we face the threat of increasing competition as a result of significant investment in the semiconductor industry by the Chinese government and various state-owned or affiliated entities, in companies such as Yangtze Memory Technologies Co., Ltd. ("YMTC") and ChangXin Memory Technologies, Inc. ("CXMT"). In addition, the May 21, 2023 decision by China's Cyberspace Administration (the "CAC") that critical information infrastructure operators in China may not purchase Micron products had an impact on our ability to compete effectively in China and elsewhere.

We and our competitors generally seek to increase wafer output, improve yields, and reduce die size, which could result in significant increases in worldwide supply and downward pressure on prices. During periods of supply overcapacity, the industry may experience a temporary interruption in increased wafer output due to curtailed capital expenditures. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We, and some of our competitors, have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, could lead to declines in average selling prices for our products and could materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages.

# Manufacturing

We manufacture our products within our own facilities located in Taiwan, Singapore, Japan, the United States, Malaysia, and China, and also utilize subcontractors to perform certain manufacturing processes. Our products are manufactured on 300mm wafers in facilities that generally operate 24 hours per day, seven days per week. Semiconductor manufacturing is capital intensive, requiring large investments in sophisticated facilities and equipment. Our DRAM, NAND, and NOR products share a number of common manufacturing processes, enabling us to leverage our product and process technology and certain resources and manufacturing infrastructure across these product lines.

**11 | 2023 10-K**

Table of Contents

Our process for manufacturing semiconductor products is complex and involves numerous precise steps, including wafer fabrication, post fabrication processing, assembly, and test. Efficient production of semiconductor products requires utilization of advanced semiconductor manufacturing techniques and effectively deploying those techniques across multiple facilities. The primary determinants of manufacturing cost are process line-width, 3D non-volatile layers, NAND cell levels, process complexity (including the number of mask layers and fabrication steps), and manufacturing yield. Other factors include the cost and sophistication of manufacturing equipment, equipment utilization, cost of raw materials, labor productivity, package type, cleanliness of our manufacturing environment, and utilization of subcontractors to perform certain manufacturing processes. As we continue to increase our production of high value products and solutions, manufacturing costs are increasingly affected by the costs of application-specific integrated circuit ("ASIC") controllers and other semiconductors, advanced and complex packaging configurations, and testing at progressively higher performance speeds and quality levels. We continuously enhance our production processes, increase bits per wafer, transition to higher density products, and utilize advanced testing and assembly processes.

Wafer fabrication occurs in a highly-controlled clean environment to minimize yield loss from contaminants. Despite stringent manufacturing controls, individual circuits may be nonfunctional or wafers may be scrapped due to equipment errors, minute impurities in materials, defects in photomasks, circuit design marginalities or defects, or contamination from airborne particles, among other factors. Success of our manufacturing operations depends largely on minimizing defects and improving process margin to maximize yield of high-quality circuits. In this regard, we employ rigorous quality controls throughout the manufacturing, screening, and testing processes. We continue to heighten quality control as our product offerings expand into higher-end segments that require increasing performance targets.

Our products are manufactured and sold in both packaged form and as unpackaged bare die. Our packaged products include packaged die, memory modules, and system-level solutions, such as SSDs, managed NAND, and MCPs. We assemble many products in-house and, in some cases, outsource assembly services for certain packaged die, memory modules, SSDs, and MCPs. We test our products at various stages in the manufacturing process, conduct numerous quality control inspections throughout the entire production flow, and perform high temperature burn-in on finished products. In addition, we use our proprietary AMBYX™ line of intelligent test and burn-in systems to perform simultaneous circuit tests of semiconductor die, capturing quality and reliability data and reducing testing time and cost.

In recent years, we have produced an increasingly broad portfolio of products and system solutions, which enhances our ability to allocate resources to our most profitable products but also increases the complexity of our manufacturing and supply chain operations. Although our product lines generally use similar manufacturing processes, our costs can be affected by frequent conversions to new products; the allocation of manufacturing capacity to more complex, smaller-volume products; and the reallocation of manufacturing capacity across various product lines.

# Resources

## Supply Chain, Materials, and Third-Party Service Providers

Our supply chain and operations are dependent on the availability of materials that meet exacting standards and the use of third parties to provide us with components and services. We generally have multiple sources of supply for our materials and services. However, only a limited number of suppliers are capable of delivering certain materials, components, and services that meet our standards and, in some cases, materials, components, or services are provided by a single or sole source, and we may be unable to qualify new suppliers on a timely basis. The availability of materials or components such as chemicals, silicon wafers, gases, photoresist, controllers, substrates, lead frames, printed circuit boards, targets, and reticle glass blanks is impacted by various factors. These factors could include a shortage of raw materials or a disruption in the processing or purification of those raw materials into finished goods. Shortages or increases in lead times have occurred in the past, are currently occurring with respect to some materials and components, and may occur from time to time in the future. Constraints within our supply chain for certain materials and integrated circuit components could limit our bit shipments, which could have a material adverse effect on our business, results of operations, or financial condition.

Micron 12

Table of Contents

Our manufacturing processes are also dependent on our relationships with third-party manufacturers of controllers, analog integrated circuits, and other components used in some of our products and with outsourced semiconductor foundries, assembly and test providers, contract manufacturers, logistics carriers, and other service providers, including providers of electricity and other utilities. Although we have certain long-term contracts with some of our suppliers, many of these contracts do not provide for long-term capacity or pricing commitments. To the extent we do not have firm commitments from our third-party suppliers over a specific time period or for any specific capacity, quantity, and/or pricing, our suppliers may allocate capacity to their other customers and capacity and/or materials may not be available when needed or at reasonable prices. Inflationary pressures have increased, and may continue to increase costs for materials, supplies, and services. Regardless of contract structure, large swings in demand may exceed our contracted supply and/or our suppliers' capacity to meet those demand changes resulting in a shortage of parts, materials, or capacity needed to manufacture our products. In addition, if any of our suppliers was to cease operations or become insolvent, this could impact their ability to provide us with necessary supplies, and we may not be able to obtain the needed supply in a timely way or at all from other providers.

Certain materials are primarily available in a limited number of countries, including rare earth elements, minerals, and metals. Trade disputes, geopolitical tensions, economic circumstances, political conditions, or public health issues may limit our ability to obtain such materials. Although these rare earth and other materials are generally available from multiple suppliers, China is the predominant producer of certain of these materials. If China were to restrict or stop exporting these materials, our suppliers' ability to obtain such supply may be constrained and we may be unable to obtain sufficient quantities, or obtain supply in a timely manner, or at a commercially reasonable cost. Constrained supply of rare earth elements, minerals, and metals may restrict our ability to manufacture certain of our products and make it difficult or impossible to compete with other semiconductor memory and storage manufacturers who are able to obtain sufficient quantities of these materials from China.

We and/or our suppliers and service providers could be affected by regional conflicts, civil unrest, labor disruptions, sanctions, tariffs, embargoes, or other trade restrictions, as well as laws and regulations enacted in response to concerns regarding climate change, conflict minerals, responsible sourcing practices, public health crises, or other matters, which could limit the supply of our materials and/or increase the cost. Environmental regulations could limit our ability to procure or use certain chemicals or materials in our operations or products. In addition, disruptions in transportation lines could delay our receipt of materials. Our ability to procure components to repair equipment essential for our manufacturing processes could also be negatively impacted by various restrictions or disruptions in supply chains, among other items. The disruption of our supply of materials, components, or services, or the extension of our lead times could have a material adverse effect on our business, results of operations, or financial condition.

Our inability to source materials, supplies, capital equipment, or third-party services could affect our overall production output and our ability to fulfill customer demand. Significant or prolonged shortages of our products could halt customer manufacturing and damage our relationships with these customers. Any damage to our customer relationships as a result of a shortage of our products could have a material adverse effect on our business, results of operations, or financial condition.

Similarly, if our customers experience disruptions to their supplies, materials, components, or services, or the extension of their lead times, they may reduce, cancel, or alter the timing of their purchases with us, which could have a material adverse effect on our business, results of operations, or financial condition.

## Patents and Licenses

As of August 31, 2023, we owned approximately 13,100 active U.S. patents and 6,300 active foreign patents. In addition, we have thousands of U.S. and foreign patent applications pending. Our patents have various terms expiring through 2042.

From time to time, we sell and/or license our technology to other parties and continue to pursue opportunities to monetize our investments in our intellectual property through partnering and other arrangements. We have also jointly developed memory and storage product and process technology with third parties on a limited basis.

Table of Contents

We have a number of patent and intellectual property license agreements and have, from time to time, licensed or sold our intellectual property to third parties. Some of these license agreements require us to make one-time or periodic payments while others have resulted in us receiving payments. We may need to obtain additional licenses or renew existing license agreements in the future, and we may enter into additional sales or licenses of intellectual property and partnering arrangements. We are unable to predict whether these license agreements can be obtained or renewed on terms acceptable to us.

# Research and Development

Our R&D efforts are focused primarily on development of memory and storage solutions, including our industry-leading DRAM and NAND technology, that enable continuous improvement in performance and cost structure for our products. In DRAM, our 1ß node was introduced ahead of the industry and we ramped our manufacturing of it during 2023. We plan to implement EUV lithography on the DRAM node after 1ß. In NAND, the introduction of our 232-layer node was also ahead of the industry and we ramped our manufacturing of it during 2023. We are also focused on developing new fundamentally different memory structures, materials, and packages designed to facilitate our transition to next generation products. Additional R&D efforts are concentrated on the enablement of advanced computing, storage, and mobile memory architectures and the investigation of new opportunities that leverage our core semiconductor expertise. Product design and development efforts include high-density DDR5, LPDDR5, HBM, CXL based products, and advanced graphics DRAM; 3D NAND (including TLC and QLC technologies); mobile and storage solutions (including firmware and controllers); managed NAND; SSDs; and other memory technologies and systems.

To compete in the semiconductor memory and storage markets, we must continue to develop technologically advanced products and processes. The continued evolution of our semiconductor product offerings is necessary to meet expected customer requirements for memory and storage products and solutions. Our process, design, firmware, controller, package, and system development efforts occur at multiple locations across the world. Our primary R&D centers are located in Boise, Idaho; India; Japan; Taiwan; China; Italy; Singapore; Germany; Malaysia; and other sites in the United States.

R&D expenses vary primarily with the number of development and pre-qualification wafers processed and end-product solutions developed, personnel costs, and the cost of advanced equipment dedicated to new product and process development, such as investments in EUV lithography equipment. Because of the lead times necessary to manufacture our products, we typically begin to process wafers before completion of performance and reliability testing. Development of a product is deemed complete when it is qualified through internal reviews and tests for performance, functionality, and reliability. R&D expenses can vary significantly depending on the timing of product qualification.

# Human Capital

We depend on a highly educated and experienced workforce to design, develop, and manufacture high-quality, cutting-edge memory and storage solutions. As of August 31, 2023, we had approximately 43,000 employees located in the following regions:

| Region | Percent All | Percent Women |
|---|---|---|
| Asia | 78 % | 34 % |
| Americas | 20 % | 20 % |
| Europe, Middle East, and Africa | 2 % | 21 % |
| Total | 100 % | 31 % |

As of August 31, 2023 and September 1, 2022, 31% of our global workforce were women. As of August 31, 2023, 25% of our technical or engineering roles were held by women, as compared to 24% as of September 1, 2022. Women comprised 17% of our senior leaders as of August 31, 2023 and September 1, 2022.

Micron 14

Our Board of Directors was comprised of four men and four women as of August 31, 2023. In addition, as of August 31, 2023, based on self-identification, one member of our Board of Directors is Asian, one member is African-American, and six members are White. One member of our Board of Directors is a veteran of the U.S. military.

## Talent Acquisition, Development, and Engagement

Finding and retaining the best and brightest people in an extremely competitive industry environment is a strategic imperative for our business. We partner with our communities, institutions, governments, and associations to expand the pipeline of diverse, highly skilled STEM talent globally. Our partnerships with K-12 and post-secondary education systems are key to training and inspiring the next generation to consider STEM careers in the semiconductor industry. We use AI to reduce or eliminate the potential for bias from resumes, allowing us to focus on individual merit over personal characteristics. We are committed to developing team members at all stages of their careers, including on-the-job training, continuing education, a robust mentoring program, and numerous internal certifications and training. In addition, we develop and accelerate our leaders' careers through targeted learning that helps them move to higher-level positions or across functions.

We use a research-based, people-centric approach to understanding and improving team member engagement. Periodically, we invite all team members to participate in our internal engagement survey, which covers questions that measure and provide insight into three driving factors: meaningfulness, availability, and psychological safety. In April 2023, 82% of our team members participated in the survey. The results of the survey are shared with all team members and management uses feedback from the survey to identify and implement continuous improvements to our culture and workplace practices.

## Compensation and Benefits

Our compensation programs are designed to support our team members' financial and personal wellbeing by providing a valuable return for their contributions to the company. Our total compensation strategy includes base salary, annual bonuses, equity awards, a discounted stock purchase plan, and a comprehensive benefits package.

## Diversity, Equality, and Inclusion

We have five diversity, equality, and inclusion ("DEI") commitments that serve as the roadmap of our DEI work internally, within our industry, and in the community at large. To hold ourselves accountable, each commitment is assigned an executive sponsor who is responsible for its strategy and execution. Our five DEI commitments are summarized as follows:

- Increase representation of underrepresented groups
- Drive equitable pay and inclusive benefits
- Champion advocacy and strengthen our culture of inclusion
- Engage with diverse financial institutions for cash management
- Increase diverse supplier representation and spending

We have a regular review of pay globally, including base pay and stock awards, to drive compensation equitably. In 2023, due to challenging industry conditions, base pay increases were suspended, however we achieved global pay equity for all underrepresented employees in compensation across bonuses and stock rewards. In 2022 and 2021, we achieved comprehensive global pay equity for all employees in total compensation across base pay, bonuses, and stock rewards. A pay equity analysis will be conducted in 2024 with our base pay merit review. We also continually assess our global leave, medical, and financial benefits to ensure inclusiveness. In addition, a portion of our company-wide annual bonus program is based on the achievement of DEI-related goals.

**15 | 2023 10-K**

## Health, Safety, and Wellbeing

Proactive efforts to prevent occupational illnesses and injuries allow us to maintain a safe, healthy, and secure workplace. Each of our sites have health and safety committees, which are designed to promote overall operations and communications regarding safety and to help lead and implement secure and compliant work areas. Our safety program creates a unified corporate safety culture by establishing a formal training structure and common safety practices across our global facilities.

In addition to our proactive efforts on safety, our team member wellness program offers resources across our five pillars of wellbeing (physical, mental, social, career, and financial). We provide services to our team members including free mental health and counseling support, on-site and near-site fitness centers, wellness spaces and health clinics at certain Micron sites, money management and other financial education tools, and encouraging team members to form healthy habits, reduce stress and reinforce mindfulness solutions by participating in wellbeing challenges and measuring their personal progress. We also provide exclusive access to near-site, company-sponsored childcare centers, financial subsidies to help families with cost, and partnerships with community centers.

We are a member of the Responsible Business Alliance ("RBA"), a group of leading companies focused on promoting responsible working conditions, ethical business practices, and environmental stewardship throughout our global supply chain. We strive to adhere to both our Code of Business Conduct and Ethics (available on our website, www.micron.com) and the RBA code of conduct, which is a demonstration of our commitment to integrity and responsible practices.

Additional information about our human capital is included in our 2023 Sustainability Report and our 2022 DEI Annual Report, each available on our website. Information contained or referenced on our website is not incorporated by reference and does not form a part of this Annual Report on Form 10-K.

# Government Regulations

Our worldwide business activities are subject to various federal, state, local, and foreign laws and our products are governed by a number of rules and regulations and customer expectations. The efforts and expenditures needed to comply with these laws, rules, and regulations do not presently have a material impact on our results of operations, capital expenditures, or competitive position. Nevertheless, compliance with existing or future government laws, including, but not limited to, our operations, products, global trade, business acquisitions, employee health and safety, and taxes could have a material adverse effect on our future results of operations, capital expenditures, or competitive position. See "Item 1A. Risk Factors" for a discussion of these potential impacts.

## Environmental Compliance

Manufacturing of our products is subject to complex and evolving federal, state, local, and foreign environmental, health, safety and product laws and regulations and expectations. We approach environmental compliance and sustainability proactively to ensure we meet applicable government regulations regarding use of raw materials and chemicals, discharges, emissions, climate change and energy use, and waste disposal and management from our manufacturing processes. Our approach also considers the expectations of our investors, customers, team members, community members, and other stakeholders. Compliance with the law and other obligations is a minimum environmental expectation at Micron. Our wafer fabrication facilities continued to conform to the requirements of the ISO 14001:2015 environmental management systems standard to ensure we are continuously improving our performance. As part of the ISO 14001 framework, we have established a global environmental policy and meet requirements, such as environmental aspects evaluation and control, compliance obligations, commitment, training, communication, document control, operational control, emergency preparedness and response, and management review. While we have not experienced any material adverse effects to our operations from environmental regulations, changes in regulations could necessitate additional capital expenditures, modification of our operations or chemical usage, or other compliance actions.

**Micron** 16

**Trade Regulations**

Sales of our memory and storage products, and the transfer of related technical information and know-how, including support, are subject to laws and regulations governing international trade, including, but not limited to, export control, customs, and sanctions regulations administered by U.S. government agencies such as the Bureau of Industry and Security ("BIS") of the U.S. Department of Commerce and the Office of Foreign Asset Control of the U.S. Department of the Treasury. Other jurisdictions, such as the European Union or China, also maintain, or may implement, similar laws and regulations with which we must comply. Any such laws or regulations may require that we either obtain licenses or other authorizations to export certain of our products or sell them to certain countries, companies, or individuals, or, in the absence of such licenses or authorizations, not export or sell the applicable products or transfer the related technical information and know-how to the affected countries, companies, or individuals. In addition, increased tariffs imposed by the countries in which our products are sold can increase the cost of our product to our customers. The laws and regulations that govern international trade change frequently, sometimes without advance notice. See "Item 1A. Risk Factors – Risks Related to Laws and Regulations – Government actions and regulations, such as export restrictions, tariffs and trade protection measures, may limit our ability to sell our products to certain customers or markets, or could otherwise restrict our ability to conduct operations" and " – Risks Related to Our Business, Operations, and Industry – We face geopolitical and other risks associated with our international operations that could materially adversely affect our business, results of operations, or financial condition."

We and/or our suppliers and service providers could be affected by tariffs, embargoes, or other trade restrictions, as well as laws and regulations enacted in response to concerns regarding climate change, conflict minerals, responsible sourcing practices, public health crises, or other matters, which could limit the supply of our materials and/or increase the cost. Environmental regulations could limit our ability to procure or use certain chemicals or materials in our operations or products. In addition, disruptions in transportation lines could delay our receipt of materials. Lead times for the supply of materials have been extended in the past. Our ability to procure components to repair equipment essential for our manufacturing processes could also be negatively impacted by various restrictions or disruptions in supply chains, among other items. The disruption of our supply of materials, components, or services, or the extension of our lead times could have a material adverse effect on our business, results of operations, or financial condition. Similarly, if our customers experience disruptions to their supplies, materials, components, or services, or the extension of their lead times, they may reduce, cancel, or alter the timing of their purchases with us, which could have a material adverse effect on our business, results of operations, or financial condition.

# Information About Our Executive Officers

Our executive officers are appointed annually by our Board of Directors and our directors are elected annually by our shareholders. All officers serve until their successors are duly chosen or elected and qualified, except in the case of earlier death, resignation, or removal.

The following presents information, as of August 31, 2023, about our executive officers:



## Scott R. Allen

*Corporate Vice President and Chief Accounting Officer*

Mr. Allen, 55, joined us in September 2020 as Corporate Vice President of Accounting. Mr. Allen was named Corporate Vice President and Chief Accounting Officer in October 2020. From August 2016 to September 2020, Mr. Allen held several executive roles at NetApp, Inc. including Senior Vice President, Chief Accounting Officer. Mr. Allen holds a Bachelor of Business Administration in Accounting from Siena College.



## April S. Arnzen

*Senior Vice President and Chief People Officer*

Ms. Arnzen, 52, joined us in December 1996 and has served in various leadership positions since that time. Ms. Arnzen was named Senior Vice President, Human Resources in June 2017 and named Senior Vice President and Chief People Officer in October 2020. Ms. Arnzen holds a BS in Human Resource Management and Marketing from the University of Idaho and is a graduate of the Stanford Graduate School of Business Executive Program.



## Manish Bhatia

*Executive Vice President, Global Operations*

Mr. Bhatia, 51, joined us in October 2017 as our Executive Vice President, Global Operations. From May 2016 to October 2017, Mr. Bhatia served as the Executive Vice President of Silicon Operations at Western Digital Corporation. From March 2010 to May 2016, Mr. Bhatia held several executive roles at SanDisk Corporation including Executive Vice President of Worldwide Operations until it was acquired by Western Digital in May 2016. Mr. Bhatia holds a BS and MS in Mechanical Engineering and an MBA, each from the Massachusetts Institute of Technology.



## Michael W. Bokan

*Senior Vice President, Worldwide Sales*

Mr. Bokan, 62, joined us in 1996 and has served in various leadership positions since that time. Mr. Bokan was named Senior Vice President, Worldwide Sales in October 2018. Mr. Bokan holds a BS in Business Administration from Colorado State University.



## Scott J. DeBoer

*Executive Vice President, Technology & Products*

Dr. DeBoer, 57, joined us in February 1995 and has served in various leadership positions since that time. Dr. DeBoer was named Executive Vice President, Technology Development in June 2017 and named Executive Vice President, Technology & Products in September 2019. Dr. DeBoer holds a PhD in Electrical Engineering and an MS in Physics from Iowa State University. He completed his undergraduate degree at Hastings College.



## Sanjay Mehrotra

*President, Chief Executive Officer, and Director*

Mr. Mehrotra, 65, joined us in May 2017 as our President, Chief Executive Officer, and Director. Mr. Mehrotra co-founded and led SanDisk Corporation as a start-up in 1988 until its eventual sale in May 2016, serving as its President and Chief Executive Officer from January 2011 to May 2016, and as a member of its Board of Directors from July 2010 to May 2016. Mr. Mehrotra served as a member of the Board of Directors for Cavium, Inc. from July 2009 until July 2018 and for Western Digital Corp. from May 2016 to February 2017 and has served since March 2021 as a member of the Board of Directors of CDW Corporation. Mr. Mehrotra holds a BS and an MS in Electrical Engineering and Computer Science from the University of California, Berkeley and is a graduate of the Stanford Graduate School of Business Executive Program.



## Mark J. Murphy

*Executive Vice President and Chief Financial Officer*

Mr. Murphy, 55, joined us in April 2022 as Executive Vice President and Chief Financial Officer. From June 2016 to April 2022, Mr. Murphy served as the Chief Financial Officer of Qorvo, Inc. Prior to Qorvo, Mr. Murphy served as Executive Vice President and Chief Financial Officer of Delphi Automotive PLC, and prior to Delphi, held executive roles at Praxair, Inc. and MEMC Electronic Materials, Inc. Mr. Murphy currently serves on the Board of Directors of Albany International Corp. Mr. Murphy is a veteran of the U.S. Marine Corps and holds an MBA from Harvard University and BS in Business from Marquette University.



## Sumit Sadana

*Executive Vice President and Chief Business Officer*

Mr. Sadana, 54, joined us in June 2017 as our Executive Vice President and Chief Business Officer. From April 2010 to May 2016, Mr. Sadana served in various roles at SanDisk Corporation, including Executive Vice President, Chief Strategy Officer, and General Manager, Enterprise Solutions until it was acquired by Western Digital in May 2016. Mr. Sadana currently serves on the Board of Directors of Silicon Laboratories, Inc. Mr. Sadana holds a B.Tech. in Electrical Engineering from the Indian Institute of Technology, Kharagpur, India and an MS in Electrical Engineering from Stanford University.

There are no family relationships between any of our directors or executive officers.

**19 | 2023 10-K**

Appx123

Table of Contents

# Available Information

Our executive offices are located at 8000 South Federal Way, Boise, Idaho 83716-9632 and our telephone number is (208) 368-4000. Information about us is available on our website, www.micron.com. Also available on our website are our Corporate Governance Guidelines, Governance and Sustainability Committee Charter, Compensation Committee Charter, Audit Committee Charter, Finance Committee Charter, Security Committee Charter, and Code of Business Conduct and Ethics. We intend to satisfy the disclosure requirement under Item 5.05 of Form 8-K regarding any amendments to, or waivers from, our Code of Business Conduct and Ethics by posting such information on our website within four business days of the amendment or waiver. Copies of these documents are available to shareholders upon request. Information contained or referenced on our website is not incorporated by reference and does not form a part of this Annual Report on Form 10-K.

Investors and others should note that we announce material financial information about our business and products through a variety of means, including our investor relations website (investors.micron.com), filings with the U.S. Securities and Exchange Commission ("SEC"), press releases, public conference calls, blog posts (micron.com/about/blog), and webcasts. We use these channels to achieve broad, non-exclusionary distribution of information to the public and for complying with our disclosure obligations under Regulation FD. Therefore, we encourage investors, the media, and others interested in our company to review the information we post on such channels.

Our filings are available free of charge on our website as soon as reasonably practicable after they are electronically filed with, or furnished to, the SEC, including our annual and quarterly reports on Forms 10-K and 10-Q and current reports on Form 8-K, our proxy statements, and any amendments to those reports or statements. The SEC's website, www.sec.gov, contains reports, proxy and information statements, and other information regarding issuers that file electronically with the SEC. The content on any website referred to in this Form 10-K is not incorporated by reference in this Form 10-K unless expressly noted.



Table of Contents

## ITEM 1A. RISK FACTORS

In addition to the factors discussed elsewhere in this Form 10-K, this section discusses important factors which could cause actual results or events to differ materially from those contained in any forward-looking statements made by us. The order of presentation is not necessarily indicative of the level of risk that each factor poses to us. Any of these factors could have a material adverse effect on our business, results of operations, financial condition, or stock price. Our operations could also be affected by other factors that are presently unknown to us or not considered significant.

# Risk Factor Summary

### *Risks Related to Our Business, Operations, and Industry*
- volatility in average selling prices of our products;
- a range of factors that may adversely affect our gross margins;
- our international operations, including geopolitical risks;
- the highly competitive nature of our industry;
- our ability to develop and produce new and competitive memory and storage technologies and products;
- realizing expected returns from capacity expansions;
- achieving or maintaining certain performance or other obligations associated with incentives from various governments;
- availability and quality of materials, supplies, and capital equipment and dependency on third-party service providers;
- a downturn in regional or worldwide economies;
- disruptions to our manufacturing process from operational issues, natural disasters, or other events;
- dependency on a select number of key customers, including international customers;
- products that fail to meet specifications, are defective, or are incompatible with end uses;
- breaches of our security systems or products, or those of our customers, suppliers, or business partners;
- attracting, retaining, and motivating highly skilled employees;
- responsible sourcing requirements and related regulations;
- environmental, social, and governance considerations;
- acquisitions and/or alliances; and
- restructure plans may not realize expected savings or other benefits.

### *Risks Related to Intellectual Property and Litigation*
- protecting our intellectual property and retaining key employees who are knowledgeable of and develop our intellectual property;
- legal proceedings and claims; and
- claims that our products or manufacturing processes infringe or otherwise violate the intellectual property rights of others or failure to obtain or renew license agreements covering such intellectual property.

### *Risks Related to Laws and Regulations*
- impacts of government actions and compliance with tariffs, trade restrictions, and/or trade regulations;
- tax expense and tax laws in key jurisdictions; and
- compliance with laws, regulations, or industry standards, including environmental considerations.

### *Risks Related to Capitalization and Financial Markets*
- our ability to generate sufficient cash flows or obtain access to external financing;
- our debt obligations;
- changes in foreign currency exchange rates;
- counterparty default risk;
- volatility in the trading price of our common stock; and
- fluctuations in the amount and frequency of our common stock repurchases and payment of cash dividends and resulting impacts.

Table of Contents

# Risks Related to Our Business, Operations, and Industry

**Volatility in average selling prices for our semiconductor memory and storage products may adversely affect our business.**

We have experienced significant volatility in our average selling prices and may continue to experience such volatility in the future. For example, average selling prices for DRAM declined in the high-40s percent range and NAND declined in the low-50s percent range for 2023 as compared to 2022. Since 2017, annual percentage changes in DRAM average selling prices have ranged from approximately plus 35% to a minus high-40s percent range. Since 2017, annual percentage changes in NAND average selling prices have ranged from nearly flat to a minus low-50s percent range. In current and recent periods, average selling prices for our products have been below our manufacturing costs and we may experience such circumstances in the future. Average selling prices for our products that decline faster than our costs have recently had an adverse effect on our business and results of operations, and in future periods could have a material adverse effect on our business, results of operations, or financial condition.

**Our gross margins may be adversely affected by a range of factors.**

Our gross margins are dependent, in part, upon continuing decreases in per gigabit manufacturing costs achieved through improvements in our manufacturing processes and product designs. Factors that may limit our ability to reduce our per gigabit manufacturing costs at sufficient levels to prevent deterioration of or improve gross margins include, but are not limited to:

- strategic product diversification decisions affecting product mix;
- increasing complexity of manufacturing processes;
- difficulties in transitioning to smaller line-width process technologies or additional 3D memory layers or NAND cell levels;
- process complexity including number of mask layers and fabrication steps;
- manufacturing yield;
- technological barriers;
- changes in process technologies;
- new products that may require relatively larger die sizes;
- start-up or other costs associated with capacity expansions;
- higher costs of goods and services due to inflationary pressures or market conditions; and
- higher manufacturing costs per gigabit due to fabrication facility underutilization, lower wafer output, and insufficient volume to run new technology nodes to achieve cost optimization.

Many factors may result in a reduction of our output or a delay in ramping production, which could lead to underutilization of our production assets. These factors may include, among others, a weak demand environment, industry oversupply, inventory surpluses, difficulties in ramping emerging technologies, supply chain disruptions, and delays from equipment suppliers. See "Part II – Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – Overview – Industry Conditions" for information regarding our current underutilization. A significant portion of our manufacturing costs are fixed and do not vary proportionally with changes in production output. As a result, lower utilization, lower wafer output, and corresponding increases in our per gigabit manufacturing costs have resulted in higher inventory carrying costs, and have had, and may continue to have, an adverse effect on our gross margins, business, results of operations, or financial condition.



22

Case 3:23-cv-25797-RFL Document 235-2 Page Filed 02/14/01/15/2024 of 143
Case 3:23-cv-25797-RFL Document 235-2 Page Filed 02/14/01/15/2024 of 143

Table of Contents

We have a broad portfolio of products to address our customers' needs, which span multiple market segments and are subject to rapid technological changes. Our manufacturing costs on a per gigabit basis vary across our portfolio as they are largely influenced by the technology node in which the solution was developed. We strive to balance our demand and supply for each technology node, but the dynamics of our markets and our customers can create periods of imbalance, which can lead us to carry elevated inventory levels. Consequently, we may incur charges in connection with obsolete or excess inventories, or we may not fully recover our costs, which would reduce our gross margins. For example, in 2023, we recorded aggregate charges of $1.83 billion to write down the carrying value of our inventories to their estimated net realizable value. In addition, due to the customized nature of certain products we manufacture, we may be unable to sell certain finished goods inventories to alternative customers or manufacture in-process inventory to different specifications, which may result in excess and obsolescence charges in future periods.

In addition, if we are unable to supply products that meet customer design and performance specifications, we may be required to sell such products at lower average selling prices, which may reduce our gross margins. Our gross margins may also be impacted by shifts in product mix, driven by our strategy to optimize our portfolio to best respond to changing market dynamics.

Our inability to prevent deterioration of or improve gross margins could have a material adverse effect on our business, results of operations, or financial condition.

**We face geopolitical and other risks associated with our international operations that could materially adversely affect our business, results of operations, or financial condition.**

In addition to our U.S. operations, a substantial portion of our operations are conducted in Taiwan, Singapore, Japan, Malaysia, China, and India, and many of our customers, suppliers, and vendors also operate internationally. In 2023, nearly half of our revenue was from sales to customers who have headquarters located outside the United States, while over 80% of our revenue in 2023 was from products shipped to customer locations outside the United States.

Our international operations are subject to a number of risks, including:

- restrictions on sales of goods or services to one or more of our significant foreign customers;
- export and import duties, changes to import and export regulations, customs regulations and processes, and restrictions on the transfer of funds, including currency controls in China, which could negatively affect the amount and timing of payments from certain of our customers and, as a result, our cash flows;
- compliance with U.S. and international laws involving international operations, including the Foreign Corrupt Practices Act of 1977, as amended, sanctions and anti-corruption laws, export and import laws, and similar rules and regulations;
- theft of intellectual property;
- political and economic instability, including instability resulting from domestic and international conflicts;
- government actions or civil unrest preventing the flow of products and materials, including delays in shipping and obtaining products and materials, cancellation of orders, or loss or damage of products;
- problems with the transportation or delivery of products and materials;
- issues arising from cultural or language differences and labor unrest;
- longer payment cycles and greater difficulty in collecting accounts receivable;
- compliance with trade, technical standards, and other laws in a variety of jurisdictions;
- contractual and regulatory limitations on the ability to maintain flexibility with staffing levels;
- disruptions to manufacturing or R&D activities as a result of actions imposed by foreign governments;
- changes in economic policies of foreign governments;
- difficulties in staffing and managing international operations; and
- public health issues.

If we or our customers, suppliers, or vendors are impacted by any of these risks, it could have a material adverse effect on our business, results of operations, or financial condition.

Appx127

Table of Contents

Following the May 21, 2023 decision of its cybersecurity review of our products sold in China, the CAC determined that critical information infrastructure operators in China may not purchase Micron products, impacting our revenue with companies headquartered in mainland China and Hong Kong, including direct sales as well as indirect sales through distributors. Some revenue with customers headquartered outside of China has also been impacted. As we try to mitigate possible impacts due to the CAC decision, revenue may come at lower prices or gross margins due to product or customer mix changes, which may impact our business results. Further actions by the Chinese government could impact additional revenue inside or outside China, or our operations in China, or our ability to ship products to our customers, any of which could have a material adverse effect on our business, results of operations, or financial condition.

Political, economic, or other actions may adversely affect our operations in Taiwan. A majority of our DRAM production output in 2023 was from our fabrication facilities in Taiwan and any loss of output could have a material adverse effect on us. Any political, economic, or other actions may also adversely affect our customers and the technology industry supply chain, for which Taiwan is a central hub, and as a result, could have a material adverse impact on us.

In addition, the U.S. government has in the past restricted American firms from selling products and software to certain of our customers and may in the future impose similar restrictions on one or more of our significant customers. These restrictions may not prohibit our competitors from selling similar products to our customers, which may result in our loss of sales and market share. Even as such restrictions are lifted, financial or other penalties or continuing export restrictions imposed with respect to our customers could have a continuing negative impact on our future revenue and results of operations, and we may not be able to recover any customers or market share we lose, or make such recoveries at acceptable average selling prices, while complying with such restrictions.

**The semiconductor memory and storage markets are highly competitive.**

We face intense competition in the semiconductor memory and storage markets from a number of companies, including Kioxia Holdings Corporation; Samsung Electronics Co., Ltd.; SK hynix Inc.; and Western Digital Corporation. Our competitors may use aggressive pricing to obtain market share. Some of our competitors are large corporations or conglomerates that may have a larger market share and greater resources to invest in technology, capitalize on growth opportunities, and withstand downturns in the semiconductor markets in which we compete. Consolidation of industry competitors could put us at a competitive disadvantage as our competitors may benefit from increased manufacturing scale and a stronger product portfolio. We operate in different jurisdictions than our competitors and may be impacted by unfavorable changes in currency exchange rates.

In addition, some governments may provide, or have provided and may continue to provide, significant assistance, financial or otherwise, to some of our competitors or to new entrants and may intervene in support of national industries and/or competitors. In particular, we face the threat of increasing competition as a result of significant investment in the semiconductor industry by the Chinese government and various state-owned or affiliated entities, in companies such as Yangtze Memory Technologies Co., Ltd. ("YMTC") and ChangXin Memory Technologies, Inc. ("CXMT"). In addition, the CAC's decision that critical information infrastructure operators in China may not purchase Micron products had an impact on our ability to compete effectively in China and elsewhere.

We and our competitors generally seek to increase wafer output, improve yields, and reduce die size, which could result in significant increases in worldwide supply and downward pressure on prices. Increases in worldwide supply of semiconductor memory and storage also result from fabrication capacity expansions, either by way of new facilities, increased capacity utilization, or reallocation of other semiconductor production to semiconductor memory and storage production. Our competitors may increase capital expenditures resulting in future increases in worldwide supply. We, and some of our competitors, have plans to ramp, or are constructing or ramping, production at new fabrication facilities. Increases in worldwide supply of semiconductor memory and storage, if not accompanied by commensurate increases in demand, could lead to declines in average selling prices for our products and could materially adversely affect our business, results of operations, or financial condition. If competitors are more successful at developing or implementing new product or process technology, their products could have cost or performance advantages.

The competitive nature of our industry could have a material adverse effect on our business, results of operations, or financial condition.



24

Table of Contents

**Our future success depends on our ability to develop and produce new and competitive memory and storage technologies and products.**

Our key semiconductor memory and storage technologies face technological barriers to continue to meet long-term customer needs. These barriers include potential limitations on stacking additional 3D memory layers, increasing bits per cell (i.e., cell levels), meeting higher density requirements, improving power consumption and reliability, and delivering advanced features and higher performance. We may face technological barriers to continue to shrink our products at our current or historical rate, which has generally reduced per gigabit cost. We have invested and expect to continue to invest in R&D for new and existing products and process technologies, such as EUV lithography, to continue to deliver advanced product requirements. Such new technologies can add complexity and risk to our schedule and may affect our costs and production output. We may be unable to recover our investment in R&D or otherwise realize the economic benefits of reducing die size or increasing memory and storage densities. Our competitors are working to develop new memory and storage technologies that may offer performance and/or cost advantages to existing technologies and render existing technologies obsolete. Accordingly, our future success may depend on our ability to develop and produce viable and competitive new memory and storage technologies.

We are developing new products, including system-level memory and storage products and solutions, which complement our traditional products or leverage their underlying design or process technology. We have invested and expect to continue to invest in new semiconductor product and system-level solution development. We are increasingly differentiating our products and solutions to meet the specific demands of our customers, which increases our reliance on our customers' ability to accurately forecast the needs and preferences of their customers. As a result, our product demand forecasts may be impacted significantly by the strategic actions of our customers. In addition, our ability to successfully introduce new products often requires us to make product specification decisions multiple years in advance of when new products enter the market.

It is important that we deliver products in a timely manner with increasingly advanced performance characteristics at the time our customers are designing and evaluating samples for their products. If we do not meet their product design schedules, our customers may exclude us from further consideration as a supplier for those products. The process to develop new products requires us to demonstrate advanced functionality, performance, and reliability, often well in advance of a planned ramp of production, in order to secure design wins with our customers. Many factors may negatively impact our ability to meet anticipated timelines and/or expected or required quality standards with respect to the development of certain of our products. In addition, some of our components have long lead-times, requiring us to place orders up to a year in advance of anticipated demand. Such long lead-times increase the risk of excess inventory or loss of sales in the event our forecasts vary substantially from actual demand.

There can be no assurance of the following:

- we will be successful in developing competitive new semiconductor memory and storage technologies and products;
- we will be able to cost-effectively manufacture new products;
- we will be able to successfully market these technologies;
- margins generated from sales of these products will allow us to recover costs of development efforts;
- we will be able to establish or maintain key relationships with customers, or that we will not be prohibited from working with certain customers, for specific chip set or design requirements;
- we will accurately predict and design products that meet our customers' specifications; or
- we will be able to introduce new products into the market and qualify them with our customers on a timely basis.

Unsuccessful efforts to develop new memory and storage technologies and products could have a material adverse effect on our business, results of operations, or financial condition.

Table of Contents

**We may not be able to achieve expected returns from capacity expansions.**

We have announced our intent to expand our production capacity and/or make capital investments in the United States and in other regions where we operate.

These expansions involve several risks including the following:

- capital expenditure requirements for capacity expansions during periods of relatively low free cash flow generation, resulting from challenging memory and storage industry conditions;
- availability of necessary funding, which may include external sources;
- ability to realize expected grants, investment tax credits, and other government incentives, including through the U.S. CHIPS and Science Act of 2022 ("CHIPS Act") and other national, international, state, and local grants;
- potential changes in laws or provisions of grants, investment tax credits, and other government incentives;
- potential restrictions on expanding in certain geographies;
- availability of equipment and construction materials;
- ability to complete construction as scheduled and within budget;
- availability of the necessary workforce;
- ability to timely ramp production in a cost-effective manner;
- increases to our cost structure until new production is ramped to adequate scale; and
- sufficient customer demand to utilize our increased capacity.

We invest our capital in areas that we believe best align with our business strategy and optimize future returns. Investments in capital expenditures may not generate expected returns or cash flows. Significant judgment is required to determine which capital investments will result in optimal returns, and we could invest in projects that are ultimately less profitable than those projects we do not select. Delays in completion and ramping of new production facilities, or failure to optimize our investment choices, could significantly impact our ability to realize expected returns on our capital expenditures.

Any of the above factors could have a material adverse effect on our business, results of operations, or financial condition.

**Our incentives from various governments are conditional upon achieving or maintaining certain performance or other obligations and are subject to reduction, termination, clawback, or could impose certain limitations on our business.**

We have received, and may in the future continue to receive, benefits and incentives from national, state, and local governments in various regions of the world designed to encourage us to establish, maintain, or increase investment, workforce, or production in those regions. These incentives may take various forms, including grants, loan subsidies, and tax arrangements, and typically require us to achieve or maintain certain levels of investment, capital spending, employment, technology deployment, or research and development activities to qualify for such incentives or could restrict us from undertaking certain activities. We may be unable to obtain significant future incentives to continue to fund a portion of our capital expenditures and operating costs, without which our cost structure would be adversely impacted. We also cannot guarantee that we will successfully achieve performance or other obligations required to qualify for these incentives or that the granting agencies will provide such funding. These incentive arrangements typically provide the granting agencies with rights to audit our compliance with their terms and obligations. Such audits could result in modifications to, or termination of, the applicable incentive program. The incentives we receive could be subject to reduction, termination, or clawback, and any decrease or clawback of government incentives could have a material adverse effect on our business, results of operations, or financial condition.



**Our business, results of operations, or financial condition could be adversely affected by the availability and quality of materials, supplies, and capital equipment, or dependency on third-party service providers.**

Our supply chain and operations are dependent on the availability of materials that meet exacting standards and the use of third parties to provide us with components and services. We generally have multiple sources of supply for our materials and services. However, only a limited number of suppliers are capable of delivering certain materials, components, and services that meet our standards and, in some cases, materials, components, or services are provided by a single or sole source, and we may be unable to qualify new suppliers on a timely basis. The availability of materials or components such as chemicals, silicon wafers, gases, photoresist, controllers, substrates, lead frames, printed circuit boards, targets, and reticle glass blanks is impacted by various factors. These factors could include a shortage of raw materials or a disruption in the processing or purification of those raw materials into finished goods. Shortages or increases in lead times have occurred in the past, are currently occurring with respect to some materials and components, and may occur from time to time in the future. Constraints within our supply chain for certain materials and integrated circuit components could limit our bit shipments, which could have a material adverse effect on our business, results of operations, or financial condition.

Our manufacturing processes are also dependent on our relationships with third-party manufacturers of controllers, analog integrated circuits, and other components used in some of our products and with outsourced semiconductor foundries, assembly and test providers, contract manufacturers, logistics carriers, and other service providers, including providers of electricity and other utilities. Although we have certain long-term contracts with some of our suppliers, many of these contracts do not provide for long-term capacity or pricing commitments. To the extent we do not have firm commitments from our third-party suppliers over a specific time period or for any specific capacity, quantity, and/or pricing, our suppliers may allocate capacity to their other customers and capacity and/or materials may not be available when needed or at reasonable prices. Inflationary pressures have increased, and may continue to increase costs for materials, supplies, and services. Regardless of contract structure, large swings in demand may exceed our contracted supply and/or our suppliers' capacity to meet those demand changes resulting in a shortage of parts, materials, or capacity needed to manufacture our products. In addition, if any of our suppliers was to cease operations or become insolvent, this could impact their ability to provide us with necessary supplies, and we may not be able to obtain the needed supply in a timely way or at all from other providers.

Certain materials are primarily available in a limited number of countries, including rare earth elements, minerals, and metals. Trade disputes, geopolitical tensions, economic circumstances, political conditions, or public health issues may limit our ability to obtain such materials. Although these rare earth and other materials are generally available from multiple suppliers, China is the predominant producer of certain of these materials. If China were to restrict or stop exporting these materials, our suppliers' ability to obtain such supply may be constrained and we may be unable to obtain sufficient quantities, or obtain supply in a timely manner, or at a commercially reasonable cost. Constrained supply of rare earth elements, minerals, and metals may restrict our ability to manufacture certain of our products and make it difficult or impossible to compete with other semiconductor memory and storage manufacturers who are able to obtain sufficient quantities of these materials from China.

We and/or our suppliers and service providers could be affected by regional conflicts, civil unrest, labor disruptions, sanctions, tariffs, embargoes, or other trade restrictions, as well as laws and regulations enacted in response to concerns regarding climate change, conflict minerals, responsible sourcing practices, public health crises, or other matters, which could limit the supply of our materials and/or increase the cost. Environmental regulations could limit our ability to procure or use certain chemicals or materials in our operations or products. In addition, disruptions in transportation lines could delay our receipt of materials. Our ability to procure components to repair equipment essential for our manufacturing processes could also be negatively impacted by various restrictions or disruptions in supply chains, among other items. The disruption of our supply of materials, components, or services, or the extension of our lead times could have a material adverse effect on our business, results of operations, or financial condition.

Our operations are dependent on our ability to procure advanced semiconductor manufacturing equipment that enables the transition to lower cost manufacturing processes. For certain key types of equipment, including photolithography tools, we are sometimes dependent on a single supplier. From time to time, we have experienced difficulties in obtaining some equipment on a timely basis due to suppliers' limited capacity. Our inability to obtain equipment on a timely basis could adversely affect our ability to transition to next generation manufacturing processes and reduce our costs. Delays in obtaining equipment could also impede our ability to ramp production and could increase our overall costs of a ramp. Our inability to obtain advanced semiconductor manufacturing equipment in a timely manner could have a material adverse effect on our business, results of operations, or financial condition.

Our construction projects to expand production and R&D capacity are highly dependent on available sources of labor, materials, equipment, and services. Increasing demand, supply constraints, inflation, and other market conditions could result in increasing shortages and higher costs for these items. Difficulties in obtaining these resources could result in significant delays in completion of our construction projects and cost increases, which could have a material adverse effect on our business, results of operations, or financial condition.

Our inability to source materials, supplies, capital equipment, or third-party services could affect our overall production output and our ability to fulfill customer demand. Significant or prolonged shortages of our products could halt customer manufacturing and damage our relationships with these customers. Any damage to our customer relationships as a result of a shortage of our products could have a material adverse effect on our business, results of operations, or financial condition.

Similarly, if our customers experience disruptions to their supplies, materials, components, or services, or the extension of their lead times, they may reduce, cancel, or alter the timing of their purchases with us, which could have a material adverse effect on our business, results of operations, or financial condition.

**Downturns in regional or worldwide economies may harm our business.**

Downturns in regional or worldwide economies, due to inflation, geopolitics, major central bank policy actions including interest rate increases, public health crises, or other factors, have harmed our business in the past and current and future downturns could also adversely affect our business. Adverse economic conditions affect demand for devices that incorporate our products, such as personal computers, smartphones, automobiles, and servers. Reduced demand for these or other products could result in significant decreases in our average selling prices and product sales. In addition, to the extent our customers or distributors have elevated inventory levels or are impacted by a deterioration in credit markets, we may experience a decrease in short-term and/or long-term demand resulting in industry oversupply and declines in pricing for our products.

A deterioration of conditions in regional or worldwide credit markets could limit our ability to obtain external financing to fund our operations and capital expenditures. In addition, we may experience losses on our holdings of cash and investments due to failures of financial institutions and other parties. Difficult economic conditions may also result in a higher rate of losses on our accounts receivable due to credit defaults. As a result, downturns in regional or worldwide economies could have a material adverse effect on our business, results of operations, or financial condition.

**If our manufacturing process is disrupted by operational issues, natural disasters, or other events, our business, results of operations, or financial condition could be materially adversely affected.**

We and our subcontractors manufacture products using highly complex processes that require technologically advanced equipment and continuous modification to improve yields and performance. Difficulties in the manufacturing process or the effects from a shift in product mix can reduce yields or disrupt production and may increase our per gigabit manufacturing costs. We and our subcontractors maintain operations and continuously implement new product and process technology at manufacturing facilities, which are widely dispersed in multiple locations in several countries including the United States, Singapore, Taiwan, Japan, Malaysia, and China. As a result of the necessary interdependence within our network of manufacturing facilities, an operational disruption at one of our or a subcontractor's facilities may have a disproportionate impact on our ability to produce many of our products.



28

Table of Contents

From time to time, there have been disruptions in our manufacturing operations as a result of power outages, improperly functioning equipment, disruptions in supply of raw materials or components, or equipment failures. We have manufacturing and other operations in locations subject to natural occurrences and possible climate changes, such as severe and variable weather and geological events resulting in increased costs, or disruptions to our manufacturing operations or those of our suppliers or customers. In addition, climate change may pose physical risks to our manufacturing facilities or our suppliers' facilities, including increased extreme weather events that could result in supply delays or disruptions. Other events, including political or public health crises, such as an outbreak of contagious diseases, may also affect our production capabilities or that of our suppliers, including as a result of quarantines, closures of production facilities, lack of supplies, or delays caused by restrictions on travel or shipping. Events of the types noted above have occurred from time to time and may occur in the future. As a result, in addition to disruptions to operations, our insurance premiums may increase or we may not be able to fully recover any sustained losses through insurance.

If production is disrupted for any reason, manufacturing yields may be adversely affected, or we may be unable to meet our customers' requirements and they may purchase products from other suppliers. This could result in a significant increase in manufacturing costs, loss of revenue, or damage to customer relationships, any of which could have a material adverse effect on our business, results of operations, or financial condition.

**A significant portion of our revenue is concentrated with a select number of customers.**

In each of the last three years, approximately one-half of our total revenue was from our top ten customers. A disruption in our relationship with any of these customers could adversely affect our business. We could experience fluctuations in our customer base or the mix of revenue by customer as markets and strategies evolve. Our customers' demand for our products may fluctuate due to factors beyond our control. In addition, any consolidation of our customers could reduce the number of customers to whom our products may be sold. Our inability to meet our customers' requirements or to qualify our products with them could adversely impact our revenue. A meaningful change in the inventory strategy of our customers could impact our industry bit demand growth outlook. The loss of, or restrictions on our ability to sell to, one or more of our major customers, or any significant reduction in orders from, or a shift in product mix by, customers could have a material adverse effect on our business, results of operations, or financial condition.

**Increases in sales of system solutions may increase our dependency upon specific customers and our costs to develop, qualify, and manufacture our system solutions.**

Our development of system-level memory and storage products is dependent, in part, upon successfully identifying and meeting our customers' specifications for those products. Developing and manufacturing system-level products with specifications unique to a customer increases our reliance upon that customer for purchasing our products at sufficient volumes and prices in a timely manner. Even if our products meet customer specifications, our sales of system-level solutions are dependent upon our customers choosing our products over those of our competitors and purchasing our products at sufficient volumes and prices. Our competitors' products may be less costly, provide better performance, or include additional features when compared to our products. Our long-term ability to sell system-level memory and storage products is reliant upon our customers' ability to create, market, and sell their products containing our system-level solutions at sufficient volumes and prices in a timely manner. If we fail to successfully develop and market system-level products, our business, results of operations, or financial condition may be materially adversely affected.

**29 | 2023 10-K**

Table of Contents

Manufacturing system-level solutions, such as SSDs, managed NAND, and HBM, typically results in higher per-unit manufacturing costs as compared to other products. Even if we are successful in selling system-level solutions to our customers in sufficient volume, we may be unable to generate sufficient profit if our per-unit manufacturing costs are not offset by higher per-unit selling prices. Manufacturing system-level solutions to customer specifications requires a longer development cycle, as compared to discrete products, to design, test, and qualify, which may increase our costs. Some of our system solutions are increasingly dependent on sophisticated firmware that may require significant customization to meet customer specifications, which increases our costs and time to market. Additionally, we may need to update our controller and hardware design as well as our firmware or develop new firmware as a result of new product introductions or changes in customer specifications and/or industry standards, which increases our costs. System complexities and extended warranties for system-level products could also increase our warranty costs. Our failure to cost-effectively manufacture system-level solutions and/or controller, hardware design, and firmware in a timely manner may result in reduced demand for our system-level products and could have a material adverse effect on our business, results of operations, or financial condition.

**Products that fail to meet specifications, are defective, or are otherwise incompatible with end uses could impose significant costs on us.**

Products that do not meet specifications or that contain, or are perceived by our customers to contain, defects or that are otherwise incompatible with end uses could impose significant costs on us or otherwise materially adversely affect our business, results of operations, or financial condition. From time to time, we experience problems with nonconforming, defective, or incompatible products after we have shipped such products. In recent periods, we have further diversified and expanded our product offerings, which could potentially increase the chance that one or more of our products could fail to meet specifications in a particular application. Our products and solutions may be deemed fully or partially responsible for functionality in our customers' products and may result in sharing or shifting of product or financial liability from our customers to us for costs incurred by the end user as a result of our customers' products failing to perform as specified. In addition, if our products and solutions perform critical functions in our customers' products or are used in high-risk consumer end products, such as autonomous driver assistance programs, home and enterprise security, smoke and noxious gas detectors, medical monitoring equipment, or wearables for child and elderly safety, our potential liability may increase. We could be adversely affected in several ways, including the following:

- we may be required or agree to compensate customers for costs incurred or damages caused by defective or incompatible products and to replace products;
- we could incur a decrease in revenue or adjustment to pricing commensurate with the reimbursement of such costs or alleged damages; and
- we may encounter adverse publicity, which could cause a decrease in sales of our products or harm our reputation or relationships with existing or potential customers.

Any of the foregoing items could have a material adverse effect on our business, results of operations, or financial condition.



30

Table of Contents

**Breaches of our security systems or products, or those of our customers, suppliers, or business partners, could expose us to losses.**

We maintain a system of controls over the physical security of our facilities. We also manage and store various proprietary information and sensitive or confidential data relating to our operations. In addition, we process, store, and transmit large amounts of data relating to our customers and employees, including sensitive personal information. Unauthorized persons, employees, former employees, nation states, or other parties may gain access to our facilities or technology infrastructure and systems to steal trade secrets or other proprietary information, compromise confidential information, create system disruptions, or cause shutdowns. This risk is exacerbated as competitors for talent, particularly engineering talent, attempt to hire our employees. Through cyberattacks on technology infrastructure and systems, unauthorized parties may obtain access to computer systems, networks, and data, including cloud-based platforms. The technology infrastructure and systems of our suppliers, vendors, service providers, cloud solution providers, and partners have in the past experienced, and may in the future experience, such attacks, which could impact our operations. Cyberattacks can include ransomware, computer denial-of-service attacks, worms, supply chain attacks, social engineering, open source vulnerabilities, and other malicious software programs or other attacks, including those using techniques that change frequently or may be disguised or difficult to detect, or designed to remain dormant until a triggering event, impersonation of authorized users, and efforts to discover and exploit any design flaws, "bugs," security vulnerabilities, as well as intentional or unintentional acts by employees or other insiders with access privileges. Additionally, some actors are using artificial intelligence technology to launch more automated, targeted and coordinated attacks. Globally, cyberattacks are increasing in number and the attackers are increasingly organized and well-financed, or supported by state actors, and are developing increasingly sophisticated systems to not only attack, but also to evade detection. In addition, geopolitical tensions or conflicts may create a heightened risk of cyberattacks. Breaches of our physical security, attacks on our technology infrastructure and systems, or breaches or attacks on our customers, suppliers, or business partners who have confidential or sensitive information regarding us and our customers and suppliers, could result in significant losses and damage our reputation with customers and suppliers and may expose us to litigation if the confidential information of our customers, suppliers, or employees is compromised.

Our products are also targets for cyberattacks, including those products utilized in cloud-based environments. While some of our products contain encryption or security algorithms to protect third-party content or user-generated data stored on our products, these products could still be hacked or the encryption schemes could be compromised, breached, or circumvented by motivated and sophisticated attackers. Further, our products contain sophisticated hardware and firmware and applications that may contain security vulnerabilities or defects in design or manufacture, including "bugs" and other problems that could interfere with the intended operation of our products. To the extent our products are hacked, or the encryption schemes are compromised or breached, this could harm our business by requiring us to employ additional resources to fix the errors or defects, exposing us to litigation, claims, and harm to our reputation.

Any of the foregoing security risks could have a material adverse effect on our business, results of operations, or financial condition.

**We must attract, retain, and motivate highly skilled employees.**

To remain competitive, we must attract, retain, and motivate executives and other highly skilled, diverse employees, as well as effectively manage succession for key employees. Competition for experienced employees in our industry can be intense. Hiring and retaining qualified executives and other employees is critical to our business. If our total compensation programs, employment benefits, and workplace culture are not viewed as competitive and inclusive, our ability to attract, retain, and motivate employees could be compromised.

At times, we experience higher levels of attrition, increasing compensation costs, and more intense competition for talent across our industry. To the extent we experience significant attrition and are unable to timely replace employees, we could experience a loss of critical skills and reduced employee morale, potentially resulting in business disruptions or increased expenses to address any disruptions. Additionally, changes to immigration policies in the countries in which we operate, as well as restrictions on travel due to public health crises or other causes, may limit our ability to hire and/or retain talent in, or transfer talent to, specific locations.

Our inability to attract, retain, and motivate executives and other employees or effectively manage succession of key roles may inhibit our ability to maintain or expand our business operations.

Table of Contents

**Compliance with responsible sourcing requirements and any related regulations could increase our operating costs, or limit the supply and increase the cost of certain materials, supplies, and services, and if we fail to comply, customers may reduce purchases from us or disqualify us as a supplier.**

We and many of our customers have adopted responsible sourcing programs that require us to meet certain environmental, social and governance criteria, and to periodically report on our performance against these requirements, including that we source the materials, supplies, and services we use and incorporate into the products we sell as prescribed by these programs. Many customer programs require us to remove a supplier within a prescribed period if such supplier ceases to comply with prescribed criteria, and our supply chain may at any time contain suppliers at risk of being removed due to non-compliance with responsible sourcing requirements. Some of our customers may elect to disqualify us as a supplier (resulting in a permanent or temporary loss of sales to such customer) or reduce purchases from us if we are unable to verify that our performance or products (including the underlying supply chain) meet the specifications of our customers' responsible sourcing programs on a continuous basis. Meeting responsible sourcing requirements may increase operating requirements and costs or limit the sourcing and availability of some of the materials, supplies, and services we use, particularly when the availability of such materials, supplies, and services is concentrated to a limited number of suppliers. From time to time, we remove suppliers or require our suppliers to remove suppliers from their supply chains based on our responsible sourcing requirements or customer requirements, and we or our suppliers may be unable to replace such removed suppliers in a timely or cost-effective manner. Any inability to replace removed suppliers in a timely or cost effective manner may affect our ability and/or the cost to obtain sufficient quantities of materials, supplies, and services necessary for the manufacture of our products. Our inability to replace suppliers we have removed in a timely or cost-effective manner or comply with customers' responsible sourcing requirements or with any related regulations could have a material adverse effect on our business, results of operations, or financial condition.

**Failure to meet environmental, social, and governance expectations or standards or achieve our related goals could adversely affect our business, results of operations, financial condition, or stock price.**

In recent years, there has been an increased focus from stakeholders on environmental, social, and governance matters, including greenhouse gas emissions and climate-related risks, sustainability, renewable energy, water stewardship, waste management, diversity, equality and inclusion, responsible sourcing and supply chain, human rights, and social responsibility. Given our commitment to relevant social and environmental issues as it relates to our business, we actively manage these issues and have established and publicly announced certain goals, commitments, and targets which we may refine or even expand further in the future. These goals, commitments, and targets reflect our current plans and aspirations and are not guarantees that we will be able to achieve them. Achieving these goals may entail significant costs, for example we have entered into several virtual power purchase agreements to obtain renewable energy credits at a cost that will vary based on future prices for electrical power. Evolving stakeholder expectations and our efforts to manage these issues, report on them, and accomplish our goals present numerous operational, regulatory, reputational, financial, legal, and other risks, any of which could have a material adverse impact, including on our reputation and stock price.

Such risks and uncertainties include:

- reputational harm, including damage to our relationships with customers, suppliers, investors, governments, or other stakeholders;
- adverse impacts on our ability to manufacture and sell products and maintain our market share;
- the success of our collaborations with third parties;
- increased risk of litigation, investigations, or regulatory enforcement action;
- unfavorable environmental, social, and governance ratings or investor sentiment;
- diversion of resources and increased costs to control, assess, and report on environmental, social, and governance metrics;
- our ability to achieve our goals, commitments, and targets within timeframes announced;
- increased costs to achieve our goals, commitments, and targets;
- unforeseen operational and technological difficulties;
- access to and increased cost of capital; and
- adverse impacts on our stock price.

*Micron* **32**

Any failure, or perceived failure, to meet evolving stakeholder expectations and industry standards or achieve our environmental, social, and governance goals, commitments, and targets could have an adverse effect on our business, results of operations, financial condition, or stock price.

**Acquisitions and/or alliances involve numerous risks.**

Acquisitions and the formation or operation of alliances, such as joint ventures and other partnering arrangements, involve numerous risks, including the following:

- integrating the operations, technologies, and products of acquired or newly formed entities into our operations;
- increasing capital expenditures to upgrade and maintain facilities;
- increased debt levels;
- the assumption of unknown or underestimated liabilities;
- the use of cash to finance a transaction, which may reduce the availability of cash to fund working capital, capital expenditures, R&D expenditures, and other business activities;
- diverting management's attention from daily operations;
- managing larger or more complex operations and facilities and employees in separate and diverse geographic areas;
- hiring and retaining key employees;
- requirements imposed by government authorities in connection with the regulatory review of a transaction, which may include, among other things, divestitures or restrictions on the conduct of our business or the acquired business;
- underestimating the costs or overestimating the benefits, including product, revenue, cost and other synergies and growth opportunities that we expect to realize, and we may not achieve those benefits;
- failure to maintain customer, vendor, and other relationships;
- inadequacy or ineffectiveness of an acquired company's internal financial controls, disclosure controls and procedures, compliance programs, and/or environmental, health and safety, anti-corruption, human resource, or other policies or practices; and
- impairment of acquired intangible assets, goodwill, or other assets as a result of changing business conditions or technological advancements.

The global memory and storage industry has experienced consolidation and may continue to consolidate. We engage, from time to time, in discussions regarding potential acquisitions and similar opportunities. To the extent we are successful in completing any such transactions, we could be subject to some or all of the risks described above. Acquisitions of, or alliances with, technology companies are inherently risky and may not be successful and could have a material adverse effect on our business, results of operations, or financial condition.

**We have incurred restructure charges and may incur restructure charges in future periods and may not realize expected savings or other benefits from restructure plans.**

In 2023, we initiated a restructure plan in response to current market conditions. See "Part II – Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Restructure and Asset Impairments" and "Part II – Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – Overview." In addition, we may in the future enter into other restructure initiatives in order to, among other items, streamline our operations, respond to changes in business conditions, our markets, or product offerings, or to centralize certain key functions.

We may not realize expected savings or other benefits from our current or future restructure activities and may incur additional restructure charges or other losses in future periods associated with other initiatives. In connection with any restructure initiatives, we could incur restructure charges, loss of production output, loss of key personnel, disruptions in our operations, and difficulties in the timely delivery of products, which could have a material adverse effect on our business, results of operations, or financial condition.

Table of Contents

# Risks Related to Intellectual Property and Litigation

**We may be unable to protect our intellectual property or retain key employees who are knowledgeable of and develop our intellectual property.**

We maintain a system of controls over our intellectual property, including U.S. and foreign patents, trademarks, copyrights, trade secrets, licensing arrangements, confidentiality procedures, non-disclosure agreements with employees, consultants, and vendors, and a general system of internal controls. Despite our system of controls over our intellectual property, it may be possible for our current or future competitors to obtain, copy, use, or disclose, illegally or otherwise, our product and process technology or other proprietary information. The laws of some foreign countries may not protect our intellectual property to the same degree as do U.S. laws, and our confidentiality, non-disclosure, and non-compete agreements may be unenforceable or difficult and costly to enforce.

Additionally, our ability to maintain and develop intellectual property is dependent upon our ability to attract, develop, and retain highly skilled employees. If our competitors or future entrants into our industry are successful in hiring our employees, they may directly benefit from the knowledge these employees gained while they were under our employment, and this may also negatively impact our ability to maintain and develop intellectual property.

Our inability to protect our intellectual property or retain key employees who are knowledgeable of and develop our intellectual property could have a material adverse effect on our business, results of operations, or financial condition.

**Legal proceedings and claims could have a material adverse effect on our business, results of operations, or financial condition.**

From time to time, we are subject to various legal proceedings and claims that arise out of the ordinary conduct of our business or otherwise, both domestically and internationally. Such claims include, but are not limited to, allegations of anticompetitive conduct and infringement of intellectual property. See "Part II – Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Contingencies."

Any claim, with or without merit, could result in significant legal fees that could negatively impact our financial results, disrupt our operations, and require significant attention from our management. We may be associated with and subject to litigation, claims, or arbitration disputes arising from, or as a result of:

- our relationships with vendors or customers, supply agreements, or contractual obligations with our subcontractors or business partners;
- the actions of our vendors, subcontractors, or business partners;
- our indemnification obligations, including obligations to defend our customers against third-party claims asserting infringement of certain intellectual property rights, which may include patents, trademarks, copyrights, or trade secrets; and
- the terms of our product warranties or from product liability claims.

As we continue to focus on developing system solutions with manufacturers of consumer products, including autonomous driving, augmented reality, and others, we may be exposed to greater potential for personal liability claims against us as a result of consumers' use of those products. We, our officers, or our directors could also be subject to claims of alleged violations of securities laws. There can be no assurance that we are adequately insured to protect against all claims and potential liabilities, and we may elect to self-insure with respect to certain matters. Exposures to various legal proceedings and claims could lead to significant costs and expenses as we defend claims, are required to pay damage awards, or enter into settlement agreements, any of which could have a material adverse effect on our business, results of operations, or financial condition.



34

Table of Contents

**Claims that our products or manufacturing processes infringe or otherwise violate the intellectual property rights of others, or failure to obtain or renew license agreements covering such intellectual property, could materially adversely affect our business, results of operations, or financial condition.**

As is typical in the semiconductor and other high technology industries, from time to time others have asserted, and may in the future assert, that our products or manufacturing processes infringe upon, misappropriate, misuse, or otherwise violate their intellectual property rights. We are unable to predict the outcome of these assertions made against us. Any of these types of claims, regardless of the merits, could subject us to significant costs to defend or resolve such claims and may consume a substantial portion of management's time and attention. As a result of these claims, we may be required to:

- pay significant monetary damages, fines, royalties, or penalties;
- enter into license or settlement agreements covering such intellectual property rights;
- make material changes to or redesign our products and/or manufacturing processes; and/or
- cease manufacturing, having made, selling, offering for sale, importing, marketing, or using products and/or manufacturing processes in certain jurisdictions.

We may not be able to take any of the actions described above on commercially reasonable terms and any of the foregoing results could have a material adverse effect on our business, results of operations, or financial condition. See "Part II – Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Contingencies."

We have a number of intellectual property license agreements. Some of these license agreements require us to make one-time or periodic payments. We may need to obtain additional licenses or renew existing license agreements in the future. We are unable to predict whether these license agreements can be obtained or renewed on terms acceptable to us. The failure to obtain or renew licenses as necessary could have a material adverse effect on our business, results of operations, or financial condition.

# Risks Related to Laws and Regulations

**Government actions and regulations, such as export restrictions, tariffs, and trade protection measures, may limit our ability to sell our products to certain customers or markets, or could otherwise restrict our ability to conduct operations.**

International trade disputes, geopolitical tensions, and military conflicts have led, and continue to lead, to new and increasing export restrictions, trade barriers, tariffs, and other trade measures that can increase our manufacturing costs, make our products less competitive, reduce demand for our products, limit our ability to sell to certain customers or markets, limit our ability to procure, or increase our costs for, components or raw materials, impede or slow the movement of our goods across borders, impede our ability to perform R&D activities, or otherwise restrict our ability to conduct operations. Increasing protectionism, economic nationalism, and national security concerns may lead to further changes in trade policy, domestic sourcing initiatives, or other formal and informal measures that could make it more difficult to sell our products in, or restrict our access to, some markets and/or customers. For example, following the May 21, 2023 decision of its cybersecurity review of our products sold in China, the CAC determined that critical information infrastructure operators in China may not purchase Micron products, impacting our revenue with companies headquartered in mainland China and Hong Kong, including direct sales as well as indirect sales through distributors. Some revenue with customers headquartered outside of China has also been impacted. Further actions by the Chinese government could impact additional revenue inside or outside China, or our operations in China, or our ability to ship products to our customers, any of which could have a material adverse effect on our business, results of operations, or financial condition.

We cannot predict what further actions may ultimately be taken with respect to export regulations, tariffs, or other trade regulations between the United States and other countries, what products or companies may be subject to such actions, or what actions may be taken by other countries in retaliation. Further changes in trade policy, tariffs, restrictions on exports or other trade barriers, or restrictions on supplies, equipment, and raw materials including rare earth minerals, may limit our ability to produce products, increase our selling and/or manufacturing costs, decrease margins, reduce the competitiveness of our products, or inhibit our ability to sell products or purchase necessary equipment and supplies. Such changes may also result in reputational harm to us, the development or adoption of technologies that compete with our products, long-term changes in global trade and technology supply chains, or negative impacts on our customers' products which incorporate our solutions. Any of the effects described in this risk factor could have a material adverse effect on our business, results of operations, or financial condition.

The technology industry is subject to intense media, political, and regulatory scrutiny, which can increase our exposure to government investigations, legal actions, and penalties. Although we have policies, controls, and procedures designed to help ensure compliance with applicable laws, there can be no assurance that our employees, contractors, suppliers, or agents will not violate such laws or our policies. Violations of trade laws, restrictions, or regulations can result in fines; criminal sanctions against us or our officers, directors, or employees; prohibitions on the conduct of our business; and damage to our reputation.

**Tax-related matters could have a material adverse effect on our business, results of operations, or financial condition.**

We are subject to income taxes in the United States and many foreign jurisdictions. Our provision for income taxes and cash tax liabilities in the future could be adversely affected by numerous factors, including changes in the geographic mix of our earnings among jurisdictions, challenges by tax authorities to our tax positions and intercompany transfer pricing arrangements, failure to meet performance obligations with respect to tax incentive agreements, expanding our operations in various countries, fluctuations in foreign currency exchange rates, adverse resolution of audits and examinations of previously filed tax returns, and changes in tax laws and regulations.

Changes to income tax laws and regulations, or the interpretation of such laws, in any of the jurisdictions in which we operate could significantly increase our effective tax rate and ultimately reduce our cash flows from operating activities and otherwise have a material adverse effect on our financial condition. Beginning in 2024, the Inflation Reduction Act of 2022 imposes a 15% book minimum tax on corporations with three-year average annual adjusted financial statement income exceeding $1 billion. The impact of this tax will depend on our facts in each year, anticipated guidance from the U.S. Department of the Treasury, and other developing global tax legislation. Further changes in the tax laws of foreign jurisdictions could arise as a result of the base erosion and profit shifting project undertaken by the Organisation for Economic Co-operation and Development ("OECD"). In December 2022, the European Union ("EU") member states reached an agreement to implement the minimum tax component ("Pillar Two") of the OECD's tax reform initiative. The directive is expected to be enacted into the national law of the EU member states by December 31, 2023. If similar directives under Pillar Two are adopted by taxing authorities in other countries where we do business, such changes could have a material adverse effect on our business, results of operations, or financial condition.

**We and others are subject to a variety of complex and evolving laws, regulations, or industry standards, including with respect to environmental, health, safety, and product considerations, which may have a material adverse effect on our business, results of operations, or financial condition.**

The manufacture of our products requires the use of facilities, equipment, chemicals, and materials that are subject to a broad array of laws and regulations in numerous jurisdictions in which we operate. Additionally, we are subject to a variety of other laws and regulations relative to the construction, maintenance, and operations of our facilities. Any changes in laws, regulations, or industry standards could cause us to incur additional direct costs, as well as increased indirect costs related to our relationships with our customers and suppliers, and otherwise harm our operations and financial condition. Any failure to comply with laws, regulations, or industry standards could adversely impact our reputation and our financial results. Additionally, we engage various third parties as sales channel partners or to represent us or otherwise act on our behalf who are also subject to a broad array of laws, regulations, and industry standards. Our engagement with these third parties may also expose us to risks associated with their respective compliance with laws and regulations.

 36

New and evolving environmental health, safety, and product considerations, including those related to greenhouse gas emissions and climate change, the purchase, use and disposal of regulated and/or hazardous chemicals, and the potential resulting environmental, health or safety impacts, may result in new laws, regulations, or industry standards that may affect us, our suppliers, and our customers. Such laws, regulations, or industry standards could cause us to incur additional direct costs for compliance, as well as increased indirect costs resulting from our customers, suppliers, or both incurring additional compliance costs that are passed on to us. These costs may adversely impact our results of operations and financial condition.

As a result of the considerations detailed in this risk factor, we could experience the following:

- suspension of production or sales of our products;
- limited supplies of chemicals or materials used to make our products;
- remediation costs;
- increased compliance costs;
- alteration of our manufacturing processes;
- regulatory penalties, fines, civil or criminal sanctions, and other legal liabilities; and
- reputational challenges.

Compliance with, or our failure, or the failure of our third-party sales channel partners or agents, to comply with, laws, regulations, or industry standards could have a material adverse effect on our business, results of operations, or financial condition.

# Risks Related to Capitalization and Financial Markets

**We may be unable to generate sufficient cash flows or obtain access to external financing necessary to fund our operations, make scheduled debt payments, pay our dividend, and make adequate capital investments.**

Our cash flows from operations depend primarily on the volume of semiconductor memory and storage products sold, average selling prices, and manufacturing costs. To develop new product and process technology, support future growth, achieve operating efficiencies, and maintain product quality, we must make significant capital investments in manufacturing technology, capital equipment, facilities, R&D, and product and process technology. We estimate capital expenditures in 2024 for property, plant, and equipment, net of partner contributions, to be slightly above $7 billion.

In the past, we have utilized external sources of financing when needed. As a result of our debt levels, expected debt amortization, prevailing interest rates, and general capital market and other economic conditions, it may be difficult for us to obtain financing on terms acceptable to us or at all. We have experienced volatility in our cash flows and operating results and we expect to continue to experience such volatility in the future, which may negatively affect our credit rating. Our credit rating may also be affected by our liquidity, financial results, economic risk, or other factors, which may increase the cost of borrowings and make it difficult for us to obtain financing on terms acceptable to us or at all. There can be no assurance that we will be able to generate sufficient cash flows, access capital or credit markets, or find other sources of financing to fund our operations, make debt payments, refinance our debt, pay our quarterly dividend, and make adequate capital investments to remain competitive in terms of technology development and cost efficiency. Our inability to do any of the foregoing could have a material adverse effect on our business, results of operations, or financial condition.

**37 | 2023 10-K**

Table of Contents

**Debt obligations could adversely affect our financial condition.**

We have incurred in the past, and expect to incur in the future, debt to finance our capital investments, business acquisitions, and to realign our capital structure. As of August 31, 2023, we had debt with a carrying value of $13.33 billion and may incur additional debt, including under our $2.50 billion Revolving Credit Facility. Our debt obligations could adversely impact us as follows:

- require us to use a large portion of our cash flow to pay principal and interest on debt, which will reduce the amount of cash flow available to fund our business activities;
- adversely impact our credit rating, which could increase borrowing costs;
- limit our future ability to raise funds for capital expenditures, strategic acquisitions or business opportunities, R&D, and other general corporate requirements;
- restrict our ability to incur specified indebtedness, create or incur certain liens, and enter into sale-leaseback financing transactions;
- increase our vulnerability to adverse economic and industry conditions;
- increase our exposure to rising interest rates from variable rate indebtedness; and
- result in certain of our debt instruments becoming immediately due and payable or being deemed to be in default if applicable cross default, cross-acceleration and/or similar provisions are triggered.

Our ability to meet our payment obligations under our debt instruments depends on our ability to generate significant cash flows or obtain external financing in the future. This, to some extent, is subject to market, economic, financial, competitive, legislative, and regulatory factors as well as other factors that are beyond our control. There can be no assurance that our business will generate cash flow from operations, or that additional capital will be available to us, in amounts sufficient to enable us to meet our debt payment obligations and to fund other liquidity needs. Additionally, events and circumstances may occur which would cause us to not be able to satisfy applicable draw-down conditions and utilize our Revolving Credit Facility. In light of industry conditions, in 2023, we amended the financial covenants in our Revolving Credit Facility and term loan agreements. See "Part II – Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – Overview – Industry Conditions" and "Part II - Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Debt." If we are unable to generate sufficient cash flows to service our debt payment obligations or satisfy our debt covenants, we may need to refinance, restructure, or amend the terms of our debt, sell assets, reduce or delay capital investments, or seek to raise additional capital. If we are unable to implement one or more of these alternatives, we may be unable to meet our debt payment obligations, which could have a material adverse effect on our business, results of operations, or financial condition.

**Changes in foreign currency exchange rates could materially adversely affect our business, results of operations, or financial condition.**

Across our global operations, significant transactions and balances are denominated in currencies other than the U.S. dollar (our reporting currency), primarily the Chinese yuan, euro, Indian rupee, Japanese yen, Malaysian ringgit, New Taiwan dollar, and Singapore dollar. In addition, a significant portion of our manufacturing costs are denominated in foreign currencies. Exchange rates for some of these currencies against the U.S. dollar have been volatile and may be volatile in future periods. If these currencies strengthen against the U.S. dollar, our manufacturing costs could significantly increase. Exchange rates for the U.S. dollar that adversely change against our foreign currency exposures could have a material adverse effect on our business, results of operations, or financial condition.

**We are subject to counterparty default risks.**

We have numerous arrangements with financial institutions that subject us to counterparty default risks, including cash deposits, investments, and derivative instruments. Additionally, we are subject to counterparty default risk from our customers for amounts receivable from them. As a result, we are subject to the risk that the counterparty will default on its performance obligations. A counterparty may not comply with its contractual commitments which could then lead to its defaulting on its obligations with little or no notice to us, which could limit our ability to mitigate our exposure. Additionally, our ability to mitigate our exposures may be constrained by the terms of our contractual arrangements or because market conditions prevent us from taking effective action. If one of our counterparties becomes insolvent or files for bankruptcy, our ability to recover any losses suffered as a result of that counterparty's default may be limited by the liquidity of the counterparty or the applicable laws governing the bankruptcy proceedings. In the event of such default, we could incur significant losses, which could have a material adverse effect on our business, results of operations, or financial condition.

**The trading price of our common stock has been and may continue to be volatile.**

Our common stock has experienced substantial price volatility in the past and may continue to do so in the future. Additionally, we, the technology industry, and the stock market as a whole have on occasion experienced extreme stock price and volume fluctuations that have affected stock prices in ways that may have been unrelated to the specific operating performance of individual companies. The trading price of our common stock may fluctuate widely due to various factors, including, but not limited to, actual or anticipated fluctuations in our financial condition and operating results, changes in financial forecasts or estimates by us or financial or other market estimates and ratings by securities and other analysts, changes in our capital structure, including issuance of additional debt or equity to the public, interest rate changes, regulatory changes, news regarding our products or products of our competitors, and broad market and industry fluctuations.

For these reasons, investors should not rely on recent or historical trends to predict future trading prices of our common stock, financial condition, results of operations, or cash flows. Investors in our common stock may not realize any return on their investment in us and may lose some or all of their investment. Volatility in the trading price of our common stock could also result in the filing of securities class action litigation matters, which could result in substantial costs and the diversion of management time and resources.

**The amount and frequency of our share repurchases may fluctuate, and we cannot guarantee that we will fully consummate our share repurchase authorization, or that it will enhance long-term shareholder value. Share repurchases could also increase the volatility of the trading price of our stock and will diminish our cash reserves.**

The amount, frequency, and execution of our share repurchases pursuant to our share repurchase authorization may fluctuate based on our operating results, cash flows, and priorities for the use of cash for other purposes. Our expenditures for share repurchases were $425 million in 2023, $2.43 billion in 2022, $1.20 billion in 2021. These other purposes include, but are not limited to, operational spending, capital spending, acquisitions, and repayment of debt. Other factors, including changes in tax laws, could also impact our share repurchases. Although our Board of Directors has authorized share repurchases of up to $10 billion of our outstanding common stock, the authorization does not obligate us to repurchase any common stock.

We cannot guarantee that our share repurchase authorization will be fully consummated or that it will enhance long-term shareholder value. The repurchase authorization could affect the trading price of our stock and increase volatility, and any announcement of a pause in, or termination of, this program may result in a decrease in the trading price of our stock. In addition, this program will diminish our cash reserves.

**There can be no assurance that we will continue to declare cash dividends in any particular amounts or at all.**

Our Board of Directors has adopted a dividend policy pursuant to which we currently pay a cash dividend on our common shares on a quarterly basis. The declaration and payment of any dividend is subject to the approval of our Board of Directors and our dividend may be discontinued or reduced at any time. There can be no assurance that we will declare cash dividends in the future in any particular amounts, or at all.

**39 | 2023 10-K**

Table of Contents

Future dividends, if any, and their timing and amount, may be affected by, among other factors: our financial condition, results of operations, capital requirements, business conditions, debt service obligations, contractual restrictions, industry practice, legal requirements, regulatory constraints, and other factors that our Board of Directors may deem relevant. A reduction in or elimination of our dividend payments could have a negative effect on the trading price of our stock.

## ITEM 1B. UNRESOLVED STAFF COMMENTS

None.

## ITEM 2. PROPERTIES

Our corporate headquarters are located in Boise, Idaho. In addition to our principal facilities described below, we own or lease numerous other facilities in locations throughout the world used for design, R&D, and sales and marketing activities. The following is a summary of our principal facilities as of August 31, 2023:



| Location | Principal Operations |
|---|---|
| Taiwan | R&D, wafer fabrication, component assembly and test, module assembly and test |
| Singapore | R&D, wafer fabrication, component assembly and test, module assembly and test |
| Japan | R&D, wafer fabrication |
| United States | R&D, wafer fabrication, reticle manufacturing |
| Malaysia | Component assembly and test, module assembly and test |
| China | Component assembly and test, module assembly and test |

We believe that our existing facilities are suitable and adequate for our present purposes. We generally utilize all of our manufacturing capacity; however, a portion of our facilities were underutilized for 2023 due to industry conditions. See "Part II – Item 7. Management's Discussion and Analysis of Financial Condition and Results of Operations – Overview – Industry Conditions" for information regarding our current underutilization.



40

To support expected memory demand in the second half of the decade, we will need to add new DRAM wafer capacity. Following the enactment of the CHIPS Act in 2022, we announced plans to invest in two leading-edge memory manufacturing fabs in the United States, contingent on CHIPS Act support through grants and investment tax credits. As part of this plan, in September 2022, we broke ground on a leading-edge memory manufacturing fab in Boise, Idaho. Construction of the fab began in October 2023 with DRAM production targeted to start in calendar 2025 and first output in early calendar 2026. In addition, in October 2022, we announced plans to build a second leading-edge DRAM manufacturing fab in Clay, New York. We expect construction to begin in calendar 2024, with production anticipated to ramp in the latter half of the decade. We expect these new fabs to fulfill our requirements for additional wafer capacity starting in the second half of the decade and beyond, in line with industry demand trends. On August 21, 2023 we announced that two of our subsidiaries had each submitted full applications on August 18, 2023 for federal funding in the form of grants under the CHIPS Act for both of these projects.

We are also advancing our global back-end assembly and test network in order to support our product portfolio and extend our ability to deliver on global customer demand in the future. We intend to make investments at our backend facility in Xi'an, China, including a new building to provide space to add more product capability, to allow us over time to serve more of the demand from our customers in China from the Xi'an facility. We also intend to build a new assembly and test facility in Gujarat, India to address demand in the latter half of this decade.

We do not identify or allocate assets by operating segment, other than goodwill. For a breakout of the carrying value of our long-lived assets by geographic area see "Part II – Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Geographic Information."

## ITEM 3. LEGAL PROCEEDINGS

For a discussion of legal proceedings, see "Part II – Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Contingencies" and "Item 1A. Risk Factors" of this Annual Report on Form 10-K.

SEC regulations require disclosure of certain proceedings related to environmental matters unless we reasonably believe that the related monetary sanctions, if any, will be less than a specified threshold. We use a threshold of $1 million for this purpose.

## ITEM 4. MINE SAFETY DISCLOSURES

Not applicable.

## PART II

## ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS, AND ISSUER PURCHASES OF EQUITY SECURITIES

# Market Information

Our common stock is listed on The Nasdaq Global Select Market under the trading symbol "MU."

# Holders of Record

As of September 29, 2023, there were approximately 1,719 shareholders of record of our common stock. A substantially greater number of holders of our common stock are "street name" or beneficial holders, whose shares are held of record by banks, brokers, and other financial institutions.

**41 | 2023 10-K**

Table of Contents

# Dividends

On September 27, 2023, our Board of Directors declared a quarterly dividend of $0.115 per share, payable in cash on October 25, 2023, to shareholders of record as of the close of business on October 10, 2023.

We currently expect quarterly dividends to continue in future periods and aim to grow our dividend payments over time. However, the declaration and payment of any future cash dividends are at the discretion and subject to the approval of our Board of Directors. Our Board of Directors' decisions regarding the amount and payment of dividends will depend on many factors, such as our financial condition, results of operations, capital requirements, business conditions, debt service obligations, contractual restrictions, industry practice, legal requirements, regulatory constraints, and other factors that our Board of Directors may deem relevant. We cannot guarantee that we will continue to pay a dividend in any future period.

# Equity Compensation Plan Information

The information required by this item is incorporated by reference from the information to be included in our 2023 Proxy Statement under the section entitled "Equity Compensation Plan Information," which will be filed with the SEC within 120 days after August 31, 2023.

# Issuer Purchase of Equity Securities

## Common Stock Repurchase Authorization

In 2018, we announced that our Board of Directors authorized the discretionary repurchase of up to $10 billion of our outstanding common stock through open-market purchases, block trades, privately-negotiated transactions, derivative transactions, and/or pursuant to Rule 10b5-1 trading plans. The repurchase authorization has no expiration date, does not obligate us to acquire any common stock, and is subject to market conditions and our ongoing determination of the best use of available cash. During the quarter ended August 31, 2023, we did not repurchase any common stock under the authorization and as of August 31, 2023, $3.11 billion of the authorization remained available for the repurchase of our common stock.

Shares of common stock withheld as payment of withholding taxes and exercise prices in connection with the vesting or exercise of equity awards are also treated as common stock repurchases. Those withheld shares of common stock are not required to be disclosed under Item 703 of Regulation S-K and accordingly are excluded from this Item 5.

 42

Table of Contents

# Performance Graph

The following graph illustrates a five-year comparison of cumulative total returns for our common stock, the S&P 500 Composite Index, and the Philadelphia Semiconductor Index (SOX) from August 31, 2018, through August 31, 2023. We operate on a 52 or 53-week fiscal year which ends on the Thursday closest to August 31. Accordingly, the last day of our fiscal year varies. For consistent presentation and comparison to the industry indices shown herein, we have calculated our stock performance graph assuming an August 31 year end.



*Note: Management cautions that the stock price performance information shown in the graph above may not be indicative of current stock price levels or future stock price performance.*

The performance graph above assumes $100 was invested on August 31, 2018 in common stock of Micron Technology, Inc., the S&P 500 Composite Index, and the Philadelphia Semiconductor Index (SOX). Any dividends paid during the period presented were assumed to be reinvested. The performance was plotted using the following data:

|  | 2018 | 2019 | 2020 | 2021 | 2022 | 2023 |
|---|---|---|---|---|---|---|
| Micron Technology, Inc. | $ 100 | $ 86 | $ 87 | $ 140 | $ 108 | $ 135 |
| S&P 500 Composite Index | 100 | 103 | 125 | 165 | 146 | 169 |
| Philadelphia Semiconductor Index (SOX) | 100 | 110 | 168 | 257 | 204 | 283 |

# ITEM 6. [RESERVED]

## ITEM 7. MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS

*This discussion should be read in conjunction with the consolidated financial statements and accompanying notes for the year ended August 31, 2023. All period references are to our fiscal periods unless otherwise indicated. Our fiscal year is the 52 or 53-week period ending on the Thursday closest to August 31. Fiscal 2023, 2022, and 2021 each contained 52 weeks. All tabular dollar amounts are in millions, except per share amounts.*

# Overview

For an overview of our business, see "Part I – Item 1. Business – Overview."

### Industry Conditions

The memory and storage industry environment deteriorated sharply in the fourth quarter of 2022 and throughout 2023 due to weak demand in many end markets combined with global and macroeconomic challenges and lower demand resulting from customer actions to reduce inventory levels. This led to significant reductions in average selling prices for both DRAM and NAND and bit shipments for DRAM, resulting in declines in revenue across all our business segments and nearly all our end markets. Due to the challenging pricing environment, we recognized charges of $1.83 billion in 2023 to write down inventories to their estimated net realizable value. Ongoing demand growth, customer inventory normalization, and industry-wide supply discipline have set the stage for increased revenue, and improved pricing and profitability throughout fiscal 2024. As a result, pricing trends have started to improve and there were no write downs of inventories to net realizable value in the fourth quarter of 2023. However, further write-downs of inventories in future quarters could occur if pricing expectations deteriorate. Given the challenging pricing environment, elevated levels of inventories for suppliers and customers, and significant supply-demand mismatch, we expect industry profitability will remain challenged into 2024.

As a result of these conditions and increases in our inventory levels, we have reduced capital expenditures and also significantly reduced wafer starts in 2023 for both DRAM and NAND. We expect wafer starts will remain significantly below peak capacity levels for the foreseeable future as we remain focused on managing down our inventories and controlling our supply. We recognized period costs from fabrication facility underutilization of $382 million in 2023 due to wafer start reductions. We estimate that we will recognize approximately $200 million of period costs from underutilization due to wafer start reductions in the first quarter of 2024. We have also taken significant steps to reduce our costs and operating expenses. These actions include the 2023 Restructure Plan discussed below and additional reductions in external spending, including implementing productivity programs across the business, suspension of our 2023 bonus company-wide, reductions in select product programs, lower discretionary spending, and cuts to 2023 executive salaries across the company.

### Impact of China Cyberspace Administration Decision

On March 31, 2023, China's Cyberspace Administration (the "CAC") notified us that it was conducting a cybersecurity review of our products sold in China. On May 21, 2023, we received notice that the CAC had concluded its review and decided that our products presented a cybersecurity risk. As such, the CAC determined that critical information infrastructure operators in China may not purchase Micron products. There is no list of the companies that have been designated as critical information infrastructure operators published by the Chinese government or otherwise available to us. Therefore, the full impact of the CAC decision on our business remains uncertain.

 44

The CAC decision has impacted our business, particularly in the domestic data center and networking markets in China. In addition, although demand for DRAM and NAND is improving as customer inventory levels continue to normalize and secular growth drivers remain intact, the CAC decision continues to impact our revenue opportunity in China. This significant headwind is impacting our outlook and slowing our recovery. We are working to mitigate this impact over time and expect quarter-to-quarter revenue variability. Our revenue with companies headquartered in mainland China and Hong Kong, including direct sales as well as indirect sales through distributors, is approximately a quarter of our worldwide revenue and remains our principal exposure to the CAC decision. Although the impact of the CAC decision remains uncertain, we believe that approximately half of that China-headquartered customer revenue, which equates to a low-double-digit percentage of our worldwide revenue, is at risk of being impacted. Despite the near-term impact to our demand as a result of the CAC decision, our long-term goal is to retain our worldwide DRAM and NAND market share.

## 2023 Restructure Plan

We initiated a restructure plan in response to challenging industry conditions (the "2023 Restructure Plan"). Under the plan, we expect our headcount reduction to approach 15% by the end of calendar 2023, through a combination of voluntary attrition and personnel reductions. In connection with the plan, we incurred restructure charges of $171 million in 2023 primarily related to employee severance costs. The 2023 Restructure Plan was substantially completed in 2023. As a result of the 2023 Restructure Plan, we expect to realize cost savings of approximately $130 million per quarter (approximately 60% in cost of goods sold, 30% in R&D, and 10% in SG&A) subsequent to 2023. Further information on restructure activities can be found in "Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Restructure and Asset Impairments."

## Lehi, Utah Fab and 3D XPoint

In 2021, we updated our portfolio strategy to further strengthen our focus on memory and storage innovations for the data center market. In connection therewith, we determined that there was insufficient market validation to justify the ongoing investments required to commercialize 3D XPoint at scale. Accordingly, we ceased development of 3D XPoint technology and engaged in discussions for the sale of our facility located in Lehi, Utah that was dedicated to 3D XPoint production. As a result, we classified the property, plant, and equipment as held for sale in 2021, ceased depreciating the assets, and recognized a $435 million restructure and asset impairment charge and a $104 million tax benefit.

We closed the sale of our Lehi facility to TI in 2022 for $893 million and disposed of $918 million of net assets, consisting primarily of property, plant, and equipment, resulting in a $23 million loss, net of selling expenses and other adjustments.

# Results of Operations

**Consolidated Results**

| For the year ended | 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|
| Revenue | $ 15,540 | 100 % | $ 30,758 | 100 % | $ 27,705 | 100 % |
| Cost of goods sold | 16,956 | 109 % | 16,860 | 55 % | 17,282 | 62 % |
| Gross margin | (1,416) | (9)% | 13,898 | 45 % | 10,423 | 38 % |
| | | | | | | |
| Research and development | 3,114 | 20 % | 3,116 | 10 % | 2,663 | 10 % |
| Selling, general, and administrative | 920 | 6 % | 1,066 | 3 % | 894 | 3 % |
| Restructure and asset impairments | 171 | 1 % | 48 | — % | 488 | 2 % |
| Other operating (income) expense, net | 124 | 1 % | (34) | — % | 95 | — % |
| Operating income (loss) | (5,745) | (37)% | 9,702 | 32 % | 6,283 | 23 % |
| | | | | | | |
| Interest income (expense), net | 80 | 1 % | (93) | — % | (146) | (1)% |
| Other non-operating income (expense), net | 7 | — % | (38) | — % | 81 | — % |
| Income tax (provision) benefit | (177) | (1)% | (888) | (3)% | (394) | (1)% |
| Equity in net income (loss) of equity method investees | 2 | — % | 4 | — % | 37 | — % |
| Net income (loss) | $ (5,833) | (38)% | $ 8,687 | 28 % | $ 5,861 | 21 % |

**Total Revenue:** Total revenue for 2023 was adversely impacted by the factors described in the section titled "Industry Conditions" above. Total revenue for 2023 decreased 49% as compared to 2022 primarily due to decreases in sales of both DRAM and NAND products.

- Sales of DRAM products decreased 51% primarily due to a high-40s percent range decline in average selling prices and decreases in bit shipments in the high-single-digit percent range.
- Sales of NAND products decreased 46% primarily due to a low-50s percent range decline in average selling prices partially offset by increases in bit shipments in the high-single-digit percent range.

Total revenue for 2022 increased 11% as compared to 2021 primarily due to increases in sales of both DRAM and NAND products.

- Sales of DRAM products increased 12% primarily due to increases in bit shipments of slightly over 10%.
- Sales of NAND products increased 11% primarily due to a high-single-digit percent increase in bit shipments and a low-single-digit percent increase in average selling prices.

**Consolidated Gross Margin**: Our consolidated gross margin has been adversely impacted by the factors described in the section titled "Industry Conditions" above. Our consolidated gross margin percentage decreased to negative 9% for 2023 from 45% for 2022 primarily due to declines in average selling prices for both DRAM and NAND and charges to write down inventories (as detailed in "Inventory NRV write-downs" below), and $382 million of facility underutilization costs in 2023.

*Inventory NRV write-downs:* Our consolidated gross margin was impacted by charges to write down inventories to their estimated net realizable value as a result of declines in average selling prices for both DRAM and NAND. As charges to write down inventories are recorded in advance of when inventories are sold, costs of goods sold in subsequent periods are lower than they otherwise would be. The impact of inventory NRV write-downs for each period reflects (1) inventory write-downs in that period, offset by (2) lower costs in that period on the sale of inventory written down in prior periods. The impacts of inventory NRV write-downs are summarized below:

*Micron* 46

| For the year ended | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| Provision to write down inventory to NRV | $ | (1,831) $ | — $ | — |
| Lower costs from sale of inventory written down in prior periods | | 844 | — | — |
| | $ | (987) $ | — $ | — |

Our consolidated gross margin percentage increased to 45% for 2022 from 38% for 2021, as a result of improvements in margins for both DRAM and NAND products, primarily due to reductions in manufacturing costs. Manufacturing cost reductions were driven by strong execution in ramping our 1α DRAM and 176-layer NAND technology nodes. For 2021, our gross margins included the impact of underutilization costs at MTU of $335 million. See "Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Lehi, Utah Fab and 3D XPoint." Also, effective as of the beginning of the second quarter of 2021, we changed our method of inventory costing from average cost to first-in, first-out ("FIFO"). Concurrently, as of the beginning of the second quarter of 2021, we modified our inventory cost absorption processes used to estimate inventory values, which affects the timing of when costs are recognized. These changes resulted in a one-time increase to cost of goods sold of approximately $293 million in 2021.

## Revenue by Business Unit

| For the year ended | | 2023 | | | 2022 | | | 2021 | |
|---|---|---|---|---|---|---|---|---|---|
| CNBU | $ | 5,710 | 37 % | $ | 13,693 | 45 % | $ | 12,280 | 44 % |
| MBU | | 3,630 | 23 % | | 7,260 | 24 % | | 7,203 | 26 % |
| EBU | | 3,637 | 23 % | | 5,235 | 17 % | | 4,209 | 15 % |
| SBU | | 2,553 | 16 % | | 4,553 | 15 % | | 3,973 | 14 % |
| All Other | | 10 | — % | | 17 | — % | | 40 | — % |
| | $ | 15,540 | | $ | 30,758 | | $ | 27,705 | |

*Percentages of total revenue may not total 100% due to rounding.*

Changes in revenue for each business unit for 2023 as compared to 2022 were as follows:

- CNBU revenue decreased 58% primarily due to declines in average selling prices for DRAM and decreases in bit shipments.
- MBU revenue decreased 50% primarily due to declines in average selling prices for both DRAM and NAND and decreases in NAND bit shipments.
- EBU revenue decreased 31% primarily due to declines in average selling prices for both DRAM and NAND and decreases in bit shipments.
- SBU revenue decreased 44% primarily due to declines in average selling prices for NAND partially offset by increases in bit shipments.

Changes in revenue for each business unit for 2022 as compared to 2021 were as follows:

- CNBU revenue increased 12% primarily due to increases in bit shipments to cloud, enterprise, and networking markets.
- MBU revenue was relatively unchanged as both DRAM and NAND revenue was relatively flat.
- EBU revenue increased 24% primarily due to strong demand growth in industrial and automotive markets.
- SBU revenue increased 15% primarily due to higher average selling prices and increases in shipments of SSD products.

## Operating Income (Loss) by Business Unit

| For the year ended | 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|
| CNBU | $ (585) | (10)% | $ 5,844 | 43 % | $ 4,295 | 35 % |
| MBU | (1,750) | (48)% | 2,160 | 30 % | 2,173 | 30 % |
| EBU | 382 | 11 % | 1,752 | 33 % | 1,006 | 24 % |
| SBU | (1,887) | (74)% | 513 | 11 % | 173 | 4 % |
| All Other | 8 | 80 % | 12 | 71 % | 20 | 50 % |
| | $ (3,832) | | $ 10,281 | | $ 7,667 | |

*Percentages reflect operating income (loss) as a percentage of revenue for each business unit.*

Changes in operating income or loss for each business unit for 2023 as compared to 2022 were as follows:

- CNBU operating income (loss) deteriorated primarily due to declines in average selling prices and lower bit shipments.
- MBU operating income (loss) deteriorated primarily due to declines in average selling prices and lower NAND bit shipments.
- EBU operating income decreased primarily due to declines in average selling prices and lower bit shipments.
- SBU operating income (loss) deteriorated primarily due to declines in average selling prices.

Changes in operating income or loss for each business unit for 2022 as compared to 2021 were as follows:

- CNBU operating income increased primarily due to higher bit shipments and manufacturing cost reductions.
- MBU operating income was relatively unchanged as slight increases in gross margins were offset by higher operating expenses.
- EBU operating income increased primarily due to manufacturing cost reductions from an increasing mix of leading-edge bits, higher bit shipments, and improved DRAM pricing in industrial and consumer markets, partially offset by higher R&D expenses.
- SBU operating income increased primarily due to improved product mix driving increases in average selling prices, increases in SSD shipments, and manufacturing cost reductions, partially offset by higher R&D expenses.

## Operating Expenses and Other

**Research and Development:** R&D expenses vary primarily with the number of development and pre-qualification wafers processed, the cost of advanced equipment dedicated to new product and process development, and personnel costs. Because of the lead times necessary to manufacture our products, we typically begin to process wafers before completion of performance and reliability testing. Development of a product is deemed complete when it is qualified through internal reviews and tests for performance and reliability. R&D expenses can vary significantly depending on the timing of product qualification.

R&D expenses for 2023 were relatively unchanged as compared to 2022 as decreases in employee compensation were offset by higher depreciation expense. R&D expenses for 2022 increased 17% as compared to 2021 primarily due to higher employee compensation from increases in headcount, higher volumes of development and prequalification wafers, and higher depreciation expense.

**Selling, General, and Administrative:** SG&A expenses for 2023 were 14% lower as compared to 2022 primarily due to decreases in employee compensation, legal fees, advertising, and professional services. SG&A expenses for 2022 were 19% higher as compared to 2021 primarily due to increases in employee compensation, professional services, and legal fees.

**Restructure and Asset Impairments:** For a discussion of restructure and asset impairments, see the Overview sections above titled "2023 Restructure Plan" and "Lehi, Utah Fab and 3D XPoint."

Table of Contents

***Interest Income (Expense), Net:*** Interest income (expense) improved for 2023 as compared to 2022 primarily as a result of increases in interest income due to higher interest rates on our cash and investments, partially offset by increases in interest expense due to higher debt balances and interest rates. Interest income (expense) improved for 2022 as compared to 2021 primarily due to an increase of $59 million in interest income as a result of increases in interest rates on our cash and investments.

***Income Taxes:*** Our income tax (provision) benefit consisted of the following:

| For the year ended | 2023 | 2022 | 2021 |
|---|---|---|---|
| Income (loss) before taxes | $ (5,658) | $ 9,571 | $ 6,218 |
| Income tax (provision) benefit | (177) | (888) | (394) |
| Effective tax rate | (3.1)% | 9.3 % | 6.3 % |

The change in our effective tax rate for 2023 as compared to 2022 was primarily due to a pre-tax loss in 2023. Despite a consolidated pre-tax loss on a worldwide basis, we have taxes payable in certain geographies due to minimum taxable income reportable in those geographies. Our effective tax rate increased in 2022 as compared to 2021 primarily due to the geographic mix of our earnings and a valuation allowance recorded against our Idaho deferred tax assets of $189 million, partially offset by tax impacts of changes in foreign currency exchange rates.

We operate in a number of jurisdictions outside the United States, including Singapore, where we have tax incentive arrangements. These incentives expire, in whole or in part, at various dates through 2034 and are conditional, in part, upon meeting certain business operations and employment thresholds. As a result of a loss before taxes and geographical mix of income, the benefit from tax incentive arrangements was not material for 2023. The effect of tax incentive arrangements reduced our tax provision by $1.12 billion (benefiting our diluted earnings per share by $1.00) for 2022 and by $758 million ($0.66 per diluted share) for 2021.

Beginning in 2024, the Inflation Reduction Act of 2022 imposes a 15% book minimum tax on corporations with three-year average annual adjusted financial statement income exceeding $1 billion. The impact of this tax will depend on our facts in each year, anticipated guidance from the U.S. Department of the Treasury, and other developing global tax legislation.

Various tax reforms are being considered in multiple jurisdictions that, if enacted, contain provisions that could materially impact our tax expense. We continue to monitor the potential impact of these various tax reform proposals to our overall global effective tax rate and financial statements.

***Other:*** Further information can be found in the following notes contained in "Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements":

- Lehi, Utah Fab and 3D XPoint
- Goodwill
- Equity Plans
- Restructure and Asset Impairments
- Other Operating (Income) Expense, Net
- Other Non-Operating Income (Expense), Net
- Income Taxes

Table of Contents

# Liquidity and Capital Resources

Our primary sources of liquidity are cash generated from operations and financing obtained from capital markets and financial institutions. Cash generated from operations is highly dependent on selling prices for our products, which can vary significantly from period to period. Cash and marketable investments totaled $10.44 billion as of August 31, 2023, and $10.98 billion as of September 1, 2022. Our cash and investments consist primarily of bank deposits, money market funds, and liquid investment-grade, fixed-income securities, which are diversified among industries and individual issuers. To mitigate credit risk, we invest through high-credit-quality financial institutions and by policy generally limit the concentration of credit exposure by restricting the amount of investments with any single obligor. As of August 31, 2023, $2.45 billion of our cash and marketable investments was held by our foreign subsidiaries.

We continuously evaluate alternatives for efficiently funding our capital expenditures and ongoing operations. We expect, from time to time, to engage in a variety of financing transactions for such purposes, including the issuance of securities. As of August 31, 2023, $2.50 billion was available to draw under our Revolving Credit Facility. On March 27, 2023, we entered into amendments to the Multi-Tranche Term Loan Agreement and the agreements governing the Revolving Credit Facility and the 2024 Term Loan A to revise the leverage ratio covenant in each such agreement, as further described in "Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Debt." Funding of certain significant capital projects is also dependent on the receipt of government incentives, which are subject to conditions and may not be obtained.

To develop new product and process technology, support future growth, achieve operating efficiencies, and maintain product quality, we must continue to invest in manufacturing technologies, facilities and equipment, and R&D. We estimate capital expenditures in 2024 for property, plant, and equipment, net of partner contributions, to be slightly above $7 billion. Actual amounts for 2024 will vary depending on market conditions. As of August 31, 2023, we had purchase obligations of approximately $915 million for the acquisition of property, plant, and equipment, of which approximately $812 million is expected to be paid within one year. For a description of other contractual obligations, such as leases, debt, and commitments, see "Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Leases," " – Debt," and " – Commitments."

To support expected memory demand in the second half of the decade, we will need to add new DRAM wafer capacity. Following the enactment of the CHIPS Act in 2022, we announced plans to invest in two leading-edge memory manufacturing fabs in the United States, contingent on CHIPS Act support through grants and investment tax credits. As part of this plan, in September 2022, we broke ground on a leading-edge memory manufacturing fab in Boise, Idaho. Construction of the fab began in October 2023 with DRAM production targeted to start in calendar 2025 and first output in early calendar 2026. In addition, in October 2022, we announced plans to build a second leading-edge DRAM manufacturing fab in Clay, New York. We expect construction to begin in calendar 2024, with production anticipated to ramp in the latter half of the decade. We expect these new fabs to fulfill our requirements for additional wafer capacity starting in the second half of the decade and beyond, in line with industry demand trends. On August 21, 2023 we announced that two of our subsidiaries had each submitted full applications on August 18, 2023 for federal funding in the form of grants under the CHIPS Act for both of these projects.

We are also advancing our global back-end assembly and test network in order to support our product portfolio and extend our ability to deliver on global customer demand in the future. We intend to make investments at our backend facility in Xi'an, China, including a new building to provide space to add more product capability, to allow us over time to serve more of the demand from our customers in China from the Xi'an facility. We also intend to build a new assembly and test facility in Gujarat, India to address demand in the latter half of this decade.

Our Board of Directors has authorized the discretionary repurchase of up to $10 billion of our outstanding common stock through open-market purchases, block trades, privately-negotiated transactions, derivative transactions, and/or pursuant to Rule 10b5-1 trading plans. The repurchase authorization has no expiration date, does not obligate us to acquire any common stock, and is subject to market conditions and our ongoing determination of the best use of available cash. Through August 31, 2023, we had repurchased an aggregate of $6.89 billion of the authorized amount. See "Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Equity."

Micron   50

Table of Contents

On September 27, 2023, our Board of Directors declared a quarterly dividend of $0.115 per share, payable in cash on October 25, 2023, to shareholders of record as of the close of business on October 10, 2023. The declaration and payment of any future cash dividends are at the discretion and subject to the approval of our Board of Directors. Our Board of Directors' decisions regarding the amount and payment of dividends will depend on many factors, including, but not limited to, our financial condition, results of operations, capital requirements, business conditions, debt service obligations, contractual restrictions, industry practice, legal requirements, regulatory constraints, and other factors that our Board of Directors may deem relevant.

We expect that our cash and investments, cash flows from operations, and available financing will be sufficient to meet our requirements at least through the next 12 months and thereafter for the foreseeable future.

## Cash Flows

| For the year ended | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| Net cash provided by operating activities | $ | 1,559 $ | 15,181 $ | 12,468 |
| Net cash provided by (used for) investing activities | | (6,191) | (11,585) | (10,589) |
| Net cash provided by (used for) financing activities | | 4,983 | (2,980) | (1,781) |
| Effect of changes in currency exchange rates on cash, cash equivalents, and restricted cash | | (34) | (106) | 41 |
| Net increase (decrease) in cash, cash equivalents, and restricted cash | $ | 317 $ | 510 $ | 139 |

*Operating Activities:* Cash provided by operating activities reflects net income (loss) adjusted for certain non-cash items, including depreciation expense, amortization of intangible assets, inventory write-downs, asset impairments, and stock-based compensation, and the effects of changes in operating assets and liabilities. The decrease in cash provided by operating activities for 2023 as compared to 2022 was primarily due to a net loss in the current year adjusted for non-cash items and the effect of an increase in inventories and a decline in accounts payable and accrued expenses, partially offset by a decrease in receivables.

The increase in cash provided by operating activities for 2022 as compared to 2021 was primarily due to higher net income adjusted for non-cash items and the effect of lower receivables, partially offset by an increase in inventories.

*Investing Activities:* For 2023, net cash used for investing activities consisted primarily of $7.68 billion of expenditures for property, plant, and equipment; contributions of $710 million received from partners to offset capital expenditures; and $868 million of net inflows from maturities, sales, and purchases of available-for-sale securities.

For 2022, net cash used for investing activities consisted primarily of $12.07 billion of expenditures for property, plant, and equipment; contributions of $115 million received from partners to offset capital expenditures; $888 million of net inflows from the sale of the Lehi, Utah fab; and $155 million of net outflows from purchases, sales, and maturities of available-for-sale securities.

For 2021, net cash used for investing activities consisted primarily of $10.03 billion of expenditures for property, plant, and equipment, partially offset by contributions of $502 million received from partners to offset capital expenditures, and $1.06 billion of net outflows from purchases, sales, and maturities of available-for-sale securities.

*Financing Activities:* For 2023, net cash provided by financing activities consisted primarily of $3.20 billion of proceeds from our 2025, 2026, and 2027 Term Loan A borrowings, $1.27 billion from the issuance of the 2029 B Notes, $896 million from the issuance of the 2033 B Notes, $749 million from the issuance of the 2033 A Notes, and $599 million from the issuance of the 2028 Notes. Cash used for financing activities included $761 million for repayments of debt, $504 million for payments of dividends to shareholders, $425 million for the acquisition of 8.6 million shares of our common stock under our share repurchase authorization, and $138 million of payments on equipment purchase contracts.

Table of Contents

For 2022, net cash used for financing activities included $2.43 billion for the acquisition of 35.4 million shares of our common stock under our share repurchase authorization, $2.03 billion of repayments of debt primarily to redeem the 2023 Notes and 2024 Notes, $461 million of cash payments of dividends to shareholders, and $141 million of payments on equipment purchase contracts. Cash used for financing activities was partially offset by aggregate proceeds of $2.00 billion from the issuance of the unsecured 2032 Green Bonds, 2041 Notes, and 2051 Notes.

For 2021, net cash used for financing activities consisted primarily of $1.20 billion for the acquisition of 15.6 million shares of our common stock under our share repurchase authorization, $295 million of payments on equipment purchase contracts, $185 million of cash payments to settle conversions of our 2032D Notes, and $147 million of repayments of finance leases and other debt. In addition, we received proceeds of $1.19 billion under an unsecured 2024 Term Loan A and used the proceeds to repay the $1.19 billion Extinguished 2024 Term Loan A.

See "Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Debt."

# Critical Accounting Estimates

The preparation of financial statements and related disclosures in conformity with U.S. GAAP requires management to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues, expenses, and related disclosures. Estimates and judgments are based on historical experience, forecasted events, and various other assumptions that we believe to be reasonable under the circumstances. Estimates and judgments may vary under different assumptions or conditions and involve a significant level of uncertainty. We evaluate our estimates and judgments on an ongoing basis. Our management believes the accounting policies below are critical in the portrayal of our financial condition and results of operations and require management's most difficult, subjective, or complex judgments.

**Contingencies**: We are subject to the possibility of losses from various contingencies. Significant judgment is necessary to estimate the probability and amount of a loss, if any, from such contingencies. An accrual is made when it is probable that a liability has been incurred or an asset has been impaired, and the amount of loss can be reasonably estimated. In accounting for the resolution of contingencies, significant judgment may be necessary to estimate amounts pertaining to periods prior to the resolution that are charged to operations in the period of resolution and amounts related to future periods.

**Goodwill**: We test goodwill for impairment in our fourth quarter each year, or more frequently if indicators of an impairment exist, to determine whether it is more likely than not that the fair value of the reporting unit with goodwill is less than its carrying value. For reporting units for which this assessment concludes that it is more likely than not that the fair value is more than its carrying value, goodwill is considered not impaired, and we are not required to perform the goodwill impairment test. Qualitative factors considered in this assessment include industry and market considerations, overall financial performance, and other relevant events and factors affecting the fair value of the reporting unit. For reporting units for which this assessment concludes that it is more likely than not that the fair value is below the carrying value, goodwill is tested for impairment by determining the fair value of each reporting unit and comparing it to the carrying value of the net assets assigned to the reporting unit. If the fair value of the reporting unit exceeds its carrying value, goodwill is considered not impaired. If the carrying value of the reporting unit exceeds its fair value, we recognize an impairment loss up to the difference between the carrying value and implied fair value. We recognized a charge of $101 million in 2023 to impair all of the goodwill assigned to our SBU reporting unit based on our quantitative assessment for impairment in the current year. The quantitative assessment indicated that the fair value for all of our other reporting units substantially exceeded their carrying value.

*Micron* 52

Table of Contents

Determining when to test for impairment, the reporting units, the assets and liabilities of the reporting unit, and the fair value of the reporting unit requires significant judgment and involves the use of significant estimates and assumptions. These estimates and assumptions include revenue growth rates, forecasted manufacturing costs, and other expenses and are developed as part of our long-range planning process. The same estimates are used in business planning, forecasting, and capital budgeting as part of our long-term manufacturing capacity analysis. These estimates and assumptions are used to calculate projected future cash flows for the reporting unit, which are discounted using a risk-adjusted rate to estimate a fair value. The discount rate requires determination of appropriate market comparables. We base fair value estimates on assumptions we believe to be reasonable but that are unpredictable and inherently uncertain. Actual future results may differ from those estimates. We assess the reasonableness of our methodology, forecasts, and assumptions by comparing the aggregate calculated fair value for our reporting units to our market capitalization.

***Income taxes:*** We are required to estimate our provision for income taxes and amounts ultimately payable or recoverable in numerous tax jurisdictions around the world. These estimates involve significant judgment and interpretations of regulations and are inherently complex. Resolution of income tax treatments in individual jurisdictions may not be known for many years after completion of the applicable year. We are also required to evaluate the realizability of our deferred tax assets on an ongoing basis in accordance with U.S. GAAP, which requires the assessment of our performance and other relevant factors. Realization of deferred tax assets is dependent on our ability to generate future taxable income. Our income tax provision or benefit is dependent, in part, on our ability to forecast future taxable income in Japan, Malaysia, the United States, Taiwan, and other jurisdictions. Such forecasts are inherently difficult and involve significant judgments including, among others, projecting future average selling prices and sales volumes, manufacturing and overhead costs, levels of capital spending, and other factors that significantly impact our analyses of the amount of net deferred tax assets that are more likely than not to be realized.

***Inventories:*** Inventories are stated at the lower of cost or net realizable value, with cost being determined on a first-in, first-out ("FIFO") basis. Cost includes depreciation, labor, material, and overhead costs, including product and process technology costs. Determining net realizable value of finished goods and work in process inventories involves significant judgments, including projecting future average selling prices, future sales volumes, and future cost per part. To project average selling prices and sales volumes, we review recent sales volumes, existing customer orders, current contract prices, industry analyses of supply and demand, and general economic trends. To project cost per part, we review trends with historical results and consider known changes in our cost structure as applicable. Actual selling prices may vary significantly from projected prices due to the volatile nature of the semiconductor memory and storage markets. When these analyses reflect estimated net realizable values below our manufacturing costs, we record a charge to cost of goods sold in advance of when inventories are actually sold. As a result, the timing of when product costs are charged to costs of goods sold can vary significantly. Differences in future average selling prices used in calculating lower of cost or net realizable value adjustments can result in significant changes in the estimated net realizable value of finished goods and work in process inventories and accordingly the amount of write-down recorded. For example, a 5% decrease in future average selling prices would have changed the estimated net realizable value of our finished goods and work in process inventories by approximately $600 million as of August 31, 2023.

U.S. GAAP provides for products to be grouped into categories in order to compare costs to net realizable values. The amount of any inventory write-down can vary significantly depending on the determination of inventory categories. We review the major characteristics of product type and markets in determining the unit of account for which we perform the lower of cost or net realizable value analysis and categorize all inventories (including DRAM, NAND, and other memory) as a single group.

***Property, plant, and equipment:*** We periodically assess the estimated useful lives of our property, plant, and equipment based on technology node transitions, capital spending, and equipment re-use rates. We also review the carrying value of property, plant, and equipment for impairment when events and circumstances indicate that the carrying value of an asset or group of assets may not be recoverable from the estimated future cash flows expected to result from its use and/or disposition. In cases where undiscounted expected future cash flows are less than the carrying value, an impairment loss is recognized equal to the amount by which the carrying value exceeds the estimated fair value of the assets. The estimate of future cash flows involves numerous assumptions which require significant judgment by us, including, but not limited to, future use of the assets for our operations versus sale or disposal of the assets, future selling prices for our products, and future production and sales volumes.

**53 | 2023 10-K**

***Revenue recognition***: Revenue is primarily recognized at a point in time when control of the promised goods is transferred to our customers in an amount that reflects the consideration we expect to be entitled to in exchange for those goods. Contracts with our customers are generally short-term in duration at fixed, negotiated prices with payment generally due shortly after delivery. We estimate a liability for returns using the expected value method based on historical returns. In addition, we generally offer price protection to our distributors, which is a form of variable consideration that decreases the transaction price. We use the expected value method, based on historical price adjustments and current pricing trends, to estimate the amount of revenue recognized from sales to distributors. Differences between the estimated and actual amounts are recognized as adjustments to revenue.

# Recently Adopted Accounting Standards

No material items.

# Recently Issued Accounting Standards

No material items.

## ITEM 7A. QUANTITATIVE AND QUALITATIVE DISCLOSURES ABOUT MARKET RISK

### Interest Rate Risk

We are exposed to interest rate risk related to our indebtedness and our investment portfolio. As of August 31, 2023 and September 1, 2022, we had fixed-rate debt with an aggregate carrying value of $7.52 billion and $4.03 billion, respectively, and as a result, the fair value of our debt fluctuates with changes in market interest rates. We estimate that, as of August 31, 2023 and September 1, 2022, a hypothetical 1% decrease in market interest rates would increase the fair value of our fixed-rate debt by approximately $475 million and $275 million, respectively.

Interest rate risk related to our investment portfolio is managed by primarily investing in shorter term securities. We estimate that, as of August 31, 2023 and September 1, 2022, a hypothetical 1% increase in interest rates would decrease the fair value of our portfolio by approximately $20 million and $30 million, respectively. Such impact would only be realized if investments were sold prior to maturity.

As of August 31, 2023 and September 1, 2022, we had floating-rate debt, including fixed-rate debt that is swapped to floating-rate debt, with an aggregate principal amount of $4.63 billion and $2.09 billion, respectively. A hypothetical 1% increase in the interest rates of this floating-rate debt would result in an increase in annual interest expense of $46 million and $21 million as of August 31, 2023 and September 1, 2022, respectively.

### Foreign Currency Exchange Rate Risk

The information in this section should be read in conjunction with the information related to changes in the currency exchange rates in "Part I – Item 1A. Risk Factors." Changes in foreign currency exchange rates could materially adversely affect our business, results of operations, or financial condition.



54

Table of Contents

The functional currency for all of our operations is the U.S. dollar. The substantial majority of our sales are transacted in the U.S. dollar; however, significant amounts of our operating expenses and capital expenditures, and certain assets and liabilities, are incurred in or exposed to other currencies, primarily the Chinese yuan, euro, Indian rupee, Japanese yen, Malaysian ringgit, New Taiwan dollar, and Singapore dollar. We have established currency risk management programs for our monetary assets and liabilities denominated in foreign currencies to hedge against fluctuations in the fair value and volatility of future cash flows caused by changes in currency exchange rates. We generally utilize currency forward contracts in these hedging programs, which reduce, but do not always entirely eliminate, the impact of currency exchange rate movements. We do not use derivative financial instruments for trading or speculative purposes.

Based on monetary assets and liabilities denominated in foreign currencies, we estimate that a hypothetical 10% adverse change in exchange rates versus the U.S. dollar would result in losses of approximately $129 million as of August 31, 2023 and $186 million as of September 1, 2022. We hedge our exposure to changes in currency exchange rates by utilizing a rolling hedge strategy for our primary currency exposures with currency forward contracts that generally mature within three months. The effectiveness of our hedges is dependent, among other factors, upon our ability to accurately measure exposures on a timely basis. To hedge the exposure of changes in cash flows from changes in currency exchange rates for certain capital expenditures and manufacturing costs, we may utilize currency forward contracts that generally mature within two years. See "Item 8. Financial Statements and Supplementary Data – Notes to Consolidated Financial Statements – Derivative Instruments."

**ITEM 8. FINANCIAL STATEMENTS AND SUPPLEMENTARY DATA**

# Index to Consolidated Financial Statements

| | |
|---|---:|
| Consolidated Statements of Operations | 57 |
| Consolidated Statements of Comprehensive Income (Loss) | 58 |
| Consolidated Balance Sheets | 59 |
| Consolidated Statements of Changes in Equity | 60 |
| Consolidated Statements of Cash Flows | 61 |
| Notes to Consolidated Financial Statements | 62 |
| Report of Independent Registered Public Accounting Firm (PCAOB ID 238) | 91 |

Micron 56

# Micron Technology, Inc.
# Consolidated Statements of Operations

(In millions, except per share amounts)

| For the year ended | | August 31, 2023 | September 1, 2022 | September 2, 2021 |
|---|---|---|---|---|
| Revenue | $ | 15,540 | $ 30,758 | $ 27,705 |
| Cost of goods sold | | 16,956 | 16,860 | 17,282 |
| Gross margin | | (1,416) | 13,898 | 10,423 |
| | | | | |
| Research and development | | 3,114 | 3,116 | 2,663 |
| Selling, general, and administrative | | 920 | 1,066 | 894 |
| Restructure and asset impairments | | 171 | 48 | 488 |
| Other operating (income) expense, net | | 124 | (34) | 95 |
| Operating income (loss) | | (5,745) | 9,702 | 6,283 |
| | | | | |
| Interest income | | 468 | 96 | 37 |
| Interest expense | | (388) | (189) | (183) |
| Other non-operating income (expense), net | | 7 | (38) | 81 |
| | | (5,658) | 9,571 | 6,218 |
| | | | | |
| Income tax (provision) benefit | | (177) | (888) | (394) |
| Equity in net income (loss) of equity method investees | | 2 | 4 | 37 |
| Net income (loss) | $ | (5,833) | $ 8,687 | $ 5,861 |
| | | | | |
| Earnings (loss) per share | | | | |
| Basic | $ | (5.34) | $ 7.81 | $ 5.23 |
| Diluted | | (5.34) | 7.75 | 5.14 |
| | | | | |
| Number of shares used in per share calculations | | | | |
| Basic | | 1,093 | 1,112 | 1,120 |
| Diluted | | 1,093 | 1,122 | 1,141 |

*See accompanying notes to consolidated financial statements.*

Table of Contents

# Micron Technology, Inc.
# Consolidated Statements of Comprehensive Income (Loss)
(In millions)

| For the year ended | | August 31, 2023 | September 1, 2022 | September 2, 2021 |
|---|---|---|---|---|
| Net income (loss) | $ | (5,833) $ | 8,687 $ | 5,861 |
| | | | | |
| Other comprehensive income (loss), net of tax | | | | |
| Gains (losses) on derivative instruments | | 234 | (516) | (67) |
| Pension liability adjustments | | 11 | 3 | 3 |
| Unrealized gains (losses) on investments | | 6 | (48) | (7) |
| Foreign currency translation adjustments | | (3) | (1) | 2 |
| Other comprehensive income (loss) | | 248 | (562) | (69) |
| Total comprehensive income (loss) | $ | (5,585) $ | 8,125 $ | 5,792 |

*See accompanying notes to consolidated financial statements.*

 **58**

# Micron Technology, Inc.
# Consolidated Balance Sheets
(In millions, except par value amounts)

| As of | | August 31, 2023 | | September 1, 2022 |
|---|---|---|---|---|
| **Assets** | | | | |
| Cash and equivalents | $ | 8,577 | $ | 8,262 |
| Short-term investments | | 1,017 | | 1,069 |
| Receivables | | 2,443 | | 5,130 |
| Inventories | | 8,387 | | 6,663 |
| Other current assets | | 820 | | 657 |
| Total current assets | | 21,244 | | 21,781 |
| Long-term marketable investments | | 844 | | 1,647 |
| Property, plant, and equipment | | 37,928 | | 38,549 |
| Operating lease right-of-use assets | | 666 | | 678 |
| Intangible assets | | 404 | | 421 |
| Deferred tax assets | | 756 | | 702 |
| Goodwill | | 1,150 | | 1,228 |
| Other noncurrent assets | | 1,262 | | 1,277 |
| Total assets | $ | 64,254 | $ | 66,283 |
| | | | | |
| **Liabilities and equity** | | | | |
| Accounts payable and accrued expenses | $ | 3,958 | $ | 6,090 |
| Current debt | | 278 | | 103 |
| Other current liabilities | | 529 | | 1,346 |
| Total current liabilities | | 4,765 | | 7,539 |
| Long-term debt | | 13,052 | | 6,803 |
| Noncurrent operating lease liabilities | | 603 | | 610 |
| Noncurrent unearned government incentives | | 727 | | 589 |
| Other noncurrent liabilities | | 987 | | 835 |
| Total liabilities | | 20,134 | | 16,376 |
| | | | | |
| Commitments and contingencies | | | | |
| | | | | |
| Shareholders' equity | | | | |
| Common stock, $0.10 par value, 3,000 shares authorized, 1,239 shares issued and 1,098 outstanding (1,226 shares issued and 1,094 outstanding as of September 1, 2022) | | 124 | | 123 |
| Additional capital | | 11,036 | | 10,197 |
| Retained earnings | | 40,824 | | 47,274 |
| Treasury stock, 141 shares held (132 shares as of September 1, 2022) | | (7,552) | | (7,127) |
| Accumulated other comprehensive income (loss) | | (312) | | (560) |
| Total equity | | 44,120 | | 49,907 |
| Total liabilities and equity | $ | 64,254 | $ | 66,283 |

*See accompanying notes to consolidated financial statements.*

Table of Contents

# Micron Technology, Inc.
# Consolidated Statements of Changes in Equity
(In millions, except per share amounts)

| | Common Stock | | | | | Accumulated Other | Total |
| | Number of Shares | Amount | Additional Capital | Retained Earnings | Treasury Stock | Comprehensive Income (Loss) | Shareholders' Equity |
|---|---|---|---|---|---|---|---|
| **Balance at September 3, 2020** | 1,194 $ | 119 $ | 8,917 $ | 33,384 $ | (3,495) $ | 71 $ | 38,996 |
| Net income (loss) | — | — | — | 5,861 | — | — | 5,861 |
| Other comprehensive income (loss), net | — | — | — | — | — | (69) | (69) |
| Stock issued under stock plans | 13 | 2 | 223 | — | — | — | 225 |
| Stock-based compensation expense | — | — | 378 | — | — | — | 378 |
| Repurchase of stock - repurchase program | — | — | — | — | (1,200) | — | (1,200) |
| Repurchase of stock - withholdings on employee equity awards | (2) | — | (12) | (82) | — | — | (94) |
| Stock issued for convertible notes | 11 | 1 | (1) | — | — | — | — |
| Cash settlement of convertible notes | — | — | (52) | — | — | — | (52) |
| Dividends and dividend equivalents declared ($0.10 per share) | — | — | — | (112) | — | — | (112) |
| **Balance at September 2, 2021** | 1,216 $ | 122 $ | 9,453 $ | 39,051 $ | (4,695) $ | 2 $ | 43,933 |
| Net income (loss) | — | — | — | 8,687 | — | — | 8,687 |
| Other comprehensive income (loss), net | — | — | — | — | — | (562) | (562) |
| Stock issued under stock plans | 12 | 1 | 244 | — | — | — | 245 |
| Stock-based compensation expense | — | — | 514 | — | — | — | 514 |
| Repurchase of stock - repurchase program | — | — | — | — | (2,432) | — | (2,432) |
| Repurchase of stock - withholdings on employee equity awards | (2) | — | (14) | (112) | — | — | (126) |
| Dividends and dividend equivalents declared ($0.315 per share) | — | — | — | (352) | — | — | (352) |
| **Balance at September 1, 2022** | 1,226 $ | 123 $ | 10,197 $ | 47,274 $ | (7,127) $ | (560) $ | 49,907 |
| Net income (loss) | — | — | — | (5,833) | — | — | (5,833) |
| Other comprehensive income (loss), net | — | — | — | — | — | 248 | 248 |
| Stock issued under stock plans | 15 | 1 | 262 | — | — | — | 263 |
| Stock-based compensation expense | — | — | 596 | — | — | — | 596 |
| Repurchase of stock - repurchase program | — | — | — | — | (425) | — | (425) |
| Repurchase of stock - withholdings on employee equity awards | (2) | — | (19) | (108) | — | — | (127) |
| Dividends and dividend equivalents declared ($0.460 per share) | — | — | — | (509) | — | — | (509) |
| **Balance at August 31, 2023** | 1,239 $ | 124 $ | 11,036 $ | 40,824 $ | (7,552) $ | (312) $ | 44,120 |

*See accompanying notes to consolidated financial statements.*


**60**

Table of Contents

# Micron Technology, Inc.
# Consolidated Statements of Cash Flows
(In millions)

| For the year ended | August 31, 2023 | September 1, 2022 | September 2, 2021 |
|---|---|---|---|
| **Cash flows from operating activities** | | | |
| Net income (loss) | $ (5,833) | $ 8,687 | $ 5,861 |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | |
| Depreciation expense and amortization of intangible assets | 7,756 | 7,116 | 6,214 |
| Provision to write down inventories to net realizable value | 1,831 | — | — |
| Stock-based compensation | 596 | 514 | 378 |
| Goodwill impairment | 101 | — | — |
| Restructure and asset impairments | 11 | 44 | 454 |
| Loss on debt repurchases and conversions | — | 83 | 1 |
| Change in operating assets and liabilities: | | | |
| Receivables | 2,763 | 190 | (1,446) |
| Inventories | (3,555) | (2,179) | 866 |
| Accounts payable and accrued expenses | (2,104) | 744 | 210 |
| Other | (7) | (18) | (70) |
| Net cash provided by operating activities | 1,559 | 15,181 | 12,468 |
| | | | |
| **Cash flows from investing activities** | | | |
| Expenditures for property, plant, and equipment | (7,676) | (12,067) | (10,030) |
| Purchases of available-for-sale securities | (723) | (1,770) | (3,163) |
| Proceeds from maturities of available-for-sale securities | 1,566 | 1,321 | 1,250 |
| Proceeds from government incentives | 710 | 115 | 495 |
| Proceeds from sales of available-for-sale securities | 25 | 294 | 856 |
| Proceeds from sale of Lehi, Utah fab | — | 888 | — |
| Other | (93) | (366) | 3 |
| Net cash provided by (used for) investing activities | (6,191) | (11,585) | (10,589) |
| | | | |
| **Cash flows from financing activities** | | | |
| Proceeds from issuance of debt | 6,716 | 2,000 | 1,188 |
| Repayments of debt | (761) | (2,032) | (1,520) |
| Payments of dividends to shareholders | (504) | (461) | — |
| Repurchases of common stock - repurchase program | (425) | (2,432) | (1,200) |
| Payments on equipment purchase contracts | (138) | (141) | (295) |
| Other | 95 | 86 | 46 |
| Net cash provided by (used for) financing activities | 4,983 | (2,980) | (1,781) |
| | | | |
| Effect of changes in currency exchange rates on cash, cash equivalents, and restricted cash | (34) | (106) | 41 |
| | | | |
| Net increase (decrease) in cash, cash equivalents, and restricted cash | 317 | 510 | 139 |
| Cash, cash equivalents, and restricted cash at beginning of period | 8,339 | 7,829 | 7,690 |
| Cash, cash equivalents, and restricted cash at end of period | $ 8,656 | $ 8,339 | $ 7,829 |
| | | | |
| **Supplemental disclosures** | | | |
| Income taxes paid, net | $ (532) | $ (493) | $ (361) |
| Interest paid, net of amounts capitalized | (323) | (154) | (171) |
| Noncash equipment acquisitions on contracts payable | 165 | 157 | 289 |

*See accompanying notes to consolidated financial statements.*

# Micron Technology, Inc.
**NOTES TO CONSOLIDATED FINANCIAL STATEMENTS**
(All tabular amounts in millions, except per share amounts)

# Significant Accounting Policies

## Basis of Presentation

We are an industry leader in innovative memory and storage solutions transforming how the world uses information to enrich life *for all*. With a relentless focus on our customers, technology leadership, and manufacturing and operational excellence, Micron delivers a rich portfolio of high-performance DRAM, NAND, and NOR memory and storage products through our Micron® and Crucial® brands. Every day, the innovations that our people create fuel the data economy, enabling advances in artificial intelligence and 5G applications that unleash opportunities — from the data center to the intelligent edge and across the client and mobile user experience.

The accompanying consolidated financial statements include the accounts of Micron Technology, Inc. and our consolidated subsidiaries and have been prepared in accordance with accounting principles generally accepted in the United States of America. Intercompany balances and transactions have been eliminated in consolidation. Certain reclassifications have been made to prior period amounts to conform to current period presentation. See "Inventories" below for changes to our significant accounting policies, and the "Inventories" note for additional information.

Our fiscal year is the 52 or 53-week period ending on the Thursday closest to August 31. Fiscal 2023, 2022, and 2021 each contained 52 weeks. All period references are to our fiscal periods unless otherwise indicated.

## Derivative and Hedging Instruments

We use derivative instruments to manage our exposure to changes in currency exchange rates from (1) our monetary assets and liabilities denominated in currencies other than the U.S. dollar and (2) forecasted cash flows for certain capital expenditures and manufacturing costs. We also use derivative instruments to manage our exposure to changes in commodity prices for manufacturing supplies and to minimize certain exposures to changes in the fair value of fixed-rate debt that result from fluctuations in benchmark interest rates. Derivative instruments are measured at their fair values and recognized as either assets or liabilities.

The accounting for changes in the fair value of derivative instruments is based on the intended use of the derivative and the resulting designation. For derivative instruments that are not designated for hedge accounting, gains or losses from changes in fair values are recognized in other non-operating income (expense) and cash flows are classified as investing activities in the statement of cash flows. For derivative instruments designated as cash flow hedges, gains or losses are included as a component of accumulated other comprehensive income and reclassified into earnings in the same line items and in the same periods in which the underlying transactions affect earnings. For derivative instruments designated as cash flow hedges, time value is excluded from the assessment of effectiveness and the gains and losses attributable to time value are recognized in earnings through an amortization approach. For derivative instruments designated as fair value hedges, changes in the fair values of the derivative instruments and the offsetting changes in the fair values of the underlying hedged items are both recognized in earnings. Cash flows from derivative instruments designated as cash flow hedges or fair value hedges are classified in the same category as the items being hedged.

We enter into master netting arrangements with our counterparties to mitigate credit risk in derivative hedge transactions. These master netting arrangements allow us and our counterparties to net settle amounts owed to each other. Derivative assets and liabilities that can be net settled with each counterparty have been presented in our consolidated balance sheet on a net basis.



62

Table of Contents

## Financial Instruments

Cash equivalents include highly liquid short-term investments with original maturities to us of three months or less that are readily convertible to known amounts of cash. Other investments with remaining maturities of less than one year are included in short-term investments. Investments with remaining maturities greater than one year are included in long-term marketable investments. The carrying value of investment securities sold is determined using the specific identification method.

## Functional Currency

The U.S. dollar is the functional currency for us and all of our consolidated subsidiaries.

## Goodwill

We perform an annual impairment assessment for goodwill in our fourth quarter each year.

## Government Incentives

We receive incentives from governmental entities related to capital expenditures, expenses, and other activities. Our government incentives may require that we meet or maintain specified spending levels and other operational metrics and may be subject to reimbursement if such conditions are not met or maintained. Government incentives are recorded in the financial statements in accordance with their purpose: as a reduction of asset costs or a reduction of expenses. Incentives related to the acquisition or construction of fixed assets are recognized as a reduction in the carrying amounts of the related assets and reduce depreciation expense over the useful lives of the assets. Incentives related to specific operating activities are offset against the related expense in the period the expense is incurred. Government incentives received prior to being earned are recognized in current or noncurrent deferred income or restricted cash, whereas government incentives earned prior to being received are recognized in current or noncurrent receivables. Cash received from government incentives related to operating expenses is included as an operating activity in the statement of cash flows, whereas cash received from incentives related to the acquisition of property, plant, and equipment is included as an investing activity.

## Inventories

Effective as of the beginning of the second quarter of 2021, we changed the method of inventory costing from average cost to FIFO. The difference between average cost and FIFO was not material to any previously reported financial statements. Therefore, we have recognized the cumulative effect of the change as a reduction of inventories and a charge to cost of goods sold of $133 million as of the beginning of the second quarter of 2021.

Inventories are stated at the lower of cost or net realizable value, with cost being determined on a FIFO basis. Cost includes depreciation, labor, material, and overhead costs, including product and process technology costs. Determining net realizable value of finished goods and work in process inventories requires projecting future average selling prices, sales volumes, and costs per part. When net realizable value is below cost, we record a charge to cost of goods sold to write down inventories to their estimated net realizable value in advance of when inventories are actually sold. We review the major characteristics of product type and markets in determining the unit of account for which we perform the lower of cost or net realizable value analysis and categorize all inventories (including DRAM, NAND, and other memory) as a single group.

## Leases

We determine if an arrangement is a lease, or contains a lease, at the inception of the arrangement and evaluate whether the lease is an operating lease or a finance lease at the commencement date. We recognize right-of-use assets and lease liabilities for operating and finance leases with terms greater than 12 months. Right-of-use assets represent our right to use an asset for the lease term, while lease liabilities represent our obligation to make lease payments. We do not separate lease and non-lease components for real-estate and gas plant leases. Sublease income is included within lease expense.

Case 3:23-cv-07517-RFL   Document 235-11   Filed 02/15/2025   Page 1 of 143

Table of Contents

## Product and Process Technology

Costs incurred to (1) acquire product and process technology, (2) patent technology, and (3) maintain patent technology, are capitalized and amortized on a straight-line basis over periods ranging up to 12.5 years. We capitalize a portion of costs incurred to patent technology based on historical data of patents issued as a percent of patents we file. Product and process technology costs are amortized over the shorter of (1) the estimated useful life of the technology, (2) the patent term, or (3) the term of the technology agreement. Fully-amortized assets are removed from product and process technology and accumulated amortization.

## Product Warranty

We generally provide a limited warranty that our products are in compliance with applicable specifications existing at the time of delivery. Under our standard terms and conditions of sale, liability for certain failures of product during a stated warranty period is usually limited to repair or replacement of defective items or return of, or a credit with respect to, amounts paid for such items. Under certain circumstances, we provide more extensive limited warranty coverage than that provided under our standard terms and conditions. Our warranty obligations are not material.

## Property, Plant, and Equipment

Property, plant, and equipment is stated at cost and depreciated using the straight-line method over estimated useful lives of generally 10 to 30 years for buildings, 7 years for production equipment, up to 7 years for other equipment, and 3 to 5 years for software. Assets held for sale are carried at the lower of estimated fair value or carrying value and are included in current assets. When property, plant, or equipment is retired or otherwise disposed, the net book value is removed and we recognize any gain or loss in results of operations.

We capitalize interest on borrowings during the period of time we carry out the activities necessary to bring assets to the condition of their intended use and location. Capitalized interest becomes part of the cost of assets.

## Research and Development

Costs related to the conceptual formulation and design of products and processes are charged to R&D expense as incurred. Development of a product is deemed complete when it is qualified through reviews and tests for performance and reliability. Subsequent to product qualification, product costs are included in cost of goods sold. Amounts from cost-sharing arrangements are reflected as a reduction of R&D expense.

## Revenue Recognition

Revenue is primarily recognized at a point in time when control of the promised goods is transferred to our customers in an amount that reflects the consideration we expect to be entitled to in exchange for those goods. Contracts with our customers are generally short-term in duration at fixed, negotiated prices with payment generally due shortly after delivery. We estimate a liability for returns using the expected value method based on historical returns. In addition, we generally offer price protection to our distributors, which is a form of variable consideration that decreases the transaction price. We use the expected value method, based on historical price adjustments and current pricing trends, to estimate the amount of revenue recognized from sales to distributors. Differences between the estimated and actual amounts are recognized as adjustments to revenue.

## Stock-based Compensation

Stock-based compensation is measured at the grant date, based on the fair value of the award, and recognized as expense under the straight-line attribution method over the requisite service period. We account for forfeitures as they occur. We issue new shares upon the exercise of stock options, conversion of share units, or issuance of shares under our ESPP.

## Treasury Stock

Treasury stock is carried at cost. When we retire our treasury stock, any excess of the repurchase price paid over par value is allocated between additional capital and retained earnings.



**Use of Estimates**

The preparation of financial statements and related disclosures in conformity with accounting principles generally accepted in the United States of America requires our management to make estimates and judgments that affect the reported amounts of assets, liabilities, revenues, expenses, and related disclosures. Estimates and judgments are based on historical experience, forecasted events, and various other assumptions that we believe to be reasonable under the circumstances. Estimates and judgments may differ under different assumptions or conditions. We evaluate our estimates and judgments on an ongoing basis. Actual results could differ from estimates.

# Lehi, Utah Fab and 3D XPoint

In 2021, we updated our portfolio strategy to further strengthen our focus on memory and storage innovations for the data center market. In connection therewith, we determined that there was insufficient market validation to justify the ongoing investments required to commercialize 3D XPoint at scale. Accordingly, we ceased development of 3D XPoint technology and engaged in discussions for the sale of our facility located in Lehi, Utah that was dedicated to 3D XPoint production. As a result, we classified the property, plant, and equipment as held for sale in 2021, ceased depreciating the assets, and recognized a $435 million restructure and asset impairment charge and a $104 million tax benefit.

We closed the sale of our Lehi facility to TI in 2022 for $893 million and disposed of $918 million of net assets, consisting primarily of property, plant, and equipment, resulting in a $23 million loss, net of selling expenses and other adjustments.

# Variable Interest Entities

A number of special purpose entities (the "Lease SPEs") were created by a third-party to facilitate equipment lease financing transactions between us and financial institutions that fund the lease financing transactions ("Financing Entities"). Neither we nor the Financing Entities have an equity interest in the Lease SPEs. The Lease SPEs are variable interest entities because their equity is not sufficient to permit them to finance their activities without additional support from the Financing Entities and because the third-party equity holder lacks characteristics of a controlling financial interest. By design, the arrangements with the Lease SPEs are merely financing vehicles and we do not bear any significant risks from variable interests with the Lease SPEs. We have determined that we do not have the power to direct the activities of the Lease SPEs that most significantly impact their economic performance and we do not consolidate the Lease SPEs.

Table of Contents

# Cash and Investments

All of our short-term investments and long-term marketable investments were classified as available-for-sale as of the dates noted below. Cash and equivalents and the fair values of our available-for-sale investments, which approximated amortized costs, were as follows:

| | As of August 31, 2023 | | | | As of September 1, 2022 | | | |
|---|---|---|---|---|---|---|---|---|
| | Cash and Equivalents | Short-term Investments | Long-term Marketable Investments[1] | Total Fair Value | Cash and Equivalents | Short-term Investments | Long-term Marketable Investments[1] | Total Fair Value |
| Cash | $ 5,771 | $ — | $ — | $ 5,771 | $ 6,055 | $ — | $ — | $ 6,055 |
| Level 1[2] | | | | | | | | |
| Money market funds | 1,629 | — | — | 1,629 | 1,196 | — | — | 1,196 |
| Level 2[3] | | | | | | | | |
| Certificates of deposit | 1,172 | 25 | — | 1,197 | 976 | 50 | — | 1,026 |
| Corporate bonds | — | 737 | 437 | 1,174 | — | 759 | 995 | 1,754 |
| Asset-backed securities | — | 15 | 387 | 402 | — | 20 | 608 | 628 |
| Government securities | 5 | 131 | 20 | 156 | 2 | 155 | 44 | 201 |
| Commercial paper | — | 109 | — | 109 | 33 | 85 | — | 118 |
| | 8,577 | $ 1,017 | $ 844 | $ 10,438 | 8,262 | $ 1,069 | $ 1,647 | $ 10,978 |
| Restricted cash[4] | 79 | | | | 77 | | | |
| Cash, cash equivalents, and restricted cash | $ 8,656 | | | | $ 8,339 | | | |

[1] The maturities of long-term marketable investments primarily range from one to five years, except for asset-backed securities which are not due at a single maturity date.

[2] The fair value of Level 1 securities is measured based on quoted prices in active markets for identical assets.

[3] The fair value of Level 2 securities is measured using information obtained from pricing services, which obtain quoted market prices for similar instruments, non-binding market consensus prices that are corroborated by observable market data, or various other methodologies, to determine the appropriate value at the measurement date. We perform supplemental analysis to validate information obtained from these pricing services. No adjustments were made to the fair values indicated by such pricing information as of August 31, 2023 or September 1, 2022.

[4] Restricted cash is included in other current assets and other noncurrent assets and primarily relates to certain government incentives received prior to being earned and for which restrictions lapse upon achieving certain performance conditions or which will be returned if performance conditions are not met.

Gross realized gains and losses from sales of available-for-sale securities were not significant for any period presented.

## Non-marketable Equity Investments

In addition to the amounts included in the table above, we had $218 million and $222 million of non-marketable equity investments without a readily determinable fair value that were included in other noncurrent assets as of August 31, 2023 and September 1, 2022, respectively. For non-marketable investments, we recognized in other non-operating income (expense) a net loss of $7 million for 2023 and net gains of $36 million for 2022 and $70 million for 2021. Our non-marketable equity investments are recorded at fair value on a non-recurring basis and classified as Level 3.

 66

# Receivables

| As of | August 31, 2023 | September 1, 2022 |
|---|---|---|
| Trade receivables | $ 2,048 $ | 4,765 |
| Income and other taxes | 194 | 251 |
| Other | 201 | 114 |
| | $ 2,443 $ | 5,130 |

# Inventories

| As of | August 31, 2023 | September 1, 2022 |
|---|---|---|
| Finished goods | $ 1,616 $ | 1,028 |
| Work in process | 6,111 | 4,830 |
| Raw materials and supplies | 660 | 805 |
| | $ 8,387 $ | 6,663 |

In 2023, we recorded charges of $1.83 billion to cost of goods sold to write down the carrying value of work in process and finished goods inventories to their estimated net realizable value.

Effective as of the beginning of the second quarter of 2021, we changed our method of inventory costing from average cost to FIFO. This change in accounting principle is preferable because in an environment with continuously changing production costs FIFO more closely matches the actual cost of goods sold with the revenues from sales of those specific units, better represents the actual cost of inventories remaining on hand at any period-end, and improves comparability with our semiconductor industry peers. The change to FIFO was not material to any prior periods, nor was the cumulative effect of $133 million material to the second quarter of 2021. As such, prior periods were not retrospectively adjusted, and the cumulative effect was reported as an increase to cost of goods sold for the second quarter of 2021 of $133 million, with an offsetting reduction to beginning inventories. This charge resulted in a corresponding reduction to operating income (loss), a $128 million reduction to net income (loss), and an $0.11 reduction to diluted earnings per share for both the second quarter and the year ended 2021.

# Property, Plant, and Equipment

| As of | August 31, 2023 | September 1, 2022 |
|---|---|---|
| Land | $ 283 $ | 280 |
| Buildings | 17,967 | 16,676 |
| Equipment[1] | 65,555 | 61,354 |
| Construction in progress[2] | 2,464 | 1,897 |
| Software | 1,316 | 1,124 |
| | 87,585 | 81,331 |
| Accumulated depreciation | (49,657) | (42,782) |
| | $ 37,928 $ | 38,549 |

[1] Includes costs related to equipment not placed into service of $2.91 billion as of August 31, 2023 and $3.35 billion as of September 1, 2022.

[2] Includes building-related construction, tool installation, and software costs for assets not placed into service.

Depreciation expense was $7.67 billion, $7.03 billion, and $6.13 billion for 2023, 2022, and 2021, respectively. Interest capitalized as part of the cost of property, plant, and equipment was $208 million, $77 million, and $66 million for 2023, 2022, and 2021, respectively.

Appx171

Table of Contents

# Intangible Assets

| | As of August 31, 2023 | | | As of September 1, 2022 | | |
|---|---|---|---|---|---|---|
| | Gross Amount | Accumulated Amortization | Net Carrying Amount | Gross Amount | Accumulated Amortization | Net Carrying Amount |
| Product and process technology | $ 613 | $ (209) | $ 404 | $ 742 | $ (321) | $ 421 |

In 2023, 2022, and 2021, we capitalized $87 million, $158 million, and $106 million, respectively, for product and process technology with weighted-average useful lives of 9 years. Amortization expense was $86 million, $85 million, and $82 million for 2023, 2022, and 2021, respectively. Expected amortization expense is $75 million for 2024, $51 million for 2025, $47 million for 2026, $43 million for 2027, and $42 million for 2028.

# Goodwill

| As of | August 31, 2023 | September 1, 2022 |
|---|---|---|
| Goodwill | $ 1,150 | $ 1,228 |

In the fourth quarter of 2023, we recognized a charge of $101 million included in other operating income (loss) to impair all of the goodwill assigned to our SBU reporting unit based on a quantitative assessment for impairment. We evaluated the fair value of our reporting units for the assessment based on an income approach, which uses a discounted cash flow methodology. The impairment of SBU goodwill reflects lower forecasted cash flows for SBU as a result of adverse conditions in the storage industry environment due to weak demand in many end markets combined with global and macroeconomic challenges and lower demand resulting from customer actions to reduce elevated inventory levels. These conditions led to significant reductions in SBU's average selling prices and bit shipments, driving declines in revenue and cash flows. The quantitative assessment for impairment indicated that the fair value for all of our other reporting units substantially exceeded their carrying value.

As of August 31, 2023, CNBU, MBU, and EBU had goodwill of $855 million, $198 million, and $97 million, respectively. As of September 1, 2022, CNBU, MBU, SBU, and EBU had goodwill of $832 million, $198 million, $101 million, and $97 million, respectively. The Company added $23 million of goodwill to CNBU from an acquisition in the third quarter of 2023.

# Leases

We have finance and operating leases through which we obtain the right to use facilities, land, and equipment that support our business operations. Our finance leases consist primarily of (i) gas and other supply agreements that are deemed to contain embedded leases and (ii) equipment leases. Our operating leases consist primarily of offices, laboratories, other facilities, and land. Certain of our operating leases include one or more options to extend the lease term for periods from one year to 10 years for real estate and one year to 99 years for land.

Certain supply or service agreements require us to exercise significant judgment to determine whether the agreement contains a lease. Our assessment includes determining whether we or the supplier control the assets used to fulfill the agreements by identifying whether we or the supplier have the right to change the type, quantity, timing, or location of the output of the assets. Our gas supply arrangements generally are deemed to contain a lease because we have the right to substantially all of the output of the assets used to produce the supply and we have the right to change the quantity and timing of the output of those assets. In determining the lease term, we assess whether we are reasonably certain to exercise any options to renew or terminate a lease or to purchase the right-of-use asset. Measuring the present value of the initial lease liability requires judgment to determine the discount rate, which we base on interest rates for borrowings with similar terms and collateral issued by entities with credit ratings similar to ours.


68

The components of lease cost are presented below:

| For the year ended | | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|---|
| Finance lease cost | | | | | | |
| Amortization of right-of-use asset | $ | 105 | $ | 99 | $ | 69 |
| Interest on lease liability | | 24 | | 24 | | 20 |
| Operating lease cost[1] | | 137 | | 125 | | 108 |
| | $ | 266 | $ | 248 | $ | 197 |

[1] Operating lease cost includes short-term and variable lease expenses, which were not material for the periods presented.

Supplemental cash flow information related to leases was as follows:

| For the year ended | | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|---|
| Cash flows used for operating activities | | | | | | |
| Finance leases | $ | 24 | $ | 23 | $ | 21 |
| Operating leases | | 139 | | 110 | | 106 |
| Cash flows used for financing activities – Finance leases | | 109 | | 103 | | 85 |
| Noncash acquisitions of right-of-use assets | | | | | | |
| Finance leases | | 508 | | 309 | | 395 |
| Operating leases | | 57 | | 197 | | 27 |

Supplemental balance sheet information related to leases was as follows:

| As of | | August 31, 2023 | | September 1, 2022 |
|---|---|---|---|---|
| Finance lease right-of-use assets (included in property, plant, and equipment) | $ | 1,311 | $ | 904 |
| Current operating lease liabilities (included in accounts payable and accrued expenses) | | 66 | | 60 |
| | | | | |
| Weighted-average remaining lease term (in years) | | | | |
| Finance leases | | 9 | | 12 |
| Operating leases | | 11 | | 12 |
| Weighted-average discount rate | | | | |
| Finance leases | | 3.86 % | | 2.65 % |
| Operating leases | | 3.21 % | | 2.90 % |

As of August 31, 2023, maturities of lease liabilities by fiscal year were as follows:

| For the year ending | | Finance Leases | | Operating Leases |
|---|---|---|---|---|
| 2024 | $ | 219 | $ | 62 |
| 2025 | | 200 | | 77 |
| 2026 | | 190 | | 76 |
| 2027 | | 185 | | 76 |
| 2028 | | 178 | | 74 |
| 2029 and thereafter | | 506 | | 453 |
| Less imputed interest | | (197) | | (149) |
| | $ | 1,281 | $ | 669 |

69 | 2023 10-K

Appx173

Table of Contents

The table above excludes obligations for leases that have been executed but have not yet commenced. As of August 31, 2023, excluded obligations consisted of $170 million of finance lease obligations over a weighted-average period of 12 years for gas supply arrangements deemed to contain embedded leases and equipment leases. We will recognize right-of-use assets and associated lease liabilities at the time such assets become available for our use.

# Accounts Payable and Accrued Expenses

| As of | August 31, 2023 | September 1, 2022 |
|---|---|---|
| Accounts payable | $ 1,725 | $ 2,142 |
| Property, plant, and equipment | 1,419 | 2,170 |
| Salaries, wages, and benefits | 367 | 877 |
| Income and other taxes | 67 | 420 |
| Other | 380 | 481 |
| | $ 3,958 | $ 6,090 |

# Debt

| | | | As of August 31, 2023 | | | | As of September 1, 2022 | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Net Carrying Amount | | | | Net Carrying Amount | | |
| | Stated Rate | Effective Rate | Principal | Current | Long-Term | Total | Principal | Current | Long-Term | Total |
| 2024 Term Loan A | 6.146 % | 6.18 % | $ 588 | $ — | $ 587 | $ 587 | $ 1,188 | $ — | $ 1,187 | $ 1,187 |
| 2025 Term Loan A | 6.681 % | 6.82 % | 1,052 | — | 1,050 | 1,050 | — | — | — | — |
| 2026 Term Loan A | 6.806 % | 6.94 % | 971 | 49 | 921 | 970 | — | — | — | — |
| 2027 Term Loan A | 6.931 % | 7.07 % | 1,123 | 57 | 1,063 | 1,120 | — | — | — | — |
| 2026 Notes | 4.975 % | 5.07 % | 500 | — | 499 | 499 | 500 | — | 498 | 498 |
| 2027 Notes[1] | 4.185 % | 4.27 % | 900 | — | 798 | 798 | 900 | — | 806 | 806 |
| 2028 Notes | 5.375 % | 5.52 % | 600 | — | 596 | 596 | — | — | — | — |
| 2029 A Notes | 5.327 % | 5.40 % | 700 | — | 697 | 697 | 700 | — | 697 | 697 |
| 2029 B Notes | 6.750 % | 6.54 % | 1,250 | — | 1,263 | 1,263 | — | — | — | — |
| 2030 Notes | 4.663 % | 4.73 % | 850 | — | 846 | 846 | 850 | — | 846 | 846 |
| 2032 Green Bonds | 2.703 % | 2.77 % | 1,000 | — | 995 | 995 | 1,000 | — | 994 | 994 |
| 2033 A Notes | 5.875 % | 5.96 % | 750 | — | 745 | 745 | — | — | — | — |
| 2033 B Notes | 5.875 % | 6.01 % | 900 | — | 890 | 890 | — | — | — | — |
| 2041 Notes | 3.366 % | 3.41 % | 500 | — | 497 | 497 | 500 | — | 496 | 496 |
| 2051 Notes | 3.477 % | 3.52 % | 500 | — | 496 | 496 | 500 | — | 496 | 496 |
| Finance lease obligations | N/A | 3.86 % | 1,281 | 172 | 1,109 | 1,281 | 886 | 103 | 783 | 886 |
| | | | $ 13,465 | $ 278 | $ 13,052 | $ 13,330 | $ 7,024 | $ 103 | $ 6,803 | $ 6,906 |

[1] In 2021, we entered into fixed-to-floating interest rate swaps on the 2027 Notes with an aggregate $900 million notional amount equal to the principal amount of the 2027 Notes. The resulting variable interest paid is at a rate equal to SOFR plus approximately 3.33%. The fixed-to-floating interest rate swaps are accounted for as fair value hedges, and as a result, the carrying values of our 2027 Notes reflect adjustments in fair value.



70

Table of Contents

As of August 31, 2023, all of our debt, other than finance lease obligations, were unsecured obligations that rank equally in right of payment with all of our other existing and future unsecured indebtedness and were effectively subordinated to all future secured indebtedness, to the extent of the value of the assets securing such indebtedness. All our unsecured debt were obligations of our parent company, Micron, and were structurally subordinated to all liabilities of its subsidiaries, including trade payables. The terms of our indebtedness generally contain cross payment default and cross acceleration provisions. Micron's guarantees of certain liabilities of its subsidiaries are unsecured obligations ranking equally in right of payment with all of Micron's other existing and future unsecured indebtedness.

## Debt Activity

The table below presents the effects of debt financing and prepayment activities in 2023:

| | Transaction Date | Increase (Decrease) in Principal | Increase (Decrease) in Carrying Value | Increase (Decrease) in Cash |
|---|---|---|---|---|
| **Issuances** | | | | |
| 2029 B Notes | October 31, 2022 | $ 750 | $ 744 | $ 744 |
| 2025 Term Loan A | November 3, 2022 | 927 | 925 | 925 |
| 2026 Term Loan A | November 3, 2022 | 746 | 745 | 745 |
| 2027 Term Loan A | November 3, 2022 | 927 | 924 | 924 |
| 2025 Term Loan A | January 5, 2023 | 125 | 125 | 125 |
| 2026 Term Loan A | January 5, 2023 | 250 | 249 | 249 |
| 2027 Term Loan A | January 5, 2023 | 225 | 225 | 225 |
| 2029 B Notes | February 9, 2023 | 500 | 520 | 520 |
| 2033 A Notes | February 9, 2023 | 750 | 745 | 745 |
| 2028 Notes | April 11, 2023 | 600 | 596 | 596 |
| 2033 B Notes | April 11, 2023 | 900 | 890 | 890 |
| **Prepayments** | | | | |
| 2024 Term Loan A | April 13, 2023 | (600) | (600) | (600) |
| | | $ 6,100 | $ 6,088 | $ 6,088 |

In 2022, we issued $2.00 billion of senior unsecured notes and received cash of $1.99 billion. The approximate $1.00 billion of net proceeds from the issuance of the 2032 Green Bonds are being used to fund eligible sustainability-focused projects. The remaining proceeds, along with cash on hand, were used to repay $1.85 billion of principal amount of notes (carrying value of $1.85 billion) for $1.93 billion in cash. We recognized losses of $83 million in connection with these repayments.

In 2021, substantially all holders of our 2032D Notes converted their notes. We settled these conversions and all remaining 2032D Notes with $185 million in cash and 11.1 million shares of our stock, which approximated the carrying value of debt and equity for those notes.

## Senior Unsecured Notes

We may redeem our 2026 Notes, 2027 Notes, 2028 Notes, 2029 A Notes, 2029 B Notes, 2030 Notes, 2032 Green Bonds, 2033 A Notes, 2033 B Notes, 2041 Notes, and 2051 Notes (the "Senior Unsecured Notes"), in whole or in part, at our option prior to their respective maturity dates at a redemption price equal to the greater of (i) 100% of the principal amount of the notes to be redeemed and (ii) the present value of the remaining scheduled payments of principal and interest, in each case plus accrued interest. We may also redeem any series of our Senior Unsecured Notes, in whole or in part, at a price equal to par between one and six months prior to maturity in accordance with the respective terms of such series.

Each series of Senior Unsecured Notes contains covenants that, among other things, limit, in certain circumstances, our ability and/or the ability of our restricted subsidiaries (which are generally domestic subsidiaries in which we own at least 80% of the voting stock and which own principal property, as defined in the indenture governing such series) to (1) create or incur certain liens; (2) enter into certain sale and lease-back transactions; and (3) consolidate with or merge with or into, or convey, transfer, or lease all or substantially all of our properties and assets, to another entity. These covenants are subject to a number of limitations and exceptions. Additionally, if a change of control triggering event, as defined in the indentures governing our Senior Unsecured Notes, occurs with respect to a series of Senior Unsecured Notes, we will be required to offer to purchase such Senior Unsecured Notes at 101% of the outstanding aggregate principal amount plus accrued interest up to the purchase date.

***2032 Green Bonds:*** We plan to allocate an amount equal to the approximate $1.00 billion of net proceeds of our unsecured 2032 Green Bonds by November 1, 2023, to fund eligible sustainability-focused projects involving renewable energy, green buildings, energy efficiency, water management, waste abatement, and a circular economy.

## Multi-Tranche Term Loan A

In 2023, we entered into a term loan agreement consisting of three tranches (the "Multi-Tranche Term Loan Agreement") and borrowed $3.20 billion in aggregate principal amount. The tranches mature on November 3, 2025 ("2025 Term Loan A"); November 3, 2026 ("2026 Term Loan A"); and November 3, 2027 ("2027 Term Loan A").

The 2026 Term Loan A and 2027 Term Loan A each require equal quarterly installment payments in an amount equal to 1.25% of the original principal amount. The 2025 Term Loan A does not require quarterly installment payments. Borrowings under the Multi-Tranche Term Loan Agreement will generally bear interest at adjusted term SOFR plus an applicable interest rate margin ranging from 1.00% to 2.00%, varying by tranche and depending on our corporate credit ratings. Adjusted term SOFR for the Multi-Tranche Term Loan Agreement is the SOFR benchmark plus 0.10%.

The Multi-Tranche Term Loan Agreement requires us to maintain, on a consolidated basis, a leverage ratio of total indebtedness to adjusted EBITDA, as defined in the Multi-Tranche Term Loan Agreement and calculated as of the last day of each fiscal quarter, not to exceed 3.25 to 1.00. On March 27, 2023, we amended the Multi-Tranche Term Loan Agreement to provide that in lieu of the foregoing leverage ratio, during the fourth quarter of 2023 and each quarter of 2024, we will be required to maintain, on a consolidated basis, a net leverage ratio of total net indebtedness to adjusted EBITDA, as defined in the Multi-Tranche Term Loan Agreement and calculated as of the last day of each fiscal quarter, not to exceed 3.25 to 1.00. Alternatively, for up to three of such five quarters, we may elect to comply with a requirement of minimum liquidity, as defined in the Multi-Tranche Term Loan Agreement, of not less than $5.0 billion. In the fourth quarter of 2023, we complied with the net leverage ratio. Each of the leverage ratio and net leverage ratio maximums, as applicable, is subject to a temporary four quarter increase in such ratio to 3.75 to 1.00 following certain material acquisitions.

The Multi-Tranche Term Loan Agreement contains other covenants that, among other things, limit, in certain circumstances, our ability and/or the ability of our restricted subsidiaries to (1) create or incur certain liens and enter into sale and lease-back transactions, (2) create, assume, incur, or guarantee certain additional secured indebtedness and unsecured indebtedness of our restricted subsidiaries, and (3) consolidate with or merge with or into, or convey, transfer, lease, or otherwise dispose of all or substantially all of our assets, to another entity. These covenants are subject to a number of limitations, exceptions, and qualifications. Our obligations under the Multi-Tranche Term Loan Agreement are unsecured.

## 2024 Term Loan A

On April 13, 2023, we used a portion of the proceeds from our April 2023 issuance of senior unsecured notes to prepay $600 million principal amount of our 2024 Term Loan A.

Micron 72

On June 7, 2023, the 2024 Term Loan A agreement was amended, pursuant to its transition provisions, to replace LIBOR-based benchmark rates with SOFR-based benchmark rates effective July 1, 2023. Subsequent to this amendment, borrowings under the 2024 Term Loan A Agreement generally bear interest at adjusted term SOFR plus an applicable interest rate margin ranging from 0.625% to 1.375% depending on our corporate credit ratings. Adjusted term SOFR for the 2024 Term Loan A is the SOFR benchmark plus a credit spread adjustment ranging from approximately 0.11% to 0.43% depending on the applicable interest period selected. Prior to July 1, 2023, the 2024 Term Loan A bore interest at a rate equal to LIBOR plus 0.625% to 1.375% based on our corporate credit ratings.

The 2024 Term Loan A agreement contains the same leverage ratio, as amended, and substantially the same other covenants as the Multi-Tranche Term Loan Agreement. Our obligations under the 2024 Term Loan A agreement are unsecured.

### Revolving Credit Facility

As of August 31, 2023, no amounts were outstanding under the Revolving Credit Facility and $2.50 billion was available to us. Under the Revolving Credit Facility, borrowings would generally bear interest at a rate equal to adjusted term SOFR plus 1.00% to 1.75%, depending on our corporate credit ratings. Adjusted term SOFR for the Revolving Credit Facility agreement is the SOFR benchmark plus a credit spread adjustment ranging from approximately 0.11% to 0.43% depending on the applicable interest period selected. Any amounts outstanding under the Revolving Credit Facility would mature in May 2026 and amounts borrowed may be prepaid without penalty.

The Revolving Credit Facility contains the same leverage ratio, as amended, and substantially the same other covenants as the Multi-Tranche Term Loan Agreement.

### Maturities of Notes Payable

As of August 31, 2023, maturities of notes payable by fiscal year were as follows:

| | | |
|---|---|---|
| 2024 | $ | 107 |
| 2025 | | 695 |
| 2026 | | 1,659 |
| 2027 | | 1,780 |
| 2028 | | 1,493 |
| 2029 and thereafter | | 6,450 |
| Unamortized issuance costs, discounts, and premium, net | | (35) |
| Hedge accounting fair value adjustment | | (100) |
| | $ | 12,049 |

# Commitments

As of August 31, 2023, we had noncancelable commitments with remaining contractual terms in excess of one year of approximately $6.7 billion for purchase obligations, of which approximately $1.2 billion will be due in 2024, $1.4 billion due in 2025, $1.0 billion due in 2026, $1.0 billion due in 2027, $700 million due in 2028, and $1.4 billion due in 2029 and thereafter. Purchase obligations primarily include payments for goods or services with either a fixed or minimum quantity and price, which includes payments for the acquisition of property, plant, and equipment. Payments for leases that have been executed but have not yet commenced are excluded.

In 2023, we entered into an 18-year power purchase agreement in Singapore to purchase up to 450 megawatts of power at predominantly variable prices. This contract is expected to supply the majority of our power consumption needs in Singapore with more favorable pricing than our previous supply arrangements.

Table of Contents

# Contingencies

We are currently a party to legal actions other than those described below arising from the normal course of business, none of which are expected to have a material adverse effect on our business, results of operations, or financial condition.

## Patent Matters

As is typical in the semiconductor and other high-tech industries, from time to time, others have asserted, and may in the future assert, that our products or manufacturing processes infringe upon their intellectual property rights.

On March 19, 2018, Micron Semiconductor (Xi'an) Co., Ltd. ("MXA") was served with a patent infringement complaint filed by Fujian Jinhua Integrated Circuit Co., Ltd. ("Jinhua") in the Fuzhou Intermediate People's Court in Fujian Province, China (the "Fuzhou Court"). On April 3, 2018, Micron Semiconductor (Shanghai) Co. Ltd. ("MSS") was served with the same complaint. The complaint alleges that MXA and MSS infringed one Chinese patent by manufacturing and selling certain Crucial DDR4 DRAM modules. The complaint seeks an order requiring MXA and MSS to destroy inventory of the accused products and equipment for manufacturing the accused products in China; to stop manufacturing, using, selling, and offering for sale the accused products in China; and to pay damages of 98 million Chinese yuan plus court fees incurred.

On March 21, 2018, MXA was served with a patent infringement complaint filed by United Microelectronics Corporation ("UMC") in the Fuzhou Court. On April 3, 2018, MSS was served with the same complaint. The complaint alleges that MXA and MSS infringed one Chinese patent by manufacturing and selling certain Crucial DDR4 DRAM modules. The complaint seeks an order requiring MXA and MSS to destroy inventory of the accused products and equipment for manufacturing the accused products in China; to stop manufacturing, using, selling, and offering for sale the accused products in China; and to pay damages of 90 million Chinese yuan plus court fees incurred. On November 26, 2021, pursuant to a settlement agreement between UMC and Micron, UMC filed an application to the Fuzhou Court to withdraw its complaints against MXA and MSS.

On April 3, 2018, MSS was served with another patent infringement complaint filed by Jinhua and an additional complaint filed by UMC in the Fuzhou Court. The additional complaints allege that MSS infringes two Chinese patents by manufacturing and selling certain Crucial MX300 SSDs. The complaint filed by UMC seeks an order requiring MSS to destroy inventory of the accused products and equipment for manufacturing the accused products in China; to stop manufacturing, using, selling, and offering for sale the accused products in China; and to pay damages of 90 million Chinese yuan plus court fees incurred. The complaint filed by Jinhua seeks an order requiring MSS to destroy inventory of the accused products and equipment for manufacturing the accused products in China; to stop manufacturing, using, selling, and offering for sale the accused products in China; and to pay damages of 98 million Chinese yuan plus court fees incurred. On November 26, 2021, pursuant to a settlement agreement between UMC and Micron, UMC filed an application to the Fuzhou Court to withdraw its complaint against MSS.

On July 5, 2018, MXA and MSS were notified that the Fuzhou Court granted a preliminary injunction against those entities that enjoins them from manufacturing, selling, or importing certain Crucial and Ballistix-branded DRAM modules and solid-state drives in China. We are complying with the ruling and have requested the Fuzhou Court to reconsider or stay its decision.



74

Table of Contents

On April 28, 2021, Netlist, Inc. ("Netlist") filed two patent infringement actions against Micron, Micron Semiconductor Products, Inc. ("MSP"), and Micron Technology Texas, LLC ("MTEC") in the U.S. District Court for the Western District of Texas. The first complaint alleges that one U.S. patent is infringed by certain of our non-volatile dual in-line memory modules. The second complaint alleges that three U.S. patents are infringed by certain of our load-reduced dual in-line memory modules ("LRDIMMs"). Each complaint seeks injunctive relief, damages, attorneys' fees, and costs. On March 31, 2022, Netlist filed a patent infringement complaint against Micron and Micron Semiconductor Germany, GmbH in Dusseldorf Regional Court alleging that two German patents are infringed by certain of our LRDIMMs. The complaint seeks damages, costs, and injunctive relief. On June 10, 2022, Netlist filed a patent infringement complaint against Micron, MSP, and MTEC in the U.S. District Court for the Eastern District of Texas ("E.D. Tex.") alleging that six U.S. patents are infringed by certain of our memory modules and HBM products. On August 1, 2022, Netlist filed a second patent infringement complaint against the same defendants in E.D. Tex. alleging that one U.S. patent is infringed by certain of our LRDIMMs. On August 15, 2022, Netlist amended the second complaint to assert that two additional U.S. patents are infringed by certain of our LRDIMMs. The complaints in E.D. Tex. seek injunctive relief, damages, and attorneys' fees.

On August 16, 2022, Sonrai Memory Ltd. filed a patent infringement action against Micron in the U.S. District Court for the Western District of Texas. The complaint alleges that two U.S. patents are infringed by certain SSD and NAND flash products. The complaint seeks damages, attorneys' fees, and costs.

On January 23, 2023, Besang Inc. filed a patent infringement complaint against Micron in the U.S. District Court for the Eastern District of Texas. The complaint alleges that one U.S. patent is infringed by certain of our 3D NAND and SSD products. The complaint seeks an injunction, damages, attorneys' fees, and costs.

Among other things, the above lawsuits pertain to substantially all of our DRAM, NAND, and other memory and storage products we manufacture, which account for substantially all of our revenue.

## Qimonda

On January 20, 2011, Dr. Michael Jaffé, administrator for Qimonda's insolvency proceedings, filed suit against Micron and Micron Semiconductor B.V. ("Micron B.V."), in the District Court of Munich, Civil Chamber. The complaint sought to void, under Section 133 of the German Insolvency Act, a share purchase agreement between Micron B.V. and Qimonda signed in fall 2008, pursuant to which Micron B.V. purchased substantially all of Qimonda's shares of Inotera (the "Inotera Shares"), representing approximately 18% of Inotera's outstanding shares at that time, and sought an order requiring us to re-transfer those shares to the Qimonda estate. The complaint also sought, among other things, to recover damages for the alleged value of the joint venture relationship with Inotera and to terminate, under Sections 103 or 133 of the German Insolvency Code, a patent cross-license between us and Qimonda entered into at the same time as the share purchase agreement.

Following a series of hearings with pleadings, arguments, and witnesses on behalf of the Qimonda estate, on March 13, 2014, the court issued judgments: (1) ordering Micron B.V. to pay approximately $1 million in respect of certain Inotera Shares sold in connection with the original share purchase; (2) ordering Micron B.V. to disclose certain information with respect to any Inotera Shares sold by it to third parties; (3) ordering Micron B.V. to disclose the benefits derived by it from ownership of the Inotera Shares, including in particular, any profits distributed on the Inotera Shares and all other benefits; (4) denying Qimonda's claims against Micron for any damages relating to the joint venture relationship with Inotera; and (5) determining that Qimonda's obligations under the patent cross-license agreement are canceled. In addition, the court issued interlocutory judgments ordering, among other things: (1) that Micron B.V. transfer to the Qimonda estate the Inotera Shares still owned by Micron B.V. and pay to the Qimonda estate compensation in an amount to be specified for any Inotera Shares sold to third parties; and (2) that Micron B.V. pay the Qimonda estate as compensation an amount to be specified for benefits derived by Micron B.V. from ownership of the Inotera Shares. The interlocutory judgments had no immediate, enforceable effect and Micron, accordingly, was able to continue to operate with full control of the Inotera Shares subject to further developments in the case. Micron and Micron B.V. appealed the judgments to the German Appeals Court, which thereafter appointed an independent expert to perform an evaluation of Dr. Jaffé's claims that the amount Micron paid for Qimonda was less than fair market value. On March 31, 2020, the expert presented an opinion to the Appeals Court concluding that the amount paid by Micron was within an acceptable range of fair value. On October 5, 2022, the Appeals Court ruled that the relevant issue to be addressed is whether Qimonda's creditors were prejudiced such that the original transaction should be voided.

Table of Contents

On May 9, 2023, Micron and Dr. Jaffé reached an agreement to dismiss the case in exchange for a one-time payment by Micron to the Qimonda estate and a waiver of each party's claims. The agreement was formally entered by the Appeals Court in July 2023 and the case was dismissed.

## Antitrust Matters

Six cases have been filed against Micron alleging price fixing of DRAM products in the following Canadian courts on the dates indicated: Superior Court of Quebec (April 30, 2018 and May 3, 2018), the Federal Court of Canada (May 2, 2018), the Ontario Superior Court of Justice (May 15, 2018), and the Supreme Court of British Columbia (May 10, 2018). The plaintiffs in these cases are individuals seeking certification of class actions on behalf of direct and indirect purchasers of DRAM in Canada (or regions of Canada) between June 1, 2016 and February 1, 2018.

On May 15, 2018, the Chinese State Administration for Market Regulation ("SAMR") notified Micron that it was investigating potential collusion and other anticompetitive conduct by DRAM suppliers in China. On May 31, 2018, SAMR made unannounced visits to our sales offices in Beijing, Shanghai, and Shenzhen to seek certain information as part of its investigation. We are cooperating with SAMR in its investigation.

## Securities Matters

On February 9, 2021, a derivative complaint was filed by a shareholder against Sanjay Mehrotra and other current and former directors of Micron, allegedly on behalf of and for the benefit of Micron, in the U.S. District Court for the District of Delaware alleging violations of securities laws, breaches of fiduciary duties, and other violations of law involving allegedly false and misleading statements about Micron's commitment to diversity and progress in diversifying its workforce, executive leadership, and Board of Directors. The complaint seeks damages, fees, interest, costs, and an order requiring Micron to take various actions to allegedly improve its corporate governance and internal procedures.

## Other Matters

In the normal course of business, we are a party to a variety of agreements pursuant to which we may be obligated to indemnify another party. It is not possible to predict the maximum potential amount of future payments under these types of agreements due to the conditional nature of our obligations and the unique facts and circumstances involved in each particular agreement. Historically, our payments under these types of agreements have not had a material adverse effect on our business, results of operations, or financial condition.

## Contingency Assessment

We are unable to predict the outcome of any of the matters noted above and cannot make a reasonable estimate of the potential loss or range of possible losses. A determination that our products or manufacturing processes infringe the intellectual property rights of others or entering into a license agreement covering such intellectual property could result in significant liability and/or require us to make material changes to our products and/or manufacturing processes. Any of the foregoing, as well as the resolution of any other legal matter noted above, could have a material adverse effect on our business, results of operations, or financial condition.

# Equity

## Common Stock Repurchases

Our Board of Directors has authorized the discretionary repurchase of up to $10 billion of our outstanding common stock through open-market purchases, block trades, privately-negotiated transactions, derivative transactions, and/or pursuant to Rule 10b5-1 trading plans. The repurchase authorization has no expiration date, does not obligate us to acquire any common stock, and is subject to market conditions and our ongoing determination of the best use of available cash. We repurchased 8.6 million shares of our common stock for $425 million in 2023 and 35.4 million shares for $2.43 billion in 2022. Through August 31, 2023, we had repurchased an aggregate of $6.89 billion under the authorization. Amounts repurchased are included in treasury stock.

Micron 76

## Dividends

In each quarter of 2023, we declared and paid dividends of $126 million ($0.115 per share). On September 27, 2023, our Board of Directors declared a quarterly dividend of $0.115 per share, payable in cash on October 25, 2023, to shareholders of record as of the close of business on October 10, 2023.

## Accumulated Other Comprehensive Income (Loss)

Changes in accumulated other comprehensive income (loss) by component for the year ended August 31, 2023 were as follows:

| | Gains (Losses) on Derivative Instruments | Unrealized Gains (Losses) on Investments | Pension Liability Adjustments | Cumulative Foreign Currency Translation Adjustment | Total |
|---|---|---|---|---|---|
| As of September 1, 2022 | $ (538) | $ (47) | $ 25 | $ — | $ (560) |
| Other comprehensive income (loss) before reclassifications | 19 | 18 | 17 | (3) | 51 |
| Amount reclassified out of accumulated other comprehensive income (loss) | 261 | 1 | (2) | — | 260 |
| Tax effects | (46) | (13) | (4) | — | (63) |
| Other comprehensive income (loss) | 234 | 6 | 11 | (3) | 248 |
| As of August 31, 2023 | $ (304) | $ (41) | $ 36 | $ (3) | $ (312) |

# Fair Value Measurements

The estimated fair values and carrying values of our outstanding debt instruments were as follows:

| | As of August 31, 2023 | | As of September 1, 2022 | |
|---|---|---|---|---|
| | Fair Value | Carrying Value | Fair Value | Carrying Value |
| Notes | $ 11,549 | $ 12,049 | $ 5,472 | $ 6,020 |

The fair values of our debt instruments were estimated based on Level 2 inputs, including the trading price of our notes when available, discounted cash flows, and interest rates based on similar debt issued by parties with credit ratings similar to ours.

**77 | 2023 10-K**

Table of Contents

# Derivative Instruments

| | Notional or Contractual Amount | Fair Value of | |
| --- | --- | --- | --- |
| | | Assets[1] | Liabilities[2] |
| **As of August 31, 2023** | | | |
| Derivative instruments with hedge accounting designation | | | |
| Cash flow currency hedges | $ 3,873 | $ 16 | $ (180) |
| Cash flow commodity hedges | 331 | 45 | — |
| Fair value interest rate hedges | 900 | — | (100) |
| | | | |
| Derivative instruments without hedge accounting designation | | | |
| Non-designated currency hedges | 1,839 | 2 | (17) |
| | | $ 63 | $ (297) |
| | | | |
| **As of September 1, 2022** | | | |
| Derivative instruments with hedge accounting designation | | | |
| Cash flow currency hedges | $ 5,427 | $ — | $ (330) |
| Cash flow commodity hedges | 97 | 1 | (6) |
| Fair value interest rate hedges | 900 | — | (91) |
| | | | |
| Derivative instruments without hedge accounting designation | | | |
| Non-designated currency hedges | 2,821 | 7 | (13) |
| | | $ 8 | $ (440) |

[1]  Included in receivables and other noncurrent assets.
[2]  Included in accounts payable and accrued expenses and other noncurrent liabilities.

## Derivative Instruments with Hedge Accounting Designation

**Cash Flow Hedges:** We utilize forward and swap contracts that generally mature within two years designated as cash flow hedges to minimize our exposure to changes in currency exchange rates or commodity prices for certain capital expenditures and manufacturing costs. Forward and swap contracts are measured at fair value based on market-based observable inputs including market spot and forward rates, interest rates, and credit-risk spreads (Level 2). We recognized gains from cash flow hedges of $30 million for 2023, and losses of $735 million and $52 million for 2022 and 2021, respectively, in accumulated other comprehensive income (loss). We recognized losses related to amounts excluded from hedge effectiveness testing on our cash flow hedges of $101 million in 2023 in cost of goods sold through an amortization approach. The amounts recognized in 2022 and 2021 were not significant. We reclassified losses of $261 million and $53 million in 2023 and 2022, respectively, and gains of $41 million in 2021, from accumulated other comprehensive income (loss) to earnings, primarily to cost of goods sold. As of August 31, 2023, we expect to reclassify $177 million of pre-tax losses related to cash flow hedges from accumulated other comprehensive income (loss) into earnings in the next 12 months.

**Fair Value Hedges:** We utilize fixed-to-floating interest rate swaps designated as fair value hedges to minimize certain exposures to changes in the fair value of fixed-rate debt that result from fluctuations in benchmark interest rates. Interest rate swaps are measured at fair value based on market-based observable inputs including interest rates and credit-risk spreads (Level 2). The changes in the fair values of derivatives designated as fair value hedges and the offsetting changes in the underlying fair values of the hedged items are both recognized in earnings. When a derivative is no longer designated as a fair value hedge for any reason, including termination and maturity, the remaining unamortized difference between the carrying value of the hedged item at that time and the face value of the hedged item is amortized to earnings over the remaining life of the hedged item, or immediately if the hedged item has matured or been extinguished. We recognized interest expense of $96 million for changes in the fair value of our interest rate swaps in 2022 and the impact to interest expense was not significant for 2023 or 2021. We also recognized offsetting reductions in interest expense of the same amounts related to the changes in the fair value of the hedged portion of the underlying debt for these periods.



78

Table of Contents

## Derivative Instruments without Hedge Accounting Designation

**Currency Derivatives:** We generally utilize a rolling hedge strategy with currency forward contracts that mature within three months to hedge our exposures of monetary assets and liabilities from changes in currency exchange rates. At the end of each reporting period, monetary assets and liabilities denominated in currencies other than the U.S. dollar are remeasured into U.S. dollars and the associated outstanding forward contracts are marked to market. Currency forward contracts are valued at fair values based on the middle of bid and ask prices of dealers or exchange quotations (Level 2). Realized and unrealized gains and losses on derivative instruments without hedge accounting designation as well as the changes in the underlying monetary assets and liabilities from changes in currency exchange rates are included in other non-operating income (expense), net. The amounts recognized for derivative instruments without hedge accounting designation were not significant for the periods presented. We do not use derivative instruments for speculative purposes.

## Derivative Counterparty Credit Risk and Master Netting Arrangements

Our derivative instruments expose us to credit risk to the extent counterparties may be unable to meet the terms of the contracts. Our maximum exposure to loss due to credit risk if counterparties fail completely to perform according to the terms of the contracts would generally equal the fair value of assets for these contracts as listed in the tables above. We seek to mitigate such risk by limiting our counterparties to major financial institutions and by spreading risk across multiple financial institutions. As of August 31, 2023 and September 1, 2022, amounts netted under our master netting arrangements were not significant.

# Equity Plans

As of August 31, 2023, 95 million shares of our common stock were available for future awards under our equity plans, including 14 million shares approved for issuance under our employee stock purchase plan ("ESPP").

## Restricted Stock and Restricted Stock Units ("Restricted Stock Awards")

As of August 31, 2023, there were 29 million shares of Restricted Stock Awards outstanding, 26 million of which contained only service conditions. For service-based Restricted Stock Awards granted through October 2021, restrictions generally lapse in one-fourth or one-third increments during each year of employment after the grant date. For service-based Restricted Stock Awards granted beginning in November 2021, restrictions generally lapse on 25% or 33% of the units granted after the first year and on 6.25% or 8.33% each quarter thereafter over the remaining three or two years of employment. Restrictions generally lapse on Restricted Stock with performance or market conditions as conditions are met over a 3-year period. At the end of the performance period, the number of actual shares to be awarded will vary between 0% and 200% of target amounts, depending upon the achievement level. In 2022, our Board of Directors approved dividend equivalent rights for unvested restricted stock units awarded on or after October 13, 2021.

Restricted Stock Awards activity for 2023 is summarized as follows:

| | Number of Shares | Weighted-Average Grant Date Fair Value Per Share |
|---|---|---|
| Outstanding as of September 1, 2022 | 23 | $ 60.93 |
| Granted | 17 | 55.99 |
| Restrictions lapsed | (9) | 58.23 |
| Canceled | (2) | 58.00 |
| Outstanding as of August 31, 2023 | 29 | 59.11 |

Table of Contents

| For the year ended | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| Restricted stock award shares granted | | 17 | 13 | 11 |
| Weighted-average grant-date fair value per share | $ | 55.99 $ | 70.81 $ | 53.58 |
| Aggregate vesting-date fair value of shares vested | $ | 514 $ | 498 $ | 385 |

## Employee Stock Purchase Plan ("ESPP")

Our ESPP is offered to substantially all employees and permitted eligible employees to purchase shares of our common stock through payroll deductions of up to 10% of their eligible compensation, subject to certain limitations prior to August 2021. Beginning in August 2021, employees are permitted to deduct up to 15% of their eligible compensation to purchase shares under the ESPP. The purchase price of the shares under the ESPP equals 85% of the lower of the fair market value of our common stock on either the first or last day of each six-month offering period. Compensation expense is calculated as of the beginning of the offering period as the fair value of the employees' purchase rights utilizing the Black-Scholes option valuation model and is recognized over the offering period. Grant-date fair value and assumptions used in the Black-Scholes option valuation model were as follows:

| For the year ended | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| Weighted-average grant-date fair value per share | $ | 17.06 $ | 18.87 $ | 20.71 |
| Average expected life in years | | 0.5 | 0.5 | 0.5 |
| Weighted-average expected volatility (based on implied volatility) | | 37 % | 43 % | 41 % |
| Weighted-average risk-free interest rate | | 5.1 % | 2.0 % | 0.1 % |
| Expected dividend yield | | 0.7 % | 0.6 % | 0.3 % |

Under the ESPP, employees purchased 5 million, 4 million, and 3 million shares of common stock in 2023, 2022, and 2021, respectively, at a per share weighted average price of $51.93, $58.52, and $51.42, respectively.

## Stock Options

As of August 31, 2023, stock options of 2 million shares were outstanding, all of which were fully exercisable. Stock options expire 8 years from the date of grant. We did not grant any stock options in 2023, 2022, or 2021. Stock options of 1 million shares were exercised in 2023. The total intrinsic value for options exercised was $30 million, $54 million, and $143 million in 2023, 2022, and 2021, respectively.

## Stock-based Compensation Expense

| For the year ended | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| Stock-based compensation expense by caption | | | | |
| Research and development | $ | 226 $ | 175 $ | 110 |
| Cost of goods sold | | 201 | 193 | 186 |
| Selling, general, and administrative | | 137 | 133 | 99 |
| Restructure | | (7) | (5) | — |
| | $ | 557 $ | 496 $ | 395 |
| | | | | |
| Stock-based compensation expense by type of award | | | | |
| Restricted stock awards | $ | 488 $ | 429 $ | 333 |
| ESPP | | 69 | 66 | 52 |
| Stock options | | — | 1 | 10 |
| | $ | 557 $ | 496 $ | 395 |



Table of Contents

Income tax benefits related to the tax deductions for share-based awards are recognized only upon the settlement of the related share-based awards. Income tax benefits for share-based awards were $68 million, $77 million, and $83 million for 2023, 2022, and 2021, respectively. Stock-based compensation expense of $88 million and $48 million was capitalized and remained in inventory as of August 31, 2023 and September 1, 2022, respectively. As of August 31, 2023, $1.26 billion of total unrecognized compensation costs for unvested awards, before the effect of any future forfeitures, was expected to be recognized through the fourth quarter of 2027, resulting in a weighted-average period of 1.3 years.

# Employee Benefit Plans

We have employee retirement plans at our U.S. and international sites. Details of significant plans are as follows:

## Employee Savings Plan for U.S. Employees

We have a 401(k) retirement plan under which U.S. employees may contribute up to 75% of their eligible pay, subject to Internal Revenue Service annual contribution limits, to various savings alternatives, none of which include direct investment in our stock. We match in cash eligible contributions from employees up to 5% of the employee's annual eligible earnings. Contribution expense for the 401(k) plan was $59 million, $66 million, and $77 million in 2023, 2022, and 2021, respectively.

## Retirement Plans

We have pension plans available to employees at various foreign sites. As of August 31, 2023, the projected benefit obligations of our plans were $175 million and plan assets were $232 million. As of September 1, 2022, the projected benefit obligations of our plans were $186 million and plan assets were $221 million. Pension expense was not material for 2023, 2022, or 2021.

# Government Incentives

We receive incentives from governmental entities primarily in India, Japan, Singapore, Taiwan, and the United States principally in the form of cash grants and tax credits. These incentives primarily relate to capital expenditures, have initial terms ranging from one year to 15 years, and may be subject to reimbursement if certain conditions are not met or maintained. The conditions attached to these incentives require us to incur expenditures related to the construction of new manufacturing facilities, the purchase and installation of specialized tools and equipment, R&D expenditures, and/or maintain certain levels of fixed asset investment or employee headcount during the incentive terms.

The line items on the balance sheet affected by government incentives were as follows:

| As of | August 31, 2023 |
|---|---|
| Receivables | $ 105 |
| Other noncurrent assets | 179 |
| Other current liabilities | 11 |
| Noncurrent unearned government incentives | 727 |

As of August 31, 2023, we had aggregate commitments from various governmental entities of up to $2 billion to be received through 2033 (in addition to the receivables and other noncurrent assets in the table above), subject to achievement of certain performance conditions. We also receive a 25% investment tax credit on qualified investments in U.S. semiconductor manufacturing under the CHIPS Act. Subsequent to August 31, 2023, we finalized an incentive arrangement under which we will receive additional grants of up to $1.3 billion.

Government incentives related to capital expenditures have reduced property, plant and equipment by $1.57 billion as of August 31, 2023, of which $584 million pertained to 2023 expenditures.

In 2023, operating income (loss) benefited by $318 million (approximately 93% in COGS and 7% in R&D) from government incentives recognized as a reduction of expense, primarily in the form of reduced depreciation expense.

# Revenue

Revenue is primarily recognized at a point in time when control of the promised goods is transferred to our customers in an amount that reflects the consideration we expect to be entitled to in exchange for those goods. Substantially all contracts with our customers are short-term in duration at fixed, negotiated prices with payment generally due shortly after delivery. From time to time, we have contracts with initial terms that include performance obligations that extend beyond one year. As of August 31, 2023, our future performance obligations beyond one year were not significant.

As of August 31, 2023 and September 1, 2022, other current liabilities included $453 million and $1.26 billion, respectively, for estimates of consideration payable to customers including estimates for pricing adjustments and returns.

In 2023, we received an aggregate of $228 million from settlements of insurance claims involving a power disruption in 2022 and an operational disruption in 2017, of which $186 million was for business interruption and recognized in revenue.

### Revenue by Technology

| For the year ended | | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|---|
| DRAM | $ | 10,978 | $ | 22,386 | $ | 20,039 |
| NAND | | 4,206 | | 7,811 | | 7,007 |
| Other (primarily NOR) | | 356 | | 561 | | 659 |
| | $ | 15,540 | $ | 30,758 | $ | 27,705 |

See "Segment and Other Information" for disclosure of disaggregated revenue by market segment.

# Restructure and Asset Impairments

| For the year ended | | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|---|
| Employee severance | $ | 163 | $ | — | $ | 3 |
| Asset impairments and other asset-related costs | | 14 | | 63 | | 478 |
| Other | | (6) | | (15) | | 7 |
| | $ | 171 | $ | 48 | $ | 488 |

In 2023, we initiated the 2023 Restructure Plan in response to challenging industry conditions. Under the 2023 Restructure Plan, we expect our headcount reduction to approach 15% by the end of calendar 2023 through a combination of voluntary attrition and personnel reductions. In connection with the plan, we incurred restructure charges of $171 million in 2023, primarily related to employee severance costs. The plan was substantially completed in the third quarter of 2023. As of August 31, 2023, we had paid $167 million in 2023 in connection with the 2023 Restructure Plan and the remaining liability was $4 million.

Restructure and asset impairments for 2022 and 2021 are primarily related to the sale of our Lehi, Utah facility. See "Lehi, Utah Fab and 3D XPoint."



82

# Other Operating (Income) Expense, Net

| For the year ended | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| Goodwill impairment | $ | 101 $ | — $ | — |
| Litigation settlement | | 68 | — | — |
| Patent license charges | | — | — | 128 |
| (Gain) loss on disposition of property, plant, and equipment | | (54) | (41) | (24) |
| Other | | 9 | 7 | (9) |
| | $ | 124 $ | (34) $ | 95 |

# Other Non-Operating Income (Expense), Net

| For the year ended | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| Gain (loss) on investments | $ | (8) $ | 26 $ | 82 |
| Loss on debt repurchases and conversions | | — | (83) | (1) |
| Other | | 15 | 19 | — |
| | $ | 7 $ | (38) $ | 81 |

# Income Taxes

Our income tax (provision) benefit consisted of the following:

| For the year ended | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| Income (loss) before income taxes and equity in net income (loss) of equity method investees | | | | |
| U.S. | $ | 235 $ | 112 $ | (211) |
| Foreign | | (5,893) | 9,459 | 6,429 |
| | $ | (5,658) $ | 9,571 $ | 6,218 |
| | | | | |
| Income tax (provision) benefit | | | | |
| Current | | | | |
| U.S. federal | $ | (5) $ | (65) $ | (42) |
| State | | (1) | (1) | (1) |
| Foreign | | (178) | (528) | (370) |
| | | (184) | (594) | (413) |
| Deferred | | | | |
| U.S. federal | | (84) | (166) | (9) |
| State | | — | (225) | 28 |
| Foreign | | 91 | 97 | — |
| | | 7 | (294) | 19 |
| | | | | |
| Income tax (provision) benefit | $ | (177) $ | (888) $ | (394) |

Table of Contents

The table below reconciles our tax (provision) benefit based on the U.S. federal statutory rate to our effective rate:

| For the year ended | | 2023 | | 2022 | | 2021 | |
|---|---|---|---|---|---|---|---|
| U.S. federal income tax (provision) benefit at statutory rate | $ | 1,188 | 21.0 % | $ (2,010) | 21.0 % | $ (1,306) | 21.0 % |
| U.S. tax on foreign operations | | 6 | 0.1 % | (322) | 3.4 % | (226) | 3.6 % |
| Change in valuation allowance | | (50) | (0.9)% | (241) | 2.5 % | 54 | (0.9)% |
| Change in unrecognized tax benefits | | (30) | (0.5)% | (67) | 0.7 % | (238) | 3.8 % |
| Foreign tax rate differential | | (1,285) | (22.8)% | 1,601 | (16.7)% | 951 | (15.4)% |
| Research and development tax credits | | 43 | 0.8 % | 66 | (0.7)% | 123 | (2.0)% |
| State taxes, net of federal benefit | | 37 | 0.7 % | — | — % | 59 | (0.9)% |
| Debt premium deductions | | — | — % | — | — % | 130 | (2.1)% |
| Other | | (86) | (1.5)% | 85 | (0.9)% | 59 | (0.8)% |
| Income tax (provision) benefit | $ | (177) | (3.1)% | $ (888) | 9.3 % | $ (394) | 6.3 % |

We operate in a number of jurisdictions outside the United States, including Singapore, where we have tax incentive arrangements. These incentives expire, in whole or in part, at various dates through 2034 and are conditional, in part, upon meeting certain business operations and employment thresholds. As a result of a loss before taxes and geographic mix of income, the benefit from tax incentive arrangements was not material for 2023. These arrangements reduced our tax provision by $1.12 billion (benefiting our diluted earnings per share by $1.00) for 2022 and by $758 million ($0.66 per diluted share) for 2021.

As of August 31, 2023, certain non-U.S. subsidiaries had cumulative undistributed earnings of $4.28 billion that were deemed to be indefinitely reinvested. A provision has not been recognized to the extent that distributions from such subsidiaries are subject to additional foreign withholding or state income tax. Determination of the amount of unrecognized deferred tax liabilities related to investments in these foreign subsidiaries is not practicable.



Table of Contents

Deferred income taxes reflect the net tax effects of temporary differences between the bases of assets and liabilities for financial reporting and income tax purposes as well as carryforwards. Deferred tax assets and liabilities consist of the following:

| As of | August 31, 2023 | September 1, 2022 |
|---|---|---|
| **Deferred tax assets** | | |
| Net operating loss and tax credit carryforwards | $ 1,112 | $ 796 |
| Accrued salaries, wages, and benefits | 39 | 157 |
| Operating lease liabilities | 135 | 138 |
| Inventories | 52 | 77 |
| Property, plant, and equipment | — | 44 |
| Other | 75 | 142 |
| Gross deferred tax assets | 1,413 | 1,354 |
| Less valuation allowance | (528) | (471) |
| Deferred tax assets, net of valuation allowance | 885 | 883 |
| | | |
| **Deferred tax liabilities** | | |
| Right-of-use assets | (115) | (126) |
| Property, plant, and equipment | (31) | — |
| Other | (100) | (68) |
| Deferred tax liabilities | (246) | (194) |
| | | |
| Net deferred tax assets | $ 639 | $ 689 |
| | | |
| **Reported as** | | |
| Deferred tax assets | $ 756 | $ 702 |
| Deferred tax liabilities (included in other noncurrent liabilities) | (117) | (13) |
| Net deferred tax assets | $ 639 | $ 689 |

We assess positive and negative evidence for each jurisdiction to determine whether it is more likely than not that existing deferred tax assets will be realized. As of August 31, 2023, and September 1, 2022, we had a valuation allowance of $528 million and $471 million, respectively, against our net deferred tax assets, primarily related to carryforwards in U.S. states and Malaysia. Changes in 2023 in the valuation allowance were due to adjustments based on management's assessment of the realizability of tax credits, allowances and net operating losses based on a level that is more likely than not to be realized.

As of August 31, 2023, our net operating loss carryforward amounts and expiration periods, as reported to tax authorities, were as follows:

| Year of Expiration | Singapore | Malaysia | State | Japan | Other | Total |
|---|---|---|---|---|---|---|
| 2024 - 2028 | $ — | $ — | $ 47 | $ 336 | $ 25 | $ 408 |
| 2029 - 2033 | — | — | 348 | 321 | 109 | 778 |
| 2034 - 2038 | — | — | 237 | — | — | 237 |
| 2039 - 2043 | — | — | 183 | — | — | 183 |
| Indefinite | 1,688 | 1,025 | 60 | — | 202 | 2,975 |
| | $ 1,688 | $ 1,025 | $ 875 | $ 657 | $ 336 | $ 4,581 |

Table of Contents

As of August 31, 2023, our federal and state tax credit carryforward amounts and expiration periods, as reported to tax authorities, were as follows:

| Year of Tax Credit Expiration | U.S. Federal | State | Total |
|---|---|---|---|
| 2024 - 2028 | $ — | $ 51 | $ 51 |
| 2029 - 2033 | — | 120 | 120 |
| 2034 - 2038 | — | 137 | 137 |
| 2039 - 2043 | 306 | 5 | 311 |
| Indefinite | — | 131 | 131 |
| | $ 306 | $ 444 | $ 750 |

Below is a reconciliation of the beginning and ending amount of our unrecognized tax benefits:

| For the year ended | 2023 | 2022 | 2021 |
|---|---|---|---|
| Beginning unrecognized tax benefits | $ 731 | $ 660 | $ 411 |
| Increases related to tax positions from prior years | 2 | 14 | 2 |
| Increases related to prior year tax positions taken in current year | 27 | — | — |
| Increases related to tax positions taken in current year | 17 | 80 | 260 |
| Decreases related to tax positions from prior years | (33) | (23) | (13) |
| Ending unrecognized tax benefits | $ 744 | $ 731 | $ 660 |

As of August 31, 2023, gross unrecognized tax benefits were $744 million, which would have an impact of approximately $581 million on our effective tax rate in the future, if recognized. Amounts accrued for interest and penalties related to uncertain tax positions were not significant for any period presented. The resolution of tax audits or expiration of statute of limitations could also reduce our unrecognized tax benefits. Although the timing of final resolution is uncertain, the estimated potential reduction in our unrecognized tax benefits in the next 12 months would not be significant.

We and our subsidiaries file income tax returns with the U.S. federal government, various U.S. states, and various foreign jurisdictions throughout the world. We regularly engage in discussions and negotiations with tax authorities regarding tax matters, including transfer pricing, and we continue to defend any and all such claims presented. Our U.S. federal and state tax returns remain open to examination for 2018 through 2023. We are currently under audit by the Internal Revenue Service for our 2018 and 2019 tax years. In addition, tax returns that remain open to examination in Singapore, Taiwan and Japan range from the years 2014 to 2023. We believe that adequate amounts of taxes and related interest and penalties have been provided, and any adjustments as a result of examinations are not expected to materially adversely affect our business, results of operations, or financial condition.

# Earnings Per Share

| For the year ended | 2023 | 2022 | 2021 |
|---|---|---|---|
| Net income (loss) – Basic and Diluted | $ (5,833) | $ 8,687 | $ 5,861 |
| | | | |
| Weighted-average common shares outstanding – Basic | 1,093 | 1,112 | 1,120 |
| Dilutive effect of equity plans and convertible notes | — | 10 | 21 |
| Weighted-average common shares outstanding – Diluted | 1,093 | 1,122 | 1,141 |
| | | | |
| Earnings (loss) per share | | | |
| Basic | $ (5.34) | $ 7.81 | $ 5.23 |
| Diluted | (5.34) | 7.75 | 5.14 |



86

Table of Contents

Antidilutive potential common shares excluded from the computation of diluted earnings per share, that could dilute basic earnings per share in the future, were as follows at the end of the periods shown:

| For the year ended | 2023 | 2022 | 2021 |
|---|---|---|---|
| Equity plans | 33 | 5 | 2 |

# Segment and Other Information

Segment information reported herein is consistent with how it is reviewed and evaluated by our chief operating decision maker. We have the following four business units, which are our reportable segments:

**Compute and Networking Business Unit ("CNBU"):** Includes memory products and solutions sold into client, cloud server, enterprise, graphics, and networking markets.
**Mobile Business Unit ("MBU"):** Includes memory and storage products sold into smartphone and other mobile-device markets.
**Embedded Business Unit ("EBU"):** Includes memory and storage products and solutions sold into automotive, industrial, and consumer markets.
**Storage Business Unit ("SBU"):** Includes SSDs and component-level solutions sold into enterprise and cloud, client, and consumer storage markets.

Certain operating expenses directly associated with the activities of a specific segment are charged to that segment. Other indirect operating income and expenses are generally allocated to segments based on their respective percentage of cost of goods sold or forecasted wafer production. We do not identify or report internally our assets (other than goodwill) or capital expenditures by segment, nor do we allocate gains and losses from equity method investments, interest, other non-operating income or expense items, or taxes to segments.

87 | 2023 10-K

| For the year ended | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| **Revenue** | | | | |
| CNBU | $ | 5,710 $ | 13,693 $ | 12,280 |
| MBU | | 3,630 | 7,260 | 7,203 |
| EBU | | 3,637 | 5,235 | 4,209 |
| SBU | | 2,553 | 4,553 | 3,973 |
| All Other | | 10 | 17 | 40 |
| | $ | 15,540 $ | 30,758 $ | 27,705 |
| | | | | |
| **Operating income (loss)** | | | | |
| CNBU | $ | (585) $ | 5,844 $ | 4,295 |
| MBU | | (1,750) | 2,160 | 2,173 |
| EBU | | 382 | 1,752 | 1,006 |
| SBU | | (1,887) | 513 | 173 |
| All Other | | 8 | 12 | 20 |
| | | (3,832) | 10,281 | 7,667 |
| | | | | |
| **Unallocated** | | | | |
| Provision to write down inventories to net realizable value | | (1,831) | — | — |
| Lower costs from sale of inventory written down in prior periods | | 844 | — | — |
| Stock-based compensation | | (564) | (501) | (395) |
| Inventory accounting policy change to FIFO | | — | — | (133) |
| Change in inventory cost absorption | | — | — | (160) |
| 3D XPoint inventory write-down | | — | — | (49) |
| Restructure and asset impairments | | (171) | (48) | (488) |
| Goodwill impairment | | (101) | — | — |
| Litigation settlement | | (68) | — | — |
| Patent license charges | | — | — | (128) |
| Other | | (22) | (30) | (31) |
| | | (1,913) | (579) | (1,384) |
| | | | | |
| Operating income (loss) | $ | (5,745) $ | 9,702 $ | 6,283 |

Depreciation and amortization expense included in operating income (loss) was as follows:

| For the year ended | | 2023 | 2022 | 2021 |
|---|---|---|---|---|
| CNBU | $ | 2,512 $ | 2,766 $ | 2,497 |
| MBU | | 2,149 | 1,725 | 1,553 |
| EBU | | 1,324 | 1,280 | 1,028 |
| SBU | | 1,751 | 1,323 | 1,101 |
| All Other | | 1 | 2 | 8 |
| Unallocated | | 19 | 20 | 27 |
| | $ | 7,756 $ | 7,116 $ | 6,214 |



88

# Certain Concentrations

Revenue by market segment as an approximate percent of total revenue is presented in the table below:

| For the year ended | 2023 | 2022 | 2021 |
|---|---|---|---|
| Automotive, industrial, and consumer | 25 % | 15 % | 15 % |
| Mobile | 25 % | 25 % | 25 % |
| Client and graphics | 15 % | 20 % | 20 % |
| Enterprise and cloud server | 15 % | 20 % | 20 % |
| SSDs and other storage | 15 % | 15 % | 15 % |

No customer accounted for 10% or more of total revenue in 2023. Revenue from Kingston Technology Company, Inc. was 12% of total revenue in 2022 and revenue from WPG Holdings Limited was 11% and 13% of total revenue in 2022 and 2021, respectively. Sales to Kingston were primarily included in our CNBU and SBU segments and sales to WPG were primarily included in our MBU, CNBU, and EBU segments.

We generally have multiple sources of supply for our raw materials and production equipment; however, only a limited number of suppliers are capable of delivering certain raw materials and production equipment that meet our standards and, in some cases, materials or production equipment are provided by a single supplier.

Financial instruments that potentially subject us to concentrations of credit risk consist principally of cash, money market accounts, certificates of deposit, fixed-rate debt securities, trade receivables, share repurchase, and derivative contracts. We invest through high-credit-quality financial institutions and, by policy, generally limit the concentration of credit exposure by restricting investments with any single obligor and monitoring credit risk of bank counterparties on an ongoing basis. A concentration of credit risk may exist with respect to receivables of certain customers. We perform ongoing credit evaluations of customers worldwide and generally do not require collateral from our customers. Historically, we have not experienced material losses on receivables. A concentration of risk may also exist with respect to our foreign currency hedges as the number of counterparties to our hedges is limited and the notional amounts are relatively large. We seek to mitigate such risk by limiting our counterparties to major financial institutions and through entering into master netting arrangements.

# Geographic Information

Revenue based on the geographic location of our customers' headquarters was as follows:

| For the year ended | | 2023 | | 2022 | | 2021 |
|---|---|---|---|---|---|---|
| United States | $ | 7,805 | $ | 16,026 | $ | 12,155 |
| Taiwan | | 2,697 | | 6,185 | | 6,606 |
| Mainland China (excluding Hong Kong) | | 2,181 | | 3,311 | | 2,456 |
| Japan | | 987 | | 1,696 | | 1,652 |
| Other Asia Pacific | | 752 | | 1,223 | | 1,420 |
| Europe | | 682 | | 505 | | 573 |
| Hong Kong | | 340 | | 1,665 | | 2,582 |
| Other | | 96 | | 147 | | 261 |
| | $ | 15,540 | $ | 30,758 | $ | 27,705 |

Long-lived assets by geographic area consisted of property, plant, and equipment and operating lease right-of-use assets and were as follows:

| As of | | August 31, 2023 | | September 1, 2022 |
|---|---|---|---|---|
| Taiwan | $ | 12,926 | $ | 13,143 |
| Singapore | | 11,283 | | 12,045 |
| Japan | | 7,323 | | 7,113 |
| United States | | 5,196 | | 5,155 |
| Malaysia | | 1,124 | | 994 |
| China | | 395 | | 440 |
| Other | | 347 | | 337 |
| | $ | 38,594 | $ | 39,227 |

 90

## Report of Independent Registered Public Accounting Firm

To the Board of Directors and Shareholders of Micron Technology, Inc.

***Opinions on the Financial Statements and Internal Control over Financial Reporting***

We have audited the accompanying consolidated balance sheets of Micron Technology, Inc. and its subsidiaries (the "Company") as of August 31, 2023 and September 1, 2022, and the related consolidated statements of operations, of comprehensive income (loss), of changes in equity and of cash flows for each of the three years in the period ended August 31, 2023, including the related notes and schedule of valuation and qualifying accounts for each of the three years in the period ended August 31, 2023 appearing under Item 15 (collectively referred to as the "consolidated financial statements"). We also have audited the Company's internal control over financial reporting as of August 31, 2023, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission (COSO).

In our opinion, the consolidated financial statements referred to above present fairly, in all material respects, the financial position of the Company as of August 31, 2023 and September 1, 2022**,** and the results of its operations and its cash flows for each of the three years in the period ended August 31, 2023 in conformity with accounting principles generally accepted in the United States of America. Also in our opinion, the Company maintained, in all material respects, effective internal control over financial reporting as of August 31, 2023, based on criteria established in *Internal Control - Integrated Framework* (2013) issued by the COSO.

*Change in Accounting Principle*

As discussed in the Significant Accounting Policies and Inventories notes to the consolidated financial statements, the Company changed the manner in which it accounts for inventory costing from the average cost inventory accounting method to the first-in, first-out inventory accounting method in 2021.

***Basis for Opinions***

The Company's management is responsible for these consolidated financial statements, for maintaining effective internal control over financial reporting, and for its assessment of the effectiveness of internal control over financial reporting, included in Management's Report on Internal Control over Financial Reporting appearing under Item 9A. Our responsibility is to express opinions on the Company's consolidated financial statements and on the Company's internal control over financial reporting based on our audits. We are a public accounting firm registered with the Public Company Accounting Oversight Board (United States) (PCAOB) and are required to be independent with respect to the Company in accordance with the U.S. federal securities laws and the applicable rules and regulations of the Securities and Exchange Commission and the PCAOB.

We conducted our audits in accordance with the standards of the PCAOB. Those standards require that we plan and perform the audits to obtain reasonable assurance about whether the consolidated financial statements are free of material misstatement, whether due to error or fraud, and whether effective internal control over financial reporting was maintained in all material respects.

Our audits of the consolidated financial statements included performing procedures to assess the risks of material misstatement of the consolidated financial statements, whether due to error or fraud, and performing procedures that respond to those risks. Such procedures included examining, on a test basis, evidence regarding the amounts and disclosures in the consolidated financial statements. Our audits also included evaluating the accounting principles used and significant estimates made by management, as well as evaluating the overall presentation of the consolidated financial statements. Our audit of internal control over financial reporting included obtaining an understanding of internal control over financial reporting, assessing the risk that a material weakness exists, and testing and evaluating the design and operating effectiveness of internal control based on the assessed risk. Our audits also included performing such other procedures as we considered necessary in the circumstances. We believe that our audits provide a reasonable basis for our opinions.

**91 | 2023 10-K**

***Definition and Limitations of Internal Control over Financial Reporting***

A company's internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles. A company's internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the company; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that receipts and expenditures of the company are being made only in accordance with authorizations of management and directors of the company; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of the company's assets that could have a material effect on the financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions, or that the degree of compliance with the policies or procedures may deteriorate.

***Critical Audit Matters***

The critical audit matter communicated below is a matter arising from the current period audit of the consolidated financial statements that was communicated or required to be communicated to the audit committee and that (i) relates to accounts or disclosures that are material to the consolidated financial statements and (ii) involved our especially challenging, subjective, or complex judgments. The communication of critical audit matters does not alter in any way our opinion on the consolidated financial statements, taken as a whole, and we are not, by communicating the critical audit matter below, providing a separate opinion on the critical audit matter or on the accounts or disclosures to which it relates.

*Net Realizable Value of Finished Goods and Work in Process Inventories*

As described in the Inventories note to the consolidated financial statements, as of August 31, 2023, the Company had net finished goods and work in process inventories totaling $7.7 billion. As disclosed by management, determining the net realizable value of the Company's finished goods and work in process inventories involves significant judgments, including projecting future average selling prices, future sales volumes, and future cost per part. The memory and storage industry environment deteriorated sharply in the fourth quarter of 2022 and throughout 2023 due to weak demand in many end markets combined with global and macroeconomic challenges and lower demand resulting from customer actions to reduce elevated inventory levels. This led to significant reductions in average selling prices for both DRAM and NAND, resulting in declines in revenue across all of the Company's business segments and nearly all end markets. The Company recorded charges of $1.83 billion to cost of goods sold to write down the carrying value of work in process and finished goods inventories to their estimated net realizable value.

The principal considerations for our determination that performing procedures relating to the net realizable value of finished goods and work in process inventories is a critical audit matter are (i) the significant judgment by management in determining the net realizable value of finished goods and work in process inventories and (ii) a high degree of auditor judgment, subjectivity, and effort in performing procedures and evaluating management's significant assumptions related to future average selling prices and future cost per part.



92

Addressing the matter involved performing procedures and evaluating audit evidence in connection with forming our overall opinion on the consolidated financial statements. These procedures included testing the effectiveness of controls relating to management's determination of the net realizable value of finished goods and work in process inventories, including controls over significant assumptions and data utilized. These procedures also included, among others (i) testing management's process for determining the net realizable value of finished goods and work in process inventories; (ii) evaluating the appropriateness of management's methodology; (iii) testing the completeness and accuracy of underlying data used in determining the net realizable value; and (iv) evaluating the reasonableness of management's significant assumptions related to future average selling prices and future cost per part. Evaluating management's assumption related to future average selling prices for certain products involved evaluating whether the assumption used by management was reasonable considering (i) current and past results, including recent sales; (ii) the consistency with external market, industry data or current contract prices; (iii) a comparison of the prior year estimates to actual results in the current fiscal year; and (iv) whether the assumption was consistent with evidence obtained in other areas of the audit. Evaluating management's assumption related to future cost per part for certain products involved evaluating whether the assumption used by management was reasonable considering (i) current and past results; (ii) a comparison of the prior year estimates to actual results in the current fiscal year; and (iii) whether the assumption was consistent with evidence obtained in other areas of the audit.

/s/ PricewaterhouseCoopers LLP

San Jose, California
October 6, 2023

We have served as the Company's auditor since 1984.

93 | 2023 10-K

Appx197

# ITEM 9. CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS ON ACCOUNTING AND FINANCIAL DISCLOSURE

None.

# ITEM 9A. CONTROLS AND PROCEDURES

An evaluation was carried out under the supervision and with the participation of our management, including our principal executive officer and principal financial officer, of the effectiveness of the design and operation of our disclosure controls and procedures (as defined in Rules 13a-15(e) and 15d-15(e) under the Securities Exchange Act of 1934, as amended (the "Exchange Act")) as of the end of the period covered by this report. Based upon that evaluation, the principal executive officer and principal financial officer concluded that those disclosure controls and procedures were effective to ensure that information required to be disclosed by us in the reports that we file or submit under the Exchange Act are recorded, processed, summarized, and reported within the time periods specified in the SEC's rules and forms and that such information is accumulated and communicated to our management, including the principal executive officer and principal financial officer, to allow timely decisions regarding disclosure.

During the fourth quarter of 2023, there were no changes in our internal control over financial reporting that have materially affected, or are reasonably likely to materially affect, our internal control over financial reporting.

## Management's Report on Internal Control Over Financial Reporting

Our management is responsible for establishing and maintaining adequate internal control over financial reporting. Internal control over financial reporting is a process designed to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with accounting principles generally accepted in the United States of America. Our internal control over financial reporting includes those policies and procedures that (i) pertain to the maintenance of records that in reasonable detail accurately reflect the transactions and dispositions of our assets; (ii) provide reasonable assurance that transactions are recorded as necessary to permit preparation of financial statements in accordance with generally accepted accounting principles, and that our receipts and expenditures are being made only in accordance with authorizations of our management and directors; and (iii) provide reasonable assurance regarding prevention or timely detection of unauthorized acquisition, use, or disposition of our assets that could have a material effect on our financial statements.

Because of its inherent limitations, internal control over financial reporting may not prevent or detect misstatements. Also, projections of any evaluation of effectiveness to future periods are subject to the risk that controls may become inadequate because of changes in conditions or that the degree of compliance with the policies or procedures may deteriorate.

Management conducted an evaluation of the effectiveness of our internal control over financial reporting based on the framework in Internal Control – Integrated Framework (2013) issued by the Committee of Sponsoring Organizations of the Treadway Commission. Based on this evaluation, management concluded that our internal control over financial reporting was effective as of August 31, 2023. The effectiveness of our internal control over financial reporting as of August 31, 2023 has been audited by PricewaterhouseCoopers LLP, an independent registered public accounting firm, as stated in their report, which is included in Part II, Item 8, of this Form 10-K.



94

# ITEM 9B. OTHER INFORMATION

### Securities Trading Plans of Directors and Executive Officers

The following director and officer, as defined in Rule 16a-1(f) of the Exchange Act, adopted a "Rule 10b5-1 trading arrangement," as defined in Item 408 of Regulation S-K, as follows:

On May 15, 2023, Sanjay Mehrotra, our President, Chief Executive Officer and Director, adopted a Rule 10b5-1 trading arrangement providing for the sale of an aggregate of up to 812,284 shares of our common stock, including up to 612,284 shares subject to outstanding stock options, which were granted in calendar 2017 and would otherwise expire in calendar 2025. The remaining shares subject to the trading arrangement are shares acquired by Mr. Mehrotra pursuant to our Restricted Stock Awards. The trading arrangement is intended to satisfy the affirmative defense in Rule 10b5-1(c). The first date that sales of any shares were permitted to be sold under the trading arrangement was August 14, 2023, and subsequent sales under the trading arrangement may occur on a regular basis for the duration of the trading arrangement until May 8, 2025, or earlier if all transactions under the trading arrangement are completed.

No other officers or directors, as defined in Rule 16a-1(f), adopted and/or terminated a "Rule 10b5-1 trading arrangement" or a "non-Rule 10b5-1 trading arrangement," as defined in Item 408 of Regulation S-K, during the last fiscal quarter.

# ITEM 9C. DISCLOSURE REGARDING FOREIGN JURISDICTIONS THAT PREVENT INSPECTIONS

Not applicable.

# PART III

# ITEM 10. DIRECTORS, EXECUTIVE OFFICERS, AND CORPORATE GOVERNANCE

# ITEM 11. EXECUTIVE COMPENSATION

# ITEM 12. SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT AND RELATED STOCKHOLDER MATTERS

# ITEM 13. CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE

# ITEM 14. PRINCIPAL ACCOUNTANT FEES AND SERVICES

Certain information concerning our executive officers is included under the caption, "Information About Our Executive Officers" in Part I, Item 1 of this report. Other information required by Items 10, 11, 12, 13, and 14 will be contained in our 2023 Proxy Statement which will be filed with the SEC within 120 days after August 31, 2023 and is incorporated herein by reference.

# PART IV

## ITEM 15. EXHIBITS AND FINANCIAL STATEMENT SCHEDULE

(a) The following documents are filed as part of this report:

1    Financial Statements: See our consolidated financial statements under Item 8.

2    Financial Statement Schedule:
See "Schedule II – Valuation and Qualifying Accounts" within Item 15 below.

Certain Financial Statement Schedules have been omitted since they are either not required, not applicable, or the information is otherwise included.

3    Exhibits. See "Index to Exhibits" within Item 15 below.

 96

Table of Contents

# SCHEDULE II

**VALUATION AND QUALIFYING ACCOUNTS**
(In millions)

| | Balance at Beginning of Year | Charged (Credited) to Income Tax Provision | Currency Translation and Charges to Other Accounts | Balance at End of Year |
|---|---|---|---|---|
| Deferred Tax Asset Valuation Allowance | | | | |
| Year ended August 31, 2023 | $ 471 | $ 58 | $ (1) | $ 528 |
| Year ended September 1, 2022 | 233 | 241 | (3) | 471 |
| Year ended September 2, 2021 | 294 | (54) | (7) | 233 |

Table of Contents

## Index to Exhibits

| Exhibit Number | Description of Exhibit | Filed Herewith | Form | Period Ending | Exhibit/ Appendix | Filing Date |
|---|---|---|---|---|---|---|
| 3.1 | Restated Certificate of Incorporation of the Registrant | | 8-K | | 99.2 | 1/26/15 |
| 3.2 | Bylaws of the Registrant, Amended and Restated | | 8-K | | 3.1 | 2/16/21 |
| 4.1 | Indenture, dated as of February 6, 2019, by and between Micron Technology, Inc. and U.S. Bank National Association, as Trustee | | 8-K | | 4.1 | 2/6/19 |
| 4.2 | First Supplemental Indenture, dated as of February 6, 2019, by and between Micron Technology, Inc. and U.S. Bank National Association, as Trustee | | 8-K | | 4.2 | 2/6/19 |
| 4.3 | Form of Note for Micron Technology, Inc.'s 4.975% Senior Notes due 2026 (included in Exhibit 4.2) | | 8-K | | 4.4 | 2/6/19 |
| 4.4 | Form of Note for Micron Technology, Inc.'s 5.327% Senior Notes due 2029 (included in Exhibit 4.2) | | 8-K | | 4.5 | 2/6/19 |
| 4.5 | Second Supplemental Indenture, dated as of July 12, 2019, by and between Micron Technology, Inc. and U.S. Bank National Association, as Trustee | | 8-K | | 4.2 | 7/12/19 |
| 4.6 | Form of Note for Micron Technology, Inc.'s 4.185% Senior Notes due 2027 (included in Exhibit 4.5) | | 8-K | | 4.3 | 7/12/19 |
| 4.7 | Form of Note for Micron Technology, Inc.'s 4.663% Senior Notes due 2030 (included in Exhibit 4.5) | | 8-K | | 4.4 | 7/12/19 |
| 4.8 | Fourth Supplemental Indenture, dated as of November 1, 2021, by and between Micron Technology, Inc. and U.S. Bank National Association, as Trustee | | 8-K | | 4.2 | 11/1/21 |
| 4.9 | Form of Note for Micron Technology, Inc.'s 2.703% Senior Notes due 2032 (included in Exhibit 4.8) | | 8-K | | 4.3 | 11/1/21 |
| 4.10 | Form of Note for Micron Technology, Inc.'s 3.366% Senior Notes due 2041 (included in Exhibit 4.8) | | 8-K | | 4.4 | 11/1/21 |
| 4.11 | Form of Note for Micron Technology, Inc.'s 3.477% Senior Notes due 2051 (included in Exhibit 4.8) | | 8-K | | 4.5 | 11/1/21 |
| 4.12 | Description of Registrant's Securities | | 10-K | 9/1/22 | 4.12 | 10/7/22 |
| 4.13 | Fifth Supplemental Indenture, dated as of October 31, 2022, by and between Micron Technology, Inc. and U.S. Bank Trust Company, National Association, as Trustee | | 8-K | | 4.2 | 10/31/22 |
| 4.14 | Form of Note for Micron Technology, Inc.'s 6.750% Senior Notes due 2029 (included in Exhibit 4.13) | | 8-K | | 4.3 | 10/31/22 |
| 4.15 | Sixth Supplemental Indenture, dated as of February 9, 2023, by and between Micron Technology, Inc. and U.S. Bank Trust Company, National Association, as Trustee | | 8-K | | 4.3 | 2/9/23 |
| 4.16 | Form of Note for Micron Technology, Inc.'s 5.875% Senior Notes due 2033 (included in Exhibit 4.15) | | 8-K | | 4.5 | 2/9/23 |
| 4.17 | Seventh Supplemental Indenture, dated as of April 11, 2023, by and between Micron Technology, Inc. and U.S. Bank Trust Company, National Association, as Trustee | | 8-K | | 4.2 | 4/11/23 |
| 4.18 | Form of Note for Micron Technology, Inc.'s 5.375% Senior Notes due 2028 (included in Exhibit 4.17) | | 8-K | | 4.3 | 4/11/23 |
| 4.19 | Form of Note for Micron Technology, Inc.'s 5.875% Senior Notes due 2033 (included in Exhibit 4.17) | | 8-K | | 4.4 | 4/11/23 |
| 10.1* | Micron Technology, Inc. Executive Officer Performance Incentive Plan | | DEF 14A | | B | 12/7/17 |
| 10.2* | Amended and Restated 2004 Equity Incentive Plan | | 10-Q | 12/1/22 | 10.1 | 12/22/22 |
| 10.3* | 2004 Equity Incentive Plan Forms of Agreement and Terms and Conditions | | 10-Q | 12/1/22 | 10.2 | 12/22/22 |
| 10.4* | Amended and Restated 2007 Equity Incentive Plan | | DEF 14A | | A | 12/1/20 |



98

| Exhibit Number | Description of Exhibit | Filed Herewith | Form | Period Ending | Exhibit/ Appendix | Filing Date |
|---|---|---|---|---|---|---|
| 10.5* | 2007 Equity Incentive Plan Forms of Agreement and Terms and Conditions | | 10-Q | 12/1/22 | 10.3 | 12/22/22 |
| 10.6* | Nonstatutory Stock Option Plan, as Amended | | 10-K | 9/1/16 | 10.10 | 10/28/16 |
| 10.7* | Nonstatutory Stock Option Plan Form of Agreement and Terms and Conditions | | 10-K | 9/1/16 | 10.11 | 10/28/16 |
| 10.8* | Form of Indemnification Agreement between the Registrant and its officers and directors | | 10-Q | 2/27/14 | 10.3 | 4/7/14 |
| 10.9* | Form of Severance Agreement | | 8-K | | 99.2 | 11/1/07 |
| 10.10* | Deferred Compensation Plan, as amended | X | | | | |
| 10.11* | Amended and Restated Executive Agreement by and between Micron Technology, Inc. and Sanjay Mehrotra | | 10-K | 9/1/22 | 10.11 | 10/7/22 |
| 10.12* | Severance Benefits for Sumit Sadana | | 10-Q | 11/30/17 | 10.70 | 12/20/17 |
| 10.13* | Form of Amendment to Executive/Severance Agreement | | 8-K | | 99.1 | 11/13/17 |
| 10.14* | Severance Benefits for Manish Bhatia | | 10-Q | 11/30/17 | 10.74 | 12/20/17 |
| 10.15* | Micron Technology, Inc. Employee Stock Purchase Plan, as amended and restated | | 10-Q | 6/2/22 | 10.1 | 7/1/22 |
| 10.16* | Severance Benefits for Mark Murphy | | 10-Q | 6/2/22 | 10.3 | 7/1/22 |
| 10.17 | Credit Agreement, dated as of May 14, 2021, by and among Micron Technology, Inc., as borrower, HSBC Bank USA, National Association, as administrative agent, the other agents party thereto, and each financial institution party from time to time thereto | | 10-Q | 6/3/21 | 10.22 | 7/1/21 |
| 10.18 | Term Loan Credit Agreement, dated as of May 14, 2021, by and among Micron Technology, Inc., as borrower, Wells Fargo Bank, National Association, as administrative agent, the other agents party thereto, and each financial institution party from time to time thereto | | 10-Q | 6/3/21 | 10.23 | 7/1/21 |
| 10.19 | Term Loan Credit Agreement, dated as of November 3, 2022, by and among Micron Technology, Inc., as borrower, Wells Fargo Bank, National Association, as administrative agent, the other agents party thereto, and each financial institution party from time to time thereto | | 10-Q | 12/1/22 | 10.4 | 12/22/22 |
| 10.20 | Incremental Amendment No. 1, dated as of January 5, 2023, to the Term Loan Credit Agreement, dated as of November 3, 2022, by and among Micron Technology, Inc., as borrower, Wells Fargo Bank, National Association, as administrative agent, and the lenders party thereto | | 10-Q | 3/2/23 | 10.1 | 3/29/23 |
| 10.21 | Amendment No. 1 to Term Loan Credit Agreement, dated as of March 27, 2023, by and among Micron Technology, Inc., as borrower, Wells Fargo Bank, National Association, as administrative agent, and the lenders party thereto | | 10-Q | 3/2/23 | 10.3 | 3/29/23 |
| 10.22 | Amendment No. 2 to Term Loan Credit Agreement, dated as of March 27, 2023, by and among Micron Technology, Inc., as borrower, Wells Fargo Bank, National Association, as administrative agent, and the lenders party thereto | | 10-Q | 3/2/23 | 10.2 | 3/29/23 |
| 10.23 | Amendment No. 1 to Credit Agreement, dated as of March 27, 2023, by and among Micron Technology, Inc., as borrower, HSBC Bank USA, National Association, as administrative agent, and the lenders party thereto | | 10-Q | 3/2/23 | 10.4 | 3/29/23 |
| 10.24* | Form of Consent for Named Executive Officers | | 10-Q | 3/2/23 | 10.5 | 3/29/23 |
| 10.25 | Amendment No. 2 to Credit Agreement, dated as of June 7, 2023, by HSBC Bank USA, National Association, as administrative agent | | 10-Q | 6/1/23 | 10.1 | 6/29/23 |
| 10.26 | Amendment No. 2 to Term Loan Credit Agreement, dated as of June 7, 2023, by Wells Fargo Bank, National Association, as administrative agent | | 10-Q | 6/1/23 | 10.2 | 6/29/23 |
| 21.1 | Subsidiaries of the Registrant | X | | | | |
| 23.1 | Consent of Independent Registered Public Accounting Firm | X | | | | |
| 31.1 | Rule 13a-14(a) Certification of Chief Executive Officer | X | | | | |

**99 | 2023 10-K**

Table of Contents

| Exhibit Number | Description of Exhibit | Filed Herewith | Form | Period Ending | Exhibit/ Appendix | Filing Date |
|---|---|---|---|---|---|---|
| 31.2 | Rule 13a-14(a) Certification of Chief Financial Officer | X | | | | |
| 32.1 | Certification of Chief Executive Officer Pursuant to 18 U.S.C. 1350 | X | | | | |
| 32.2 | Certification of Chief Financial Officer Pursuant to 18 U.S.C. 1350 | X | | | | |
| 97.1 | Compensation Recoupment (Clawback) Policy, as amended and restated | X | | | | |
| 101.INS | Inline XBRL Instance Document - the instance document does not appear in the Interactive Data File because its XBRL tags are embedded within the Inline XBRL document | X | | | | |
| 101.SCH | Inline XBRL Taxonomy Extension Schema Document | X | | | | |
| 101.CAL | Inline XBRL Taxonomy Extension Calculation Linkbase Document | X | | | | |
| 101.DEF | Inline XBRL Taxonomy Extension Definition Linkbase Document | X | | | | |
| 101.LAB | Inline XBRL Taxonomy Extension Label Linkbase Document | X | | | | |
| 101.PRE | Inline XBRL Taxonomy Extension Presentation Linkbase Document | X | | | | |
| 104 | Cover Page Interactive Data File (formatted as Inline XBRL and contained in Exhibit 101) | X | | | | |

* Indicates management contract or compensatory plan or arrangement.

## ITEM 16. FORM 10-K SUMMARY

None.



100

# SIGNATURES

Pursuant to the requirements of Section 13 or 15(d) of the Securities Exchange Act of 1934, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

Micron Technology, Inc.

Date   October 6, 2023
By:   _/s/ Mark Murphy_
**Mark Murphy**
Executive Vice President and Chief Financial Officer
(Principal Financial Officer)

Pursuant to the requirements of the Securities Exchange Act of 1934, this report has been signed below by the following persons on behalf of the Registrant and in the capacities and on the dates indicated.

| Signature | Title | Date |
|---|---|---|
| _/s/ Sanjay Mehrotra_<br>**(Sanjay Mehrotra)** | President and Chief Executive Officer and Director (Principal Executive Officer) | October 6, 2023 |
| _/s/ Mark Murphy_<br>**(Mark Murphy)** | Executive Vice President and Chief Financial Officer (Principal Financial Officer) | October 6, 2023 |
| _/s/ Scott Allen_<br>**(Scott Allen)** | Corporate Vice President and Chief Accounting Officer (Principal Accounting Officer) | October 6, 2023 |
| _/s/ Richard M. Beyer_<br>**(Richard M. Beyer)** | Director | October 6, 2023 |
| _/s/ Lynn Dugle_<br>**(Lynn Dugle)** | Director | October 6, 2023 |
| _/s/ Steve Gomo_<br>**(Steve Gomo)** | Director | October 6, 2023 |
| _/s/ Linnie Haynesworth_<br>**(Linnie Haynesworth)** | Director | October 6, 2023 |
| _/s/ Mary Pat McCarthy_<br>**(Mary Pat McCarthy)** | Director | October 6, 2023 |
| _/s/ Robert E. Switz_<br>**(Robert E. Switz)** | Chair of the Board Director | October 6, 2023 |
| _/s/ MaryAnn Wright_<br>**(MaryAnn Wright)** | Director | October 6, 2023 |

**101 | 2023 10-K**

Appx205

**Exhibit 10.10**

# MICRON TECHNOLOGY, INC.
# DEFERRED COMPENSATION PLAN

Effective March 1, 2017

Amended and Restated Effective October 1, 2023

## PREAMBLE

The Plan is intended to be a "plan which is unfunded and is maintained by an employer primarily for the purpose of providing deferred compensation for a select group of management or highly compensated employees" within the meaning of Sections 201(2), 301(a)(3) and 401(a)(1) of the Employee Retirement Income Security Act of 1974, as amended, or an "excess benefit plan" within the meaning of Section 3(36) of the Employee Retirement Income Security Act of 1974, as amended, or a combination of both. The Plan is further intended to conform with the requirements of Internal Revenue Code Section 409A and the final regulations issued thereunder and shall be interpreted, implemented and administered in a manner consistent therewith.

1

## Article 1 -     GENERAL

**1.1**     **Purpose**. The purpose of the Plan is to provide Eligible Employees an opportunity to defer to a future date the receipt of base and bonus compensation for services performed for the Employer.

**1.2**     **Effective Date.** The Effective Date of the Plan is March 1, 2017.

## Article 2 -     DEFINITIONS

Pronouns used in the Plan are in the masculine gender but include the feminine gender unless the context clearly indicates otherwise. Wherever used herein, the following terms have the meanings set forth below, unless a different meaning is clearly required by the context:

**2.1**     **"Account"** means an account established for the purpose of recording amounts credited on behalf of a Participant and any income, expenses, gains, losses or distributions included thereon. The Account shall be a bookkeeping entry only and shall be utilized solely as a device for the measurement and determination of the amounts to be paid to a Participant or to the Participant's Beneficiary pursuant to the Plan.

**2.2**     **"Administrator"** means the DCP Committee.

**2.3**     "**Base Compensation**" means the Participant's base rate of compensation (including regular compensation, holiday, vacation, personal and sick pay) payable for services performed for the Employer for the Plan Year, as adjusted to reflect increases and decreases to the base rate during the Plan Year.

**2.4**     **"Beneficiary"** means the persons, trusts, estates or other entities entitled under Section 8.2 to receive benefits under the Plan upon the death of a Participant.

**2.5**     **"Board" or "Board of Directors"** means the Board of Directors of the Plan Sponsor.

**2.6**     **"Bonus Compensation"** means the Participant's annual bonus or incentive compensation payable for services performed for the Employer for the Plan Year pursuant to, among others designated by the Employer, the Micron Technology, Inc. Executive Incentive Plan, the Micron Technology, Inc. Annual Incentive Plan, and/or the Micron Technology, Inc. Incentive Pay Plan.

**2.7**     **"Change in Control"** means the occurrence of an event involving the Plan Sponsor that is described in Section 9.6.

**2.8**     **"Code"** means the Internal Revenue Code of 1986, as amended.

**2.9**     **"Compensation**" means Base Compensation, Bonus Compensation, Fiscal Year Compensation and/or Performance-Based Compensation.

**2.10**     "**Covered Compensation**" means such Compensation deferred under the Plan that constitutes incentive compensation under the Micron Recoupment Policy.

2

**2.11** "**DCP Committee**" means the Senior Vice President and Chief People Officer of Micron (or individual with similar successor responsibilities) or any other individual or committee appointed by such officer to administer the Plan.

**2.12** "**Disability**" means a determination by the Administrator that the Participant is either (a) unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or can be expected to last for a continuous period of not less than 12 months, or (b) is, by reason of any medically determinable physical or mental impairment which can be expected to result in death or last for a continuous period of not less than twelve months, receiving income replacement benefits for a period of not less than three months under an accident and health plan covering employees of the Employer. A Participant will be considered to have incurred a Disability if he is determined to be totally disabled by the Social Security Administration or the Railroad Retirement Board.

**2.13** "**Discretionary Credits**" has the meaning set forth in Section 5.1 hereof.

**2.14** "**Distribution Date**" means the earliest to occur of: (1) a Specified Payment Date elected by the Participant or (2) the Participant's Separation from Service for any reason (including death or Disability). Notwithstanding the foregoing, in the case of a distribution to a Specified Employee on account of Separation from Service, the Distribution Date shall be the Specified Employee Delayed Payment Date.

3

2.15   "**Election Period**" means the period established by the Administrator during which Participant deferral and distribution elections must be made in accordance with the requirements of Code Section 409A.  The Election Period for Base Compensation and for Bonus Compensation shall end no later than the last day of the Plan Year immediately preceding the Plan Year in which such Base Compensation or Bonus Compensation is earned. The Election Period for Fiscal Year Compensation that does not qualify as Performance-Based Compensation shall end no later than the last day of the immediately preceding Fiscal Year in which such Fiscal Year Compensation is earned (or such earlier date as the Administrator may prescribe). The Election Period for Performance-Based Compensation shall end no later than six (6) months before the end of the Fiscal Year or other period in which the Performance-Based Compensation is earned (or such earlier date as the Administrator may prescribe); provided, that the Eligible Employee is employed continuously from the later of the beginning of the performance period or the date the performance criteria are established through the date an election is made to defer such Performance-Based Compensation and the amount of such Performance-Based Compensation has not become readily ascertainable as of the date the election is made; and further provided, however, that the Election Period with respect to the first Plan Year in which an Eligible Employee is eligible to participate in the Plan may, to the extent permitted under Code Section 409A, end no later than thirty (30) days after the Eligible Employee first becomes eligible under the Plan and shall apply only to compensation earned after such election is made. A former Eligible Employee who again becomes an Eligible Employee shall be treated as newly eligible to make deferrals under the Plan within thirty (30) days upon return to eligible status if: (i) the former Eligible Employee has received distribution of the full amount of his or her Account balance attributable to deferral contributions and on or before the last such distribution was not eligible to make deferral contributions for periods after the last distribution payment; or (ii) the former Eligible Employee has not been eligible to make deferral contributions at any time during the twenty-four (24)-month period ending on the date he or she again becomes an Eligible Employee. In addition, if an Eligible Employee is or was eligible to participate in another plan that is aggregated with the elective deferral portion of the Plan under Code Section 409A, participation in such plan shall be treated as participation in the Plan for purposes of determining whether the Eligible Employee is treated as newly eligible under the Plan.  Except in the case of the first Plan Year in which an Eligible Employee is eligible to participate in the Plan, including a former Eligible Employee who is treated as newly eligible to make deferrals, the effective date of elections to defer Base or Bonus Compensation shall be the first day of the calendar year following such election, the effective date of elections to defer Fiscal Year Compensation shall be the first day of the Fiscal Year following such election, and in the case of an election to defer Performance-Based Compensation, such election shall be effective with respect to Performance-Based Compensation payable after the end of the applicable performance period.

2.16   "**Eligible Employee**" means an employee of the Employer selected by the Employer for participation in the Plan.

2.17   "**Employer**" means the Plan Sponsor and any other entity which is authorized by the Plan Sponsor to participate in and, in fact, does adopt the Plan.

2.18   "**ERISA**" means the Employee Retirement Income Security Act of 1974, as amended.

4

**2.19**   **"Fiscal Year"** means the Employer's fiscal year, if other than the calendar year.

**2.20**   **"Fiscal Year Compensation"** means the Participant's actual bonus or incentive compensation earned for services performed for the Employer for the Fiscal Year, of which no amount is paid or payable during the Fiscal Year, pursuant to, among others designated by the Employer, the Micron Technology, Inc. Executive Incentive Plan, the Micron Technology, Inc. Annual Incentive Plan, and/or the Micron Technology, Inc. Incentive Pay Plan.

**2.21**   **"Micron Recoupment Policy"** means the Micron Technology, Inc. Compensation Recoupment (Clawback) Policy, as adopted by the Compensation Committee of the Board of Directors on September 25, 2023, as amended and restated from time-to-time, and any similar successor policy.

**2.22**   **"Participant"** means an Eligible Employee who commences participation in the Plan in accordance with Article 3.

5

2.23 **"Performance-Based Compensation"** means any bonus, award or other compensation paid or payable during the Fiscal Year, pursuant to, among others designated by the Employer, the Micron Technology, Inc. Executive Incentive Plan, the Micron Technology, Inc. Annual Incentive Plan, and/or the Micron Technology, Inc. Incentive Pay Plan, the amount of which, or the entitlement to which, is contingent on the satisfaction of pre-established organizational or individual performance criteria relating to a performance period of at least twelve (12) consecutive months. For such bonus or award to be performance-based with respect to a Participant's deferral election with respect to such bonus or award, the following requirements must be met: (i) the performance criteria must be established in writing no later than ninety (90) days after the beginning of the applicable "performance period"; (ii) the outcome of the performance criteria must be substantially uncertain when the criteria are established; (iii) no bonus or award, or portion of any bonus or award, that will be paid either regardless of performance, or based upon a level of performance that is substantially certain to be met at the time the criteria are established, shall be considered Performance-Based Compensation; (iv) Performance-Based Compensation shall not include payments based upon subjective performance criteria unless: (a) the subjective performance criteria are bona fide and relate to the Participant's performance, the performance of a group of employees that includes the Participant, or the performance of a business unit for which the Participant provides services (which may include the entire organization); and (b) the determination that any subjective performance criteria have been met is not made by the Participant or a family member of the Participant (as defined in Code Section 267(c) (4), applied as if the family of an individual includes the spouse of any member of the family), or a person under the effective control of the Participant or such a family member, and no amount of the compensation of the person making such determination is effectively controlled in whole or in part by the Participant or such a family member. A performance-based bonus that otherwise meets the above criteria may provide for payment regardless of satisfaction of the performance criteria upon the Participant's death, disability (defined as a medically determinable physical or mental impairment resulting in the Participant's inability to perform the duties of his or her position or any substantially similar position, where such impairment can be expected to result in death or can be expected to last for a continuous period of not less than six (6) months), or a change in control event (as defined in Treasury Regulations Section 1.409A-3(i)(5)(i)). Any amount that actually becomes payable upon such events without regard to the satisfaction of the performance criteria will not be considered Performance-Based Compensation.

2.24 **"Plan"** means the unfunded plan of deferred compensation set forth herein, as adopted by the Plan Sponsor and as amended from time to time.

2.25 **"Plan Sponsor"** means Micron Technology, Inc. or any successor by merger, consolidation or otherwise.

2.26 **"Plan Year"** means the period commencing January 1 and ending on December 31.

2.27 **"Related Employer"** means the Employer and (a) any corporation that is a member of a controlled group of corporations as defined in Code Section 414(b) that includes the Employer and (b) any trade or business that is under common control as defined in Code Section 414(c) that includes the Employer.

6

**2.28** **"Separation from Service"** means the date that the Participant dies, retires or otherwise has a termination of employment with respect to all entities comprising the Related Employer. A Separation from Service does not occur if the Participant is on military leave, sick leave or other bona fide leave of absence if the period of leave does not exceed six months or such longer period during which the Participant's right to reemployment is provided by statute or contract. If the period of leave exceeds six months and the Participant's right to re-employment is not provided either by statute or contract, a Separation from Service will be deemed to have occurred on the first day following the six-month period. If the period of leave is due to any medically determinable physical or mental impairment that can be expected to result in death or can be expected to last for a continuous period of not less than six months, where the impairment causes the Participant to be unable to perform the duties of his or her position of employment or any substantially similar position of employment, a 29 -month period of absence may be substituted for the six -month period.

Whether a termination of employment has occurred is based on whether the facts and circumstances indicate that the Related Employer and the Participant reasonably anticipated that no further services would be performed after a certain date or that the level of bona fide services the Participant would perform after such date (whether as an employee or as an independent contractor) would permanently decrease to no more than 20 percent of the average level of bona fide services performed (whether as an employee or an independent contractor) over the immediately preceding 36 -month period (or the full period of services to the Related Employer if the employee has been providing services to the Related Employer for less than 36 months).

An independent contractor is considered to have experienced a Separation from Service with the Related Employer upon the expiration of the contract (or, in the case of more than one contract, all contracts) under which services are performed for the Related Employer if the expiration constitutes a good-faith and complete termination of the contractual relationship.

If a Participant provides services as both an employee and an independent contractor of the Related Employer, the Participant must separate from service both as an employee and as an independent contractor to be treated as having incurred a Separation from Service. If a Participant ceases providing services as an independent contractor and begins providing services as an employee, or ceases providing services as an employee and begins providing services as an independent contractor, the Participant will not be considered to have experienced a Separation from Service until the Participant has ceased providing services in both capacities.

If a Participant provides services both as an employee and as a member of the board of directors of a corporate Related Employer (or an analogous position with respect to a noncorporate Related Employer), the services provided as a director are not taken into account in determining whether the Participant has incurred a Separation from Service as an employee for purposes of a nonqualified deferred compensation plan in which the Participant participates as an employee that is not aggregated under Code Section 409A with any plan in which the Participant participates as a director.

7

If a Participant provides services both as an employee and as a member of the board of directors of a corporate related Employer (or an analogous position with respect to a noncorporate Related Employer), the services provided as an employee are not taken into account in determining whether the Participant has experienced a Separation from Service as a director for purposes of a nonqualified deferred compensation plan in which the Participant participates as a director that is not aggregated under Code Section 409A with any plan in which the Participant participates as an employee.

All determinations of whether a Separation from Service has occurred will be made in a manner consistent with Code Section 409A and the final regulations thereunder.

2.29    **"Specified Employee"** is an employee who on the date of his Separation from Service is a "specified employee" within the meaning given such term under Code Section 409A and the regulations thereunder applying the default criteria.

2.30    **"Specified Employee Delayed Payment Date"** means the first business day of the seventh month following the date of a Specified Employee's Separation from Service.

2.31    **"Specified Payment Date"** means a calendar year elected by the Participant to receive his or her deferrals that is after the Plan Year for which the deferrals are made.

2.32    **"Valuation Date"** means each business day of the Plan Year that the Nasdaq Global Stock Market is open.

2.33    **"Years of Service"** shall be determined in accordance with the Participant's Years of Service credited under the Micron Technology, Inc. Retirement at Micron (RAM) Plan.

### Article 3 -    PARTICIPATION

3.1    **Participation.** An Eligible Employee shall commence participation in the Plan upon the effectiveness of his first deferral election in accordance with Section 4.1.

3.2    **Termination of Participation.** The Administrator may terminate a Participant's participation in the Plan in a manner consistent with Code Section 409A. If the Employer terminates a Participant's participation before the Participant experiences a Separation from Service the Participant's vested Accounts shall be paid in accordance with the provisions of Article 9.

8

**Article 4 -       PARTICIPANT ELECTIONS**

4.1    **Deferral Agreement**. An Eligible Employee may elect during the applicable Election Period, by executing in writing or electronically a deferral agreement on form(s) approved by the Administrator, to defer the receipt of a designated percentage of Base Compensation per payroll period that is earned and payable after the effective date of such election, a designated percentage of Bonus Compensation per payroll period that is earned and payable after the effective date of such election, a designated percentage of Fiscal Year Compensation that is earned and payable after the effective date of such election and a designated percentage of Performance-Based Compensation that is payable after the effective date of such election and have such amount credited to the Participant's Account pursuant to the terms of the Plan.  The Participant shall make a separate deferral election for Base and Bonus Compensation deferrals for each Plan Year and a separate deferral election of Performance-Based Compensation and Fiscal Year Compensation for a Fiscal Year.

A new deferral election must be timely executed for each Plan Year or Fiscal Year, as applicable, during which the Eligible Employee desires to defer Compensation. An Eligible Employee who does not timely execute a deferral election shall be deemed to have elected zero deferrals of Compensation for such Plan Year or Fiscal Year, as applicable.

4.2    **Revocation/Modification of Deferral Elections**.  Except as otherwise provided in Section 9.2, a Participant may not revoke or modify his deferral agreement after the Election Period.  The Administrator in its discretion may cancel a deferral election if permitted under Code Section 409A (such as upon disability), provided that the Participant shall not be provided an election with respect to such cancellation.

4.3    **Amount of Deferrals**. An Eligible Employee is not required to make a deferral election for any Plan Year or Fiscal Year. However, if an Eligible Employee makes a deferral election, the following minimums and maximums apply. These minimums and/or maximums may be modified by the Administrator for a given Plan Year or Fiscal Year on the election forms for such Plan Year or Fiscal Year without the need of a formal plan amendment.

(a)    **Minimum Base Compensation Deferral Election**. The minimum deferral election percentage an Eligible Employee may make for a Plan Year with respect to Base Compensation is 1% of Base Compensation.

(b)    **Minimum Bonus, Fiscal Year and Performance-Based Compensation Deferral Election**. The minimum deferral election percentage an Eligible Employee may make for a Plan Year or Fiscal Year, as applicable, with respect to Bonus, Fiscal Year or Performance-Based Compensation is 1% of such Eligible Employee's bonus or incentive compensation for a Plan Year or Fiscal Year, as applicable.

(c)    **Maximum Base Compensation Deferral Election**. The maximum deferral election percentage an Eligible Employee may make for a Plan Year with respect to Base Compensation is 75% of Base Compensation.

9

(d) **Maximum Bonus, Fiscal Year and Performance-Based Compensation Deferral Election**. The maximum deferral election percentage an Eligible Employee may make for a Plan Year or Fiscal Year, as applicable, with respect to Bonus, Fiscal Year or Performance-Based Compensation is 100% of such Eligible Employee's bonus or incentive compensation for a Plan Year or Fiscal Year, as applicable.

**4.4**    **Timing of Election to Defer.** Each Eligible Employee who desires to defer Compensation otherwise payable during a Plan Year or Fiscal Year must execute a deferral agreement within the Election Period.

**4.5**    **Election of Payment Schedule and Form of Payment.** All elections of a payment schedule and a form of payment will be made in accordance with rules and procedures established by the Administrator. At the time an Eligible Employee completes a deferral agreement during the Election Period, the Eligible Employee must elect a form of payment in which to receive such deferrals in a payment schedule permitted under Section 9.3 and may elect a Specified Payment Date that occurs during the Participant's employment. If an Eligible Employee fails to elect a form of payment permitted under Section 9.3, then he shall be deemed to have elected a lump sum form of payment.

**4.6**    **No Deferrals from Severance**.  Deferral elections shall not apply to severance or other amounts payable after a Participant's Separation from Service.

## Article 5 -    EMPLOYER CONTRIBUTIONS

**5.1**    **Employer Contributions.** The Employer may, in its sole discretion, make discretionary Employer credits ("Discretionary Credits") on behalf of any Eligible Participant. In its sole         discretion, the Employer shall determine the Eligible Participants to be credited with any Discretionary Credit, the amount of any such Discretionary Credit and the vesting schedule applicable thereto (including any accelerated vesting thereof and the events of such acceleration). In addition, the Employer may permit the Participant to elect the timing and form of distribution of such Discretionary Credits, provided that any such election shall be made no later than the latest time permitted by Code Section 409A.

## Article 6 -    ACCOUNTS AND CREDITS

**6.1**    **Establishment of Account.** For accounting and computational purposes only, the Administrator will establish and maintain an Account on behalf of each Participant which will reflect the credits made pursuant to Section 6.2, distributions or withdrawals, along with the earnings, expenses, gains and losses allocated thereto, attributable to the hypothetical investments made with the amounts in the Account as provided in Article 7. The Administrator will establish and maintain such other records and accounts, as it decides in its discretion to be reasonably required or appropriate to discharge its duties under the Plan.

**6.2**    **Credits to Account.** A Participant's Account will be credited with the amount of his elective deferrals under Section 4.1 at the time the amount subject to the deferral election would otherwise have been payable to the Participant and the amount of Employer contributions treated as allocated on his behalf under Article 5.

10

## Article 7 - INVESTMENT OF CONTRIBUTIONS

**7.1**    **Investment Options.** The amount credited to each Account shall be treated as invested in the investment options selected in advance by the Administrator. The Administrator, in its sole discretion, shall be permitted to add or remove notional investment options from the Plan menu from time to time, provided that any such additions or removals of investment options shall not be effective with respect to any period prior to the effective date of such change.

**7.2**    **Investment Allocations**. A Participant's investment allocation constitutes a deemed, not actual, investment among the investment options comprising the investment menu. At no time shall a Participant have any real or beneficial ownership in any investment option included in the investment menu, nor shall the Employer or any trustee acting on its behalf have any obligation to purchase actual securities as a result of a Participant's investment allocation. A Participant's investment allocation shall be used solely for purposes of adjusting the value of a Participant's Account.

    (a) A Participant shall specify an investment allocation for each of his Accounts in accordance with procedures established by the Administrator. Except as otherwise provided by the Administrator, the following provisions of this Section 7.2 shall apply to allocations under the Plan.

        (i) Allocation among the investment options must be designated in increments of 1%. The Participant's investment allocation will become effective on the same business day or, in the case of investment allocations received after a time specified by the Administrator, the next business day.

        (ii) A Participant may change an investment allocation on any business day, both with respect to future credits to the Plan and with respect to existing Accounts, in accordance with procedures adopted by the Administrator. Changes shall become effective on the same business day or, in the case of investment allocations received after a time specified by the Administrator, the next business day, and shall be applied prospectively.

**7.3**    **Adjustment of Accounts.** The amount credited to each Account shall be adjusted for hypothetical investment earnings, expenses, gains or losses in an amount equal to the earnings, expenses, gains or losses attributable to the investment options selected by the Participant from among the investment options provided in Section 7.1. A Participant (or the Participant's Beneficiary after the death of the Participant) may, in accordance with rules and procedures established by the Administrator, select the investments from among the options provided in Section 7.1 to be used for the purpose of calculating future hypothetical investment adjustments to the Account or to future credits to the Account under Section 6.2 effective as of the Valuation Date coincident with or next following notice to the Administrator. Each Account shall be adjusted as of each Valuation Date to reflect: (a) the hypothetical investment earnings, expenses, gains and losses described above; (b) amounts credited pursuant to Section 6.2; and (c) distributions or withdrawals. In addition, each Account may be adjusted for its allocable share of the hypothetical costs and expenses associated with the maintenance of the hypothetical investments provided in Section 7.1.

11

## Article 8 - RIGHT TO BENEFITS

**8.1** **Vesting.**

(a) A Participant, at all times, has a 100% nonforfeitable interest in the amounts credited to his Account attributable to his elective deferrals made in accordance with Section 4.1.

(b) A Participant's right to the amounts credited to his Account attributable to Discretionary Credits made in accordance with Article 5, if any, shall vest at to 100% of the applicable Discretionary Credit on the date that such Participant achieves two Years of Service (each, an "Employer Contribution Vesting Date"). Upon a Separation from Service prior to an Employer Contribution Vesting Date, the Participant shall forfeit the nonvested portion of his Account. Notwithstanding the foregoing, a Participant's rights to the amounts credited to his Account attributable to Discretionary Credits made in accordance with Article 5, if any, shall vest as to 100% of the applicable Discretionary Credit in the event of such Participant's death or Disability, or upon the occurrence of a Change in Control.

**8.2** **Death; Disability.**

A Participant may designate a Beneficiary or Beneficiaries, or change any prior designation of Beneficiary or Beneficiaries in accordance with rules and procedures established by the Administrator.

A copy of the death notice or other sufficient documentation must be filed with and approved by the Administrator. If upon the death of the Participant there is, in the opinion of the Administrator, no designated Beneficiary for part or all of the Participant's vested Account, such amount will be paid to his estate (such estate shall be deemed to be the Beneficiary for purposes of the Plan) in accordance with the provisions of Article 9.

## Article 9 - DISTRIBUTION OF BENEFITS

**9.1** **Amount of Benefits.** The vested amount credited to a Participant's Account as determined under Articles 6, 7 and 8 shall determine and constitute the basis for the value of benefits payable to the Participant under the Plan.

12

Appx218

9.2 **Method and Timing of Distributions**. Except as otherwise expressly provided herein, amounts credited to a Participant's Account shall be paid to the Participant in accordance with the Participant's distribution election under Article 4. Distributions shall commence to be paid to the Participant as soon as administratively feasible following the Distribution Date, but in no event later than the time prescribed by Treas. Reg. Section 1.409A-3(d). A Participant may make a one (1) time change to his or her distribution election for a Plan Year or Fiscal Year, as applicable, to elect a later Specified Payment Date in accordance with this Section 9.2 and may make a one (1) time change to his or her distribution election for a Plan Year or Fiscal Year, as applicable, to elect a different payment schedule in accordance with this Section 9.2; provided, however, that an election to defer payment or change the form of distribution shall not take effect until at least 12 months after the date on which the election is made and shall be effective only if (i) the election is made at least twelve (12) months before the Specified Payment Date or payment schedule would otherwise commence or occur, and (ii) the Participant elects a new Specified Payment Date or payment schedule that delays the Specified Payment Date or payment schedule at least five (5) years. For purposes of this Section 9.2, a series of installment payments is always treated as a single payment and not as a series of separate payments.

9.3 **Form of Distribution**. Vested amounts credited to a Participant's Account shall, at the Participant's election specified in his deferral agreement in accordance with Article 4, be payable to the Participant in a single sum cash payment or in substantially equal annual cash installments over not less than two (2) years and not more than ten (10) years. Annual installment payments shall be calculated by dividing the Account balance by the remaining annual installments to be made.

9.4 **Payment Election Overrides.** Notwithstanding the Participant's election as to the time and form of payment, upon the Participant's death or Disability, the Participant's entire Account (including any amounts with respect to which installment payments have previously commenced) shall be paid to the Participant or his Beneficiary in a single sum cash payment.

9.5 **Change in Control.** Notwithstanding the Participant's election as to the time and form of payment, in the event of a Change in Control, the Participant's entire Account (including any amounts with respect to which installment payments have previously commenced) shall be paid to the Participant in a single sum cash payment upon the Change in Control.

A Change in Control, for purposes of the Plan, will occur upon a change in the ownership of the Plan Sponsor, a change in the effective control of the Plan Sponsor or a change in the ownership of a substantial portion of the assets of the Plan Sponsor. The Plan Sponsor, for this purpose, includes any corporation identified in this Section 9.6.

If a Participant continues to make deferrals in accordance with Article 4 after he has received a distribution due to a Change in Control, the residual amount payable to the Participant shall be paid at the time and in the form specified in the elections he makes in accordance with Article 4 or upon his death or Disability as provided in Article 8.

13

Whether a Change in Control has occurred will be determined by the Administrator in accordance with the rules and definitions set forth in this Section 9.6. A distribution to the Participant will be treated as occurring upon a Change in Control if the Plan Sponsor terminates the Plan in accordance with Section 10.2 and distributes the Participant's benefits within twelve months of a Change in Control as provided in Section 10.3.

(a) **Relevant Corporations.** To constitute a Change in Control for purposes of the Plan, the event must relate to (i) the corporation for whom the Participant is performing services at the time of the Change in Control, (ii) the corporation that is liable for the payment of the Participant's benefits under the Plan (or all corporations liable if more than one corporation is liable) but only if either the deferred compensation is attributable to the performance of services by the Participant for such corporation (or corporations) or there is a bona fide business purpose for such corporation (or corporations) to be liable for such payment and, in either case, no significant purpose of making such corporation (or corporations) liable for such payment is the avoidance of federal income tax, or (iii) a corporation that is a majority shareholder of a corporation identified in (i) or (ii), or any corporation in a chain of corporations in which each corporation is a majority shareholder of another corporation in the chain, ending in a corporation identified in (i) or (ii). A majority shareholder is defined as a shareholder owning more than fifty percent (50%) of the total fair market value and voting power of such corporation.

(b) **Stock Ownership.** Code Section 318(a) applies for purposes of determining stock ownership. Stock underlying a vested option is considered owned by the individual who owns the vested option (and the stock underlying an unvested option is not considered owned by the individual who holds the unvested option). If, however, a vested option is exercisable for stock that is not substantially vested (as defined by Treasury Regulation Section 1.83-3(b) and (j)) the stock underlying the option is not treated as owned by the individual who holds the option.

14

(c) **Change in the Ownership of a Corporation.** A change in the ownership of a corporation occurs on the date that any one person or more than one person acting as a group, acquires ownership of stock of the corporation that, together with stock held by such person or group, constitutes more than fifty percent (50%) of the total fair market value or total voting power of the stock of such corporation. If any one person or more than one person acting as a group is considered to own more than fifty percent (50%) of the total fair market value or total voting power of the stock of a corporation, the acquisition of additional stock by the same person or persons is not considered to cause a change in the ownership of the corporation (or to cause a change in the effective control of the corporation as discussed below in Section 9.6(d)). An increase in the percentage of stock owned by any one person, or persons acting as a group, as a result of a transaction in which the corporation acquires its stock in exchange for property will be treated as an acquisition of stock. Section 9.6(c) applies only when there is a transfer of stock of a corporation (or issuance of stock of a corporation) and stock in such corporation remains outstanding after the transaction. For purposes of this Section 9.6(c), persons will not be considered to be acting as a group solely because they purchase or own stock of the same corporation at the same time or as a result of a public offering. Persons will, however, be considered to be acting as a group if they are owners of a corporation that enters into a merger, consolidation, purchase or acquisition of stock, or similar business transaction with the corporation. If a person, including an entity, owns stock in both corporations that enter into a merger, consolidation, purchase or acquisition of stock, or similar transaction, such shareholder is considered to be acting as a group with other shareholders in a corporation only with respect to ownership in that corporation prior to the transaction giving rise to the change and not with respect to the ownership interest in the other corporation.

15

(d) **Change in the effective control of a corporation.** A change in the effective control of a corporation occurs on the date that either (i) any one person, or more than one person acting as a group, acquires (or has acquired during the twelve month period ending on the date of the most recent acquisition by such person or persons) ownership of stock of the corporation possessing thirty percent (30%) or more of the total voting power of the stock of such corporation, or (ii) a majority of members of the corporation's board of directors is replaced during any twelve month period by directors whose appointment or election is not endorsed by a majority of the members of the corporation's board of directors prior to the date of the appointment or election, provided that for purposes of this paragraph (ii), the term corporation refers solely to the relevant corporation identified in Section 9.6(a) for which no other corporation is a majority shareholder for purposes of Section 9.6(a). In the absence of an event described in Section 9.6(d)(i) or (ii), a change in the effective control of a corporation will not have occurred. A change in effective control may also occur in any transaction in which either of the two corporations involved in the transaction has a change in the ownership of such corporation as described in Section 9.6(c) or a change in the ownership of a substantial portion of the assets of such corporation as described in Section 9.6(e). If any one person, or more than one person acting as a group, is considered to effectively control a corporation within the meaning of this Section 9.6(d), the acquisition of additional control of the corporation by the same person or persons is not considered to cause a change in the effective control of the corporation or to cause a change in the ownership of the corporation within the meaning of Section 9.6(c). For purposes of this Section 9.6(d), persons will or will not be considered to be acting as a group in accordance with rules similar to those set forth in Section 9.6(c) with the following exception. If a person, including an entity, owns stock in both corporations that enter into a merger, consolidation, purchase or acquisition of stock, or similar transaction, such shareholder is considered to be acting as a group with other shareholders in a corporation only with respect to the ownership in that corporation prior to the transaction giving rise to the change and not with respect to the ownership interest in the other corporation.

16

(e) **Change in the ownership of a substantial portion of a corporation's assets.** A change in the ownership of a substantial portion of a corporation's assets occurs on the date that any one person, or more than one person acting as a group (as determined in accordance with rules similar to those set forth in Section 9.6(d)), acquires (or has acquired during the twelve month period ending on the date of the most recent acquisition by such person or persons) assets from the corporation that have a total gross fair market value equal to or more than forty percent (40%) of the total gross fair market value of all of the assets of the corporation immediately prior to such acquisition or acquisitions. For this purpose, gross fair market value means the value of the assets of the corporation or the value of the assets being disposed of determined without regard to any liabilities associated with such assets. There is no Change in Control event under this Section 9.6(e) when there is a transfer to an entity that is controlled by the shareholders of the transferring corporation immediately after the transfer. A transfer of assets by a corporation is not treated as a change in ownership of such assets if the assets are transferred to (i) a shareholder of the corporation (immediately before the asset transfer) in exchange for or with respect to its stock, (ii) an entity, fifty percent (50%) or more of the total value or voting power of which is owned, directly or indirectly, by the corporation, (iii) a person, or more than one person acting as a group, that owns, directly or indirectly, fifty percent (50%) or more of the total value or voting power of all the outstanding stock of the corporation, or (iv) an entity, at least fifty (50%) of the total value or voting power of which is owned, directly or indirectly, by a person described in Section 9.6(e)(iii). For purposes of the foregoing, and except as otherwise provided, a person's status is determined immediately after the transfer of assets.

9.6    **Permissible Delays in Payment.** Distributions may be delayed beyond the date payment would otherwise occur in accordance with the provisions of Articles 8 and 9 in any of the following circumstances as long as the Employer treats all payments to similarly situated Participants on a reasonably consistent basis.

(a) The Employer may delay payment if it reasonably anticipates that its deduction with respect to such payment would be limited or eliminated by the application of Code Section 162(m). Payment must be made during the Participant's first taxable year in which the Employer reasonably anticipates, or should reasonably anticipate, that if the payment is made during such year the deduction of such payment will not be barred by the application of Code Section 162(m) or during the period beginning with the Participant's Separation from Service and ending on the later of the last day of the Employer's taxable year in which the Participant separates from service or the 15th day of the third month following the Participant's Separation from Service. If a scheduled payment to a Participant is delayed in accordance with this Section 9.7(a), all scheduled payments to the Participant that could be delayed in accordance with this Section 9.7(a) will also be delayed.

(b) The Employer may also delay payment if it reasonably anticipates that the making of the payment will violate federal securities laws or other applicable laws provided payment is made at the earliest date on which the Employer reasonably anticipates that the making of the payment will not cause such violation.

17

Appx223

(c) The Employer reserves the right to amend the Plan to provide for a delay in payment upon such other events and conditions as the Secretary of the Treasury may prescribe in generally applicable guidance published in the Internal Revenue Bulletin.

**9.7**     **Permitted Acceleration of Payment.** The Employer may permit acceleration of the time or schedule of any payment or amount scheduled to be paid pursuant to a payment under the Plan provided such acceleration would be permitted by the provisions of Reg. Sec. 1.409A-3(j)(4), including the following events:

(a) **Domestic Relations Order.** A payment may be accelerated if such payment is made to an alternate payee pursuant to and following the receipt and qualification of a domestic relations order as defined in Code Section 414(p).

(b) **Compliance with Ethics Agreements and Legal Requirements.** A payment may be accelerated as may be necessary to comply with ethics agreements with the Federal government or as may be reasonably necessary to avoid the violation of Federal, state, local or foreign ethics law or conflicts of laws, in accordance with the requirements of Code Section 409A.

(c) **FICA Tax.** A payment may be accelerated to the extent required to pay the Federal Insurance Contributions Act tax imposed under Code Sections 3101, 3121(a) and 3121(v)(2) with respect to compensation deferred under the Plan (the "FICA Amount"). Additionally, a payment may be accelerated to pay the income tax on wages imposed under Code Section 3401 on the FICA Amount and to pay the additional income tax at source on wages attributable to the pyramiding Code Section 3401 wages and taxes. The total payment under this subsection (c) may not exceed the aggregate of the FICA Amount and the income tax withholding related to the FICA Amount.

(d) **Section 409A Additional Tax.** A payment may be accelerated if the Plan fails to meet the requirements of Code Section 409A; provided that such payment may not exceed the amount required to be included in income as a result of the failure to comply with the requirements of Code Section 409A.

(e) **Offset.** A payment may be accelerated in the Employer's discretion as satisfaction of a debt of the Participant to the Employer, where such debt is incurred in the ordinary course of the service relationship between the Participant and the Employer, the entire amount of the reduction in any of the Employer's taxable years does not exceed $5,000, and the reduction is made at the same time and in the same amount as the debt otherwise would have been due and collected from the Participant.

(f) **Other Events.** A payment may be accelerated in the Administrator's discretion in connection with such other events and conditions as permitted by Code Section 409A.

18

## Article 10 -   AMENDMENT AND TERMINATION

**10.1**  **Amendment by Plan Sponsor.** The Plan Sponsor reserves the right to amend the Plan (for itself and each Employer) through action of its Board of Directors. No amendment can directly or indirectly deprive any current or former Participant or Beneficiary of all or any portion of his Account which had accrued and vested prior to the amendment.

**10.2**  **Plan Termination Following Change in Control or Corporate Dissolution.** The Plan Sponsor reserves the right to terminate the Plan and distribute all amounts credited to all Participant Accounts within the 30 days preceding or the twelve months following a Change in Control as determined in accordance with the rules set forth in Section 9.6. For this purpose, the Plan will be treated as terminated only if all agreements, methods, programs and other arrangements sponsored by the Related Employer immediately after the Change in Control which are treated as a single plan under Reg. Sec. 1.409A-1(c)(2) are also terminated so that all participants under the Plan and all similar arrangements are required to receive all amounts deferred under the terminated arrangements within twelve months of the date the Plan Sponsor irrevocably takes all necessary action to terminate the arrangements. In addition, the Plan Sponsor reserves the right to terminate the Plan within twelve months of a corporate dissolution taxed under Code Section 331 or with the approval of a bankruptcy court pursuant to 11 U. S. C. Section 503(b)(1)(A) provided that amounts deferred under the Plan are included in the gross incomes of Participants in the latest of (a) the calendar year in which the termination and liquidation occurs, (b) the first calendar year in which the amount is no longer subject to a substantial risk of forfeiture, or (c) the first calendar year in which payment is administratively practicable.

**10.3**  **Other Plan Terminations.** The Plan Sponsor retains the discretion to terminate the Plan if (a) all arrangements sponsored by the Plan Sponsor that would be aggregated with any terminated arrangement under Code Section 409A and Reg. Sec. 1.409A-1(c)(2) are terminated, (b) no payments other than payments that would be payable under the terms of the arrangements if the termination had not occurred are made within twelve months of the termination of the arrangements, (c) all payments are made within twenty-four months of the date the Plan Sponsor takes all necessary action to irrevocably terminate and liquidate the arrangements, (d) the Plan Sponsor does not adopt a new arrangement that would be aggregated with any terminated arrangement under Code Section 409A and the regulations thereunder at any time within the three year period following the date of termination of the arrangement, and (e) the termination does not occur proximate to a downturn in the financial health of the Plan sponsor. The Plan Sponsor also reserves the right to amend the Plan to provide that termination of the Plan will occur under such conditions and events as may be prescribed by the Secretary of the Treasury in generally applicable guidance published in the Internal Revenue Bulletin.

## Article 11 -   THE TRUST

**11.1**  **Establishment of Trust.** The Plan Sponsor may but is not required to establish a trust to hold amounts which the Plan Sponsor may contribute from time to time to correspond to some or all amounts credited to Participants under Section 6.2. In the event that the Plan Sponsor wishes to establish a trust to provide a source of funds for the payment of Plan benefits, any such trust shall be constructed to constitute an unfunded arrangement that does not affect the status of the Plan as an unfunded plan for purposes of Title I of ERISA and the Code.

**11.2**  **Rabbi Trust.** Any trust established by the Plan Sponsor shall be between the Plan Sponsor and a trustee pursuant to a separate written agreement under which assets are held, administered and managed, subject to the claims of the Plan Sponsor's creditors in the event of the Plan Sponsor's insolvency. The trust is intended to be treated as a rabbi trust in accordance with existing guidance of the Internal Revenue Service, and the establishment of the trust shall not cause the Participant to realize current income on amounts contributed thereto. The Plan Sponsor must notify the trustee in the event of a bankruptcy or insolvency.

**11.3**  **Investment of Trust Funds.** Any amounts contributed to the trust by the Plan Sponsor shall be invested by the trustee in accordance with the provisions of the trust and the instructions of the Plan Sponsor. Trust investments need not reflect the hypothetical investments selected by Participants under Section 7.1 for the purpose of adjusting Accounts and the earnings or investment results of the trust need not affect the hypothetical investment adjustments to Participant Accounts under the Plan.

## Article 12 -   PLAN ADMINISTRATION

**12.1**  **Powers and Responsibilities of the Administrator.** The Administrator has the full power and the full responsibility to administer the Plan in all of its details, subject, however, to the applicable requirements of ERISA. The Administrator's powers and responsibilities include, but are not limited to, the following:

(a) To make and enforce such rules and procedures as it deems necessary or proper for the efficient administration of the Plan;

(b) To interpret the Plan, its interpretation thereof to be final, except as provided in Section 12.2, on all persons claiming benefits under the Plan;

(c) To decide all questions concerning the Plan and the eligibility of any person to participate in the Plan;

(d) To administer the claims and review procedures specified in Section 12.2;

(e) To compute the amount of benefits which will be payable to any Participant, former Participant or Beneficiary in accordance with the provisions of the Plan;

(f) To determine the person or persons to whom such benefits will be paid;

(g) To authorize the payment of benefits;

20

Appx226

(h) To comply with the reporting and disclosure requirements of Part 1 of Subtitle B of Title I of ERISA;

(i) To appoint such agents, counsel, accountants, and consultants as may be required to assist in administering the Plan;

(j) By written instrument, to allocate and delegate its responsibilities, including the formation of an administrative committee to administer the Plan.

**12.2 Claims and Review Procedures.**

**Claims Procedure**. If any person believes he is being denied any rights or benefits under the Plan, such person may file a claim in writing with the Administrator. If any such claim is wholly or partially denied, the Administrator will notify such person of its decision in writing. Such notification will be given within 90 days (45 days in the case of a claim regarding Disability) after the claim is received by the Administrator. The Administrator may extend the period for providing the notification by 90 days (30 days in the case of a claim regarding Disability) if special circumstances require an extension of time for processing the claim and if written notice of such extension and circumstance is given to such person within the initial 90 -day period (45 day period in the case of a claim regarding Disability). If such notification is not given within such period, the claim will be considered denied as of the last day of such period and such person may request a review of his claim. Such notification will contain (i) specific reasons for the denial, (ii) specific reference to pertinent Plan provisions, (iii) a description of any additional material or information necessary for such person to perfect such claim and an explanation of why such material or information is necessary, and (iv) a description of the Plan's review procedures and the time limits applicable to such procedures, including a statement of the person's right to bring a civil action following an adverse decision on review. In addition, for a claim regarding Disability, such notification will be provided in a culturally and linguistically appropriate manner and will contain (v) a discussion of the decision, including an explanation of the basis for disagreeing with or not following: (a) the views provided by the claimant's health care or vocation professionals who treated and evaluated the claimant; (b) the views of medical or vocational experts whose advice was obtained by the plan, regardless of whether the advice was relied upon in making the benefit determination; and (c) any disability determination made by the Social Security Administration, (vi) if the adverse benefit determination is based on medical necessity, experimental treatment, or similar exclusion or limit, either an explanation of the scientific or clinical judgement for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that an explanation will be provided free of charge upon request, (vii) the specific internal rules, guidelines, protocols, standards or other similar criteria (a "Guideline") that were relied upon in making the adverse determination or a statement that such Guideline does not exist, and (viii) a statement that the claimant is entitled to receive, upon request and free of charge, reasonable access to, and copies of, all documents, records, and other information relevant to the claim for benefits.

21

**Review Procedure**. Within 60 days (180 days in the case of a claim regarding Disability) after the date on which a person receives a written notification of denial of claim (or, if written notification is not provided, within 60 days (180 days in the case of a claim regarding Disability) of the date denial is considered to have occurred), such person (or his duly authorized representative) may (i) file a written request with the Administrator for a review of his denied claim and of pertinent documents and (ii) submit written issues and comments to the Administrator. The decision on review will be made within 60 days (45 days in the case of a claim regarding Disability). The Administrator may extend the period for making the decision on review by 60 days (45 days in the case of a claim regarding Disability) if special circumstances require an extension of time for processing the request such as an election by the Administrator to hold a hearing, and if written notice of such extension and circumstances is given to such person within the initial 60-day period (45 days in the case of a claim regarding Disability). If the decision on review is not made within such period, the claim will be considered denied. In the case of a claim regarding Disability, before a final adverse benefit determination is made, the Administrator will provide the claimant, free of charge, with any new or additional evidence or rationale considered, relied upon, or generated by the plan in connection with the claim as soon as possible and sufficiently in advance of the final notice to give the claimant a reasonable opportunity to respond prior to that date.

The Administrator will notify such person of its decision in writing. Such notification will be written in a manner calculated to be understood by such person and will contain specific reasons for the decision as well as specific references to pertinent Plan provisions. The notification will explain that the person is entitled to receive, upon request and free of charge, reasonable access to and copies of all pertinent documents and has the right to bring a civil action following an adverse decision on review. In addition, for a claim regarding Disability, the notification will be provided in a culturally and linguistically appropriate manner and will contain (i) a discussion of the decision, including an explanation of the basis for disagreeing with or not following the views provided by the claimant's health care or vocation professionals that treated and evaluated the claimant; the views of medical or vocational experts whose advise was obtained by the plan, regardless of whether the advice was relied upon in making the benefit determination; and any disability determination made by the Social Security Administration, (ii) if the adverse benefit determination is based on medical necessity, experimental treatment, or similar exclusion or limit, either an explanation of the scientific or clinical judgement for the determination, applying the terms of the plan to the claimant's medical circumstances, or a statement that explanation will be provided free of charge upon request, (iii) any Guideline that was relied upon in making the adverse determination or a statement that such Guideline does not exist.

**Exhaustion of Claims Procedures and Right to Bring Legal Claim**. No action at law or equity shall be brought more than one (1) year after the Administrator's affirmation of a denial of a claim, or, if earlier, more than four (4) years after the facts or events giving rising to the claimant's allegation(s) or claim(s) first occurred.

22

**12.3** **Plan Administrative Costs.** All reasonable costs and expenses (including legal, accounting, and employee communication fees) incurred by the Administrator in administering the Plan shall be paid by the Plan to the extent not paid by the Employer.

## Article 13 -   MISCELLANEOUS

**13.1** **Unsecured General Creditor of the Employer.** Participants and their Beneficiaries, heirs, successors and assigns shall have no legal or equitable rights, interests or claims in any property or assets of the Employer. For purposes of the payment of benefits under the Plan, any and all of the Employer's assets shall be, and shall remain, the general, unpledged, unrestricted assets of the Employer. Each Employer's obligation under the Plan shall be merely that of an unfunded and unsecured promise to pay money in the future.

**13.2** **Employer's Liability.** Each Employer's liability for the payment of benefits under the Plan shall be defined only by the Plan and by the deferral elections entered into between a Participant and the Employer. An Employer shall have no obligation or liability to a Participant under the Plan except as provided by the Plan and a deferral election or agreements. An Employer shall have no liability to Participants employed by other Employers.

**13.3** **Limitation of Rights.** Neither the establishment of the Plan, nor any amendment thereof, nor the creation of any fund or account, nor the payment of any benefits, will be construed as giving to the Participant or any other person any legal or equitable right against the Employer, the Plan or the Administrator, except as provided herein; and in no event will the terms of employment or service of the Participant be modified or in any way affected hereby.

**13.4** **Anti-Assignment.** Except as may be necessary to fulfill a domestic relations order within the meaning of Code Section 414(p), none of the benefits or rights of a Participant or any Beneficiary of a Participant shall be subject to the claim of any creditor. In particular, to the fullest extent permitted by law, all such benefits and rights shall be free from attachment, garnishment, or any other legal or equitable process available to any creditor of the Participant and his or her Beneficiary. Neither the Participant nor his or her Beneficiary shall have the right to alienate, anticipate, commute, pledge, encumber, or assign any of the payments which he or she may expect to receive, contingently or otherwise, under the Plan, except the right to designate a Beneficiary to receive death benefits provided hereunder. Notwithstanding the preceding, the benefit payable from a Participant's Account may be reduced, at the discretion of the administrator, to satisfy any debt or liability to the Employer.

23

**13.5    Facility of Payment.** If the Administrator determines, on the basis of medical reports or other evidence satisfactory to the Administrator, that the recipient of any benefit payments under the Plan is incapable of handling his affairs by reason of minority, illness, infirmity or other incapacity, the Administrator may direct the Employer to disburse such payments to a person or institution designated by a court which has jurisdiction over such recipient or a person or institution otherwise having the legal authority under State law for the care and control of such recipient. The receipt by such person or institution of any such payments therefore, and any such payment to the extent thereof, shall discharge the liability of the Employer, the Plan and the Administrator for the payment of benefits hereunder to such recipient.

**13.6    Notices.** Any notice or other communication to the Employer or Administrator in connection with the Plan shall be deemed delivered in writing if addressed to the Plan Sponsor at the following address: 8000 South Federal Way, Boise, ID 83707, and if either actually delivered at said address or, in the case or a letter, 5 business days shall have elapsed after the same shall have been deposited in the United States mails, first-class postage prepaid and registered or certified.

**13.7    Tax Withholding.** If the Employer concludes that tax is owing with respect to any deferral or payment hereunder, the Employer shall withhold such amounts from any payments due the Participant or from amounts deferred, as permitted by law, or otherwise make appropriate arrangements with the Participant or his Beneficiary for satisfaction of such obligation. Tax, for purposes of this Section 13.7 means any federal, state, local or any other governmental income tax, employment or payroll tax, excise tax, or any other tax or assessment owing with respect to amounts deferred, any earnings thereon, and any payments made to Participants under the Plan.

**13.8    Indemnification.**

(a)    Each Indemnitee (as defined in Section 13.8(e)) shall be indemnified and held harmless by the Employer for all actions taken by him and for all failures to take action (regardless of the date of any such action or failure to take action), to the fullest extent permitted by the law of the jurisdiction in which the Employer is incorporated, against all expense, liability, and loss (including, without limitation, attorneys' fees, judgments, fines, taxes, penalties, and amounts paid or to be paid in settlement) reasonably incurred or suffered by the Indemnitee in connection with any Proceeding (as defined in Subsection (e)). No indemnification pursuant to this Section shall be made, however, in any case where (1) the act or failure to act giving rise to the claim for indemnification is determined by a court to have constituted willful misconduct or recklessness or (2) there is a settlement to which the Employer does not consent.

24

(b) The right to indemnification provided in this Section shall include the right to have the expenses incurred by the Indemnitee in defending any Proceeding paid by the Employer in advance of the final disposition of the Proceeding, to the fullest extent permitted by the law of the jurisdiction in which the Employer is incorporated; provided that, if such law requires, the payment of such expenses incurred by the Indemnitee in advance of the final disposition of a Proceeding shall be made only on delivery to the Employer of an undertaking, by or on behalf of the Indemnitee, to repay all amounts so advanced without interest if it shall ultimately be determined that the Indemnitee is not entitled to be indemnified under this Section or otherwise.

(c) Indemnification pursuant to this Section shall continue as to an Indemnitee who has ceased to be such and shall inure to the benefit of his heirs, executors, and administrators. The Employer agrees that the undertakings made in this Section shall be binding on its successors or assigns and shall survive the termination, amendment or restatement of the Plan.

(d) The foregoing right to indemnification shall be in addition to such other rights as the Indemnitee may enjoy as a matter of law or by reason of insurance coverage of any kind and is in addition to and not in lieu of any rights to indemnification to which the Indemnitee may be entitled pursuant to the by-laws of the Employer.

(e) For the purposes of this Section, the following definitions shall apply:

    (i) "Indemnitee" shall mean each person serving as an Administrator (or any other person who is an employee, director, or officer of the Employer) who was or is a party to, or is threatened to be made a party to, or is otherwise involved in, any Proceeding, by reason of the fact that he is or was performing administrative functions under the Plan.

    (ii) "Proceeding" shall mean any threatened, pending, or completed action, suit, or proceeding (including, without limitation, an action, suit, or proceeding by or in the right of the Employer), whether civil, criminal, administrative, investigative, or through arbitration.

**13.9**   **Successors.** The provisions of the Plan shall bind and inure to the benefit of the Plan Sponsor, the Employer and their successors and assigns and the Participant and the Participant's designated Beneficiaries.

**13.10**   **Disclaimer.** It is the Plan Sponsor's intention that the Plan comply with the requirements of Code Section 409A. Neither the Plan Sponsor nor the Employer shall have any liability to any Participant should any provision of the Plan fail to satisfy the requirements of Code Section 409A.

**13.11**   **Governing Law.** The Plan will be construed, administered and enforced according to the laws of Delaware.

25

**13.12** **Clawback.** Covered Compensation that is elected to be deferred under the Plan, including amounts currently deferred under the Plan (and earnings thereon) and any amounts previously deferred under the Plan and subsequently paid to Participants (and earnings thereon), shall at all times remain subject to the Micron Recoupment Policy as follows:

(a) If a Participant has timely and properly elected to defer Covered Compensation under the Plan that has become subject to recoupment or forfeiture under the Micron Recoupment Policy prior to the date such Covered Compensation would otherwise be credited as a deferral under the Plan, the Participant's deferral election with respect to such Covered Compensation will remain in full force and effect (without adjustment or proration) and will be applied to the amount of Covered Compensation that remains payable to such Participant after reduction of the amount of Covered Compensation payable in accordance with the Micron Recoupment Policy.

(b) In the event a Participant's Covered Compensation becomes subject to recoupment or forfeiture under the Micron Recoupment Policy, and all or a portion of such Covered Compensation was credited to the Participant's Account under the Plan, the Participant's Account may be reduced by forfeiting the amount of such Covered Compensation (and any earnings thereon) that remains credited to the Participant's Account under the Plan.

(c) In the event a Participant's Covered Compensation becomes subject to recoupment or forfeiture under the Micron Recoupment Policy, and all or a portion of such Covered Compensation was credited to the Participant's Account under the Plan, and all or a portion of such Covered Compensation so credited (and any earnings thereon) was subsequently distributed from the Plan to the Participant, the amount of such Covered Compensation (and any earnings thereon) so distributed from the Plan shall remain subject to the Micron Recoupment Policy. Such Covered Compensation (including earnings) so distributed shall be subject to recoupment in accordance with the Micron Recoupment Policy as though such amount was not previously credited under the Plan.

(d) In the event that a Participant's Account has been paid or has become payable to a Beneficiary or alternate payee in accordance with the operation of the Plan or in accordance with law, any amount subject to forfeiture or recoupment under subsections (b) and (c) above shall remain subject to forfeiture or recoupment in accordance with the terms of the Micron Recoupment Policy with respect to such Beneficiary or alternate payee to the maximum extent permitted by law.

(e) The provisions of this Section 13.12 are not intended to constitute an assignment of a Participant's interest under the Plan in violation of Section 13.4 of the Plan. Further, the reduction of a Participant's Account by forfeiture in accordance with this Section 13.12 is not intended to constitute an impermissible acceleration of benefits in violation of Code Section 409A or a payment to the Plan Sponsor in violation of any trust established by the Plan Sponsor under Article 11 of the Plan.

26

Effective as of October 1, 2023, except as otherwise expressly provided herein.

MICRON TECHNOLOGY, INC.

/s/ April Arnzen
By: April Arnzen
Its: Senior Vice President and Chief People Officer

27

EXHIBIT 21.1

# MICRON TECHNOLOGY, INC.
# SUBSIDIARIES OF THE REGISTRANT*

| Name | State (or Jurisdiction) in which Organized |
|------|--------------------------------------------|
| Micron Europe Limited | United Kingdom |
| Micron Japan, Ltd. | Japan |
| Micron Memory Japan, K.K. | Japan |
| Micron Memory Malaysia Sdn. Bhd. | Malaysia |
| Micron Memory Taiwan Co., Ltd. | Taiwan |
| Micron Semiconductor Asia, LLC | Delaware |
| Micron Semiconductor Asia Operations Pte. Ltd. | Singapore |
| Micron Semiconductor Asia Pte. Ltd. | Singapore |
| Micron Semiconductor Products, Inc. | Idaho |
| Micron Semiconductor (Xi'an) Co., Ltd. | China |
| Micron Technology B.V. | Netherlands |
| Micron Technology Taiwan, Inc. | Taiwan |
| S-Squared Insurance Company, Inc. | Hawaii |

* The above list of subsidiaries of Micron Technology, Inc. omitted subsidiaries which, considered in the aggregate as a single subsidiary, would not constitute a significant subsidiary as of the end of the year covered by this report.

EXHIBIT 23.1

# CONSENT OF INDEPENDENT REGISTERED PUBLIC ACCOUNTING FIRM

We hereby consent to the incorporation by reference in the Registration Statements on Form S-3 (File No. 333-249838) and Form S-8 (File Nos. 333-17073, 333-50353, 333-103341, 333-120620, 333-133667, 333-140091, 333-148357, 333-159711, 333-171717, 333-179592, 333-190010, 333-196293, 333-203467, 333-217314, 333-223874, 333-234359, 333-255794, 333-273808) of Micron Technology, Inc. of our report dated October 6, 2023 relating to the financial statements and financial statement schedule and the effectiveness of internal control over financial reporting, which appears in this Form 10-K.

/s/ PricewaterhouseCoopers LLP

San Jose, California
October 6, 2023

**EXHIBIT 31.1**

## RULE 13a-14(a) CERTIFICATION OF
## CHIEF EXECUTIVE OFFICER

I, Sanjay Mehrotra, certify that:

1. I have reviewed this Annual Report on Form 10-K of Micron Technology, Inc.;

2. Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3. Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4. The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a. Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b. Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c. Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d. Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5. The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a. All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    b. Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   October 6, 2023

/s/ Sanjay Mehrotra
Sanjay Mehrotra
President and Chief Executive Officer and Director

**EXHIBIT 31.2**

## RULE 13a-14(a) CERTIFICATION OF
## CHIEF FINANCIAL OFFICER

I, Mark Murphy, certify that:

1.  I have reviewed this Annual Report on Form 10-K of Micron Technology, Inc.;

2.  Based on my knowledge, this report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this report;

3.  Based on my knowledge, the financial statements, and other financial information included in this report, fairly present in all material respects the financial condition, results of operations, and cash flows of the registrant as of, and for, the periods presented in this report;

4.  The registrant's other certifying officer(s) and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-15(e) and 15d-15(e)) and internal control over financial reporting (as defined in Exchange Act Rules 13a-15(f) and 15d-15(f)) for the registrant and have:

    a.  Designed such disclosure controls and procedures, or caused such disclosure controls and procedures to be designed under our supervision, to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this report is being prepared;

    b.  Designed such internal control over financial reporting, or caused such internal control over financial reporting to be designed under our supervision, to provide reasonable assurance regarding the reliability of financial reporting and the preparation of financial statements for external purposes in accordance with generally accepted accounting principles;

    c.  Evaluated the effectiveness of the registrant's disclosure controls and procedures and presented in this report our conclusions about the effectiveness of the disclosure controls and procedures, as of the end of the period covered by this report based on such evaluation; and

    d.  Disclosed in this report any change in the registrant's internal control over financial reporting that occurred during the registrant's most recent fiscal quarter (the registrant's fourth fiscal quarter in the case of an annual report) that has materially affected, or is reasonably likely to materially affect, the registrant's internal control over financial reporting; and

5.  The registrant's other certifying officer(s) and I have disclosed, based on our most recent evaluation of internal control over financial reporting, to the registrant's auditors and the audit committee of the registrant's board of directors (or persons performing the equivalent functions):

    a.  All significant deficiencies and material weaknesses in the design or operation of internal control over financial reporting which are reasonably likely to adversely affect the registrant's ability to record, process, summarize, and report financial information; and

    b.  Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal control over financial reporting.

Date:   October 6, 2023                                              /s/ Mark Murphy
                                                                    _____
                                                                    Mark Murphy
                                                                    Executive Vice President and Chief Financial Officer

**EXHIBIT 32.1**

**CERTIFICATION OF CHIEF EXECUTIVE OFFICER**
**PURSUANT TO 18 U.S.C. 1350**

I, Sanjay Mehrotra, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of Micron Technology, Inc. on Form 10-K for the period ended August 31, 2023, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in the Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Micron Technology, Inc.

Date:   October 6, 2023                                    /s/ Sanjay Mehrotra
                                                            _____
                                                            Sanjay Mehrotra
                                                            President and Chief Executive Officer and Director

EXHIBIT 32.2

**CERTIFICATION OF CHIEF FINANCIAL OFFICER**
**PURSUANT TO 18 U.S.C. 1350**

I, Mark Murphy, certify, pursuant to 18 U.S.C. 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that the Annual Report of Micron Technology, Inc. on Form 10-K for the period ended August 31, 2023, fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934 and that information contained in the Annual Report on Form 10-K fairly presents, in all material respects, the financial condition and results of operations of Micron Technology, Inc.

Date:   October 6, 2023

/s/ Mark Murphy
Mark Murphy
Executive Vice President and Chief Financial Officer

**Exhibit 97.1**

**MICRON TECHNOLOGY, INC.**

**COMPENSATION RECOUPMENT (CLAWBACK) POLICY**

As Amended and Restated effective September 25, 2023

Micron Technology, Inc. (the "**Company**") is committed to strong corporate governance. As part of this commitment, the Compensation Committee (the "**Compensation Committee**") of Company's Board of Directors (the "**Board**"), having previously adopted a Compensation Recoupment (Clawback) Policy effective as of October 20, 2016, hereby amends and restates the Policy, effective as of the date specified above. This Policy is intended to further the Company's pay-for-performance philosophy and to comply with applicable law by providing for the recovery of certain executive compensation in the event of an Accounting Restatement. The capitalized terms in this Policy are defined below.

The application of the Policy to Executive Officers is not discretionary and applies without regard to whether an Executive Officer was at fault, except to the limited extent provided below.

**Persons Covered by the Policy**

This Policy is binding and enforceable against all Executive Officers.

**Administration of the Policy**

The Compensation Committee has full authority to administer this Policy. The Compensation Committee is authorized to interpret and construe this Policy and to make all determinations necessary, appropriate, or advisable for the administration of this Policy. In addition, if determined in the discretion of the Board, this Policy may be administered by the independent members of the Board or another independent committee thereof, in which case all references herein to the Compensation Committee shall be deemed references to the independent members of the Board or the other independent committee of the Board, as applicable. All determinations of the Compensation Committee and any other administrator of the Policy will be final and binding on all interested persons and will be given the maximum deference permitted by law.

**Compensation Covered by the Policy**

This Policy applies to all Incentive-Based Compensation that is Received on or after October 2, 2023, by a person (a) after such individual became an Executive Officer, (B) who was as an Executive Officer at any time during the applicable performance period for that Incentive-Based Compensation and (c) during the Covered Period ("**Clawback Eligible Incentive-Based Compensation**").

-1-

**Events Requiring Application of the Policy**

If the Company is required to prepare an accounting restatement due to the material noncompliance of the Company with any financial reporting requirement under the securities laws, including any required accounting restatement to correct an error in previously issued financial statements that is material to the previously issued financial statements, or that would result in a material misstatement if the error were corrected in the current period or left uncorrected in the current period (an "**Accounting Restatement**"); <u>AND</u>

any Executive Officer has Received Clawback Eligible Incentive-Based Compensation that exceeds the amount of Incentive-Based Compensation that otherwise would have been Received had such Incentive-Based Compensation been determined based on the restated amounts, computed without regard to any taxes paid (such compensation, the "**Excess Compensation**" (which the Nasdaq listing standards describe as erroneously awarded incentive-based compensation);

then, the Company will recover reasonably promptly the amount of such Excess Compensation in compliance with this Policy unless an exception applies under this Policy.

**Determining Excess Compensation for Certain Incentive-Based Compensation**

To determine the amount of Excess Compensation for Incentive-Based Compensation based on stock price or total shareholder return, where it is not subject to mathematical recalculation directly from the information in an Accounting Restatement:

- The amount must be based on a reasonable estimate of the effect of the Accounting Restatement on the stock price or total shareholder return upon which the Incentive-Based Compensation was Received; and

- The Company must maintain documentation of the determination of that reasonable estimate and provide such documentation to the Exchange.

**Exceptions to the Policy**

The Company must recover the Excess Compensation in accordance with this Policy except to the limited extent that the conditions set forth below are met, and the Compensation Committee has made a determination that recovery of the Excess Compensation would be impracticable:

A.   The direct expense paid to a third party to assist in enforcing this Policy would exceed the amount to be recovered. Before reaching this conclusion, the Company must make a reasonable attempt to recover such Excess Compensation, document such reasonable attempt(s) to recover, and provide that documentation to the Exchange; or

B.   Recovery would violate home country law where that law was adopted prior to November 28, 2022. Before reaching this conclusion, the Company must obtain an opinion of home country counsel, acceptable to the Exchange, that recovery would result in such a violation, and must provide such opinion to the Exchange; or

-2-

C.    Recovery would likely cause an otherwise tax-qualified retirement plan, under which benefits are broadly available to employees of the Company, to fail to meet the requirements of 26 U.S.C. 401(a)(13) or 26 U.S.C. 411(a) and regulations thereunder.

**Defined Terms in this Policy**

The capitalized terms in this Policy have the following meaning, unless clearly required otherwise by the context.

"**Accounting Restatement**" is defined in the "Events Requiring Application of the Policy" section of this Policy.

"**Accounting Restatement Determination Date**" means the earliest to occur of:

A.    The date the Board, a committee of the Board, or one or more of the officers of the Company authorized to take such action if Board action is not required, concludes, or reasonably should have concluded, that the Company is required to prepare an Accounting Restatement; and

B.    The date a court, regulator, or other legally authorized body directs the Company to prepare an Accounting Restatement.

"**Covered Period**" means the three completed fiscal years immediately preceding the Accounting Restatement Determination Date, as well as any transition period (that results from a change in the Company's fiscal year) within or immediately following those three completed fiscal years in accordance with Rule 10D-1 under the Exchange Act. The Company's obligation to recover Excess Compensation (as defined below) is not dependent on if or when the restated financial statements are filed.

"**Excess Compensation**" is defined in the "Events Requiring Application of the Policy" section of this Policy.

"**Executive Officer**" means each individual who either (a) at the time of determination is designated as an "officer" of the Company in accordance with Exchange Act Rule 16a-1(f), (b) at any time prior to the time of determination was designated as an "officer" of the Company in accordance with Exchange Act Rule 16a-1(f). Each Executive Officer must sign and return to the Company an acknowledgement (in substantially the form provided in this Policy or provided by a duly authorized representative of the Company) that the Executive Officer agrees to be bound by the terms and comply with the Policy. However, this Policy will be enforceable against each Executive Officer whether or not the Executive Officer complies with the preceding sentence.

"**Exchange**" is defined in the "Other Important Information in the Policy" section of this Policy.

"**Exchange Act**" means the Securities Exchange Act of 1934, as amended and any valid regulation or applicable guidance of general applicability thereunder.

-3-

"**Financial Reporting Measure**" means a measure that is determined and presented in accordance with the accounting principles used in preparing the Company's financial statements, and any measure that is derived wholly or in part from such measure. Stock price and total shareholder return are also Financial Reporting Measures. A Financial Reporting Measure need not be presented within the financial statements or included in a filing with the Securities and Exchange Commission.

"**Incentive-Based Compensation**" means any compensation that is granted, earned, or vested based wholly or in part upon the attainment of a Financial Reporting Measure.

The following items of compensation are not Incentive-Based Compensation under the Policy: salaries, bonuses paid solely at the discretion of the Compensation Committee or the Board that are not paid from a bonus pool that is determined by satisfying a Financial Reporting Measure, bonuses paid solely upon satisfying one or more subjective standards and/or completion of a specified employment period, non-equity incentive plan awards earned solely upon satisfying one or more strategic measures or operational measures, and equity awards for which the grant is not contingent upon achieving any Financial Reporting Measure performance goal and vesting is contingent solely upon completion of a specified employment period (e.g., time-based vesting equity awards) and/or attaining one or more non-Financial Reporting Measures.

"**Policy**" means this Compensation Recoupment (Clawback) Policy (a compensation "clawback" policy), as it may be amended from time to time.

"**Received**" means that the Financial Reporting Measure specified for earning an Incentive-Based Compensation award is attained in the relevant Company fiscal period, even if the payment or grant of the Incentive-Based Compensation occurs after the end of that fiscal period. As described above in Compensation Covered by the Policy, Incentive-Based Compensation that is Received before the Effective Date is not subject to this amended and restated Policy, although such Incentive-Based Compensation may be subject to recoupment as provided in the Company's Compensation Recoupment (Clawback) Policy adopted effective as of October 20, 2016 (that is, the Policy as in effect prior to this amendment and restatement).

-4-

**Repayment of Excess Compensation**

The Company will seek recovery of any Excess Compensation reasonably promptly and any affected Executive Officer is required to repay such Excess Compensation. Subject to applicable law, the Company may recover such Excess Compensation by requiring the Executive Officer to repay such amount to the Company by direct payment to the Company or such other means or combination of means as the Compensation Committee determines to be appropriate (which determinations need not be identical as to each Executive Officer), including but not limited to (a) seeking recovery of any gain realized on the vesting, exercise, settlement, sale, transfer, or other disposition of any equity-based awards; (b) offsetting the amount to be recovered from any compensation otherwise owed by the Company to the Executive Officer, whether earned before or after the date of the foregoing determination and whether earned pursuant to employment or under a severance, consulting or other post-employment agreement or arrangement; (c) cancelling outstanding vested or unvested equity awards; (d) requiring reimbursement of previously-paid cash Incentive-Based Compensation; and/or (e) taking any other remedial and recovery action permitted by law, as determined by the Compensation Committee, in each case, notwithstanding any Executive Officer's belief (whether legitimate or reasonably or not) that the Excess Compensation had been previously earned under applicable law and therefore not subject to recoupment. This Policy does not preclude the Company from taking any other action to enforce an Executive Officer's obligations to the Company or to discipline an Executive Officer, including (without limitation) termination of employment, institution of civil proceedings, reporting of misconduct to appropriate governmental authorities, reduction of future compensation opportunities or change in role.

This Policy is in addition to the requirements of Section 304 of the Sarbanes-Oxley Act of 2002 that are applicable to the Company's Chief Executive Officer and Chief Financial Officer and any other applicable regulatory requirements.

Notwithstanding the terms of any of the Company's organizational documents (including, but not limited to, the Company's Bylaws), any corporate policy or any contract (including, but not limited to, any indemnification agreement), the Company will not indemnify any Executive Officer or former Executive Officer against any loss of Excess Compensation. The Company will not pay for or reimburse insurance premiums for an insurance policy that covers potential recovery obligations. In the event the Company is required to recover Excess Compensation from a former Executive Officer pursuant to this Policy, the Company will be entitled to seek such recovery in order to comply with applicable law, regardless of the terms of any release of claims or separation agreement the former Executive Officer may have signed.

This Policy is intended to comply with Section 10D of the Exchange Act, Rule 10D-1 under the Exchange Act, and with the listing standards of the New York Stock Exchange (the "**Exchange**"), the trading platform on which the securities of the Company primarily are listed. This Policy will be interpreted in a manner that is consistent with the requirements of Section 10D of the Exchange Act, Rule 10D-1 under the Exchange Act and with the listing standards of the Exchange, including (but not limited to) any interpretive guidance provided by the Exchange.

-5-

**Other Important Information**

The Compensation Committee or Board may amend and/or terminate this Policy from time to time. Unless otherwise determined by the Compensation Committee, this Policy will terminate upon the Company ceasing to be a listed issuer within the meaning of Section 10D of the Exchange Act.

If any provision of this Policy or the application of any such provision to any Executive Officer shall be adjudicated to be invalid, illegal or unenforceable in any respect, such invalidity, illegality or unenforceability shall not affect any other provisions of this Policy, and the invalid, illegal or unenforceable provisions shall be deemed amended to the minimum extent necessary to render any such provision or application enforceable.

**ACKNOWLEDGEMENT**

- I acknowledge that I have received, read and understand the Micron Technology, Inc. (the "**Company**") Compensation Recoupment (Clawback) Policy, as amended and restated effective October 2, 2023 (the "**Policy**").

- I agree that the Policy applies to me, and is binding on all of my beneficiaries, heirs, executors, administrators or other legal representatives, and that the Company's right to recovery in order to comply with applicable law will apply, regardless of the terms of any release of claims or separation agreement I have signed or will sign in the future.

- I agree to be bound by and to comply with the Policy and understand that determinations of the Compensation Committee (as such term is used in the Policy) will be final and binding and will be given the maximum deference permitted by law.

- I agree that my current indemnification rights, whether in an individual agreement or the Company's organizational documents, exclude the right to be indemnified for amounts required to be recovered under the Policy.

- I agree that my failure to comply in all respects with the Policy is a basis for termination of my employment with the Company and any affiliate of the Company as well as any other appropriate discipline.

- I understand that neither the Policy, nor the application of the Policy to me, provides a basis for resignation for good reason, constructive termination or any similar concept under any applicable employment agreement or arrangement.

- I understand that if I have questions concerning the meaning or application of the Policy, it is my responsibility to seek guidance from Human Resources or my own personal advisers.

- I agree that neither this Acknowledgement nor the Policy is meant to constitute an employment contract.

Agreed and accepted:


**Executive**


‾‾
(*print name*)


‾‾
(*signature*)


‾‾
(*date*)


-7-

# Exhibit 12



# State of Idaho Labor Force And Economic Profile

Last Updated: November 2023

## State of Idaho Economic Overview



| | |
|---|---|
| Civilian Labor Force (Oct 2023) | 971,208 |
| Unemployment Rate (Oct 2023) | 3.2% |
| Population (2022) | 1,939,033 |
| Median Household Income (2021) | $63,377 |
| Per Capita Personal Income (2021) | $52,369 |
| Poverty Rate (2021) | 11.4% |

Idaho Department of Labor    labor.idaho.gov    

A proud partner of the americanjobcenter network

The Idaho Department of Labor is an equal opportunity employer and service provider. Reasonable accommodations are available upon request. Dial 711 for Idaho Relay Service.

# 1. Statewide Demographic Characteristics, 2021 5-Year ACS

| | State of Idaho | State of Idaho (%) | United States (%) |
|---|---|---|---|
| **Total Population** | 1,811,617 | 100.0% | 329,725,481 |
| **Race/Ethnicity** | | | |
| White, one race | 1,567,799 | 86.5% | 68.2% |
| Black or African American alone, not hispanic | 12,242 | 0.7% | 12.6% |
| Native American alone, not hispanic | 22,799 | 1.3% | 0.8% |
| Asian alone, not hispanic | 24,616 | 1.4% | 5.7% |
| Hispanic or Latino (of any race) | 234,561 | 12.9% | 18.4% |
| **Gender** | | | |
| Male | 912,529 | 50.4% | 49.5% |
| Female | 899,088 | 49.6% | 50.5% |
| **Age** | | | |
| Median age | 36.8 | - | 38.4 |
| Under 18 years | 458,830 | 25.3% | 22.5% |
| Over 18 years | 1,352,787 | 74.7% | 77.5% |
| 21 years and over | 1,185,197 | 65.4% | 68.3% |
| Over 65 years | 287,098 | 15.8% | 16.0% |
| **Educational Attainment  (Population 25 years and over)** | | | |
| Less than 9th grade | 39,820 | 2.2% | 3.3% |
| High school graduate (with equivalencies) | 338,282 | 18.7% | 18.2% |
| Some college, no degree | 296,583 | 16.4% | 13.4% |
| Associate's degree | 126,524 | 7.0% | 6.1% |
| Bachelor's degree | 253,762 | 14.0% | 14.7% |
| Graduate or professional degree | 132,502 | 7.3% | 9.5% |
| **Median Household Income** | $63,377 | - | $69,021 |

Source: US Census Bureau- American Community Survey 5-Year Estimates

# 2. Labor Force Growth, October 2022 to October 2023

| | Labor Force | Employment | Unemployed | Unemployment Rate |
|---|---|---|---|---|
| October 2023 | 971,208 | 939,743 | 31,465 | 3.2% |
| October 2022 | 954,969 | 928,189 | 26,780 | 2.8% |
| **YoY % Change** | 1.7% | 1.2% | 17.5% | 0.4% |

Source: Idaho Department of Labor- Local Area Unemployment Statistics (LAUS)

## 3. Seasonally-Adjusted Unemployment Rate, 2012 to October 2023



| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2023-01 | 2023-02 | 2023-03 | 2023-04 | 2023-05 | 2023-06 | 2023-07 | 2023-08 | 2023-09 | 2023-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| State of Idaho | 8.3 | 7.2 | 6.1 | 4.8 | 4.1 | 3.8 | 3.2 | 2.9 | 2.9 | 5.3 | 3.6 | 2.9 | 2.6 | 2.6 | 2.6 | 2.6 | 2.7 | 2.8 | 3 | 3.1 | 3.2 |
| United States | 8.9 | 8.1 | 7.4 | 6.2 | 5.3 | 4.9 | 4.4 | 3.9 | 3.7 | 8.1 | 5.3 | 3.4 | 3.6 | 3.5 | 3.4 | 3.7 | 3.6 | 3.5 | 3.8 | 3.8 | 3.9 |

Source: Idaho Department of Labor- Local Area Unemployment Statistics (LAUS)

## 4. Seasonally-Adjusted Labor Force and Employment, 2012 to October 2023



| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 | 2023-01 | 2023-02 | 2023-03 | 2023-04 | 2023-05 | 2023-06 | 2023-07 | 2023-08 | 2023-09 | 2023-10 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Labor Force | 765 | 769 | 771 | 780 | 795 | 815 | 834 | 857 | 882 | 899 | 917 | 964 | 958 | 960 | 961 | 963 | 964 | 965 | 967 | 969 | 971 |
| Employment | 702 | 714 | 724 | 742 | 762 | 784 | 807 | 832 | 856 | 851 | 884 | 936 | 933 | 935 | 936 | 938 | 939 | 938 | 938 | 939 | 940 |

Source: Idaho Department of Labor- Local Area Unemployment Statistics (LAUS)

## 5. Industry Covered Employment and Wages, 2012, 2021, and 2022

| Industry Sector | 2012 | | 2021 | | 2022 | |
|---|---|---|---|---|---|---|
| | Average Employment | Average Wages | Average Employment | Average Wages | Average Employment | Average Wages |
| Total Covered Wages | 605,430 | $36,690 | 790,554 | $50,718 | 807,317 | $55,134 |
| Natural Resources and Mining | 24,636 | $34,355 | 26,896 | $45,743 | 26,261 | $49,802 |
| Construction | 29,152 | $40,785 | 58,870 | $52,186 | 62,175 | $58,288 |
| Manufacturing | 56,082 | $50,908 | 70,192 | $67,003 | 72,224 | $71,093 |
| Trade,Transportation, and Utilities | 125,700 | $34,021 | 159,720 | $47,865 | 160,757 | $52,292 |
| Information | 9,825 | $44,295 | 8,771 | $73,750 | 9,627 | $80,498 |
| Financial Activities | 26,706 | $46,221 | 37,222 | $73,839 | 38,404 | $76,313 |
| Professional and Business Services | 73,810 | $44,104 | 102,395 | $65,692 | 103,724 | $73,668 |
| Education and Health Services | 138,879 | $35,367 | 175,678 | $47,000 | 180,004 | $50,562 |
| Leisure and Hospitality | 62,089 | $14,838 | 85,251 | $21,304 | 88,488 | $23,421 |
| Other Services | 15,446 | $25,705 | 20,313 | $37,326 | 20,788 | $41,890 |
| Public Administration | 43,040 | $43,877 | 45,233 | $55,074 | 44,862 | $58,985 |

Source: Idaho Department of Labor- Quarterly Census of Employment Wages (QCEW)

## 6. Top Employers, 2022

| Employer | Ownership | Employee Range |
|---|---|---|
| St. Luke's Health System | Private | 10,000+ |
| Wal-Mart | Private | 5,000+ |
| Micron Technology | Private | 5,000+ |
| Albertson's Inc. | Private | 5,000+ |
| Saint Alphonsus Health System | Private | 5,000+ |
| Boise State University | State Government | 2,500 - 4,999 |
| Battelle Energy Alliance | Private | 5,000+ |
| West Ada School District | Local Government | 2,500 - 4,999 |
| Boise School District | Local Government | 2,500 - 4,999 |
| Kootenai Health | Local Government | 2,500 - 4,999 |

NOTE: Only employers that have given the Department permission to release employment range data are listed. Source: Idaho Department of Labor- Quarterly Census of Employment Wages (QCEW)

## 7. Real Per Capita Income, 2011 to 2021



| | 2011 | 2012 | 2013 | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 | 2020 | 2021 |
|---|---|---|---|---|---|---|---|---|---|---|---|
| State of Idaho | 33,627 | 35,201 | 36,229 | 37,863 | 39,622 | 40,385 | 41,905 | 43,766 | 45,741 | 48,759 | 52,369 |
| United States | 42,783 | 44,614 | 44,894 | 47,017 | 48,891 | 49,812 | 51,811 | 54,098 | 56,047 | 59,510 | 64,143 |

## 8. Labor Force Commuting Patterns, 2020

It is estimated that 702,719 workers lived and worked in Idaho in 2020. Another 39,157 workers were employed in the State Idaho but lived outside, while 61,438 workers commuted to other States for work.



Source: US Census Bureau

## 9. Top 10 Cities Where People Who Work in the State of Idaho Live, 2020

| City of Residence | Count of All Jobs | Percentage of Total Jobs |
|---|---|---|
| Boise City | 106,867 | 14.4% |
| Meridian | 50,267 | 6.8% |
| Nampa | 42,021 | 5.7% |
| Idaho Falls | 25,900 | 3.5% |
| Caldwell | 23,202 | 3.1% |
| Pocatello | 21,370 | 2.9% |
| Twin Falls | 19,011 | 2.6% |
| Coeur d'Alene | 17,928 | 2.4% |
| Lewiston | 11,478 | 1.5% |
| Post Falls | 11,152 | 1.5% |

Note: "All Jobs" includes private and public sector jobs. It also includes a count of workers with multiple jobs. Source: US Census Bureau- Longitudinal Employer-Household Dynamics (LEHD)

Appx253

## 10. Top 10 Cities Where People Who Live in the State of Idaho Work, 2020

| City of Employment | Count of All Jobs | Percentage of Total Jobs |
|---|---|---|
| Boise City | 172,757 | 22.6% |
| Meridian | 49,721 | 6.5% |
| Idaho Falls | 43,823 | 5.7% |
| Nampa | 38,353 | 5.0% |
| Twin Falls | 28,267 | 3.7% |
| Coeur d'Alene | 27,887 | 3.6% |
| Pocatello | 24,884 | 3.3% |
| Caldwell | 17,048 | 2.2% |
| Rexburg | 11,945 | 1.6% |
| Lewiston | 11,254 | 1.5% |

Note: "All Jobs" includes private and public sector jobs. It also includes a count of workers with multiple jobs. Source: US Census Bureau- Longitudinal Employer-Household Dynamics (LEHD)

## For more Information, Contact:

#Error

— Blank Page —

# Exhibit 15



March 26, 2015

## Micron and Intel Unveil New 3D NAND Flash Memory

### *Technology Advancements Enable Three Times More Capacity[1] than Other NAND Technologies*

**NEWS HIGHLIGHTS**

- 3D NAND technology uses floating gate cells and enables the highest-density flash device ever developed-three times higher capacity[1] than other NAND die in production.
- Enables gum stick-sized SSDs with more than 3.5 terabytes (TB) of storage and standard 2.5-inch SSDs with greater than 10TB
- Innovative process architecture techniques extend Moore's Law for flash storage, bringing significant improvements in density while lowering the cost of NAND flash.

**Multimedia Elements:**

- Media Kit - Micron / Intel

**BOISE, Idaho and SANTA CLARA, Calif., March 26, 2015** - Micron Technology, Inc. (Nasdaq: MU), and Intel Corporation today revealed the availability of their 3D NAND technology, the world's highest-density flash memory. Flash is the storage technology used inside the lightest laptops, fastest data centers, and nearly every cellphone, tablet and mobile device.

This new 3D NAND technology, which was jointly developed by Intel and Micron, stacks layers of data storage cells vertically with extraordinary precision to create storage devices with three times higher capacity1 than competing NAND technologies. This enables more storage in a smaller space, bringing significant cost savings, low power usage and high performance to a range of mobile consumer devices as well as the most demanding enterprise deployments.

Planar NAND flash memory is nearing its practical scaling limits, posing significant challenges for the memory industry. 3D NAND technology is poised to make a dramatic impact by keeping flash storage solutions aligned with Moore's Law, the trajectory for continued performance gains and cost savings, driving more widespread use of flash storage.

"Micron and Intel's collaboration has created an industry-leading solid-state storage technology that offers high density, performance and efficiency and is unmatched by any flash today," said Brian Shirley, vice president of Memory Technology and Solutions at Micron Technology. "This 3D NAND technology has the potential to create fundamental market shifts. The depth of the impact that flash has had to date-from smartphones to flash-optimized supercomputing-is really just scratching the surface of what's possible."

"Intel's development efforts with Micron reflect our continued commitment to offer leading and innovative non-volatile memory technologies to the marketplace," said Rob Crooke, senior vice president and general manager, Non-Volatile Memory Solutions Group, Intel Corporation. "The significant improvements in density and cost enabled by our new 3D NAND technology innovation will accelerate solid-state storage in computing platforms."

### Innovative Process Architecture
One of the most significant aspects of this technology is in the foundational memory cell itself. Intel and Micron chose to use a floating gate cell, a universally utilized design refined through years of high-volume planar flash manufacturing. This is the first use of a floating gate cell in 3D NAND, which was a key design choice to enable greater performance and increase quality and reliability.

The new 3D NAND technology stacks flash cells vertically in 32 layers to achieve 256Gb multilevel cell (MLC) and 384Gb triple-level cell (TLC) die that fit within a standard package. These capacities can enable gum stick-sized SSDs with more than 3.5TB of storage and standard 2.5-inch SSDs with greater than 10TB. Because capacity is achieved by stacking cells vertically, the individual cell dimensions can be considerably larger. This is expected to increase both performance and endurance and make even the TLC designs well-suited for data center storage.

The key product features of this 3D NAND design include:

- **Large Capacities** -Three times the capacity of existing 3D technology[1]-up to 48GB of NAND per die-enabling three-fourths of a terabyte to fit in a single fingertip-sized package.
- **Reduced Cost per GB** - First-generation 3D NAND is architected to achieve better cost efficiencies than planar NAND.
- **Fast** - High read/write bandwidth, I/O speeds and random read performance.
- **Green** - New sleep modes enable low-power use by cutting power to inactive NAND die (even when other die in the same package are active), dropping power consumption significantly in standby mode.
- **Smart** - Innovative new features improve latency and increase endurance over previous generations, and also make system integration easier.

The 256Gb MLC version of 3D NAND is sampling with select partners today, and the 384Gb TLC design will be sampling later this spring. The fab production line has already begun initial runs, and both devices will be in full production by the fourth quarter of this year. Both companies are also developing individual lines of SSD solutions based on 3D NAND technology and expect those products to be available within the next year.

---

*Follow us online!*

**Micron**
*Take part in Micron's social conversations where we're talking all things storage and memory:*

- Innovations Blog: www.micronblogs.com
- Twitter*: www.twitter.com/micronstorage
- YouTube*: www.youtube.com/microntechnology

**Intel**
*Contribute to the SSD conversations through Intel's social channels:*

- IT Peer Network Blogs: communities.intel.com/community/itpeernetwork/blog
- Facebook*: www.facebook.com/Intel
- Twitter*: www.twitter.com/IntelSSD
- YouTube*: www.youtube.com/user/channelintel

**Micron Technology, Inc.**
Micron Technology, Inc., is a global leader in advanced semiconductor systems. Micron's broad portfolio of high-performance memory technologies-including DRAM, NAND and NOR Flash-is the basis for solid state drives, modules, multichip packages and other system solutions. Backed by more than 35 years of technology leadership, Micron's memory solutions enable the world's most innovative computing, consumer, enterprise storage, networking, mobile, embedded and automotive applications. Micron's common stock is traded on the NASDAQ under the MU symbol. To learn more about Micron Technology, Inc., visit www.micron.com

**Intel**
Intel (NASDAQ: INTC) is a world leader in computing innovation. The company designs and builds the essential technologies that serve as the foundation for the world's computing devices. As a leader in corporate responsibility and sustainability, Intel also manufactures the world's first commercially available "conflict-free" microprocessors. Additional information about Intel is available at newsroom.intel.com and blogs.intel.com, and about Intel's conflict-free efforts at conflictfree.intel.com.

--------------------------------------------------------------------------------
©2015 Micron Technology, Inc. All rights reserved. Micron and the Micron orbit logo are trademarks of Micron Technology, Inc. Intel is a trademark of Intel Corporation in the United States and other countries.
*All other trademarks are the property of their respective owners.
This document contains forward looking statements. Forward looking statements are predictions, projections and other statements about future events that are based on current expectations and assumptions and, as a result, are subject to risks and uncertainties. Many factors could cause actual results to differ materially from the forward-looking statements in this document. A detailed discussion of the factors that could affect Intel's results and plans is included in Intel's SEC filings, including the annual report on Form 10-K.

_____

[1]Capacity difference based on comparison between Micron and Intel 384 Gb TLC 3D NAND die and other industry 3D NAND TLC

James R. Batchelder (CSB # 136347)
Andrew T. Radsch (CSB # 303665)
James F. Mack (CSB # 322056)
Nancy N. Attalla (CSB # 341070)
**ROPES & GRAY LLP**
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303-2284
Telephone: (650) 617-4000
james.batchelder@ropesgray.com
andrew.radsch@ropesgray.com
james.mack@ropesgray.com
nancy.attalla@ropesgray.com

Jared Bobrow (CA State Bar No. 133712)
jbobrow@orrick.com
J. Jason Lang (CA State Bar No. 255642)
jlang@orrick.com
Diana M. Rutowski (CA State Bar No. 233878)
drutowski@orrick.com
**ORRICK, HERRINGTON & SUTCLIFFE LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650-614-7400
Facsimile: +1 650-614-7401

*Attorneys for Plaintiff and Counter-Claim Defendant YANGTZE MEMORY TECHNOLOGIES COMPANY, LTD. and Counter-Claim Defendant YANGTZE MEMORY TECHNOLOGIES, INC.*

*Attorneys for Defendant and Counter-Claim Plaintiff MICRON TECHNOLOGY, INC., and Defendant MICRON CONSUMER PRODUCTS GROUP LLC*

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

YANGTZE MEMORY TECHNOLOGIES
COMPANY, LTD.,

             Plaintiff,

    v.

MICRON TECHNOLOGY, INC., et al.,

             Defendants.

Case No. 3:23-cv-05792-RFL

**JOINT STIPULATION AND [PROPOSED] PROTECTIVE ORDER FOR LITIGATION INVOLVING PATENTS, HIGHLY SENSITIVE CONFIDENTIAL INFORMATION AND/OR TRADE SECRETS
DEMAND FOR JURY TRIAL**

Judge: Hon. Rita F. Lin

MICRON TECHNOLOGY, INC.,

             Counterclaim Plaintiff,

    v.

YANGTZE MEMORY TECHNOLOGIES
COMPANY, LTD., and YANGTZE
MEMORY TECHNOLOGIES, INC.,

             Counterclaim Defendants.

*United States District Court*
*Northern District of California*

United States District Court
Northern District of California

1.     <u>PURPOSES AND LIMITATIONS</u>

    Disclosure and discovery activity in this action are likely to involve production of confidential, proprietary, or private information for which special protection from public disclosure and from use for any purpose other than prosecuting this litigation may be warranted. Accordingly, the parties hereby stipulate to and petition the court to enter the following Stipulated Protective Order. The parties acknowledge that this Order does not confer blanket protections on all disclosures or responses to discovery and that the protection it affords from public disclosure and use extends only to the limited information or items that are entitled to confidential treatment under the applicable legal principles. The parties further acknowledge, as set forth in Section 14.4, below, that this Stipulated Protective Order does not entitle them to file confidential information under seal; Civil Local Rule 79-5 sets forth the procedures that must be followed and the standards that will be applied when a party seeks permission from the court to file material under seal.

2.     <u>DEFINITIONS</u>

    2.1     <u>Challenging Party</u>: a Party or Non-Party that challenges the designation of information or items under this Order.

    2.2     <u>"CONFIDENTIAL" Information or Items</u>: information (regardless of how it is generated, stored or maintained) or tangible things that qualify for protection under Federal Rule of Civil Procedure 26(c).

    2.3     <u>Counsel (without qualifier)</u>: Outside Counsel of Record and House Counsel (as well as their support staff).

    2.4     <u>Designating Party</u>: a Party or Non-Party that designates information or items that it produces in disclosures or in responses to discovery as "CONFIDENTIAL," or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."

    2.5     <u>Disclosure or Discovery Material</u>: all items or information, regardless of the medium or manner in which it is generated, stored, or maintained (including, among other things, testimony, transcripts, and tangible things), that are produced or generated in disclosures or responses to discovery in this matter.

2

2.6     Expert: a person with specialized knowledge or experience in a matter pertinent to the litigation who (1) has been retained by a Party or its counsel to serve as an expert witness or as a consultant in this action, (2) is not a past or current employee of a Party or of a Party's competitor, and (3) at the time of retention, is not anticipated to become an employee of a Party or of a Party's competitor.

2.7     "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" Information or Items: extremely sensitive "Confidential Information or Items," disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.8     "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items: extremely sensitive "Confidential Information or Items" representing computer code and associated comments and revision histories, formulas, engineering specifications, or schematics that define or otherwise describe in detail the algorithms or structure of software or hardware designs, disclosure of which to another Party or Non-Party would create a substantial risk of serious harm that could not be avoided by less restrictive means.

2.9     House Counsel: attorneys who are employees of a party to this action. House Counsel does not include Outside Counsel of Record or any other outside counsel.

2.10    Non-Party: any natural person, partnership, corporation, association, or other legal entity not named as a Party to this action.

2.11    Outside Counsel of Record: attorneys who are not employees of a party to this action but are retained to represent or advise a party to this action and have appeared in this action on behalf of that party or are affiliated with a law firm which has appeared on behalf of that party.

2.12    Party: any party to this action, including all of its officers, directors, employees, consultants, retained experts, and Outside Counsel of Record (and their support staffs).

2.13    Producing Party: a Party or Non-Party that produces Disclosure or Discovery Material in this action.

2.14    Professional Vendors: persons or entities that provide litigation support services (e.g., photocopying, videotaping, translating, preparing exhibits or demonstrations, and organizing,

3

storing, or retrieving data in any form or medium) and their employees and subcontractors.

2.15    Protected Material: any Disclosure or Discovery Material that is designated as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or as "HIGHLY CONFIDENTIAL – SOURCE CODE."

2.16    Receiving Party: a Party that receives Disclosure or Discovery Material from a Producing Party.

*      *      *      *

**THE FOLLOWING DEFINITIONS PERTAIN TO TECHNICAL INFORMATION**

2.17    Circuit Schematic Files: a computer file or document containing a graphical representation of an integrated circuit that shows the connections between the various components of the circuit. Circuit Schematic Files include complete hierarchical printouts (e.g., in PDF format) of schematic and logical netlist views that are used for abstract level simulation, but not for device fabrication.

2.18    HDL Source Code: a computer file or files that contain electronic hardware descriptions in a hardware description language, such as Verilog or VHDL. HDL Source Code refers only to native electronic files that are in a human readable format suitable for input to an assembler, compiler, interpreter, synthesis tool, or other translator.

2.19    Physical Design Files: a computer file or document that shows the physical arrangement of the components of the integrated circuit, also called the circuit layout. Physical Design Files are typically the final output product of integrated circuit design that is used by a foundry to fabricate an integrated circuit. Physical Design Files may include, for example, GDS (Graphic Database System), GDSII stream format, DEF (Design Exchange Format), and LEF (Library Exchange Format) files.

2.20    Process Descriptions: Documents that describe the process or recipe for forming a semiconductor.  To the extent that a document includes only a small excerpt that describes the process or recipe for forming a semiconductor, the parties will in good faith work to determine the proper designation for the document..

2.20    Source Code: computer code, scripts, assembly, binaries, object code, source code

4

listings and descriptions of source code, object code listings and descriptions of object code, and HDL Source Code, Register Transfer Level (RTL), or GDS files that describe the hardware design of any semiconductor chip.

      2.21   <u>Source Code Material</u>: all Source Code, HDL Source Code, Physical Design Files, and Process Descriptions.

3.   <u>SCOPE</u>

      The protections conferred by this Stipulation and Order cover not only Protected Material (as defined above), but also (1) any information copied or extracted from Protected Material; (2) all copies, excerpts, summaries, or compilations of Protected Material; and (3) any testimony, conversations, or presentations by Parties or their Counsel that might reveal Protected Material. However, the protections conferred by this Stipulation and Order do not cover the following information: (a) any information that is in the public domain at the time of disclosure to a Receiving Party or becomes part of the public domain after its disclosure to a Receiving Party as a result of publication not involving a violation of this Order, including becoming part of the public record through trial or otherwise; and (b) any information known to the Receiving Party prior to the disclosure or obtained by the Receiving Party after the disclosure from a source who obtained the information lawfully and under no obligation of confidentiality to the Designating Party. Any use of Protected Material at trial shall be governed by a separate agreement or order.

4.   <u>DURATION</u>

      Even after final disposition of this litigation, the confidentiality obligations imposed by this Order shall remain in effect until a Designating Party agrees otherwise in writing or a court order otherwise directs. Final disposition shall be deemed to be the later of (1) dismissal of all claims and defenses in this action, with or without prejudice; and (2) final judgment herein after the completion and exhaustion of all appeals, rehearings, remands, trials, or reviews of this action, including the time limits for filing any motions or applications for extension of time pursuant to applicable law.

5.   <u>DESIGNATING PROTECTED MATERIAL</u>

      5.1   <u>Exercise of Restraint and Care in Designating Material for Protection</u>. Each Party or Non-Party that designates information or items for protection under this Order must take care to

United States District Court
Northern District of California

1  limit any such designation to specific material that qualifies under the appropriate standards. To the

2  extent it is practical to do so, the Designating Party must designate for protection only those parts

3  of material, documents, items, or oral or written communications that qualify – so that other portions

4  of the material, documents, items, or communications for which protection is not warranted are not

5  swept unjustifiably within the ambit of this Order.

6  Mass, indiscriminate, or routinized designations are prohibited. Designations that are shown

7  to be clearly unjustified or that have been made for an improper purpose (e.g., to unnecessarily

8  encumber or retard the case development process or to impose unnecessary expenses and burdens

9  on other parties) expose the Designating Party to sanctions.

10  If it comes to a Designating Party's attention that information or items that it designated for

11  protection do not qualify for protection at all or do not qualify for the level of protection initially

12  asserted, that Designating Party must promptly notify all other parties that it is withdrawing the

13  mistaken designation.

14  5.2  <u>Manner and Timing of Designations</u>. Except as otherwise provided in this Order (see,

15  e.g., second paragraph of section 5.2(a) below), or as otherwise stipulated or ordered, Disclosure or

16  Discovery Material that qualifies for protection under this Order must be clearly so designated

17  before the material is disclosed or produced.

18  Designation in conformity with this Order requires:

19  (a) <u>for information in documentary form</u> (e.g., paper or electronic documents, but excluding

20  transcripts of depositions or other pretrial or trial proceedings), that the Producing Party affix the

21  legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or

22  "HIGHLY CONFIDENTIAL – SOURCE CODE" to each page that contains protected material,

23  except as otherwise specified herein. If only a portion or portions of the material on a page qualifies

24  for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by

25  making appropriate markings in the margins) and must specify, for each portion, the level of

26  protection being asserted.

27  A Party or Non-Party that makes original documents or materials available for inspection

28  need not designate them for protection until after the inspecting Party has indicated which material

United States District Court
Northern District of California

it would like copied and produced. During the inspection and before the designation, all of the material made available for inspection shall be deemed "HIGHLY CONFIDENTIAL – SOURCE CODE." After the inspecting Party has identified the documents it wants copied and produced, the Producing Party must determine which documents, or portions thereof, qualify for protection under this Order. Then, before producing the specified documents, the Producing Party must affix the appropriate legend ("CONFIDENTIAL," or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE) to each page that contains Protected Material. If only a portion or portions of the material on a page qualifies for protection, the Producing Party also must clearly identify the protected portion(s) (e.g., by making appropriate markings in the margins) and must specify, for each portion, the level of protection being asserted.

(b) for testimony given in deposition or in other pretrial or trial proceedings, that the Designating Party identify on the record, before the close of the deposition, hearing, or other proceeding, all protected testimony and specify the level of protection being asserted. When it is impractical to identify separately each portion of testimony that is entitled to protection and it appears that substantial portions of the testimony may qualify for protection, the Designating Party may invoke on the record (before the deposition, hearing, or other proceeding is concluded) a right to have up to 21 days to identify the specific portions of the testimony as to which protection is sought and to specify the level of protection being asserted. Only those portions of the testimony that are appropriately designated for protection within the 21 days shall be covered by the provisions of this Stipulated Protective Order. Alternatively, a Designating Party may specify, at the deposition or up to 21 days afterwards if that period is properly invoked, that the entire transcript shall be treated as "CONFIDENTIAL" or "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY."

Parties shall give the other parties notice if they reasonably expect a deposition, hearing or other proceeding to include Protected Material so that the other parties can ensure that only authorized individuals who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A) are present at those proceedings. The use of a document as an exhibit at a deposition shall not in any way affect its designation as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE."

Transcripts containing Protected Material shall have an obvious legend on the title page that the transcript contains Protected Material, and the title page shall be followed by a list of all pages (including line numbers as appropriate) that have been designated as Protected Material and the level of protection being asserted by the Designating Party. The Designating Party shall inform the court reporter of these requirements. Any transcript that is prepared before the expiration of a 21-day period for designation shall be treated during that period as if it had been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" in its entirety unless otherwise agreed. After the expiration of that period, the transcript shall be treated only as actually designated.

(c) <u>for information produced in some form other than documentary and for any other tangible items</u>, that the Producing Party affix in a prominent place on the exterior of the container or containers in which the information or item is stored the legend "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE." If only a portion or portions of the information or item warrant protection, the Producing Party, to the extent practicable, shall identify the protected portion(s) and specify the level of protection being asserted.

(d) <u>Where electronic files and documents are produced in native electronic format</u>, such electronic files and documents shall be designated for protection under this Order by providing notice to the recipient by email or by any other reasonable method for so designating Protected Material produced in electronic format. When native electronic files or documents are printed, in total or in part, for use at deposition, in a court proceeding, or for provision in printed form to an outside person pre-approved pursuant to paragraph 7.2(e), the Party printing the documents shall affix the original production number and confidentiality designation to every page of the document. No native file or document shall be printed or converted and used in this litigation for any purpose without including the original production number and confidentiality designation.

(e) All Protected Materials that are not reduced to documentary, tangible, or physical form or that cannot be conveniently designated in the manner set forth above shall be designated by the designating Party by informing the receiving Party in writing.

(f) If a document has more than one designation, the more restrictive or higher

8

United States District Court
Northern District of California

designation applies.

      5.3    <u>Inadvertent Failures to Designate</u>. If timely corrected, an inadvertent failure to designate qualified information or items does not, standing alone, waive the Designating Party's right to secure protection under this Order for such material. Upon timely correction of a designation, the Receiving Party must make reasonable efforts to assure that the material is treated in accordance with the provisions of this Order.

      5.4    <u>Productions Prior to Entry of this Order</u>. Any document produced before issuance of this Order with a designation other that those specified in this Order shall receive the same treatment as if designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" under this Order, unless and until such document is redesignated to have a different classification under this Order.

6.    <u>CHALLENGING CONFIDENTIALITY DESIGNATIONS</u>

      6.1    <u>Timing of Challenges</u>. Any Party or Non-Party may challenge a designation of confidentiality at any time. Unless a prompt challenge to a Designating Party's confidentiality designation is necessary to avoid foreseeable, substantial unfairness, unnecessary economic burdens, or a significant disruption or delay of the litigation, a Party does not waive its right to challenge a confidentiality designation by electing not to mount a challenge promptly after the original designation is disclosed.

      6.2    <u>Meet and Confer</u>. The Challenging Party shall initiate the dispute resolution process by providing written notice of each designation it is challenging and describing the basis for each challenge. To avoid ambiguity as to whether a challenge has been made, the written notice must recite that the challenge to confidentiality is being made in accordance with this specific paragraph of the Protective Order. The parties shall attempt to resolve each challenge in good faith and must begin the process by conferring directly (in voice to voice dialogue; other forms of communication are not sufficient) within 14 days of the date of service of notice. In conferring, the Challenging Party must explain the basis for its belief that the confidentiality designation was not proper and must give the Designating Party an opportunity to review the Protected Material, to reconsider the circumstances, and, if no change in designation is offered, to explain the basis for the chosen designation. A Challenging Party may proceed to the next stage of the challenge process only if it

9

has engaged in this meet and confer process first or establishes that the Designating Party is unwilling to participate in the meet and confer process in a timely manner.

6.3    <u>Judicial Intervention</u>. If the Parties cannot resolve a challenge without court intervention, the Designating Party shall file and serve a motion to retain confidentiality under Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) within 21 days of the initial notice of challenge or within 14 days of the parties agreeing that the meet and confer process will not resolve their dispute, whichever is earlier.[1] Each such motion must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed in the preceding paragraph. Failure by the Designating Party to make such a motion including the required declaration within 21 days (or 14 days, if applicable) shall automatically waive the confidentiality designation for each challenged designation. In addition, the Challenging Party may file a motion challenging a confidentiality designation at any time if there is good cause for doing so, including a challenge to the designation of a deposition transcript or any portions thereof. Any motion brought pursuant to this provision must be accompanied by a competent declaration affirming that the movant has complied with the meet and confer requirements imposed by the preceding paragraph.

The burden of persuasion in any such challenge proceeding shall be on the Designating Party. Frivolous challenges and those made for an improper purpose (e.g., to harass or impose unnecessary expenses and burdens on other parties) may expose the Challenging Party to sanctions. Unless the Designating Party has waived the confidentiality designation by failing to file a motion to retain confidentiality as described above, all parties shall continue to afford the material in question the level of protection to which it is entitled under the Producing Party's designation until the court rules on the challenge.

7.    <u>ACCESS TO AND USE OF PROTECTED MATERIAL</u>

7.1    <u>Basic Principles</u>. A Receiving Party may use Protected Material that is disclosed or

---

[1] It may be appropriate in certain circumstances for the parties to agree to shift the burden to move on the Challenging Party after a certain number of challenges are made to avoid an abuse of the process. The burden of persuasion would remain on the Designating Party.

United States District Court
Northern District of California

produced by another Party or by a Non-Party in connection with this case only for prosecuting, defending, or attempting to settle this litigation. Such Protected Material may be disclosed only to the categories of persons and under the conditions described in this Order. When the litigation has been terminated, a Receiving Party must comply with the provisions of Section 15 below (FINAL DISPOSITION).

Protected Material must be stored and maintained by a Receiving Party at a location and in a secure manner[2] that ensures that access is limited to the persons authorized under this Order.

7.2     Disclosure of "CONFIDENTIAL" Information or Items. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may (subject to any other applicable law or regulation) disclose any information or item designated "CONFIDENTIAL" only to:

(a) the Receiving Party's Outside Counsel of Record in this action, as well as employees of said Outside Counsel of Record to whom it is reasonably necessary to disclose the information for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A;

(b) up to two (2) House Counsel of the Receiving Party or its affiliates who are members of at least one state bar in good standing (or a foreign equivalent thereof), whose functions require access to CONFIDENTIAL material. No CONFIDENTIAL material shall be disclosed to a Party employee, officer, or director until the individual has signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), thereby declaring that he or she has read and understands this Protective Order and agrees to be bound by its provisions. Such written agreement shall be retained by counsel for the receiving Party and a copy provided to the producing Party seven (7) days prior to such disclosure;

(c) Experts (i.e., not existing employees or affiliates of a Party or an affiliate of a Party) retained for the purpose of this litigation, provided that: (1) such Expert is not a current officer,

---

[2] It may be appropriate under certain circumstances to require the Receiving Party to store any electronic Protected Material in password-protected form.

United States District Court
Northern District of California

United States District Court
Northern District of California

director, or employee of a party, nor anticipates at the time of retention to become an officer, director, or employee of a Party; and (2) the Expert has completed the approval procedures of Section 7.4 and the "Acknowledgment and Agreement to Be Bound" attached as Exhibit A hereto[3];

(d) the court and its personnel;

(e) court reporters and their staff, professional jury or trial consultants, and Professional Vendors to whom disclosure is reasonably necessary for this litigation and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A);

(f) during their depositions, witnesses in the action to whom disclosure is reasonably necessary and who have signed the "Acknowledgment and Agreement to Be Bound" (Exhibit A), unless otherwise agreed by the Designating Party or ordered by the court. Pages of transcribed deposition testimony or exhibits to depositions that reveal Protected Material must be separately bound by the court reporter and may not be disclosed to anyone except as permitted under this Stipulated Protective Order.

(g) the author or recipient of a document containing the information or a custodian or other person who otherwise possessed or knew the information. However, to the extent that former engineers or employees of one party are now employees, directors, officers or agents of the opposing party in this suit, they are prohibited from receiving, or being informed regarding, any party CONFIDENTIAL technical information regardless of whether they are the author of the technical information or possessed or knew of the technical information while at the party they were formerly employed, absent prior, express approval from the former employer party.

7.3 <u>Disclosure of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" and "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items</u>. Unless otherwise ordered by the court or permitted in writing by the Designating Party, a Receiving Party may (subject to any other applicable law or regulation) disclose any information or item designated "HIGHLY

---

[3] A separate "Acknowledgment and Agreement to Be Bound" shall not be required for staff members working under the supervision of an individual signing Exhibit A. An individual signing Exhibit A, however, shall accept full responsibility for taking measures to ensure that staff members working under his or her supervision comply with terms of this Protective Order.

12

CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" only to the individuals listed in paragraphs 7.2(a) and (c-g).

7.4    Procedures for Approving or Objecting to Disclosure of "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" Information or Items to Experts.

(a) Unless otherwise ordered by the court or agreed to in writing by the Designating Party, a Party that seeks to disclose to an Expert (as defined in this Order) any information or item that has been designated "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" or any confidential technical information regardless of how such information is designated pursuant to section 7.3 first must make a written request to the Designating Party that (1) identifies the general categories of "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information that the Receiving Party seeks permission to disclose to the Expert, (2) sets forth the full name of the Expert and the city and state of his or her primary residence, (3) attaches a copy of the Expert's current resume, (4) identifies the Expert's current employer(s), business address, and title, (5) identifies each person or entity from whom the Expert has received compensation or funding for work in his or her areas of expertise or to whom the expert has provided professional services, including in connection with a litigation, at any time during the preceding five years, (6) identifies (by name and number of the case, filing date, and location of court) any litigation in connection with which the Expert has offered expert testimony, including through a declaration, report, or testimony at a deposition or trial, during the preceding five years, and (7) identifies the Expert's prior work related to NAND technology during the preceding five years.

(b) A Party that makes a request and provides the information specified in the preceding respective paragraphs may disclose the subject Protected Material to the identified Designated House Counsel or Expert unless, within 14 days of delivering the request, the Party receives a written objection from the Designating Party. Any such objection must set forth in detail the grounds on which it is based.

(c) A Party that receives a timely written objection must meet and confer with the

United States District Court
Northern District of California

Designating Party (through direct voice to voice dialogue) to try to resolve the matter by agreement within seven days of the written objection. If no agreement is reached, the Party seeking to make the disclosure to the Expert may file a motion as provided in Civil Local Rule 7 (and in compliance with Civil Local Rule 79-5, if applicable) seeking permission from the court to do so. Any such motion must describe the circumstances with specificity, set forth in detail the reasons why the disclosure to the Expert is reasonably necessary, assess the risk of harm that the disclosure would entail, and suggest any additional means that could be used to reduce that risk. In addition, any such motion must be accompanied by a competent declaration describing the parties' efforts to resolve the matter by agreement (i.e., the extent and the content of the meet and confer discussions) and setting forth the reasons advanced by the Designating Party for its refusal to approve the disclosure.

In any such proceeding, the Party opposing disclosure to the Expert shall bear the burden of proving that the risk of harm that the disclosure would entail (under the safeguards proposed) outweighs the Receiving Party's need to disclose the Protected Material to its Expert.

8.      PROSECUTION AND ACQUISITION BAR

Absent written consent from the Producing Party, any individual who receives access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" that is related to technology related to or capable of use in NAND memory or NAND memory devices, other than non-technical information such as financial or licensing information, or "HIGHLY CONFIDENTIAL – SOURCE CODE" information shall not be involved in (i) the prosecution of patents or patent applications relating to technology related to or capable of use in NAND memory or NAND memory devices, including without limitation the patents asserted in this action and any patent or application claiming priority to or otherwise related to the patents asserted in this action, before any foreign or domestic agency, including the United States Patent and Trademark Office ("the Patent Office"); or (ii) the acquisition of patents or patent rights involving technology related to or capable of use in NAND memory or NAND memory devices for the purpose of asserting them against the Producing Party. For purposes of this paragraph, "prosecution" includes directly or indirectly drafting, amending, advising, or otherwise affecting the scope or maintenance of patent claims. To avoid any doubt, "prosecution" as used in this paragraph does not include representing

a party challenging a patent, or responding to a patent challenge, before a domestic or foreign agency (including, but not limited to, a reissue protest, *ex parte* reexamination or *inter partes* reexamination). This Prosecution Bar shall begin when access to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" or "HIGHLY CONFIDENTIAL – SOURCE CODE" information is first received by the affected individual and shall end two (2) years after final termination of this action.

9.    SOURCE CODE MATERIAL

    (a)    To the extent production of Source Code Material becomes necessary in this case, a Producing Party may designate source code as "HIGHLY CONFIDENTIAL – SOURCE CODE" if it comprises or includes confidential, proprietary or trade secret source code;

    (b)    Source Code Material designated as "HIGHLY CONFIDENTIAL – SOURCE CODE" shall be subject to all of the protections afforded to "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information, and may be disclosed only to the individuals to whom "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY" information may be disclosed, as set forth in sections 7.3 and 7.4;

    (c)    Any source code, with exception of the Physical Design Files and HDL Source Code as addressed in paragraphs 9 (d-f), produced in discovery shall be made available for inspection, in a format allowing it to be reasonably reviewed and searched, during normal business hours or at other mutually agreeable times, at an office of the Producing Party's counsel or another mutually agreed upon location. The source code shall be made available for inspection on a Secure Computer in a secured room without Internet access or network access to other computers (except such network connections may be made by the Producing Party to provide access to the Producing Party's Source Code Material), and the Receiving Party shall not copy, remove, or otherwise transfer any portion of the source code onto any recordable media or recordable device.

    (d)    Access to a Party's Physical Design Files, HDL Source Code, and Circuit Schematic Files shall be provided only in the ordinary course of business in which the material is viewed and stored, in a secure room on a Secure Computer (that is, the computer may not be linked to any network, including a local area network ("LAN"), an intranet or the Internet, and all input/output

United States District Court
Northern District of California

15

Appx273

ports, such as USB, must be blocked, as necessary and appropriate to prevent and protect any unauthorized copying, transmission, removal, or other transfer of any HIGHLY CONFIDENTIAL – SOURCE CODE material outside or away from the computer on which such material is provided for inspection, except such network connections may be made by the Producing Party to provide access to the Producing Party's Source Code Material). Micron and YMTC will make their Secure Computer available for review in the United States at counsel's office in Silicon Valley or another location mutually agreed by the parties. The Producing Party may visually monitor the activities of the Receiving Party's representatives during any source code review, but only to ensure that there is no unauthorized recording, copying, or transmission of the source code;

(e)    As to the Producing Party's Secure Computer, at the Receiving Party's request, the Producing Party will provide a license to the Receiving Party's requested outside counsel and/or Experts so that the licensed individual(s) can review relevant materials. Only the licensed individual(s) are permitted to operate the Secure Computer. After the Secure Computer has been prepared and provided to the Receiving Party, the Producing Party shall thereafter provide access to the Secure Computer during regular business hours on reasonable notice provided in writing by the Receiving Party (which shall be no less than at least three-week notice for the initial inspection and one-week notice for subsequent inspections), although the Parties will be reasonable in accommodating reasonable requests to conduct inspections at other times and to accommodate a shorter notice period if possible. This written notice from the Receiving Party shall identify in writing to Micron the persons who will be conducting the inspection or will be present during the inspection. The Receiving Party will not request an unreasonable number of inspections or inspections of an unreasonable length. The Parties agree to cooperate in good faith such that maintaining Producing Party's Source Code Material at the location(s) specified herein shall not unreasonably hinder the Receiving Party's ability to efficiently and effectively conduct the prosecution or defense of this action. Source Code will be made available for inspection between the hours of 8 a.m. and 5 p.m. local time on business days (i.e., weekdays that are not Federal holidays), although the Parties will be reasonable in accommodating reasonable requests to conduct inspections at other times;

(f)    In addition, the Receiving Party shall not be permitted to bring electronic devices,

16

Appx274

United States District Court
Northern District of California

including but not limited to hard drives, cellular phones, PDAs, cameras, and voice recorders, into the location of the Secure Computer with the following exception: the Receiving Party may bring paper, writing instruments, and/or a note taking computer provided by the Producing Party into the location of the Secure Computer for the purpose of taking notes. The Producing Party shall provide a note taking computer that has installed at least Notepad++ (or other comparable note taking software) and winZIP (or other comparable software to encrypt files) and at least one open USB port to transfer the notes to a USB thumb drive.  These notes shall be limited to that which is reasonably necessary to facilitate the Receiving Party's furtherance of its claims and defenses in this case and may not be used as an attempt to circumvent the printing restrictions below. The Receiving Party must label any such notes "HIGHLY CONFIDENTIAL – SOURCE CODE" on each page.  There shall be no electronic transmission of the notes other than for review by the Receiving Party's expert witness that has completed the approval process of Section 7.4 and/or the Receiving Party's outside counsel;

(g)    The Producing Party shall install software tools that are sufficient for viewing and searching the material on the Secure Computer;

(h)    Unless otherwise agreed in advance by the Parties in writing, the Receiving Party's approved outside counsel and/or Experts shall remove all notes, documents, and all other materials from the room that may contain work product and/or attorney-client privileged information at the end of each day. The Producing Party shall not be responsible for any items left in the review room;

(i)    Other than as provided herein, the Receiving Party will not copy, remove, or otherwise transfer any HIGHLY CONFIDENTIAL – SOURCE CODE material from the Secure Computer including, without limitation, copying, removing, or transferring the material onto any other computers or peripheral equipment. The Receiving Party will not electronically transmit any HIGHLY CONFIDENTIAL – SOURCE CODE material in any way from the Producing Party's facilities or the offices of its Outside Counsel of Record. This provision does not prevent the Parties from including HIGHLY CONFIDENTIAL – SOURCE CODE material in filings with the Court made under seal;

(j)    At the request of the Receiving Party, and subject to any export control restrictions,

17

Appx275

the Producing Party shall provide paper copies ("Original Printouts") of portions of the materials on the Secure Computer that is requested by the Receiving Party and is reasonably necessary to facilitate the Receiving Party's preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial. The Producing Party shall Bates number, copy, and label "HIGHLY CONFIDENTIAL – SOURCE CODE" material on any Original Printouts. The receiving Party may print not more than 1500 pages—including no more than 30 consecutive pages. If the Producing Party objects that the portions requested to be printed are excessive and/or not reasonably necessary to any case preparation activity, the Producing Party shall make such objection known to the Receiving Party within five (5) days. The Parties shall meet and confer within two (2) business days of any such objection. If, after meeting and conferring, the Producing Party and the Receiving Party cannot resolve the objection, the objection may be jointly submitted to the Court for resolution within three (3) business days of the meet and confer. The Producing Party may challenge the amount of source code requested in hard copy form pursuant to the dispute resolution procedure set forth in Paragraph 6.3 whereby the Producing Party is the "Challenging Party" and the Receiving Party is the "Designating Party" for purposes of dispute resolution. In the absence of any objection, or upon resolution of any such dispute, the Producing Party shall provide via overnight mail one copy set of such Original Printouts to the Receiving Party within three (3) business days if printouts were made during the inspection and five (5) business days if printouts were only requested during the inspection. The Original Printouts shall constitute part of the HIGHLY CONFIDENTIAL – SOURCE CODE material produced by the Producing Party in this action;

(k)     The Receiving Party's Outside Counsel of Record may make no more than six (6) additional paper copies of any portions of the Original Printouts of HIGHLY CONFIDENTIAL – SOURCE CODE material received from a Producing Party, not including copies attached to court filings or used at depositions

(l)     The Receiving Party shall maintain a record of any individual who has inspected any portion of the source code in electronic or paper form. The Receiving Party's outside counsel of record and any person receiving a copy of any HIGHLY CONFIDENTIAL – SOURCE CODE material (excluding the Court and court personnel) shall maintain and store any paper copies of the

material at their offices in a manner that prevents duplication of or unauthorized access to the material, including, without limitation, storing the material in a locked room or cabinet at all times when it is not in use;

(m) All paper copies of HIGHLY CONFIDENTIAL – SOURCE CODE material shall be securely destroyed in a timely manner if they are no longer in use (e.g., at the conclusion of a deposition). Copies of any such material that are marked as deposition exhibits shall not be provided to the court reporter or attached to deposition transcripts; rather, the deposition record will identify the exhibit by its production numbers. If the deposition exhibit has been marked up or altered in any way by the deponent, the receiving Party shall store the exhibit in the same way paper copies of the HIGHLY CONFIDENTIAL – SOURCE CODE material are stored;

(n) Except as provided in this subparagraph, absent express written permission from the Producing Party, the Receiving Party may not create electronic images, or any other images, or make electronic copies, of the HIGHLY CONFIDENTIAL – SOURCE CODE material from any paper copy of material for use in any manner (including by way of example only, the Receiving Party may not scan the material to a PDF or photograph the material). Paper copies of the Original Printouts also may not be converted into an electronic document, and may not be scanned using optical character recognition ("OCR") technology. However, a Receiving Party may make and use images and/or electronic copies of portions of the material if reasonably necessary for court filings, expert reports, discovery responses, and other similar documents, provided that the such documents are appropriately marked under this Order, restricted to those who are entitled to have access to them as specified herein, and, if filed with the Court, filed under seal in accordance with the Court's rules, procedures and orders. To the extent portions of Source Code Material are included in such documents, either (1) the entire document will be stamped and treated as HIGHLY CONFIDENTIAL – SOURCE CODE or (2) those pages containing Source Code Material will be separately stamped and treated as HIGHLY CONFIDENTIAL – SOURCE CODE;

(o) Except for what is necessary for court filings, a Receiving Party shall not transmit HIGHLY CONFIDENTIAL – SOURCE CODE material or any summaries of such documents that are in electronic form (e.g., PDF, TIFF, Word, Excel files) outside of the Receiving Party (e.g., in e-

United States District Court
Northern District of California

19

mail traveling on the Internet) unless the documents are encrypted or transferred in a secure manner such as SFTP; and

(p)     Nothing in this Order shall be construed as a representation or admission that any Source Code Material is properly discoverable in this action, or to obligate any Party to produce any Source Code Material.

10.   PROTECTED MATERIAL SUBPOENAED OR ORDERED PRODUCED IN OTHER LITIGATION

If a Party is served with a subpoena or a court order issued in other litigation that compels disclosure of any information or items designated in this action as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" that Party must:

(a) promptly notify in writing the Designating Party. Such notification shall include a copy of the subpoena or court order;

(b) promptly notify in writing the party who caused the subpoena or order to issue in the other litigation that some or all of the material covered by the subpoena or order is subject to this Protective Order. Such notification shall include a copy of this Stipulated Protective Order; and

(c) cooperate with respect to all reasonable procedures sought to be pursued by the Designating Party whose Protected Material may be affected.[4]

If the Designating Party timely seeks a protective order, the Party served with the subpoena or court order shall not produce any information designated in this action as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE" before a determination by the court from which the subpoena or order issued, unless the Party has obtained the Designating Party's permission. The Designating Party shall bear the burden and expense of seeking protection in that court of its confidential material – and nothing in these provisions should be construed as authorizing or encouraging a Receiving Party in this

---

[4] The purpose of imposing these duties is to alert the interested parties to the existence of this Protective Order and to afford the Designating Party in this case an opportunity to try to protect its confidentiality interests in the court from which the subpoena or order issued.

20

action to disobey a lawful directive from another court.

11.    A NON-PARTY'S PROTECTED MATERIAL SOUGHT TO BE PRODUCED IN THIS LITIGATION

(a)    The terms of this Order are applicable to information produced by a Non-Party in this action and designated as "CONFIDENTIAL," "HIGHLY CONFIDENTIAL – ATTORNEYS' EYES ONLY," or "HIGHLY CONFIDENTIAL – SOURCE CODE". Such information produced by Non-Parties in connection with this litigation is protected by the remedies and relief provided by this Order. Nothing in these provisions should be construed as prohibiting a Non-Party from seeking additional protections.

(b)    In the event that a Party is required, by a valid discovery request, to produce a Non-Party's confidential information in its possession, and the Party is subject to an agreement with the Non-Party not to produce the Non-Party's confidential information, then the Party shall:

1.    promptly notify in writing the Requesting Party and the Non-Party that some or all of the information requested is subject to a confidentiality agreement with a Non-Party;

2.    promptly provide the Non-Party with a copy of the Stipulated Protective Order in this litigation, the relevant discovery request(s), and a reasonably specific description of the information requested; and

3.    make the information requested available for inspection by the Non-Party.

(c)    If the Non-Party fails to object or seek a protective order from this court within 14 days of receiving the notice and accompanying information, the Receiving Party may produce the Non-Party's confidential information responsive to the discovery request. If the Non-Party timely seeks a protective order, the Receiving Party shall not produce any information in its possession or control that is subject to the confidentiality agreement with the Non-Party before a determination by the court.[5] Absent a court order to the contrary, the Non-Party shall bear the burden and expense of seeking protection in this court of its Protected Material.

---

[5] The purpose of this provision is to alert the interested parties to the existence of confidentiality rights of a Non-Party and to afford the Non-Party an opportunity to protect its confidentiality interests in this court.

12.    <u>UNAUTHORIZED DISCLOSURE OF PROTECTED MATERIAL</u>

If a Receiving Party learns that, by inadvertence or otherwise, it has disclosed Protected Material to any person or in any circumstance not authorized under this Stipulated Protective Order, the Receiving Party must immediately (a) notify in writing the Designating Party of the unauthorized disclosures, (b) use its best efforts to retrieve all unauthorized copies of the Protected Material, (c) inform the person or persons to whom unauthorized disclosures were made of all the terms of this Order, and (d) request such person or persons to execute the "Acknowledgment and Agreement to Be Bound" that is attached hereto as Exhibit A.

13.    <u>INADVERTENT PRODUCTION OF PRIVILEGED OR OTHERWISE PROTECTED MATERIAL</u>

If information is produced in discovery that is subject to a claim of privilege or of protection as trial-preparation material, the party making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return or destroy the specified information and any copies it has and may not sequester, use or disclose the information until the claim is resolved. This includes a restriction against presenting the information to the court for a determination of the claim. This provision is not intended to modify whatever procedure may be established in an e-discovery order that provides for production without prior privilege review. Pursuant to Federal Rule of Evidence 502(d) and (e), insofar as the parties reach an agreement on the effect of disclosure of a communication or information covered by the attorney-client privilege or work product protection, the parties may incorporate their agreement in the stipulated protective order submitted to the court.

Nothing in this Order shall require production of documents, information or other material that a Party contends is protected from disclosure by the attorney-client privilege, the work product doctrine, or other privilege, doctrine, or immunity. If documents, information or other material subject to a claim of attorney-client privilege, work product doctrine, or other privilege, doctrine, or immunity is inadvertently or unintentionally produced, such production shall in no way prejudice or otherwise constitute a waiver of, or estoppel as to, any such privilege, doctrine, or immunity. Any Party that inadvertently or unintentionally produces documents, information or other material it reasonably believes are protected under the attorney-client privilege, work product doctrine, or other

22

privilege, doctrine, or immunity may obtain the return of such documents, information or other material by promptly notifying the recipient(s) in writing of the Bates number of the document and the basis of the privilege, doctrine, or immunity being asserted. Within seven (7) days of such written notice, the Producing Party shall provide a privilege log for the inadvertently or unintentionally produced documents, information or other material. Promptly upon receiving notice in writing of inadvertently or unintentionally produced documents (including the Bates number of the document and the basis of the privilege, doctrine, or immunity being asserted), the recipient(s) shall gather and return all copies of such documents, information or other material to the producing Party, except for any pages containing privileged or otherwise protected markings by the recipient(s), which pages shall instead be destroyed and certified as such to the Producing Party. Such return or confirmation of destruction shall not preclude the Receiving Party from seeking to compel production of the materials within twenty-eight (28) days of receiving the privilege log or at such other time as the Parties agree to in writing, and shall not constitute an admission by the Receiving Party that the materials were, in fact, privileged or otherwise protected in any way. The Producing Party shall retain the inadvertently produced material for submission to the Court in the event the Receiving Party moves to compel. Summaries of inadvertently produced material shall be destroyed by the Receiving Party within fourteen (14) days of receiving the privilege log if a motion to compel is not brought or, if a motion to compel is brought, within fourteen (14) days of the Court's denial of such motion.

If inadvertently produced privileged material is used during a deposition, used as an exhibit to a pleading filed with the Court, or identified for use at trial or otherwise disclosed to the Court, the Producing Party has two (2) weeks from the date of disclosure to provide notice of the inadvertent production. Notwithstanding any other provision of this Order, failure to provide notice within this two (2) week period shall constitute a waiver of any applicable privileges or immunities with respect to the inadvertently produced privileged material only, and shall not be construed as a general waiver of any applicable privilege or immunity with respect to the subject matter disclosed therein.

14.      MISCELLANEOUS

    14.1      Right to Further Relief. Nothing in this Order abridges the right of any person to seek its modification by the court in the future.

    14.2      Right to Assert Other Objections. By stipulating to the entry of this Protective Order no Party waives any right it otherwise would have to object to disclosing or producing any information or item on any ground not addressed in this Stipulated Protective Order. Similarly, no Party waives any right to object on any ground to use in evidence of any of the material covered by this Protective Order.

    14.3      Export Control. Except for Protected Material in the possession of the Court or court personnel, Protected Material received by receiving Parties must be stored and maintained at a location in the United States and in a secure manner that ensures that access is limited to the persons authorized under this Order. Disclosure of Protected Material shall be subject to all applicable laws and regulations relating to the export of technical data contained in such Protected Material, including the release of such technical data to foreign persons or nationals in the United States or elsewhere. The Producing Party shall be responsible for identifying any such controlled technical data, and the Receiving Party shall take measures necessary to ensure compliance. Notwithstanding the above, where a deponent is made available for examination outside of the United States, the Receiving Party may transport Protected Material to and from the location of the depositions. To ensure compliance with applicable United States Export Administration Regulations, the Producing Party will designate which documents are subject to this regulation by prominently affixing the label "Subject to United States Export Administration Regulation."

    14.4      Filing Protected Material. Without written permission from the Designating Party or a court order secured after appropriate notice to all interested persons, a Party may not file in the public record in this action any Protected Material. A Party that seeks to file under seal any Protected Material must comply with Civil Local Rule 79-5. Protected Material may only be filed under seal pursuant to a court order authorizing the sealing of the specific Protected Material at issue. Pursuant to Civil Local Rule 79-5, a sealing order will issue only upon a request establishing that the Protected Material at issue is privileged, protectable as a trade secret, or otherwise entitled to protection under

United States District Court
Northern District of California

the law. If a Receiving Party's request to file Protected Material under seal pursuant to Civil Local Rule 79-5 is denied by the court, then the Receiving Party may file the Protected Material in the public record pursuant to Civil Local Rule 79-5 unless otherwise instructed by the court.

14.5   The Order applies to pretrial discovery. Nothing in this Order shall be deemed to prevent the Parties from introducing any Protected Material into evidence at the trial of this action, or from using any information contained in Protected Material at the trial of this action, subject to any pretrial order issued by this Court.

14.6   Any Party knowing or believing that any other party is in violation of or intends to violate this Order and has raised the question of violation or potential violation with the opposing party and has been unable to resolve the matter by agreement may move the Court for such relief as may be appropriate in the circumstances.

14.7   Production of Protected Material by each of the Parties shall not be deemed a publication of the documents, information and material (or the contents thereof) produced so as to void or make voidable whatever claim the Parties may have as to the proprietary and confidential nature of the documents, information or other material or its contents.

14.8   Nothing in this Order shall be construed to effect an abrogation, waiver or limitation of any kind on the rights of each of the Parties to assert any applicable discovery or trial privilege.

14.9   By entering this Protective Order and limiting the disclosure of information in this action, the Court does not intend to preclude another court from finding that information may be relevant and subject to disclosure in another case. Any person or Party subject to this Protective Order who becomes subject to a motion to disclose another Party's information designated pursuant to this Protective Order shall promptly notify that Party of the motion so that the Party may have an opportunity to appear and be heard on whether that information should be disclosed.

14.10   The Parties may, by stipulation, provide for exceptions to this Protective Order. Each of the Parties shall also retain the right to file a motion with the Court (a) to modify this Order to allow disclosure of Protected Material to additional persons or entities if reasonably necessary to prepare and present this action and (b) to apply for additional protection of Protected Material.

25

15. <u>FINAL DISPOSITION</u>

Within 60 days after the final disposition of this action, as defined in paragraph 4, each Receiving Party must return all Protected Material to the Producing Party or destroy such material. As used in this subdivision, "all Protected Material" includes all copies, abstracts, compilations, summaries, and any other format reproducing or capturing any of the Protected Material. Whether the Protected Material is returned or destroyed, the Receiving Party must submit a written certification to the Producing Party (and, if not the same person or entity, to the Designating Party) by the 60-day deadline that (1) identifies (by category, where appropriate) all the Protected Material that was returned or destroyed and (2) affirms that the Receiving Party has not retained any copies, abstracts, compilations, summaries or any other format reproducing or capturing any of the Protected Material. Notwithstanding this provision, Counsel are entitled to retain an archival copy of all pleadings, motion papers, trial, deposition, and hearing transcripts, legal memoranda, correspondence, deposition and trial exhibits, expert reports, attorney work product, and consultant and expert work product, even if such materials contain Protected Material. Any such archival copies that contain or constitute Protected Material remain subject to this Protective Order as set forth in Section 4 (DURATION).

IT IS SO STIPULATED, THROUGH COUNSEL OF RECORD.

Appx284

United States District Court
Northern District of California

1    Dated:  July 16, 2024

2

3    By: */s/ Andrew T. Radsch*                   By: */s/ Diana M. Rutowski*

4    James R. Batchelder (CSB # 136347)         Jared Bobrow (State Bar No. 133712)
     Andrew T. Radsch (CSB # 303665)            jbobrow@orrick.com
5    James F. Mack (CSB # 322056)               Jason Lang (State Bar No. 255642)
     Nancy N. Attalla (CSB # 341070)            jlang@orrick.com
6    **ROPES & GRAY LLP**                        Diana M. Rutowski (State Bar No.
     1900 University Avenue, 6th Floor          233878)
7    East Palo Alto, CA 94303-2284              drutowski@orrick.com
     Telephone: (650) 617-4000                  **ORRICK, HERRINGTON &**
8    james.batchelder@ropesgray.com             **SUTCLIFFE LLP**
     andrew.radsch@ropesgray.com                1000 Marsh Road
9    james.mack@ropesgray.com                   Menlo Park, CA 94025-1015
     nancy.attalla@ropesgray.com                Telephone: +1 650 614 7400
10                                              Facsimile: +1 650 614 7401
11   Rachael Bacha (NYB # 4817938)
12   **ROPES & GRAY LLP**                        *Attorneys for Defendant and Counter-*
     1211 Avenue of the America                 *claim*
13   New York, NY 10036                         *Plaintiff MICRON TECHNOLOGY,*
     Telephone: (212) 596-9062                   *INC.,*
14   rachael.bacha@ropesgray.com                *and Defendant MICRON CONSUMER*
     Allen S. Cross (DCB# 252687)               *PRODUCTS GROUP LLC*
15   Nicole S. L. Pobre (DCB # 1735421)
16   **ROPES & GRAY LLP**
     2099 Pennsylvania Avenue,
17   N.W. Washington, D.C. 20006
     Telephone: (202) 508-4600
18   nicole.pobre@ropesgray.com

19   *Attorneys for Plaintiff and*
20   *Counterclaim*
     *Defendant YANGTZE MEMORY*
21   *TECHNOLOGIES and Counterclaim*
     *Defendant COMPANY, LTD. AND*
22   *YANGTZE*
     *MEMORY TECHNOLOGIES, INC.*
23

24   PURSUANT TO STIPULATION, IT IS SO ORDERED.

25

26   DATED: ___JULY 19, 2024___         _____

27                                      Honorable Thomas S. Hixson
                                        United States District/Magistrate Judge
28

**ATTESTATION**

I, <u>Andrew T. Radsch</u>, am the ECF user whose identification and password are being used to file this Stipulation. In compliance with Civil L.R. 5-1(i)(3), I hereby attest that all signatories to this document have concurred in this filing.

Date: July 16, 2024                          By: /s/ _Andrew T. Radsch_

EXHIBIT A

ACKNOWLEDGMENT AND AGREEMENT TO BE BOUND

I, _____ [print or type full name], of _____ [print or type full address], declare under penalty of perjury that I have read in its entirety and understand the Stipulated Protective Order that was issued by the United States District Court for the Northern District of California on [date] in the case of **Yangtze Memory Techs. Co., Ltd. v. Micron Tech., Inc., et al, Case No. 5:23-cv-05792 (N.D. Cal.)**. I agree to comply with and to be bound by all the terms of this Stipulated Protective Order and I understand and acknowledge that failure to so comply could expose me to sanctions and punishment in the nature of contempt. I solemnly promise that I will not disclose in any manner any information or item that is subject to this Stipulated Protective Order to any person or entity except in strict compliance with the provisions of this Order.

I further agree to submit to the jurisdiction of the United States District Court for the Northern District of California for the purpose of enforcing the terms of this Stipulated Protective Order, even if such enforcement proceedings occur after termination of this action.

I hereby appoint _____ [print or type full name] of _____ [print or type full address and telephone number] as my California agent for service of process in connection with this action or any proceedings related to enforcement of this Stipulated Protective Order.


Date: _____

City and State where sworn and signed: _____

Printed name: _____
             [printed name]

Signature: _____
             [signature]

United States District Court
Northern District of California

29

JARED BOBROW (STATE BAR NO. 133712)
jbobrow@orrick.com
JASON LANG (STATE BAR NO. 255642)
jlang@orrick.com
DIANA M. RUTOWSKI (STATE BAR NO. 233878)
drutowski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone:    +1 650 614 7400
Facsimile:    +1 650 614 7401

*Attorneys for Defendant and Counterclaim
Plaintiff Micron Technology, Inc., and Defendant
Micron Consumer Products Group, LLC*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

### SAN FRANCISCO DIVISION

| | |
|---|---|
| YANGTZE MEMORY TECHNOLOGIES COMPANY, LTD., | Case No. 3:23-cv-05792- RFL |
| Plaintiff, | **MICRON'S AMENDED ANSWER TO YMTC'S AMENDED CONSOLIDATED COMPLAINT AND AMENDED COUNTERCLAIMS** |
| v. | |
| MICRON TECHNOLOGY, INC., et al., | **DEMAND FOR JURY TRIAL** |
| Defendants. | Judge: Hon. Rita F. Lin |
| | **REDACTED - PUBLIC VERSION** |
| MICRON TECHNOLOGY, INC., | |
| Counterclaim Plaintiff, | |
| v. | |
| YANGTZE MEMORY TECHNOLOGIES COMPANY, LTD., and YANGTZE MEMORY TECHNOLOGIES, INC., | |
| Counterclaim Defendants. | |

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

AMENDED ANSWER TO AMENDED CONSOLIDATED
COMPLAINT AND AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

1    Defendants Micron Technology, Inc. ("Micron Technology" or "MTI") and Micron

2  Consumer Products Group LLC ("MCPG") (collectively "Defendants" or "Micron"), by and

3  through their undersigned counsel, hereby submit this Amended Answer to the First Amended

4  Consolidated Complaint ("FACC") of Yangtze Memory Technologies Company, Ltd. ("YMTC"),

5  which was filed on October 8, 2024.   Counterclaim plaintiff Micron Technology also asserts

6  counterclaims against YMTC and Yangtze Memory Technologies, Inc. ("YMTC Inc.") (YMTC

7  and YMTC Inc. collectively, "the YMTC Entities").  To the extent not expressly admitted below,

8  Defendants deny each and every allegation of the FACC.

9                              **PRELIMINARY STATEMENT**

10    1.    Micron admits that YMTC filed its original complaint in this action on November

11  9, 2023 in which it purported to assert claims under United States Patent Nos. 10,950,623,

12  11,501,822, 10,658,378, 10,937,806, 10,861,872, 11,468,957, 11,600,342, and 10,868,031

13  ("YMTC 1").  Micron further admits that YMTC filed another complaint against Micron to

14  commence a second action on July 12, 2024 in which it purported to assert claims under U.S. Patent

15  Nos. 10,879,254, 11,581,322, 10,886,291, 11,482,532, 11,145,666, 11,450,604, 10,672,711,

16  11,101,276, 11,568,941, 10,879,164, and 12,010,838 ("YMTC 2").  Micron admits that it filed a

17  Motion to Consolidate the two cases and that the Court granted the motion on August 21, 2024.

18  Micron admits that YMTC filed a Consolidated Complaint pursuant to the Court's August 21, 2024

19  Order Granting Motion to Consolidate on September 3, 2024 and that Micron filed its Answer and

20  Counterclaims to that Consolidated Complaint on September 17, 2024.  Micron further admits that

21  YMTC files this First Amended Consolidated Complaint.  Except so admitted, Micron denies the

22  allegations of paragraph 1 of the FACC.

23                              **NATURE OF THE ACTION**

24    2.    Micron is without knowledge or information sufficient to form a belief as to the truth

25  of the allegations in the fourth and sixth sentences of paragraph 2 of the FACC and, on that basis,

26  denies them.  Micron denies the remaining allegations of paragraph 2 of the FACC.

27    3.    Micron is without knowledge or information sufficient to form a belief as to the truth

28

- 1 -                    AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

of the allegations in the second sentence of paragraph 3 of the FACC and, on that basis, denies

them.  Micron denies the remaining allegations of paragraph 3 of the FACC.

4.      Micron admits that 3D NAND flash memory is a widely used form of memory, that

it is used in a variety of products and solutions, and that competition and innovation are beneficial

to society.  Except as so admitted, Micron denies the allegations of paragraph 4 of the FACC.

5.      Micron denies the allegations of paragraph 5 of the FACC.

6.      Micron admits that YMTC is asserting the "Asserted Patents" against Micron in this

lawsuit.  Except as so admitted, Micron denies the allegations of paragraph 6 of the FACC.

## THE PARTIES

7.      Admitted.

8.      Micron admits the first sentence of paragraph 8 of the FACC.  Micron further admits

that it does not contest the propriety of service of process in this action through CSC in Sacramento,

California.  Except as so admitted, Micron denies the allegations of paragraph 8 of the FACC.

9.      Micron admits that MCPG is a wholly-owned subsidiary of MTI, that it is organized

under the laws of the State of Delaware, and that it has a principal place of business at 110 Holger

Way, San Jose, California 95134.  MCPG further admits that it does not contest the propriety of

service of process in this action through CSC in Sacramento, California.  Except as so admitted,

Micron denies the allegations of paragraph 9 of the FACC.

10.     Micron denies the allegations of paragraph 10 of the FACC.

11.     Micron denies the allegations of paragraph 11 of the FACC.

## JURISDICTION AND VENUE

12.     Without admitting that YMTC has standing to maintain this lawsuit, Micron admits

the allegations of paragraph 12 of the FACC.

13.     Micron admits that the Court has personal jurisdiction over Micron for purposes of

this action.  Except as so admitted, Micron denies the allegations of paragraph 13 of the FACC.

14.     Micron denies the allegations of paragraph 14 of the FACC.

15.     Micron denies the allegations of paragraph 15 of the FACC.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 2 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx290

1    16.   Micron admits that venue for this action is proper in this judicial district.  Except as

2    so admitted, Micron denies the allegations of paragraph 16 of the FACC.

3    17.   Micron denies the allegations of paragraph 17 of the FACC.

4                          **DIVISIONAL ASSIGNMENT**

5    18.   Micron admits that, under General Order No. 44, this district maintains a district-

6    wide system of assignment for "intellectual property rights" actions.  Except as so admitted, Micron

7    denies the allegations of paragraph 18 of the FACC.

8                    **YMTC'S ALLEGED INNOVATIONS AND PATENTS**

9    19.   Micron admits that YMTC has a wholly-owned subsidiary, YMTC Inc., in this

10   judicial district.  Micron further admits that YMTC supplies 3D NAND products on a global basis,

11   including in the United States.  Micron denies the second sentence of paragraph 19 of the FACC.

12   Except as so admitted and denied, Micron lacks knowledge or information sufficient to form a

13   belief as to the truth of the allegations in paragraph 19 of the FACC and, on that basis, denies them.

14   20.   Micron denies the last sentence of paragraph 20 of the FACC.  Except as so denied,

15   Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations

16   in paragraph 20 of the FACC and, on that basis, denies them.

17   21.   Micron denies the allegations of paragraph 21 of the FACC.

18   22.   Micron denies the allegations of paragraph 22 of the FACC.

19                 **MICRON'S ACCUSED PRODUCTS AND ACTIVITIES**

20   23.   Micron admits that MTI is an industry leader in innovative computer-memory and

21   data-storage solutions, including 3D NAND.  Except as so admitted, Micron denies the allegations

22   of paragraph 23 of the FACC.

23   24.   Micron admits that MTI and/or one or more of its subsidiaries has designed, made,

24   used, sold, and/or offered for sale 96-Layer 3D NAND memory products, including products with

25   the B27A design ID.  Micron lacks knowledge or information sufficient to form a belief as to the

26   truth of the allegations in the second sentence of paragraph 24 of the FACC and, on that basis,

27   denies them.  Except as so admitted and denied, Micron denies the allegations of paragraph 24 of

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 3 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

1     the FACC.

2         25.     Micron admits that MTI and/or one or more of its subsidiaries has designed, made,

3     used, sold, and/or offered for sale 128-Layer 3D NAND memory products, including products with

4     the B37R design ID. Micron lacks knowledge or information sufficient to form a belief as to the

5     truth of the allegations in the second sentence of paragraph 25 of the FACC and, on that basis,

6     denies them. Except as so admitted and denied, Micron denies the allegations of paragraph 25 of

7     the FACC.

8         26.     Micron admits that MTI and/or one or more of its subsidiaries has designed, made,

9     used, sold, and/or offered for sale 176-Layer 3D NAND memory products, including products with

10     the N48R and B47R design IDs. Micron lacks knowledge or information sufficient to form a belief

11     as to the truth of the allegations in the second and third sentences of paragraph 26 of the FACC

12     and, on that basis, denies them. Except as so admitted and denied, Micron denies the allegations

13     of paragraph 26 of the FACC.

14         27.     Micron admits that MTI and/or one or more of its subsidiaries has designed, made,

15     used, sold, and/or offered for sale 232-Layer 3D NAND memory products, including products with

16     the B58R design ID. Micron lacks knowledge or information sufficient to form a belief as to the

17     truth of the allegations in the second sentence of paragraph 27 of the FACC and, on that basis,

18     denies them. Except as so admitted and denied, Micron denies the allegations of paragraph 27 of

19     the FACC.

20         28.     Micron admits that MTI and/or one or more of its subsidiaries has designed, made,

21     used, sold, and/or offered for sale DDR5 DRAM memory products with the Y2BM design ID.

22     Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations

23     in the second part of the first sentence of paragraph 28 of the FACC and, on that basis, denies them.

24     Except as so admitted and denied, Micron denies the allegations of paragraph 28 of the FACC.

25         29.     Micron admits that YMTC purports to call certain 3D NAND products and a DDR

26     5 DRAM product as the "Accused Memory Products." Except as so admitted, Micron denies the

27     allegations of paragraph 29 of the FACC.

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 4 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx292

30.     Micron admits that MTI and/or one or more of its subsidiaries has made, used, sold, and/or offered for sale the "Accused Memory Products."  Micron further admits that various third parties may use one or more of the "Accused Memory Products" in their own products and solutions.  Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 30 of the FACC and, on that basis, denies them.

31.     Micron admits that MTI and/or one or more of its subsidiaries has conducted research, development, and testing of the "Accused Memory Products."  Except as so admitted, Micron denies the allegations of paragraph 31 of the FACC.

32.     Micron denies the allegations of paragraph 32 of the FACC.

33.     Micron admits that MTI and/or one or more of its subsidiaries sells and/or offers to sell the Accused Memory Products.  Except as so admitted, Micron denies the allegations of paragraph 33 of the FACC.

34.     Micron admits that the micron.com website lists one or more distributors.  Except as so admitted, Micron denies the allegations of paragraph 34 of the FACC.

35.     Micron admits that MTI and/or one or more of its subsidiaries has used the Accused Memory Products and has sold and/or offered to sell the Accused Memory Products to one or more customers in a number of sectors.  Except as so admitted, Micron denies the allegations of paragraph 35 of the FACC.

36.     Micron denies the allegations of paragraph 36 of the FACC.

37.     Micron denies the allegations of paragraph 37 of the FACC.

38.     Micron denies the allegations of paragraph 38 of the FACC.

39.     Micron denies the allegations of paragraph 39 of the FACC.

**COUNT I**

40.     Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

41.     Micron admits that YMTC filed as Exhibit 1 what appears to be a copy of the '623 patent, which is entitled "3D NAND Memory Device and Method of Forming the Same."  Except

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx293

1  as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of
2  the allegations in paragraph 41 of the FACC and, on that basis, denies them.

3  42.  Micron denies the allegations of paragraph 42 of the FACC.

4  43.  Micron denies the allegations of paragraph 43 of the FACC.

5  44.  Micron denies the allegations of paragraph 44 of the FACC.

6  45.  Micron admits that it identified numerous deficiencies in YMTC's original
7  complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products
8  include or practice one or more claim limitations of the '623 patent.  Micron's motion to dismiss is
9  on file with the Court and speaks for itself.  Except as so admitted, Micron denies the allegations
10 of paragraph 45 of the FACC.

11 46.  Micron denies the allegations of paragraph 46 of the FACC.

12 47.  Micron denies the allegations of paragraph 47 of the FACC.

13 48.  Micron denies the allegations of paragraph 48 of the FACC.

14 49.  Micron denies the allegations of paragraph 49 of the FACC.

15 50.  Micron denies the allegations of paragraph 50 of the FACC.

16 **COUNT II**

17 51.  Micron incorporates by reference and realleges its responses to all the foregoing
18 paragraphs of this Answer as if fully set forth herein.

19 52.  Micron admits that YMTC filed as Exhibit 2 what appears to be a copy of the '822
20 patent, which is entitled "Non-Volatile Memory Device and Control Method."  Except as so
21 admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the
22 allegations in paragraph 52 of the FACC and, on that basis, denies them.

23 53.  Micron denies the allegations of paragraph 53 of the FACC.

24 54.  Micron denies the allegations of paragraph 54 of the FACC.

25 55.  Micron denies the allegations of paragraph 55 of the FACC.

26 56.  Micron admits that it identified numerous deficiencies in YMTC's original
27 complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 6 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

include or practice one or more claim limitations of the '822 patent.  Micron's motion to dismiss is on file with the Court and speaks for itself.  Except as so admitted, Micron denies the allegations of paragraph 56 of the FACC.

57.     Micron denies the allegations of paragraph 57 of the FACC.

58.     Micron denies the allegations of paragraph 58 of the FACC.

59.     Micron denies the allegations of paragraph 59 of the FACC.

60.     Micron denies the allegations of paragraph 60 of the FACC.

61.     Micron denies the allegations of paragraph 61 of the FACC.

## COUNT III

62.     Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

63.     Micron admits that YMTC filed as Exhibit 3 what appears to be a copy of the '378 patent, which is entitled "Through Array Contact (TAC) for Three-Dimensional Memory Devices." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 63 of the FACC and, on that basis, denies them.

64.     Micron denies the allegations of paragraph 64 of the FACC.

65.     Micron denies the allegations of paragraph 65 of the FACC.

66.     Micron denies the allegations of paragraph 66 of the FACC.

67.     Micron admits that it identified numerous deficiencies in YMTC's original complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products include or practice one or more claim limitations of the '378 patent.  Micron's motion to dismiss is on file with the Court and speaks for itself.  Except as so admitted, Micron denies the allegations of paragraph 67 of the FACC.

68.     Micron denies the allegations of paragraph 68 of the FACC.

69.     Micron denies the allegations of paragraph 69 of the FACC.

70.     Micron denies the allegations of paragraph 70 of the FACC.

71.     Micron denies the allegations of paragraph 71 of the FACC.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 7 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx295

72. Micron denies the allegations of paragraph 72 of the FACC.

73. Micron denies the allegations of paragraph 73 of the FACC.

**COUNT IV**

74. Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

75. Micron admits that YMTC filed as Exhibit 4 what appears to be a copy of the '806 patent, which is entitled "Through Array Contact (TAC) for Three-Dimensional Memory Devices." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 75 of the FACC and, on that basis, denies them.

76. Micron denies the allegations of paragraph 76 of the FACC.

77. Micron denies the allegations of paragraph 77 of the FACC.

78. Micron denies the allegations of paragraph 78 of the FACC.

79. Micron admits that it identified numerous deficiencies in YMTC's original complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products include or practice one or more claim limitations of the '806 patent. Micron's motion to dismiss is on file with the Court and speaks for itself. Except as so admitted, Micron denies the allegations of paragraph 79 of the FACC.

80. Micron denies the allegations of paragraph 80 of the FACC.

81. Micron denies the allegations of paragraph 81 of the FACC.

82. Micron denies the allegations of paragraph 82 of the FACC.

83. Micron denies the allegations of paragraph 83 of the FACC.

84. Micron denies the allegations of paragraph 84 of the FACC.

85. Micron denies the allegations of paragraph 85 of the FACC.

**COUNT V**

86. Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

87. Micron admits that YMTC filed as Exhibit 5 what appears to be a copy of the '872

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 8 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx296

patent, which is entitled "Three-Dimensional Memory Device and Method for Forming the Same." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 87 of the FACC and, on that basis, denies them.

88.    Micron denies the allegations of paragraph 88 of the FACC.

89.    Micron denies the allegations of paragraph 89 of the FACC.

90.    Micron denies the allegations of paragraph 90 of the FACC.

91.    Micron admits that it identified numerous deficiencies in YMTC's original complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products include or practice one or more claim limitations of the '872 patent. Micron's motion to dismiss is on file with the Court and speaks for itself. Except as so admitted, Micron denies the allegations of paragraph 91 of the FACC.

92.    Micron denies the allegations of paragraph 92 of the FACC.

93.    Micron denies the allegations of paragraph 93 of the FACC.

94.    Micron denies the allegations of paragraph 94 of the FACC.

95.    Micron denies the allegations of paragraph 95 of the FACC.

96.    Micron denies the allegations of paragraph 96 of the FACC.

**COUNT VI**

97.    Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

98.    Micron admits that YMTC filed as Exhibit 6 what appears to be a copy of the '957 patent, which is entitled "Architecture and Method for NAND Memory Operation." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 98 of the FACC and, on that basis, denies them.

99.    Micron denies the allegations of paragraph 99 of the FACC.

100.    Micron denies the allegations of paragraph 100 of the FACC.

101.    Micron denies the allegations of paragraph 101 of the FACC.

102.    Micron admits that it identified numerous deficiencies in YMTC's original

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 9 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

Appx297

complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products include or practice one or more claim limitations of the '957 patent. Micron's motion to dismiss is on file with the Court and speaks for itself. Except as so admitted, Micron denies the allegations of paragraph 102 of the FACC.

103. Micron denies the allegations of paragraph 103 of the FACC.

104. Micron denies the allegations of paragraph 104 of the FACC.

105. Micron denies the allegations of paragraph 105 of the FACC.

106. Micron denies the allegations of paragraph 106 of the FACC.

107. Micron denies the allegations of paragraph 107 of the FACC.

**COUNT VII**

108. Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

109. Micron admits that YMTC filed as Exhibit 7 what appears to be a copy of the '342 patent, which is entitled "Method for Reading Three-Dimensional Flash Memory." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 109 of the FACC and, on that basis, denies them.

110. Micron denies the allegations of paragraph 110 of the FACC.

111. Micron denies the allegations of paragraph 111 of the FACC.

112. Micron denies the allegations of paragraph 112 of the FACC.

113. Micron admits that it identified numerous deficiencies in YMTC's original complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products include or practice one or more claim limitations of the '342 patent. Micron's motion to dismiss is on file with the Court and speaks for itself. Except as so admitted, Micron denies the allegations of paragraph 113 of the FACC.

114. Micron denies the allegations of paragraph 114 of the FACC.

115. Micron denies the allegations of paragraph 115 of the FACC.

116. Micron denies the allegations of paragraph 116 of the FACC.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 10 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx298

1     117.    Micron denies the allegations of paragraph 117 of the FACC.

2     118.    Micron denies the allegations of paragraph 118 of the FACC.

3            **COUNT VIII**

4     119.    Micron incorporates by reference and realleges its responses to all the foregoing

5  paragraphs of this Answer as if fully set forth herein.

6     120.    Micron admits that YMTC filed as Exhibit 8 what appears to be a copy of the '031

7  patent, which is entitled "Multiple-Stack Three-Dimensional Memory Device and Fabrication

8  Method Thereof." Except as so admitted, Micron lacks knowledge or information sufficient to

9  form a belief as to the truth of the allegations in paragraph 120 of the FACC and, on that basis,

10  denies them.

11     121.    Micron denies the allegations of paragraph 121 of the FACC.

12     122.    Micron denies the allegations of paragraph 122 of the FACC.

13     123.    Micron denies the allegations of paragraph 123 of the FACC.

14     124.    Micron admits that it identified numerous deficiencies in YMTC's original

15  complaint in Micron's motion to dismiss, including YMTC's failure to plead that Micron's products

16  include or practice one or more claim limitations of the '031 patent. Micron's motion to dismiss is

17  on file with the Court and speaks for itself. Except as so admitted, Micron denies the allegations

18  of paragraph 124 of the FACC.

19     125.    Micron denies the allegations of paragraph 125 of the FACC.

20     126.    Micron denies the allegations of paragraph 126 of the FACC.

21     127.    Micron denies the allegations of paragraph 127 of the FACC.

22     128.    Micron denies the allegations of paragraph 128 of the FACC.

23     129.    Micron denies the allegations of paragraph 129 of the FACC.

24

25

26

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 11 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

COUNT IX

130.    Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

131.    Micron admits that YMTC filed as Exhibit 9 what appears to be a copy of the '254 patent, which is entitled "Three-Dimensional Memory Devices Having Through Array Contacts And Methods For Forming The Same." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 131 of the FACC and, on that basis, denies them.

132.    Micron denies the allegations of paragraph 132 of the FACC.

133.    Micron denies the allegations of paragraph 133 of the FACC.

134.    Micron denies the allegations of paragraph 134 of the FACC.

135.    Micron denies the allegations of paragraph 135 of the FACC.

136.    Micron denies the allegations of paragraph 136 of the FACC.

137.    Micron denies the allegations of paragraph 137 of the FACC.

138.    Micron denies the allegations of paragraph 138 of the FACC.

139.    Micron denies the allegations of paragraph 139 of the FACC.

140.    Micron denies the allegations of paragraph 140 of the FACC.

COUNT X

141.    Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

142.    Micron admits that YMTC filed as Exhibit 10 what appears to be a copy of the '322 patent, which is entitled "Three-Dimensional Memory Devices Having Through Array Contacts And Methods For Forming The Same." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 142 of the FACC and, on that basis, denies them.

143.    Micron denies the allegations of paragraph 143 of the FACC.

144.    Micron denies the allegations of paragraph 144 of the FACC.

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 12 -

AMENDED ANSWER TO AMENDED CONSOLIDATED COMPLAINT AND AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx300

145.    Micron denies the allegations of paragraph 145 of the FACC.

146.    Micron denies the allegations of paragraph 146 of the FACC.

147.    Micron denies the allegations of paragraph 147 of the FACC.

148.    Micron denies the allegations of paragraph 148 of the FACC.

149.    Micron denies the allegations of paragraph 149 of the FACC.

**COUNT XI**

150.    Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

151.    Micron admits that YMTC filed as Exhibit 11 what appears to be a copy of the '291 patent, which is entitled "Joint Opening Structures Of Three-Dimensional Memory Devices And Methods For Forming The Same."  Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 151 of the FACC and, on that basis, denies them.

152.    Micron denies the allegations of paragraph 152 of the FACC.

153.    Micron denies the allegations of paragraph 153 of the FACC.

154.    Micron denies the allegations of paragraph 154 of the FACC.

155.    Micron denies the allegations of paragraph 155 of the FACC.

156.    Micron denies the allegations of paragraph 156 of the FACC.

157.    Micron denies the allegations of paragraph 157 of the FACC.

158.    Micron denies the allegations of paragraph 158 of the FACC.

159.    Micron denies the allegations of paragraph 159 of the FACC.

160.    Micron denies the allegations of paragraph 160 of the FACC.

**COUNT XII**

161.    Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

162.    Micron admits that YMTC filed as Exhibit 12 what appears to be a copy of the '532 patent, which is entitled "Joint Opening Structures of Three-Dimensional Memory Devices and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 13 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx301

Methods For Forming the Same." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 162 of the FACC and, on that basis, denies them.

163. Micron denies the allegations of paragraph 163 of the FACC.

164. Micron denies the allegations of paragraph 164 of the FACC.

165. Micron denies the allegations of paragraph 165 of the FACC.

166. Micron denies the allegations of paragraph 166 of the FACC.

167. Micron denies the allegations of paragraph 167 of the FACC.

168. Micron denies the allegations of paragraph 168 of the FACC.

169. Micron denies the allegations of paragraph 169 of the FACC.

170. Micron denies the allegations of paragraph 170 of the FACC.

171. Micron denies the allegations of paragraph 171 of the FACC.

**COUNT XIII**

172. Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

173. Micron admits that YMTC filed as Exhibit 13 what appears to be a copy of the '666 patent, which is entitled "Staircase Structure For Memory Device." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 173 of the FACC and, on that basis, denies them.

174. Micron denies the allegations of paragraph 174 of the FACC.

175. Micron denies the allegations of paragraph 175 of the FACC.

176. Micron denies the allegations of paragraph 176 of the FACC.

177. Micron denies the allegations of paragraph 177 of the FACC.

178. Micron denies the allegations of paragraph 178 of the FACC.

179. Micron denies the allegations of paragraph 179 of the FACC.

180. Micron denies the allegations of paragraph 180 of the FACC.

181. Micron denies the allegations of paragraph 181 of the FACC.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 14 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

Appx302

**COUNT XIV**

182.    Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

183.    Micron admits that YMTC filed as Exhibit 14 what appears to be a copy of the '604 patent, which is entitled "Staircase Structure In Three-Dimensional Memory Device And Method For Forming The Same." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 183 of the FACC and, on that basis, denies them.

184.    Micron denies the allegations of paragraph 184 of the FACC.

185.    Micron denies the allegations of paragraph 185 of the FACC.

186.    Micron denies the allegations of paragraph 186 of the FACC.

187.    Micron denies the allegations of paragraph 187 of the FACC.

188.    Micron denies the allegations of paragraph 188 of the FACC.

189.    Micron denies the allegations of paragraph 189 of the FACC.

190.    Micron denies the allegations of paragraph 190 of the FACC.

191.    Micron denies the allegations of paragraph 191 of the FACC.

192.    Micron denies the allegations of paragraph 192 of the FACC.

**COUNT XV**

193.    Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

194.    Micron admits that YMTC filed as Exhibit 15 what appears to be a copy of the '711 patent, which is entitled "Word Line Contact Structure For Three-Dimensional Memory Devices And Fabrication Methods Thereof." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 194 of the FACC and, on that basis, denies them.

195.    Micron denies the allegations of paragraph 195 of the FACC.

196.    Micron denies the allegations of paragraph 196 of the FACC.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 15 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

197.   Micron denies the allegations of paragraph 197 of the FACC.

198.   Micron denies the allegations of paragraph 198 of the FACC.

199.   Micron denies the allegations of paragraph 199 of the FACC.

200.   Micron denies the allegations of paragraph 200 of the FACC.

201.   Micron denies the allegations of paragraph 201 of the FACC.

202.   Micron denies the allegations of paragraph 202 of the FACC.

**COUNT XVI**

203.   Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

204.   Micron admits that YMTC filed as Exhibit 16 what appears to be a copy of the '276 patent, which is entitled "Word Line Contact Structure For Three-Dimensional Memory Devices And Fabrication Methods Thereof." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 204 of the FACC and, on that basis, denies them.

205.   Micron denies the allegations of paragraph 205 of the FACC.

206.   Micron denies the allegations of paragraph 206 of the FACC.

207.   Micron denies the allegations of paragraph 207 of the FACC.

208.   Micron denies the allegations of paragraph 208 of the FACC.

209.   Micron denies the allegations of paragraph 209 of the FACC.

210.   Micron denies the allegations of paragraph 210 of the FACC.

211.   Micron denies the allegations of paragraph 211 of the FACC.

212.   Micron denies the allegations of paragraph 212 of the FACC.

213.   Micron denies the allegations of paragraph 213 of the FACC.

**COUNT XVII**

214.   Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

215.   Micron admits that YMTC filed as Exhibit 17 what appears to be a copy of the '941

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 16 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx304

1    patent, which is entitled "Memory Including a Plurality of Portions and Used For Reducing

2    Program Disturbance And Program Method Thereof."  Except as so admitted, Micron lacks

3    knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph

4    215 of the FACC and, on that basis, denies them.

5          216.    Micron denies the allegations of paragraph 216 of the FACC.

6          217.    Micron denies the allegations of paragraph 217 of the FACC.

7          218.    Micron denies the allegations of paragraph 218 of the FACC.

8          219.    Micron denies the allegations of paragraph 219 of the FACC.

9          220.    Micron denies the allegations of paragraph 220 of the FACC.

10        221.    Micron denies the allegations of paragraph 221 of the FACC.

11        222.    Micron denies the allegations of paragraph 222 of the FACC.

12        223.    Micron denies the allegations of paragraph 223 of the FACC.

13        224.    Micron denies allegations of paragraph 224 of the FACC.

14                  **COUNT XVIII**

15        225.    Micron incorporates by reference and realleges its responses to all the foregoing

16    paragraphs of this Answer as if fully set forth herein.

17        226.    Micron admits that YMTC filed as Exhibit 18 what appears to be a copy of the '164

18    patent, which is entitled "Integrated Circuit Electrostatic Discharge Bus Structure And Related

19    Methods."  Except as so admitted, Micron lacks knowledge or information sufficient to form a

20    belief as to the truth of the allegations in paragraph 226 of the FACC and, on that basis, denies

21    them.

22        227.    Micron denies the allegations of paragraph 227 of the FACC.

23        228.    Micron denies the allegations of paragraph 228 of the FACC.

24        229.    Micron denies the allegations of paragraph 229 of the FACC.

25        230.    Micron denies the allegations of paragraph 230 of the FACC.

26        231.    Micron denies the allegations of paragraph 231 of the FACC.

27        232.    Micron denies the allegations of paragraph 232 of the FACC.

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 17 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx305

233. Micron denies the allegations of paragraph 233 of the FACC.

234. Micron denies the allegations of paragraph 234 of the FACC.

235. Micron denies the allegations of paragraph 235 of the FACC.

**COUNT XIX**

236. Micron incorporates by reference and realleges its responses to all the foregoing paragraphs of this Answer as if fully set forth herein.

237. Micron admits that YMTC filed as Exhibit 19 what appears to be a copy of the '838 patent, which is entitled "Staircase Structure For Memory Device." Except as so admitted, Micron lacks knowledge or information sufficient to form a belief as to the truth of the allegations in paragraph 237 of the FACC and, on that basis, denies them.

238. Micron denies the allegations of paragraph 238 of the FACC.

239. Micron denies the allegations of paragraph 239 of the FACC.

240. Micron denies the allegations of paragraph 240 of the FACC.

241. Micron denies the allegations of paragraph 241 of the FACC.

242. Micron denies the allegations of paragraph 242 of the FACC.

243. Micron denies the allegations of paragraph 243 of the FACC.

244. Micron denies the allegations of paragraph 244 of the FACC.

245. Micron denies the allegations of paragraph 245 of the FACC.

**PLAINTIFF'S PRAYER FOR RELIEF**

Micron denies that YMTC is entitled to any relief whatsoever in this action, either as prayed for in the FACC or otherwise.

**DEFENSES**

Without assuming any burden other than imposed by law, Micron asserts the following defenses in response to the allegations in the FACC. Micron reserves the right to assert additional defenses as they become known throughout the course of discovery in this action, including any defenses currently unknown to Micron. The assertion of a defense below is not a concession that Micron bears the burden of proving the matter asserted. Micron incorporates by reference and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 18 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx306

1 | realleges paragraphs 1-87 of MTI's Amended Counterclaims.

**First Defense: Failure to State a Claim**

1. The FACC fails to state a claim upon which relief can be granted.

**Second Defense: Noninfringement**

2. Micron has not infringed and does not infringe, directly or indirectly, any claim of the Asserted Patents.

**Third Defense: Prior Commercial Use**

3. Micron is not liable for any alleged infringement of the '254 patent under 35 U.S.C. § 273. Micron, acting in good faith, internally commercially used what YMTC claims to be the subject matter of at least claim 1 of the '254 patent in the United States more than a year before the effective filing date of the '254 patent through at least its ▮ device and has continued its commercial use thereafter through arm's length sales or arm's length commercial transfers in the United States of Micron products that YMTC accuses of infringement, including sales of the Micron 130, 140 and 150 series products.

4. Micron is not liable for any alleged infringement of the '322 patent under 35 U.S.C. § 273. Micron, acting in good faith, internally commercially used what YMTC claims to be the subject matter of at least claim 1 of the '322 patent in the United States more than a year before the effective filing date of the '322 patent through at least its ▮ device and has continued its commercial use thereafter through arm's length sales or arm's length commercial transfers in the United States of Micron products that YMTC accuses of infringement, including sales of the Micron 130, 140 and 150 series products.

5. Micron is not liable for any alleged infringement of the '291 patent under 35 U.S.C. § 273. Micron, acting in good faith, internally commercially used what YMTC claims to be the subject matter of at least claim 1 of the '291 patent in the United States more than a year before the effective filing date of the '291 patent through at least its ▮ device and has continued its commercial use thereafter through arm's length sales or arm's length commercial transfers in the United States of Micron products that YMTC accuses of infringement, including sales of the

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 19 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx307

1   Micron 110 and 120 series products.

2       6.    5.    Micron is not liable for any alleged infringement of the '532 patent under 35

3   U.S.C. § 273. Micron, acting in good faith, internally commercially used what YMTC claims to be

4   the subject matter of at least claim 1 of the '532 patent in the United States more than a year before

5   the effective filing date of the '532 patent through at least its ▮▮ device and has continued its

6   commercial use thereafter through arm's length sales or arm's length commercial transfers in the

7   United States of Micron products that YMTC accuses of infringement, including sales of the

8   Micron 110 and 120 series products.

9       7.    Micron is not liable for any alleged infringement of the '378 patent under 35 U.S.C.

10   § 273. Micron, acting in good faith, internally commercially used what YMTC claims to be the

11   subject matter of at least claim 15 of the '378 patent in the United States more than a year before

12   the effective filing date of the '378 patent through at least its ▮▮ device and has continued its

13   commercial use thereafter through arm's length sales or arm's length commercial transfers in the

14   United States of Micron products that YMTC accuses of infringement, including sales of the

15   Micron ▮▮ product.

16       8.    Micron is not liable for any alleged infringement of the '806 patent under 35 U.S.C.

17   § 273. Micron, acting in good faith, internally commercially used what YMTC claims to be the

18   subject matter of at least claim 8 of the '806 patent in the United States more than a year before the

19   effective filing date of the '806 patent through at least its ▮▮ device and has continued its

20   commercial use thereafter through arm's length sales or arm's length commercial transfers in the

21   United States of Micron products that YMTC accuses of infringement, including sales of the

22   Micron ▮▮ product.

23       9.    Micron is not liable for any alleged infringement of the '872 patent under 35 U.S.C.

24   § 273. Micron, acting in good faith, internally commercially used what YMTC claims to be the

25   subject matter of at least claim 1 of the '872 patent in the United States more than a year before the

26   effective filing date of the '872 patent through at least its ▮▮ device and has continued its

27   commercial use thereafter through arm's length sales or arm's length commercial transfers in the

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 20 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

1    United States of Micron products that YMTC accuses of infringement, including sales of the

2    Micron 130, 140 and 150 series products.

3            10.     Micron is not liable for any alleged infringement of the '623 patent under 35 U.S.C.

4    § 273. Micron, acting in good faith, internally commercially used what YMTC claims to be the

5    subject matter of at least claim 1 of the '623 patent in the United States more than a year before the

6    effective filing date of the '623 patent through at least its ▮▮▮▮ device and has continued its

7    commercial use thereafter through arm's length sales or arm's length commercial transfers in the

8    United States of Micron products that YMTC accuses of infringement, including sales of the

9    Micron 110 and 120 series products.

10           11.     Micron is not liable for any alleged infringement of the '604 patent under 35 U.S.C.

11   § 273. Micron, acting in good faith, internally commercially used what YMTC claims to be the

12   subject matter of at least claim 1 of the '604 patent in the United States more than a year before the

13   effective filing date of the '604 patent through at least its ▮▮▮▮ device and has continued its

14   commercial use thereafter through arm's length sales or arm's length commercial transfers in the

15   United States of Micron products that YMTC accuses of infringement, including sales of the

16   Micron 150 and 160 series products.

17           12.     Micron is not liable for any alleged infringement of the '031 patent under 35 U.S.C.

18   § 273. Micron, acting in good faith, internally commercially used what YMTC claims to be the

19   subject matter of at least claim 1 of the '031 patent in the United States more than a year before the

20   effective filing date of the '031 patent through at least its ▮▮▮▮ device and has continued its

21   commercial use thereafter through arm's length sales or arm's length commercial transfers in the

22   United States of Micron products that YMTC accuses of infringement, including sales of the

23   Micron 130, 140 and 150 series products.

24           13.     Micron is not liable for any alleged infringement of the '164 patent under 35 U.S.C.

25   § 273. Micron, acting in good faith, internally commercially used what YMTC claims to be the

26   subject matter of at least claim 8 of the '164 patent in the United States more than a year before the

27   effective filing date of the '164 patent through at least its ▮▮▮▮ device and has continued its

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 21 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx309

1  commercial use thereafter through arm's length sales or arm's length commercial transfers in the
2  United States of Micron products that YMTC accuses of infringement, including sales of the
3  Micron LPDRAM products.

4        14.    Micron is not liable for any alleged infringement of the '941 patent under 35 U.S.C.
5  § 273. Micron, acting in good faith, internally commercially used what YMTC claims to be the
6  subject matter of at least claim 1 of the '941 patent in the United States more than a year before the
7  effective filing date of the '941 patent through at least its ▮▮▮ device and has continued its
8  commercial use thereafter through arm's length sales or arm's length commercial transfers in the
9  United States of Micron products that YMTC accuses of infringement, including sales of the
10  Micron 140 and 150 series products.

11        15.    Micron is not liable for any alleged infringement of the '822 patent under 35 U.S.C.
12  § 273. Micron, acting in good faith, internally commercially used what YMTC claims to be the
13  subject matter of at least claim 1 of the '822 patent in the United States more than a year before the
14  effective filing date of the '822 patent through at least its ▮▮▮ device and has continued its
15  commercial use thereafter through arm's length sales or arm's length commercial transfers in the
16  United States of Micron products that YMTC accuses of infringement, including sales of the
17  Micron 140 and 150 series products.

18                  **Fourth Defense: Invalidity**

19        16.    One or more of the claims of the Asserted Patents are invalid for failure to satisfy
20  the conditions for patentability set forth in 35 U.S.C. § 1 et seq., including 35 U.S.C. §§ 101, 102,
21  103, and/or 112.

22        17.    The '322 and '254 patents are invalid for failure to satisfy the conditions for
23  patentability set forth in 35 U.S.C. § 101 because Hongbin Zhu, one of the named inventors on the
24  '254 and '322 patents, did not "invent[] or discover[]" the inventions claimed in the '254 and '322
25  patents but instead derived them from others at MTI. Hongbin Zhu worked as an engineer from
26  January 9, 2006, to September 18, 2017. The application which resulted in the '322 and '254
27  patents was filed on August 21, 2018, meaning that Hongbin Zhu had been working on 3D NAND

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 22 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx310

1   technology at Micron shortly before the filing of the application for this patent. On information and

2   belief, Hongbin Zhu worked at Micron with other Micron employees to conceive of the inventions

3   claimed in the '322 and '254 patents and thus did not invent or discover the inventions claimed in

4   the '322 and '254 patents.

5          18.    The '378 and '806 patents are invalid for failure to satisfy the conditions for

6   patentability set forth in 35 U.S.C. § 101 because Zhenyu Lu, Qian Tao, and Yushi Hu, three of the

7   named inventors on the '378 and '806 patents, did not "invent[] or discover[]" the inventions

8   claimed in the '378 and '806 patents but instead derived them from others at MTI.  Zhenyu Lu

9   worked as a Senior Engineer – NAND Process Integration at Micron from August 9, 2004, to

10  February 24, 2015; Qian Tao worked as a Senior Engineer – NAND Process Integration at Micron

11  from June 6, 2011, to May 2, 2017; and Yushi Hu worked as a Senior Engineer – NAND Process

12  Integration at Micron from June 27, 2011, to August 12, 2016.  The application which resulted in

13  the '378 and '806 patents has an effective filing date of May 3, 2018, meaning that these three

14  individuals had been working on 3D NAND technology at Micron shortly before the filing of the

15  application for this patent. On information and belief, these three individuals worked at Micron

16  with other Micron employees to conceive of the inventions claimed in the '378 and '806 patents

17  and thus did not invent or discover the inventions claimed in the '378 and '806 patents.

18         19.    The '031 patent is invalid for failure to satisfy the conditions for patentability set

19  forth in 35 U.S.C. § 101 because Jun Liu, Zhenyu Lu, Qian Tao, and Yushi Hu, four of the named

20  inventors on the '031 patent, did not "invent[] or discover[]" the invention claimed in the '031

21  patent but instead derived them from others at MTI.  Jun Liu worked in SMTS Process Integration

22  at Micron from September 3, 2002, to June 9, 2017. Zhenyu Lu worked as a Senior Engineer –

23  NAND Process Integration at Micron from August 9, 2004, to February 24, 2015; Qian Tao worked

24  as a Senior Engineer – NAND Process Integration at Micron from June 6, 2011, to May 2, 2017;

25  and Yushi Hu worked as a Senior Engineer – NAND Process Integration at Micron from June 27,

26  2011, to August 12, 2016.  The application which resulted in the '031 patent was filed on September

27  10, 2018, meaning that these four individuals had been working on 3D NAND technology at

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 23 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx311

1    Micron shortly before the filing of the application for this patent. On information and belief, these

2    four individuals worked at Micron with other Micron employees to conceive of the inventions

3    claimed in the '031 patent and thus did not invent or discover the inventions claimed in the '031

4    patent.

5          20.    The '957 patent is invalid for failure to satisfy the conditions for patentability set

6    forth in 35 U.S.C. § 101 because Changhyun Lee, one of the named inventors on the '957 patent,

7    did not "invent[] or discover[]" the invention claimed in the '957 patent but instead derived them

8    from others at MTI.  Changhyun Lee worked as a Principal Engineer – NAND Cell Device at

9    Micron from September 14, 2015, to October 23, 2019.  The application which resulted in the '957

10   patent was filed on March 4, 2021, meaning that Changhyun Lee had been working on 3D NAND

11   technology at Micron shortly before the filing of the application for this patent. On information and

12   belief, Changhyun Lee worked at Micron with other Micron employees to conceive of the

13   inventions claimed in the '957 patent and thus did not invent or discover the inventions claimed in

14   the '957 patent.

15                       **Fifth Defense: Prosecution History Estoppel and/or Disclaimer**

16         21.    Based on proceedings before the U.S. Patent and Trademark Office during the

17   prosecution of the applications that led to or resulted in the Asserted Patents, YMTC is precluded

18   or otherwise estopped from asserting that any claim of the Asserted Patents covers, either literally

19   or under the doctrine of equivalents, any product or method made, performed, used, sold, offered

20   for sale, or imported by Micron.

21                       **Sixth Defense: Limitation on Damages and Costs**

22         22.    YMTC's claims and prayer for relief are barred in whole or in part by 35 U.S.C.

23   §§ 286, 287, and/or 288, including without limitation based on failure to mark and lack of notice.

24                       **Seventh Defense: Government Sales**

25         23.    YMTC's claims are barred in whole or in part by 28 U.S.C. § 1498 to the extent

26   they relate to use or manufacture of the alleged inventions of the Asserted Patents by or for the

27   United States.

28

- 24 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

1

**Eighth Defense: Standing**

2          24.     Micron is not liable for the acts that YMTC alleges infringe the '254 patent (Count

3   IX) and the '322 patent (Count X) because YMTC lacks standing to assert the '254 and '322

4   patents.  MTI is the true owner of the '254 and '322 patents by virtue of the assignment agreement

5   entered into between Hongbin Zhu, one of the named inventors on the '254 and '322 patents, and

6   MTI.  Hongbin Zhu assigned all right, title and interest in the claimed inventions that are the subject

7   matter of at least claim 1 of the '254 patent and at least claim 1 of the '322 patent to Micron during

8   his employment at MTI.  His assignment predates the priority dates of the '254 patent and the '322

9   patent.

10         25.     Micron is not liable for the acts that YMTC alleges infringe the '378 patent (Count

11  III) and the '806 patent (Count IV) because YMTC lacks standing to assert the '378 and '806

12  patents.  MTI is the true owner of the '378 and '806 patents by virtue of the assignment agreement

13  entered into between Qian Tao, one of the named inventors on the '378 and '806 patents, and MTI.

14  Qian Tao assigned all right, title and interest in the claimed inventions that are the subject matter

15  of at least claim 1 of the '378 patent and at least claim 8 of the '806 patent to Micron during his

16  employment at MTI.  His assignment predates the priority dates of the '378 patent and the '806

17  patent.

18         26.     Micron is not liable for the acts that YMTC alleges infringe the '031 patent (Count

19  VIII) because YMTC lacks standing to assert the '031 patent.  MTI is the true owner of the '031

20  patent by virtue of the assignment agreements entered into between Jun Liu and Yushi Hu, two of

21  the named inventors on the '031 patent, and MTI.  Jun Liu and Yushi Hu assigned all right, title

22  and interest in the claimed invention that is the subject matter of at least claim 1 of the '031 patent

23  to Micron during their employment at MTI.  Their assignments predate the priority date of the '031

24  patent.

25         27.     Micron is not liable for the acts that YMTC alleges infringe the '957 patent (Count

26  VI) because YMTC lacks standing to assert the '957 patent.  MTI is the true owner of the '957

27  patent by virtue of the assignment agreement entered into between Changhyun Lee, one of the

28

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

named inventors on the '957 patent, and MTI. Changhyun Lee assigned all right, title and interest in the claimed invention that is the subject matter of at least claim 1 of the '957 patent to Micron during his employment at MTI. His assignment predates the priority date of the '957 patent.

<u>**Ninth Defense: Estoppel**</u>

28.    YMTC is estopped from asserting the claims of the '254, '322, '378, '806, '031, and '957 patents against Micron because it is not the true owner of the '254, '322, '378, '806, '031, and '957 patents.

**MTI'S AMENDED COUNTERCLAIMS**

Defendant and Counterclaim Plaintiff MTI hereby submits its counterclaims against Plaintiff and Counterclaim Defendant YMTC and Defendant YMTC Inc. (collectively the "YMTC Entities") as follows:

<u>**Nature of the Action**</u>

1.    MTI asserts these patent infringement claims against the YMTC Entities arising from their infringement of U.S. Patent Nos. 8,945,996 (the "'996 patent") and 10,872,903 (the "'903 patent") (collectively, the "MTI Asserted Patents"). On information and belief, each of the YMTC Entities has committed the acts of infringement described herein individually and together as one enterprise.

2.    MTI also asserts a counterclaim for declaratory judgment of ownership of the '254, '322, '378, '806, '031, and '957 patents.

<u>**The Parties**</u>

3.    MTI is a Delaware corporation with its principal place of business at 8000 South Federal Way, Boise, Idaho 83716.

4.    On information and belief, YMTC is a Chinese company with its principal place of business at No.88 Weilai 3rd Road, East Lake High-tech Development Zone, Wuhan, Hubei, China.

5.    On information and belief, YMTC Inc. is a California corporation with its principal place of business at 2953 Bunker Hill Lane, Ste. 206, Santa Clara, California 95054.

<u>**Jurisdiction and Venue**</u>

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 26 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx314

6.      MTI brings these counterclaims under the Patent Laws of the United States, 35 U.S.C. §§ 1 et seq., and the Declaratory Judgment Act 28 U.S.C. § 2201, *et seq.*, against the YMTC Entities for their infringement of the MTI Asserted Patents and to obtain declaratory relief as to MTI's ownership of the '254, '322, '378, '806, '031, and '957 patents, respectively.

7.      This Court has subject matter jurisdiction over MTI's counterclaims pursuant to 28 U.S.C. §§ 1331, 1338(a), and 1367.

8.      This Court has personal jurisdiction over YMTC, which is the plaintiff in this action. Further, YMTC has committed acts of infringement in this District through its business and sales activities in the Northern District of California, including directly and/or indirectly selling, offering for sale, importing, and/or using products that practice (or are made in a manner that practices) one or more claims of the MTI Asserted Patents.

9.      This Court has personal jurisdiction over YMTC Inc., which has its principal place of business in Santa Clara, California, in this judicial District. Further, YMTC Inc. has committed acts of infringement in this District through its business and sales activities in the Northern District of California, including directly and/or indirectly selling, offering for sale, importing, and/or using products that practice (or are made in a manner that practices) one or more claims of the MTI Asserted Patents.

10.     Venue over these counterclaims is proper in this District. YMTC is a foreign company and filed the underlying lawsuit in this District. YMTI resides in this District, has a regular and established place of business in the District, and has committed acts of infringement in this District.

11.     YMTC claims to the be the owner by assignment of the entire right, title, and interest in the '254, '322, '378, '806, '031, and '957 patents.

12.     An immediate, real, and justiciable controversy exists between MTI and YMTC with respect to the ownership of the '254, '322, '378, '806, '031, and '957 patents by virtue of YMTC's claim that MTI infringes the '254, '322, '378, '806, '031, and '957 patents.

**MTI's Innovations and Patents**

- 27 -

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

AMENDED ANSWER TO AMENDED CONSOLIDATED COMPLAINT AND AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx315

13. MTI was founded in 1978 and is headquartered in Boise, Idaho. Since that time, MTI has become a world leader in innovative computer-memory and data-storage solutions, employing more than 43,000 employees worldwide with more than 5,000 employees in Idaho. Ex. 1 at 2; Ex. 2 at 5.

14. MTI is the only U.S.-based manufacturer of semiconductor memory devices, and its presence in the U.S. is growing. MTI recently announced plans to invest approximately $15 billion through the end of the decade to construct a new memory manufacturing plant in Boise, Idaho and up to $100 billion over the next 20-plus years to build a fab near Syracuse, New York. Exs. 3-4. MTI's commitment to innovation is evident from its expansive patent portfolio that includes over 54,000 patents. Ex 1 at 2.

15. For over a decade, MTI has been at the forefront of developing new and innovative 3D NAND memory products. In March 2015, MTI launched its first 3D NAND product, a 32-layer high density memory chip. Ex. 5. Doing so required years of research and development before the product launch. These efforts led MTI to file dozens of patents on 3D NAND technology long before the product launch. Indeed, MTI described innovative 3D NAND arrays in patents it filed well before 2015. Exs. 6-7.

16. Since its initial 3D NAND product launch in 2015, MTI has continued to lead the world in 3D NAND innovation by developing and offering chips with greater memory capacity and capabilities. In early 2018, MTI doubled the number of layers in its 3D NAND products, releasing its 64-layer 3D NAND. Ex. 8. Thereafter, in 2019, MTI sampled its 128-layer 3D NAND (Ex. 9 at 7) and, in 2020, MTI was the first company in the world to launch 176-layer 3D NAND. Ex. 10. In July 2022, MTI became the first company to scale its 3D NAND technology to 232-layers in production. Ex. 11. MTI has received numerous awards for and widespread recognition of its innovative 3D NAND technology. *See, e.g.*, Exs. 12-14.

### The Accused YMTC Products and the YMTC Entities' Infringing Activities

17. YMTC is a global manufacturer and supplier of 3D NAND memory products. YMTC was founded in 2016 and is majority-owned by the Chinese government. Ex. 15. YMTC's

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

1  founding followed the 2015 announcement of the Made in China 2025 initiative by Chinese

2  President Xi Jinping.  Ex. 16.  The Made in China 2025 initiative positioned semiconductors as a

3  critical growth industry for the Chinese economy.  *Id.*  The Chinese Government's investment

4  platform for funding the expansion of its semiconductor industry is the National Integrated Circuit

5  Industry Investment Fund, more commonly known as the "Big Fund." *Id.*

6       18.  Latecomer YMTC has developed four generations of NAND storage devices since

7  its founding in 2016: a first-generation 3D NAND storage technology incorporating a 32-layer 3D

8  NAND memory array, a second-generation 3D NAND storage technology incorporating at least a

9  64-layer 3D NAND memory array, a third-generation 3D NAND storage technology incorporating

10  at least a 128-layer 3D NAND memory array, and a fourth generation 3D NAND storage

11  technology incorporating at least a 232-layer 3D NAND memory array. Ex. 17.

12       19.  Unsurprisingly, given MTI's nearly decade long head start over YMTC into 3D

13  NAND memory development, the YMTC Entities began to hire NAND engineers from MTI or its

14  affiliates and has hired at least 20 such engineers to date.  Indeed, at least eight of the named

15  inventors on the YMTC Asserted Patents (*see* Dkt. No. 151) previously worked as engineers on 3D

16  NAND R&D at Micron before they filed the YMTC Asserted Patents.  Some of these named

17  inventors are Hongbin Zhu, Qian Tao, Yushi Hu, Jun Liu and Changhyun Lee.

18       20.  On or around January 9, 2006, MTI hired Hongbin Zhu as an engineer to work at

19  MTI's headquarters in Boise, Idaho.  In consideration of providing employment to Mr. Zhu, Mr.

20  Zhu "assign[ed] and agree[d] to assign to [MTI], or its designee, all of [his] right, title and interest

21  in and to all inventions, discoveries, ideas, processes, works of authorship, mask works, drawings,

22  logos, developments, concepts, and improvements…whether or not patentable, copyrightable, or

23  subject to other forms of protection, made, created, developed, written, reduced to practice, or

24  conceived by [him], in whole or in part, either solely or jointly with others, during the period of

25  time [he is] in the employ of or providing service to [MTI], whether during or outside of regular

26  working hours."  Ex. 18 at 1 (Assignment Agreement between Hongbin Zhu and MTI).

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 29 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx317

21.     During his 11 years of employment in Boise, Idaho at MTI, Mr. Zhu had access to information about the development of Micron's 3D NAND technology, including on the designs for its 128-Layer and 176-Layer 3D NAND products.  Mr. Zhu was also involved with, worked on, and jointly collaborated with other engineers at Micron on the development of the Micron Accused Products, including on the B27A, B37R and B47R products.  Among other things, Mr. Zhu knew about, worked on, and jointly collaborated with other engineers at Micron on alternating multiple-tier stack structures, the formation of channel structures through the stack, the formation of openings that extend through the stack, spacers on the sidewall of the openings, through array contacts that bury into the substrate, and slit structures that separate the memory stack (the slits being formed after through array contacts), at least under YMTC's construction of its patents.  Consequently, per his Assignment Agreement, Mr. Zhu assigned, at least, any and all of the aforementioned individual and/or joint development work to Micron.  This work is the subject matter of at least claim 1 of the '322 and '254 patents that were later filed by YMTC.

22.     Then, on September 18, 2017, after 11 years at MTI, Mr. Zhu left the company.  Mr. Zhu told Micron on September 15, 2017, that he was leaving Micron because he needed to move closer to his aging father.  On the same date, he executed a "Separation Statement" reaffirming his obligations with respect to Micron confidential information, which stated that he continued to agree not to use or disclose Micron confidential information.  Based on the foregoing, and following the closing of its employee termination process, MTI did not have reason to suspect that Mr. Zhu would utilize joint development work of MTI to apply for patents at a new employer, did not have reason to monitor Mr. Zhu's post-employment patent activities, and therefore did not do so.

23.     After his departure from MTI, Mr. Zhu joined YMTC, where, based on information and belief, he has served as YMTC's vice president of research and development.  On information and belief, while at YMTC, Mr. Zhu also worked on the development of alternating multiple-tier stack structures, the formation of channel structures through the stack, the formation of openings that extend through the stack, spacers on the sidewall of the openings, through array contacts that bury into the substrate, and slit structures that separate the memory stack (the slits being formed

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

1  after the through array contacts), which is the subject matter of at least claim 1 of the '322 and '254

2  patents that were filed by YMTC.

3      24.     On November 21, 2020, YMTC filed Patent Application No. 17/100,847, which

4  claims priority to PCT/CN2018/101482, filed on August 21, 2018, and issued as the '322 patent on

5  February 14, 2023.  The '322 patent names Mr. Zhu as an inventor and claims technologies that

6  Mr. Zhu learned of and worked on while at Micron.

7      25.     On January 17, 2020, YMTC filed Patent Application No. 16/745,343, which claims

8  priority to PCT/CN2018/101482, filed on August 21, 2018, and issued as the '254 patent on

9  December 29, 2020.  The '254 patent names Mr. Zhu as an inventor and claims technologies that

10  Mr. Zhu learned of and worked on while at Micron.

11     26.     Another former Micron employee who is now a named inventor on YMTC's

12  Asserted Patents is Qian Tao.  On or around June 6, 2011, MTI hired Qian Tao as an engineer to

13  work at MTI's headquarters in Boise, Idaho.  In consideration of providing employment to Mr.

14  Tao, Mr. Tao "assign[ed] and agree[d] to assign to [MTI], or its designee, all of [his] right, title and

15  interest in and to all inventions, discoveries, ideas, processes, works of authorship, mask works,

16  drawings, logos, developments, concepts, and improvements…whether or not patentable,

17  copyrightable, or subject to other forms of protection, made, created, developed, written, reduced

18  to practice, or conceived by [him], in whole or in part, either solely or jointly with others, during

19  the period of time [he is] in the employ of or providing service to [MTI], whether during or outside

20  of regular working hours."  Ex. 23 (Assignment Agreement between Qian Tao and MTI).

21     27.     During his nearly 6 years of employment in Boise, Idaho at MTI, Mr. Tao had access

22  to information about the development of Micron's 3D NAND technology, including on the designs

23  for its 64-Layer 3D NAND products.  Among other things, Mr. Tao knew about, worked on, and

24  jointly collaborated with other engineers at Micron on alternating multiple-tier stack and staircase

25  structures, dielectric structures extending through the stack on isolation structures, through array

26  contacts through the dielectric structure, channel structures, epitaxial layers, etch stop plugs, and

27  slit structures, at least under YMTC's construction of its patents.  Consequently, per his Assignment

28

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 31 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx319

1   Agreement, Mr. Tao assigned at least any and all of the aforementioned individual and/or joint

2   development work to Micron. This work is the subject matter of at least claim 1 of the '378 patent

3   and claim 8 of the '806 patent that were later filed by YMTC.

4       28.     Then, on May 2, 2017, after nearly 6 years at MTI, Mr. Tao left the company. MTI

5   did not have reason to suspect that Mr. Tao would utilize joint development work of MTI to apply

6   for patents at a new employer, did not have reason to monitor Mr. Tao's post-employment patent

7   activities, and therefore did not do so.

8       29.     After his departure from MTI, Mr. Tao joined YMTC. On information and belief,

9   while at YMTC, Mr. Tao worked on the development of alternating multiple-tier stack and staircase

10  structures, dielectric structures extending through the stack on isolation structures, through array

11  contacts through the dielectric structure, channel structures, epitaxial layers, etch stop plugs, and

12  slit structures, which is the subject matter of at least claim 1 of the '378 patent and claim 8 of the

13  '806 patent that were filed by YMTC.

14      30.     On July 27, 2018, YMTC filed Patent Application No. 16/047,182, which claims

15  priority to PCT/CN2018/085421, filed on May 3, 2018, and issued as the '378 patent on May 19,

16  2020. The '378 patent names Mr. Tao as an inventor and claims technologies that Mr. Tao learned

17  of, worked on, and jointly collaborated with other Micron engineers on while at Micron.

18      31.     On May 5, 2020, YMTC filed Patent Application No. 16/867,404, which claims

19  priority to Patent Application No. 16/047,182, filed on July 27, 2018, now Patent No. 10,658,378,

20  which is a continuation of Patent Application No. PCT/CN2018/085421, filed on May 3, 2018, and

21  issued as the '806 patent on March 2, 2021. The '806 patent names Mr. Tao as an inventor and

22  claims technologies that Mr. Tao learned of, worked on, and jointly collaborated with other Micron

23  engineers on while at Micron.

24      32.     Another former Micron employee who is now a named inventor on YMTC's

25  Asserted Patents is Yushi Hu. On or around June 27, 2011, MTI hired Yushi Hu as an engineer to

26  work at MTI's headquarters in Boise, Idaho. In consideration of providing employment to Mr. Hu,

27  Mr. Hu "assign[ed] and agree[d] to assign to [MTI], or its designee, all of [his] right, title and

28

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

- 32 -

1    interest in and to all inventions, discoveries, ideas, processes, works of authorship, mask works,

2    drawings, logos, developments, concepts, and improvements…whether or not patentable,

3    copyrightable, or subject to other forms of protection, made, created, developed, written, reduced

4    to practice, or conceived by [him], in whole or in part, either solely or jointly with others, during

5    the period of time [he is] in the employ of or providing service to [MTI], whether during or outside

6    of regular working hours." Ex. 24 (Assignment Agreement between Yushi Hu and MTI).

7         33.    During his more than 5 years of employment in Boise, Idaho at MTI, Mr. Hu had

8    access to information about the development of Micron's 3D NAND technology, including on the

9    designs for its 32 and 96-Layer 3D NAND products, as well as multi-deck developmental chips

10   and replacement gate developmental technologies.  Among other things, Mr. Hu knew about,

11   worked on, and jointly collaborated with other engineers at Micron on alternating multiple-tier

12   staircase structures, insulating fill structures, dual deck structures, through-array contacts, aligned

13   support pillars, unaligned channel structures, and replacement gate technologies, at least under

14   YMTC's construction of its patents.  Consequently, per his Assignment Agreement, Mr. Hu

15   assigned at least any and all of the aforementioned individual and/or joint development work to

16   Micron.  This work is the subject matter of at least claim 1 of the '031 patent that was filed by

17   YMTC.

18        34.    Then, on August 12, 2016, after more than 5 years at MTI, Mr. Hu left the company.

19   MTI did not have reason to suspect that Mr. Hu would utilize joint development work of MTI to

20   apply for patents at a new employer, did not have reason to monitor Mr. Hu's post-employment

21   patent activities, and therefore did not do so.

22        35.    After his departure from MTI, Mr. Hu joined YMTC.  On information and belief,

23   while at YMTC, Mr. Hu worked on the development of alternating multiple-tier staircase structures,

24   insulating fill structures, dual deck structures, through-array contacts, aligned support pillars,

25   unaligned channel structures, and replacement gate technologies, which is the subject matter of at

26   least claim 1 of the '031 patent that was later filed by YMTC.

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 33 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx321

36.      Another former Micron employee who is now a named inventor on YMTC's Asserted Patents is Jun Liu.  On or around September 3, 2002, MTI hired Jun Liu as an engineer to work at MTI's headquarters in Boise, Idaho.  In consideration of providing employment to Mr. Liu, Mr. Liu "assign[ed] and agree[d] to assign to [MTI], or its designee, all of [his] right, title and interest in and to all inventions, discoveries, ideas, processes, works of authorship, mask works, drawings, logos, developments, concepts, and improvements…whether or not patentable, copyrightable, or subject to other forms of protection, made, created, developed, written, reduced to practice, or conceived by [him], in whole or in part, either solely or jointly with others, during the period of time [he is] in the employ of or providing service to [MTI], whether during or outside of regular working hours."  Ex. 25 (Assignment Agreement between Jun Liu and MTI).

37.      During his nearly 15 years of employment in Boise, Idaho at MTI, Mr. Liu had access to information about the development of Micron's 3D NAND technology, including on the designs for its 96-Layer 3D NAND products.  Among other things, Mr. Liu knew about, worked on, and jointly collaborated with other engineers at Micron on alternating multiple-tier staircase structures with contacts and through array contacts, dual deck structures, and replacement gate technologies, at least under YMTC's construction of its patents.  Consequently, per his Assignment Agreement, Mr. Liu assigned, at least, any and all of the aforementioned individual and/or joint development work to Micron.  This work is the subject matter of, at least, claim 1 of the '031 patent that was filed by YMTC.

38.      Then, on June 9, 2017, after nearly 15 years at MTI, Mr. Liu left the company.  MTI did not have reason to suspect that Mr. Liu would utilize joint development work of MTI to apply for patents at a new employer, did not have reason to monitor Mr. Liu's post-employment patent activities, and therefore did not do so.

39.      After his departure from MTI, Mr. Liu joined YMTC.  On information and belief, while at YMTC, Mr. Liu worked on the development of alternating multiple-tier staircase structures with contacts and through array contacts, dual deck structures, and replacement gate technologies, which is the subject matter of at least claim 1 of the '031 patent that was later filed by YMTC.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 34 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

40.     On September 10, 2018, YMTC filed Patent Application No. 16/126,919, which claims priority to PCT/CN2018/097432, filed on July 27, 2018, and issued as the '031 patent on December 15, 2020.  The '031 patent names Mr. Hu and Mr. Liu as an inventors and claims technologies that Mr. Hu and Mr. Liu learned of, worked on, and jointly collaborated with other Micron engineers on while at Micron.

41.     Another former Micron employee who is now a named inventor on YMTC's Asserted Patents is Changhyun Lee.  On or around September 14, 2015, MTI hired Changhyun Lee as an engineer to work at MTI's headquarters in Boise, Idaho.  In consideration of providing employment to Mr. Lee, Mr. Lee "agree[d] to and do hereby assign to [MTI], or its designee, all of [his] existing and future right, title and interest in and to all Intellectual Property made, created, developed, written, reduced to practice, or conceived by [him], in whole or in part, either solely or jointly with others (i) while [he] [is] employed by Micron, whether during or outside of regular working hours."  Ex. 26 (Assignment Agreement between Changhyun Lee and MTI).

42.     During his more than 4 years of employment in Boise, Idaho at MTI, Mr. Lee had access to information about the development of Micron's 3D NAND technology, including on the designs for its 32 and 64-Layer 3D NAND products, as well as Micron's development of access algorithms.  Among other things, Mr. Lee knew about, worked on, and jointly collaborated with other engineers at Micron on pre-verify and verify stages, along with first and second bias voltages and first and second bias voltages, at least under YMTC's construction of its patents.  Consequently, per his Assignment Agreement, Mr. Lee assigned at least any and all of the aforementioned individual and/or joint development work to Micron.  This work is the subject matter of at least claim 1 of the '957 patent that was filed by YMTC.

43.     Then, on October 23, 2019, after more than 4 years at MTI, Mr. Lee left the company.  After his departure from MTI, Mr. Lee joined YMTC.  On information and belief, while at YMTC, Mr. Lee worked on the development of alleged pre-verify and verify stages, along with first and second bias voltages and first and second bias voltages, which is the subject matter of at least claim 1 of the '957 patent that was later filed by YMTC.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 35 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx323

44. On March 4, 2021, YMTC filed Patent Application No. 17/191,768, which claims priority to PCT/CN2020/136482, filed on December 15, 2020, and issued as the '957 patent on October 11, 2022. The '957 patent names Mr. Lee as an inventor and claims technologies that Mr. Lee learned of, worked on, and jointly collaborated with other engineers on while at Micron.

45. The YMTC Entities have directly and/or indirectly used, sold, offered for sale, imported, supplied, or otherwise distributed into the United States, and provided support for, their 128-layer 3D NAND storage technology and products containing the same (collectively, the "YMTC 128L Accused Products"), including the X2-6070 and other memory chips (and memory products containing the same) that have the same or similar structures, features, or functionalities, and/or are made by the same or similar Xtacking® 2.0 technology manufacturing processes, as the aforementioned exemplary product. YMTC makes the YMTC 128L Accused Products in China.

46. For example, as set forth in YMTC's Patent Local Rule 3-4 contentions and accompanying document production (YMTC-MICRON_0009683), YMTC has imported into and sold in the United States YMTC 128L Accused Products, product numbers YMN09TC1B1JC6C_000 and YMN09TC1B1HC6C_000, within the last six years.

47. On information and belief, YMTC controls and has controlled YMTC Inc.

48. YMTC admits that it is "dedicated to the development of memory products for the global market" and that it "maintains ties to Silicon Valley through a wholly-owned subsidiary, Yangtze Memory Technologies, Inc." Dkt. No. 29 ¶ 24.

**Counterclaim I**
**(Infringement of U.S. Patent No. 8,945,996)**

49. MTI restates and incorporates by reference its allegations in Paragraphs 1 through 48 of its Counterclaims.

50. MTI, owns all right, title, and interest, including the right to recover damages for past, present, and future infringement, in and to U.S. Patent No. 8,945,996, entitled "Methods of forming circuitry components and methods of forming an array of memory cells." A true and correct copy of the '996 patent is attached as Exhibit 19.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 36 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx324

51.     The '996 patent was duly and legally issued by the United States Patent and Trademark Office on Feb. 3, 2015.

52.     The YMTC Entities have infringed at least claims 1-4, 6-10, 12, 13, 16-18, 23-26, 28, 30, and 32 of the '996 patent under 35 U.S.C. § 271(g), literally and/or under the doctrine of equivalents, by directly or indirectly importing into the United States at least the YMTC 128L Accused Products, including at least product numbers YMN09TC1B1JC6C_000 and YMN09TC1B1HC6C_000, which are made outside the United States using the patented processes of at least the foregoing claims, are not materially changed by subsequent processes, and are not a trivial and nonessential component of another product.

53.     The YMTC 128L Accused Products are made with, used to perform, and/or practice each and every limitation of at least claims 1-4, 6-10, 12, 13, 16-18, 23-26, 28, 30, and 32 of the '996 patent.  A claim chart providing examples of how the YMTC 128L Accused Products practice the foregoing claims is attached as Exhibit 20 hereto and is incorporated by reference herein.

54.     YMTC makes the YMTC 128L Accused Products in China in accordance with the methods claimed in at least claims 1-4, 6-10, 12, 13, 16-18, 23-26, 28, 30, and 32 of the '996 patent.

55.     As a result of the YMTC Entities' infringement of the '996 patent, MTI is entitled to monetary damages in an amount adequate to compensate for the YMTC Entities' infringement, but in no event less than a reasonable royalty for the use made of the invention by the YMTC Entities, together with interest and costs as fixed by the Court.

**Counterclaim II**
**(Infringement of U.S. Patent No. 10,872,903)**

56.     MTI restates and incorporates by reference its allegations in Paragraphs 1 through 55 of its Counterclaims.

57.     MTI, owns all right, title, and interest, including the right to recover damages for past, present, and future infringement, in and to U.S. Patent No. 10,872,903, entitled "Three dimensional memory and methods of forming the same." A true and correct copy of the '903 patent is attached as Exhibit 21.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 37 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

Appx325

58.     The '903 patent was duly and legally issued by the United States Patent and Trademark Office on Dec. 22, 2020.

59.     The YMTC Entities have infringed at least claims 1-3, 5, 7-9, and 17-20 of the '903 patent under 35 U.S.C. § 271(a), literally and/or under the doctrine of equivalents, by using, offering for sale, selling, and/or importing into the United States, without authorization, the YMTC 128L Accused Products, including at least product numbers YMN09TC1B1JC6C_000 and YMN09TC1B1HC6C_000.

60.     The YMTC 128L Accused Products are used to perform and/or practice each and every limitation of at least claims 1-3, 5, 7-9, and 17-20 of the '903 patent.  A claim chart providing examples of how the YMTC 128L Accused Products practice each limitation of at least the foregoing claims is attached as Exhibit 22 hereto and is incorporated by reference herein.

61.     There are no marking requirements with which Micron and its licensees have not complied for the period before February 2, 2024.  Micron has not made, used, sold, offered for sale, or imported into the United States any "patented articles" under the '903 patent.  Moreover, on information and belief, prior to February 2, 2024, none of Micron's licensees made, used, sold, offered for sale, or imported into the United States any "patented articles" under the '903 patent.

62.     The YMTC Entities had actual notice of their infringement of the '903 patent on February 16, 2024, the date Micron filed its Answer to First Amended Complaint and Counterclaims (Dkt. No. 35).

63.     As a result of the YMTC Entities' infringement of the '903 patent, MTI is entitled to monetary damages in an amount adequate to compensate for the YMTC Entities' infringement, but in no event less than a reasonable royalty for the use made of the invention by the YMTC Entities, together with interest and costs as fixed by the Court.

## Counterclaim III
### (Declaratory Judgment of Ownership of the '322 patent)

64.     MTI restates and incorporates by reference its allegations in Paragraphs 1 through 63 of its Counterclaims.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

65.     MTI is the true owner of the '322 patent by virtue of the assignment agreement entered into between Hongbin Zhu, one of the named inventors on the '322 patent, and MTI. Hongbin Zhu assigned all right, title and interest in the claimed invention that is the subject matter of at least claim 1 of the '322 patent to MTI during his employment at MTI.  His assignment predates the priority date of the '322 patent.

66.     MTI holds equitable title to the '322 patent.

67.     As such, MTI seeks declaratory relief that it is the sole and exclusive owner of the '322 patent or, in the alternative, that it owns a pro rata undivided interest in the '322 patent, and seeks transfer of legal title from YMTC to MTI.

**Counterclaim IV**
**(Declaratory Judgment of Ownership of the '254 patent)**

68.     MTI restates and incorporates by reference its allegations in Paragraphs 1 through 67 of its Counterclaims.

69.     MTI is the true owner of the '254 patent by virtue of the assignment agreement entered into between Hongbin Zhu, one of the named inventors on the '254 patent, and MTI. Hongbin Zhu assigned all right, title and interest in the claimed invention that is the subject matter of at least claim 1 of the '254 patent to MTI during his employment at MTI.  His assignment predates the priority date of the '254 patent.

70.     MTI holds equitable title to the '254 patent.

71.     As such, MTI seeks declaratory relief that it is the sole and exclusive owner of the '254 patent or, in the alternative, that it owns a pro rata undivided interest in the '254 patent, seeks transfer of legal title from YMTC to MTI.

**Counterclaim V**
**(Declaratory Judgment of Ownership of the '378 patent)**

72.     MTI restates and incorporates by reference its allegations in Paragraphs 1 through 71 of its Counterclaims.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 39 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx327

73.     MTI is the true owner of the '378 patent by virtue of the assignment agreement entered into between Qian Tao, one of the named inventors on the '378 patent, and MTI.  Qian Tao assigned all right, title and interest in the claimed invention that is the subject matter of at least claim 1 of the '378 patent to MTI during his employment at MTI.  His assignment predates the priority date of the '378 patent.

74.     MTI holds equitable title to the '378 patent.

75.     As such, MTI seeks declaratory relief that it is the sole and exclusive owner of the '378 patent or, in the alternative, that it owns a pro rata undivided interest in the '378 patent, seeks transfer of legal title from YMTC to MTI.

**Counterclaim VI**
**(Declaratory Judgment of Ownership of the '806 patent)**

76.     MTI restates and incorporates by reference its allegations in Paragraphs 1 through 75 of its Counterclaims.

77.     MTI is the true owner of the '806 patent by virtue of the assignment agreement entered into between Qian Tao, one of the named inventors on the '806 patent, and MTI.  Qian Tao assigned all right, title and interest in the claimed invention that is the subject matter of at least claim 8 of the '806 patent to MTI during his employment at MTI.  His assignment predates the priority date of the '806 patent.

78.     MTI holds equitable title to the '806 patent.

79.     As such, MTI seeks declaratory relief that it is the sole and exclusive owner of the '806 patent or, in the alternative, that it owns a pro rata undivided interest in the '806 patent, seeks transfer of legal title from YMTC to MTI.

**Counterclaim VII**
**(Declaratory Judgment of Ownership of the '031 patent)**

80.     MTI restates and incorporates by reference its allegations in Paragraphs 1 through 79 of its Counterclaims.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 40 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx328

81.     MTI is the true owner of the '031 patent by virtue of the assignment agreement entered into between Yushi Hu and Jun Liu, two of the named inventors on the '031 patent, and MTI.  Yushi Hu and Jun Liu assigned all right, title and interest in the claimed invention that is the subject matter of at least claim 1 of the '031 patent to MTI during his employment at MTI.  Their assignment predates the priority date of the '031 patent.

82.     MTI holds equitable title to the '031 patent.

83.     As such, MTI seeks declaratory relief that it is the sole and exclusive owner of the '031 patent or, in the alternative, that it owns a pro rata undivided interest in the '031 patent, seeks transfer of legal title from YMTC to MTI.

**Counterclaim VIII**
**(Declaratory Judgment of Ownership of the '957 patent)**

84.     MTI restates and incorporates by reference its allegations in Paragraphs 1 through 83 of its Counterclaims.

85.     MTI is the true owner of the '957 patent by virtue of the assignment agreement entered into between Changhyun Lee, one of the named inventors on the '957 patent, and MTI.  Changhyun Lee assigned all right, title and interest in the claimed invention that is the subject matter of at least claim 1 of the '957 patent to MTI during his employment at MTI.  His assignment predates the priority date of the '957 patent.

86.     MTI holds equitable title to the '957 patent.

87.     As such, MTI seeks declaratory relief that it is the sole and exclusive owner of the '957 patent or, in the alternative, that it owns a pro rata undivided interest in the '957 patent, seeks transfer of legal title from YMTC to MTI.

**DEMAND FOR A JURY TRIAL**

Defendants and counterclaim plaintiff request a jury trial on all issues related to YMTC's claims and MTI's counterclaims that are so triable.

**PRAYER FOR RELIEF**

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 41 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx329

WHEREFORE, having fully answered, Micron pray that the Court enter judgment as follows:

A.     A judgment in favor of Micron and against YMTC on all of YMTC's claims, including a dismissal with prejudice of all of YMTC's claims;

B.     A judgment declaring that Micron has not infringed, contributed to the infringement of, or induced others to infringe, either directly or indirectly, literally or under the doctrine of equivalents, any valid claims of the YMTC Asserted Patents (under 35 U.S.C. §§271 and 273);

C.     A judgment declaring that the YMTC Asserted Patents are invalid;

D.     A judgment declaring that this YMTC's case against Micron is exceptional and an award to Micron of its reasonable costs and expenses of litigation, including attorneys' fees and expert witness fees;

E.     A judgment declaring that YMTC lacks standing to assert the '254, '322, '378, '806, '031, and '957 patents;

F.     A judgment declaring that YMTC is estopped from asserting the '254, '322, '378, '806, '031, and '957 patents;

G.     A judgment in favor of MTI and against the YMTC Entities on all of MTI's Counterclaims;

H.     A judgment in favor of MTI that the YMTC Entities have infringed, either literally and/or under the doctrine of equivalents, one or more claims of each of the MTI Asserted Patents;

I.     An order pursuant to 35 U.S.C. § 283 enjoining the YMTC Entities and their subsidiaries, parents, divisions, affiliates, successors, assigns, transferees, officers, directors, attorneys, agents, servants, employees, privies, and all other persons in active concert or participation with any of the foregoing, from continued acts of infringement of the claims of the MTI Asserted Patents;

J.     A judgment and order requiring the YMTC Entities to pay MTI its damages, costs, expenses, and pre-judgment and post-judgment interest for the YMTC Entities' infringement;

ORRICK, HERRINGTON & SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-cv-05792-RFL

Appx330

1  K.  If a permanent injunction is not granted, then a judicial determination of the

2 conditions for the YMTC Entities future infringement, such as an ongoing royalty;

3  L.  A judgment declaring that MTI is the sole and exclusive owner of all right, title and

4 interest in the '254, '322, '378, '806, '031, and '957 patents;

5  M.  A judgment compelling YMTC to transfer legal title of the '254, '322, '378, '806,

6 '031, and '957 patents to MTI;

7  N.  A judgment declaring that MTI's case against the YMTC Entities is exceptional and

8 an award to MTI of its reasonable costs and expenses of litigation, including attorneys' fees and

9 expert witness fees;

10  O.  All other relief that the Court deems just and proper.

11

12 Dated: October 31, 2024     ORRICK, HERRINGTON & SUTCLIFFE LLP

13

14         By:    */s/ Jared Bobrow*
              Jared Bobrow

15

16         *Attorneys for Defendant and Counterclaim*
         *Plaintiff Micron Technology, Inc., and Defendant*
         *Micron Consumer Products Group LLC*

17

18

19

20

21

22

23

24

25

26

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 43 -

AMENDED ANSWER TO AMENDED
CONSOLIDATED COMPLAINT AND
AMENDED COUNTERCLAIMS
CASE NO. 3:23-CV-05792-RFL

Appx331

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF CALIFORNIA
## SAN FRANCISCO DIVISION

|  |  |
|---|---|
| YANGTZE MEMORY TECHNOLOGIES COMPANY, LTD., <br><br> Plaintiff, <br><br> v. <br><br> MICRON TECHNOLOGY, INC., et al., <br><br> Defendants. | Case No. 3:23-cv-05792-RFL <br><br> **JOINT LETTER BRIEF REGARDING MICRON'S SOURCE CODE** <br><br><br> Judge: Hon. Thomas S. Hixson <br> Courtroom: E, 15th Floor |
| MICRON TECHNOLOGY, INC., <br><br> Counterclaim Plaintiff, <br><br> v. <br><br> YANGTZE MEMORY TECHNOLOGIES COMPANY, LTD., and YANGTZE MEMORY TECHNOLOGIES, INC., <br><br> Counterclaim Defendants. |  |

The Honorable Thomas S. Hixon
San Francisco Courthouse
Courtroom E, 15th Floor
450 Golden Gate Avenue
San Francisco, CA 94102

Dear Magistrate Judge Hixon,

Pursuant to Your Honor's Discovery Standing Order dated June 17, 2024, Defendants Micron Technology, Inc. and Micron Consumer Products Group LLC and Counterclaim Plaintiff Micron Technology, Inc. (collectively "Micron") and Plaintiff and Counterclaim Defendant Yangtze Memory Technologies Company Ltd. and Counterclaim Defendant Yangtze Memory Technologies, Inc. (collectively "YMTC") submit this joint letter concerning YMTC's requests for printouts of Micron's source code. The parties have met and conferred and have reached an impasse on the issues raised herein.

Respectfully submitted,

By:  /s/ Kevin C. Wheeler                     By:  /s/ J. Jason Lang

The Honorable Thomas S. Hixson
November 26, 2024

James R. Batchelder (CSB # 136347)
Andrew T. Radsch (CSB # 303665)
James F. Mack (CSB # 322056)
Nancy N. Attalla (CSB # 341070)
**ROPES & GRAY LLP**
1900 University Avenue, 6th Floor
East Palo Alto, CA 94303-2284
Telephone: (650) 617-4000
james.batchelder@ropesgray.com
andrew.radsch@ropesgray.com
james.mack@ropesgray.com
nancy.attalla@ropesgray.com

Rachael Bacha (*Pro Hac Vice*)
Hyun-Joong Kim (*Pro Hac Vice*)
Alexander Middleton (*Pro Hac Vice*)
**ROPES & GRAY LLP**
1211 Avenue of the America
New York, NY 10036
Telephone: (212) 596-9062
rachael.bacha@ropesgray.com

Nicole S. L. Pobre (*Pro Hac Vice*)
**ROPES & GRAY LLP**
2099 Pennsylvania Avenue,
N.W. Washington, D.C. 20006
Telephone: (202) 508-4600
nicole.pobre@ropesgray.com

Kevin C. Wheeler (CSB # 261177)
**LATHAM & WATKINS LLP**
555 11th Street NW, Suite 1000
Washington, DC 20004-1327
Telephone: (202) 637-2200
kevin.wheeler@lw.com

Clement Naples (*Pro Hac Vice*)
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
clement.naples@lw.com

Brenda L. Danek (*Pro Hac Vice*)
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
brenda.danek@lw.com

Thomas W. Yeh (CSB # 287118)
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234

Jared Bobrow (State Bar No. 133712)
jbobrow@orrick.com
Jason Lang (State Bar No. 255642)
jlang@orrick.com
Diana M. Rutowski (State Bar No. 233878)
drutowski@orrick.com
**ORRICK, HERRINGTON &
SUTCLIFFE LLP**
1000 Marsh Road
Menlo Park, CA 94025-1015
Telephone: +1 650 614 7400
Facsimile: +1 650 614 7401

*Attorneys for Defendant and Counter-
claim Plaintiff MICRON TECHNOLOGY,
INC., and Defendant MICRON
CONSUMER PRODUCTS GROUP LLC*

The Honorable Thomas S. Hixson
November 26, 2024

thomas.yeh@lw.com

Brett M. Sandford (CSB # 302072)
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
brett.sandford@lw.com

*Attorneys for Plaintiff and Counterclaim*
*Defendant YANGTZE MEMORY*
*TECHNOLOGIES and Counterclaim*
*Defendant COMPANY, LTD. AND*
*YANGTZE MEMORY TECHNOLOGIES,*
*INC.*

The Honorable Thomas S. Hixson
November 26, 2024

## Micron's Position

This dispute focuses on the propriety of a YMTC evasion of Protective Order protocols that balance a YMTC need for evidence relating to infringement allegations, and Micron's need to limit access to its most advanced and most sensitive technical information. Specifically, this Court must decide whether YMTC should be allowed to have, in hard copy form for use outside the source code inspection room, 73 pages from one of Micron's most secure and sensitive Source Code documents (the 150 Series Traveler) (YMTC's position), or whether YMTC should be limited to a reasonable number of hard copy pages from that document, e.g., 15 pages (Micron's position). As demonstrated below, YMTC's request defeats the purpose of an inspection protocol, is excessive, and is not reasonably necessary to any case preparation activity. This request is thus improper under the Protective Order. Dkt. 80, ¶ 9(j).

### Micron's Source Code and Protective Order Source Code Provisions

This case involves 19 YMTC patents and more than a dozen Micron semiconductor products. As a result, Micron has made a substantial amount of Source Code, including recipes, layouts, circuit schematics, and Travelers (Micron's crown jewel Source Code, *see infra*) available for inspection on a secure source code computer. At YMTC's insistence, and for its own convenience, Micron has made that Source Code available for inspection in Orrick's Menlo Park offices.

Recognizing the sensitivity of the Source Code at issue, the Protective Order has three provisions to ensure that the parties act reasonably in requesting paper printouts. Two provisions apply to voluminous Source Code Materials. Taking layouts as an example, millions of printouts could be made from a single layout. Schematics are similar. Thus, the Protective Order includes the typical overall limits on total pages (1500 pages) and consecutive pages (30 pages). Dkt. 80, ¶ 9(j). The third provision, however, recognizes that some Source Code Materials are not voluminous but that producing all or a substantial portion of such Source Code in hard copy form is unreasonable as such production unnecessary risks the security of the Source Code. For this type of Source Code, the Protective Order provides: "If the Producing Party objects that the portions requested to be printed are excessive and/or not reasonably necessary to any case preparation activity, the Producing Party shall make such objection …." Dkt. 80, ¶ 9(j). The Protective Order then provides a procedure to raise the objection to the Court, as Micron has done here.

### The Training Travelers—Particularly the 150 Series—Are Micron's Crown Jewel Material

The Travelers (also known as Trainers) have the highest security level of any category of documents at Micron. They contain extremely sensitive and valuable information that describe in detail the highly confidential fabrication processes used to manufacture each series of Micron's 3D NAND products, the technical reasons for employing those processes (and not others), and the physical arrangement of the fabricated elements. Their value is clear from the fact that the Department of Justice secured a criminal conviction against UMC for stealing this kind of information from Micron and loading it onto "off network" laptop computers. *See* https://www.justice.gov/opa/pr/taiwan-company-pleads-guilty-trade-secret-theft-criminal-case-involving-prc-state-owned. The threat to Micron from the theft of this type of document is very real. For this reason, Micron applies the highest level of security to protecting these documents. Very few Micron employees have access to this material. Even making this information available

The Honorable Thomas S. Hixson
November 26, 2024

for inspection created significant difficulty and required numerous escalation measures to secure waivers of Micron's no-access policy, e.g., automatic security measures prevent Traveler information from being viewable outside of Micron's computing environment. What's more, the 150 Series is the most recent production Series of Micron 3D NAND. In short, protecting this material is critical to Micron's ongoing success in the semiconductor industry.

***YMTC's Inspections and Source Code Requests***

YMTC has conducted numerous inspections of Micron's Source Code on a secure computer, including on July 17, August 15-16, August 26-30, October 23-24, and November 5-6. Until now, YMTC has largely been reasonable in requesting hard copies of materials it has inspected. After the first two inspections—in which its experts reviewed the Source Code Materials—YMTC requested 6 pages of layout images and 7 pages of 3 different Traveler series. After the third inspection—in which another of its experts reviewed the Source Code—YMTC requested 49 pages of layout images and 28 pages from 5 different Traveler Series. In all of these expert-conducted inspections, there was no request for more than 5 pages from a single Traveler series and no more than 2 sequentially-numbered pages. Micron provided paper copies of this material to YMTC.

The last two inspections were not conducted by an expert, but instead by a Latham & Watkins employee (Shuai Yuan). YMTC requested over 90 pages from the 150 Series Traveler (there are four 150 Series versions, with the 150 Series Traveler at issue being the most comprehensive). This amounts to approximately 30% of the Traveler. YMTC later reduced its request to 73 pages (approximately 20% of the Traveler).

**YMTC's Request Is Excessive And Not Reasonably Necessary For Case Preparation**

The Protective Order prohibits requests that are "excessive and/or not reasonably necessary to any case preparation activity." Dkt. 80, ¶9(j). YMTC's request is both "excessive" and "not reasonably necessary to any case preparation activity."

First, requesting 20% of one of Micron's most confidential and secure documents is "excessive" on its face, because the point of an inspection is to inspect and take notes, not broadly request what one views. But it gets worse. YMTC's current request (after reducing the request) appears to be for pages 107, 115, 122-127, 130-131, 141-146, 153, 156, 160-163, 174, 189-197, 200-201, 206-207, 209-214, 221, 224-232, 234-239, 260, 264-267, 272-279. The pages before and after these pages relate to features not at issue in this case. And between pages 107 and 279 numerous irrelevant slides appear, e.g., title slides, summary slides, and background information. Thus, YMTC is effectively requesting the vast majority of pages that contain Micron's most sensitive information and that have any relevancy connection to this case (87% to be specific). This, too, demonstrates the excessiveness of the request.

Second, this information is "not reasonably necessary for any case preparation." The point of an inspection is to analyze the material, take notes, and use those notes to develop the party's positions. At the most recent inspections, this obviously did not occur, as Mr. Yuan's inspection resulted in a vastly different request than YMTC's experts. Only a handful of images are necessary

The Honorable Thomas S. Hixson
November 26, 2024

for actual filings, reports, or the like. And given the convenient location for YMTC, YMTC can continue its inspections if it so desires.

Third, YMTC's request would render the security provisions of the source code inspection process null and void. Coming to an inspection and then requesting such a large portion of a highly sensitive document in paper form is no different than Micron simply producing that document to YMTC in paper form in the first instance. The entire point of the inspection procedure is to allow Micron to protect the Source Code Material in a secure environment.

## YMTC's Position

Micron's sole basis for its objection is that YMTC's requested printout of 73 pages is "excessive" or "not reasonably necessary" under the Protective Order—and not based on any per se restrictions on printouts in that Order. These 73 disputed pages come from a document (the "150 Series Traveler") that spans over 1,000 pages. Micron admits that the document contains highly relevant evidence of the "fabrication process used" to manufacture the accused 150 Series products. And the Protective Order expressly allows for the Parties to print 1,500 pages from the source code computer "to facilitate the Receiving Party's preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial." Dkt. 80 ¶ 9(j). Micron's attempt to block the production of a mere 73 pages serves no legitimate purpose other than hampering YMTC's ability to prove Micron's widespread infringement. Micron's objection should be overruled.

Micron neither cites a single case supporting its position nor identifies a legitimate reason for withholding this important evidence of its infringement. Instead, Micron's argument is based on hyperbolic claims of secrecy and baseless *ad hominem* attacks on Latham & Watkins, LLP non-attorney personnel. Each argument fails, and confirms that Micron's true aim is to stonewall legitimate discovery of Micron's infringement. *Compare, e.g.*, *Manchester v. Sivantos GmbH*, No. 17-cv-5309, 2019 WL 1598754, at *4 (C.D. Cal. Jan. 30, 2019) ("There is no justification for refusing to produce hard copies of the 85 documents requested by Sivantos.").

*First*, YMTC's request does not come close to the Protective Order's restrictions on producing hard copy source code, which limits requests to "1500 pages" total or "30 consecutive pages." Dkt. 80 ¶ 9(j). YMTC's 73-page request is not a blanket request. It is specifically targeted to 19 different portions of the 1,000+ page "150 Series Traveler" document. And, contrary to Micron's 20% claim,[1] YMTC only seeks about 7% of the 1,000+ total pages from the 150 Series Traveler document—far less than courts consistently find to be reasonable. *See, e.g.*, *Definitive Holdings, LLC v. Powerteq LLC*, No. 18-cv-844, 2020 WL 6263041, at *2 (D. Utah Oct. 23, 2020) ("The court, therefore, will order the production of the 268 pages of source code" because source code has "central importance in resolving the issues in this case."); *Manchester*, 2019 WL 1598754, at *3-4 (ordering production of has 85 pages of source code printouts, noting

---

[1] The 150 Series Traveler's document—a single document—is split into numerous parts on the code machine, presumably due to size. To manufacture its 20% number, instead of properly calculating the percentage of requested pages compared to the total pages in the actual document, Micron calculated the percentage based on only the one part of the traveler document containing the requested pages for printing. Micron articulates no reasoned basis for measuring this percentage against only one part of the full document.

The Honorable Thomas S. Hixson
November 26, 2024

that plaintiff "been arbitrary and unreasonable in refusing to provide hard copies of all 85 documents at issue"); *MobileMedia Ideas LLC v. HTC Corp.*, No. 10-cv-112, 2012 WL 7783403, at *2 (E.D. Tex. Oct. 19, 2012) ("Given the enormous size of the source code reviewed by HTC, the Court does not find MMI's 7,700 page print request unreasonable."). The 150 Series Traveler represents only a small fraction of the total source code that Micron has made available for inspection in this case, confirming YMTC's request is not excessive. YMTC's request is particularly reasonable given that this case involves 19 YMTC patents and more than a dozen accused Micron products.

Moreover, Micron **admits** that the requested pages have a "relevancy connection" to this case. Micron, however, suggests that because "[t]he pages before and after" the requested pages "relate to features not at issue in this case," that somehow makes YMTC's request "excessive." Micron has it backwards. By limiting its printout request to the pages relevant to features that are "at issue in this case," YMTC's request is by definition **not** excessive. Moreover, Micron's contention that the requested pages are not reasonably necessary because they are not "for actual filings, reports, or the like" conflates different provisions of the protective order. A separate provisions governs the inclusion of source code material in such documents, and permits including only "portions of [printed] material [in such documents] if reasonably necessary…." Dkt. 80 ¶ 9(n).

**Second**, Micron's concerns about protecting the secrecy of its information are fully resolved by the protections of the protective order itself. "A protective order is in place to prevent improper disclosure and use of copies of the source code-related documents." *Manchester*, 2019 WL 1598754, at *4. For example, the Protective Order requires YMTC and its counsel to: (i) "maintain a record of any individual who has inspected any portion of the source code in electronic or paper form," (ii) "maintain and store any paper copies of the material at their offices in a manner that prevents duplication of or unauthorized access to the material, including, without limitation, storing the material in a locked room or cabinet at all times when it is not in use," and (iii) destroy any copies "in a timely manner if they are no longer in use." Dkt. 80 ¶ 9(k). YMTC has and will continue to abide by those provisions—and Micron does not suggest otherwise. *Compare MobileMedia*, 2012 WL 7783403, at *2 ("MMI's representations … that it will safeguard the confidentiality of the printed source code pages pursuant to the Protective Order provide sufficient justification for permitting the print request at this stage of the case."). Having jointly negotiated and agreed to the Protective Order in this case, Micron should not be allowed to ignore the security it provides to block legitimate discovery based only on speculative attorney argument. If a party can simply withhold discovery because the information is "sensitive" or "confidential," there would be no need for protective orders.

**Third**, Micron baldly claims that Dr. Shuai Yuan, who conducted the source code review did not "analyze the material, take notes, and use those notes to develop the party's positions." This unsupported assertion should be disregarded outright and, regardless, provides no basis for Micron to withhold highly relevant source code. Moreover, Dr. Yuan is a senior technical analyst who has been employed by Latham for over 10 years. Dr. Yuan earned a bachelor's degree in Physics, a master's degree in Electrical Engineering, and a PhD in bioengineering. Dr. Yuan spent roughly seven hours each day of the review in Orrick's offices reviewing and analyzing the source code. As Micron admits, Dr. Yuan identified the relevant portions of the Traveler's documents for printing. Thus, Micron should promptly produce the requested printouts so that this

The Honorable Thomas S. Hixson
November 26, 2024

indisputably relevant evidence supporting YMTC's claims can be cited in pleadings, expert reports, etc. as contemplated by the Protective Order.

YMTC respectfully requests that the Court order Micron to provide the requested 73 pages of source code print outs within three days of the Court's order.

**ATTESTATION RE ELECTRONIC SIGNATURES**

I, Jason Lang, am the ECF User whose ID and password are being used to file this JOINT LETTER BRIEF. I attest pursuant to Northern District Local Rule 5-1(i) that all other signatories to this document, on whose behalf this filing is submitted, concur in the filing's contents and have authorized this filing. I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Dated: November 26, 2024                    **ORRICK, HERRINGTON & SUTCLIFFE LLP**

By: _____/s/ *J. Jason Lang*_____
                    J. Jason Lang

```
1                    UNITED STATES DISTRICT COURT

2                   NORTHERN DISTRICT OF CALIFORNIA

3        Before The Honorable Thomas S. Hixson, Magistrate Judge

4

5  YANGTZE MEMORY TECHNOLOGIES    )
   COMPANY, LTD.,                 )
6                                 )
              Plaintiff,          )
7                                 )
   vs.                           )    No. C 23-05792-RFL
8                                 )
   MICRON TECHNOLOGY, INC.,       )
9  et al.,                        )
                                  )
10             Defendants.        )
   _____)
11

12                                   San Francisco, California
                                     Thursday, December 12, 2024
13

14   TRANSCRIPT OF PROCEEDINGS OF THE OFFICIAL ELECTRONIC SOUND
                RECORDING 11:00 - 11:30 = 30 MINUTES
15

   APPEARANCES:
16

   For Plaintiff:
17                                   Latham & Watkins
                                     505 Montgomery Street
18                                   Suite 2000
                                     San Francisco, California
19                                      94111
                                 BY: BRETT M. SANDFORD, ESQ.
20
                                     Latham & Watkins
21                                   355 South Grand Avenue
                                     Suite 100
22                                   Los Angeles, California 90071
                                 BY: THOMAS YEH, ESQ.
23

24            (APPEARANCES CONTINUED ON NEXT PAGE)

25
```

2

1  For Defendants:
2                              Orrick, Herrington &
                                Sutcliffe, LLP
3                              1000 Marsh Road
                               Menlo Park, California 94025
                          BY:  JEREMY J. LANG, ESQ.
4                              DIANA RUTOWSKI, ESQ.

5  Transcribed by:            Echo Reporting, Inc.
                              Contracted Court Reporter/
6                             Transcriber
                              echoreporting@yahoo.com
7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

3

1  Thursday, December 12, 2024                    11:00 a.m.

2                      P-R-O-C-E-E-D-I-N-G-S

3                          --oOo--

4          THE CLERK:  We're here in civil action 23-5792,

5  Yangtze Memory Technologies Company, Ltd versus Micron

6  Technology, Inc., et al., the Honorable Thomas S. Hixson

7  presiding.

8      Counsel, please state your appearances.  Let's start

9  with Plaintiff's counsel.

10         MR. YEH (via Zoom):  Good morning, everyone.

11 Thomas Yeh for Plaintiff YMTC.  With me is my partner Brett

12 Sandford.  And I believe in the gallery, in-house counsel

13 for YMTC, Daniel Chan, is also present.

14         THE COURT:  Good morning.

15         MR. SANDFORD (via Zoom):  Good morning.

16         MR. LANG (via Zoom):  Good morning, your Honor.

17 Jason Lang from Orrick on behalf of Defendant and Counter-

18 complainant Micron.  In the gallery is senior director of

19 litigation and licensing, Dave Westergard,, from Micron.

20 And I'll be arguing one of the motions with my partner.

21 I'll let her introduce herself.

22         THE COURT:  Good morning.

23         MS. RUTOWSKI (via Zoom):  Good morning, your

24 Honor.  Diana Rutowski from Orrick, also on behalf of

25 Micron.  Thank you.

4

1          THE COURT:  Good morning.

2      We're here on two discovery motions.  The first is ECF

3  number 180 concerning the source code.

4      Let me turn to Micron.  One of the arguments that YMTC

5  makes is that the item at issue was broken apart into

6  several items on the source code computer.  And so they

7  disagree with your representation that they're seeking 20-

8  percent of the code of that item.  But I would like to hear

9  your thoughts about that --

10          MR. LANG:  Yes.  I have two responses to that.

11  And I wish we could do an in-camera inspection.  And I think

12  they'll concede that that is the comprehensive version.

13  That is why they are requesting all of the pages from that

14  version.  The other part -- there's one unique part of the

15  other parts.  The other part -- the part we're talking about

16  today is the comprehensive version and basically has a lot

17  of the same material from a lot of those other parts.  It's

18  the most comprehensive version.  That's why they're

19  requesting all the pages from there.

20      The second response I would like to make, your Honor,

21  is, you know, it's 80-percent, in our view, of what they're

22  asking for.  You know, even if it was seven-percent as it --

23  what they're saying, their own case laws -- the case law

24  they're citing completely shows how excessive this is.  The

25  Manchester case was 85 out of 75,000.  That was 0.1-percent.

5

1  The <u>MobileMedia</u> case was 7,700 out of 4 million.  That's .2

2  percent.  And I've got to reiterate, your Honor, as I did in

3  the papers, for a discovery motion, this is absolutely

4  critical to Micron.  Not only was there this conviction of

5  UMC, there was a trial in 2024 in San Francisco.  In fact,

6  this is an ongoing threat.  I've worked for Micron 15 to 20

7  years.  This document is the absolute crown jewel.  This is

8  their most recent production version.  It's not just the

9  hundreds of millions of dollars that go into the design that

10  is reflected in that document.  They then build -- their new

11  fab is $100 billion.  This document is the absolute threat

12  to their ongoing life as a business.

13       We're just asking that they be reasonable.  Thirty-

14  percent, 20-percent of this document is not reasonable.  We

15  made the inspection, to do it in California at their urging.

16  They've done 10 inspections.  They're doing one tomorrow.

17  They're doing one next week.  They can come, take notes.

18  They can cite this -- from their notes this document.  But

19  the idea that 20-percent of this document would be out there

20  when there are these ongoing threats is just -- I cannot

21  stress the importance of this motion -- of this hearing,

22  your Honor.

23       THE COURT:  All right.  Thank you.  If I

24  understand the protective order correctly, the people who

25  would have access to the printouts would be YMTC's experts

*Echo Reporting, Inc.*

6

1  and outside counsel, but that the client would not receive

2  that.  Is that correct?

3          MR. LANG:  That's right, your Honor.  But it would

4  be out there in paper.  And those same people can just, you

5  know, drive down the street and come view it in our office.

6  And we're saying that 15 pages is reasonable.  That's what

7  we're asking for.  They can print the most 15 important

8  pages.  And then for the other ones, just take notes.  If

9  you have to go back, come back.  They've done more than 10

10 inspections, you know, we're very reasonable.  If they ask

11 for an inspection in two days, we'll make it happen.

12         THE COURT:  All right.  Thank you.

13     And YMTC, let's turn to you for your own response.

14         MR. SANDFORD:  Thank you, your Honor.  I'll

15 address both those points in reverse order, if I may,

16 starting with security.

17     I take Counsel for his word.  We understand they

18 believe this is very confidential information.  It's not

19 really the issue.  We jointly negotiated a protective order

20 for exactly that reason.  It's a -- an extremely restrictive

21 protective order.  There's been no suggestion that there's

22 been any compromises to date.  As your Honor correctly

23 noted, it's only outside counsel and experts that would be

24 viewing this material.  And we've reassured them that we

25 will continue to follow that as we have.  So it's really

7

1  that -- the whole concerns about security, while valid on

2  their part, are misplaced for this argument.  It's not a

3  basis to block the discovery.  They agreed to 1,500 pages

4  under the protective order and 30 consecutive pages.  If

5  this was a crown jewel, as it is and as it may be, then they

6  should have negotiated that into the protective order.  And

7  their concerns about that they're out there in hard copy,

8  well, that exists whether they're 73 pages or 15 pages.

9  We're just talking the amount of it, right?  That -- those

10  concerns aren't really -- they don't really drive force for

11  this specific request that they're making.  So that's to the

12  protective order.

13       The second point is just briefly on the percentages.

14  Really, the premise of their argument is that we're

15  requesting an excessive percentage.  And depending on how

16  you look at this traveler's document, it's -- they say it's

17  20-percent, and we say it's lower.  It doesn't really matter

18  because that's not what the protective order says.  We think

19  they're dividing by one chapter of the total book as opposed

20  to the over 1,000 page book.  And that's the right thing.

21  But it really doesn't matter because the protective order is

22  crystal clear.  It was jointly negotiated and ordered, no

23  more than 30 pages, no more than 1,500 total, or you can

24  object for excessiveness like they're doing.  There's no

25  percentage cap.  And really, the way it's being calculated,

*Echo Reporting, Inc.*

8

1  we disagree with how they're doing it, but it's not really

2  germane here.

3       The point is, we started at 90.  We tried to be

4  reasonable to compromise.  It's only 73 pages.  We cite law

5  that we think supports that.  They cite zero cases.  The

6  protective order is within this.  And we think there's

7  really no basis in the protective order, the cases, or

8  really any practical impacts of our request.  It's facially

9  reasonable and should be granted.

10            THE COURT:  All right.

11       And does Micron have any reply arguments you would like

12  to make?

13            MR. LANG:  Yes, your Honor.  The 1,500 pages and

14  the 30 consecutive pages is about something totally else.

15  That's about when you're looking at -- there's many millions

16  and millions of pages.  The excessive clause was negotiated

17  into the PO for this very reason.  And the idea that we

18  didn't cite any cases, we're citing their own cases.  Again,

19  if you look at Manchester, that was .1-percent.  If we look

20  at MobileMedia, that was .2 percent.  So when you look at

21  our 15 pages that we're asking that they take, even if you

22  use their math, which we disagree with, and you get to

23  1,000, those cases are consistent with the 15 -- with the 15

24  pages.

25            THE COURT:  Okay.  Thank you.

9

1    I would like to turn to the other motion, ECF number
2  181, which is about YMTC's interrogatory number 12.
3    And let me turn to YMTC.  Micron seems to have a good
4  point that if they have to respond to rog 12 right now, they
5  would have to provide non-infringement contentions for 188
6  claims that will be dropped from the case within likely a
7  few months.  And that seems like it would be a wasted
8  effort.  And so let me ask YMTC, why should I tell them to
9  do that?
10    MR. YEH:  Good morning, your Honor.  So I know
11  Micron brings up in their briefing the number of total
12  claims at issue.  What's missing there is there's actually
13  only 39 independent claims at issue.  And in view of some of
14  the burden arguments, YMTC is willing to limit its request
15  to non-infringement positions for just the 39 independent
16  claims at issue.  And why it's important to have those now
17  rather than, as Micron proposes, in April is because the
18  parties are going through the claim construction process
19  now.
20    As your Honor is aware, during claim construction, the
21  parties identify the claim terms where the meaning of the
22  term is in dispute, oftentimes because the interpretation of
23  a particular term can affect the parties' infringement
24  disputes.  And YMTC's proposal on why these should be
25  exchanged now rather than after the claim construction

10

1  process as Micron proposes is so that both parties can go

2  into the claim construction process aware of each other's

3  respective non-infringement positions.  Micron has asserted

4  patents in this case too.

5       I think, fundamentally, the issue with Micron's

6  proposal of waiting until after the parties and Court has

7  gone through the entire claim construction process, so at

8  which point Judge Lin will have issued a claim construction

9  order -- waiting until that point to exchange

10 non-infringement positions will be wasteful and inefficient.

11 The net result is there's going to be a significant risk

12 under Micron's proposal that terms should -- that should

13 have been construed because of the non-infringement

14 positions taken by the parties won't be construed because

15 the parties don't know during claim construction what the

16 non-infringement positions are.  And that would be

17 inefficient because, as your Honor is aware, a jury can't

18 resolve claim construction issues.  So what's going to

19 happen is if there are later arising claim construction

20 disputes, we're going to need another round exchanging

21 constructions, another round of claim construction briefing

22 before Judge Lin, and another claim construction hearing.

23       Right now, we can avoid all that by Micron providing

24 its non-infringement positions for the 39 independent

25 claims, and we would avoid the risks of having wasted claim

11

1  construction efforts.

2         THE COURT:  And so are you saying that having the

3  non-infringement contentions for the 39 independent claims

4  would likely assist the parties in deciding which claims

5  need to be presented to Judge Lin for claim construction?

6         MR. YEH:  Yes, your Honor.

7         THE COURT:  All right.

8     Well, let me turn to Micron.  YMTC is backing down from

9  their request that Micron provide non-infringement

10 contentions for all 228 claims at issue.  And they're now

11 saying just the 39 independent claims.  That's a change in

12 what they had argued for in the joint discovery letter

13 brief, and it seems like a big one.  So what are your

14 thoughts on YMTC's new proposal at this hearing?

15        MS. RUTOWSKI:  It is a change.  And, your Honor, I

16 would submit that it's still inconsistent with the case law,

17 even the case law that YMTC has cited.  All of the cases

18 cited involve situations where the claims had already been

19 whittled down by the plaintiffs.  The Halo Electronics case

20 that YMTC cites, that had gone down to 15 claims nearly

21 three years into the case.  Claim construction hearing had

22 already been held in that case.  The Implicit Networks case

23 cited by YMTC as well, that had been pending for over a year

24 and a half.  A claim construction order had issued.  The

25 plaintiffs there had already updated their infringement

*Echo Reporting, Inc.*

12

1  contentions with source code citations after that claim

2  construction order.

3      So, you know, even this proposal of 39 claims, you

4  know, we don't know which, if any, of those 39 claims will

5  be in the phase one narrowing that's imminent in January.

6  We don't know which, if any, of those 39 claims would be in

7  the phase two narrowing that occurs after the claim

8  construction order and which we think, in light of the case

9  law, would be the appropriate time for non-infringement

10  contentions to be exchanged.

11      So again, you know, even with this narrowing that YMTC

12  is proposing here, it is inconsistent with the timing and

13  the procedure that's set forth in the case law, and it still

14  leads to potential wasteful efforts.

15      And, your Honor, I would just make a couple additional

16  points.  One of the cases that we cite, the SpeedTrack case,

17  talks about how the burden is on YMTC at this phase in the

18  case and that, typically, with respect to contention

19  interrogatories, you know, those judges typically use their

20  discretion to order responses later in the case.  And YMTC,

21  you know, has not, as the party prosecuting this case, met

22  its burden to show that -- under that case and others, that

23  contention interrogatories -- you know, that it would be

24  appropriate to respond to this contention interrogatory at

25  this stage.  As that case says, you know, Plaintiff, YMTC,

13

1 is the party prosecuting the case.  They know what their

2 contentions are.  They know what constructions they need to

3 show infringement.  They bear the burden.

4      The other point I would make is that the infringement

5 contentions that we have from YMTC at this point are just,

6 you know, fatally deficient.  A hundred and eighteen times

7 they rely on information and belief.  They are conclusory.

8 You know, we need more detailed contentions that cite to the

9 source code, consistent with the Implicit Networks case,

10 before we can meaningfully respond with non-infringement

11 positions.

12      And as my colleague, Jason Lang, pointed out, YMTC

13 since serving these, they've now inspected the source code

14 computer for 13 days.  They've got six more days of

15 inspection lined up starting tomorrow.  So we would propose

16 an exchange of infringement contentions prior to -- with

17 source code citations after that phase two narrowing, before

18 non-infringement contentions would become ripe in this case.

19          THE COURT:  Well, if you don't think your

20 opponent's infringement contentions are good enough, you can

21 move to compel.  But I don't think you can use your belief

22 that the other side's contentions are not well developed to

23 avoid your own obligations in discovery.

24      So if I order Micron to provide its non-infringement

25 contentions, I would also need to specify a deadline.  It

14

1  looks like under the case schedule, YMTC has to narrow its

2  case from 228 claims to 70 claims by January 14th.  So at

3  that point, most of the narrowing and whittling down will

4  have been accomplished.  So if I order Micron to provide

5  non-infringement contentions for the 39 independent claims

6  and I set a date -- a deadline of after January 14th, that

7  seems like a lot of the whittling, or most of it, would

8  already have happened.  And, of course, if they were to drop

9  any of those 39 independent claims by January 14th, then

10 there would be no need for Micron to provide

11 non-infringement contentions for them.

12     So what do you recommend?  If I were to -- I understand

13 you don't want me to order Micron to provide

14 non-infringement contentions for the 39 independent claims,

15 but I'm considering whether to do that.  If I were to do

16 that, what would Micron recommend as a deadline to provide

17 its non-infringement contentions in view of the January 14th

18 deadline for YMTC to do the first set of narrowing?

19          MR. LANG:  Your Honor, may I jump in here and make

20 one point?  To inform you, there's been discussions.  I have

21 asked YMTC if they would be willing to supplement their

22 infringement contentions with citations of source code.  We

23 haven't moved because I think it's fair for the parties to

24 be able to supplement those contentions with source code.

25 For number one, when Micron filed its infringement

*Echo Reporting, Inc.*

15

1  contentions or served them, we didn't have access to their

2  source code because they were asking us to go to China to

3  view it, which the Court later rejected.  When they served

4  their first wave of infringement contentions, they either

5  didn't have access to our source code or had very little

6  access to the source code because of a dispute that the

7  Court later rejected.

8       We would ask that after that narrowing, the parties be

9  given, say, three weeks to supplement their infringement

10 contentions with citations of source code, and then, say,

11 three weeks after that for both parties to provide

12 non-infringement contentions on the independent claims

13 should the Court be inclined to order something along those

14 lines.

15           THE COURT:  The infringement contentions are

16 governed by the Patent Local Rules, and they have not been

17 referred to me.  Rather, discovery has been referred to me.

18 So I'm here to address interrogatory 12, and that's it.

19 That's the discovery dispute that is in front of me.  So --

20      And in responding to a contention discovery request,

21 your contentions are whatever they are.  If your contention

22 is that you can't develop your non-infringement theories

23 because you think the other side's are -- disclosures are

24 inadequate, as long as that is a truthful statement of your

25 contentions, then that would seem to be an acceptable

16

1  discovery response.  You would probably want to update it

2  later as the other side makes more disclosures.  But in my

3  opinion, a contention rog, just ask what are your

4  contentions, and then you decide what your contentions are.

5       And so -- but I would like to turn back to a deadline

6  in view of the January 14th deadline for YMTC to narrow its

7  case down to 70 claims.  If I were to order Micron to

8  provide non-infringement contentions for the 39 independent

9  claims, what does Micron think a reasonable deadline ought

10 to be?

11          MR. LANG:  I think at least a month after that.

12 This is complicated technology.  There's a lot of discussion

13 back and forth with Micron that's involved in this.  So we

14 would request at least a month after the narrowing.

15          THE COURT:  And let me turn to YMTC.  A month

16 after the narrowing would be mid-February.  Is there any

17 case-related reason why you would need the -- a response to

18 rog 12 before then?

19          MR. YEH:  Yes, your Honor.  It's because the claim

20 construction process is going on in parallel.  And that's

21 where the non-infringement contentions are really necessary

22 to flesh out the parties' disputes, so we can work

23 cooperatively and decide what terms actually need to be

24 presented before Judge Lin and avoid potentially having to

25 redo the claim construction process because disputes arise

*Echo Reporting, Inc.*

17

1    based on Micron's non-infringement position.

2        So our position -- you know, and let me just back up.

3    The parties proposed constructions are due January 6, so

4    that's when the parties have to say, "This is what I think

5    term X means."  And that's when it would be most helpful to

6    have the non-infringement contentions.  If your Honor is

7    inclined to wait until the claim narrowing, our position

8    would be a week or so after that.

9        And just to address one last point.  With respect to

10   how long this case has been pending for.  So with respect to

11   the first wave of patents, Micron has had YMTC's contentions

12   I think since -- let me just make sure I get this right --

13   since May 2024, so nearly seven months ago.  And with

14   respect to the remaining patents, Micron has had those

15   contentions since October, so over two months ago.  And by

16   the time we get into January, that's going to be three

17   months or more.

18       During this time, Micron has analyzed the claims.  They

19   filed 22 IPRs that addressed the asserted claims.  So the

20   very same claims they're refusing to provide their

21   non-infringement contingence for, they've already found

22   prior art, they've made invalidity arguments on a claim by

23   claim, element by element basis.  And those are big filings,

24   your Honor.  They are hundreds of pages long.

25       So the notion that it's too burdensome for Micron to

18

1  provide its non-infringement contentions, really basic

2  position in this case, because of burden and especially

3  since we're proposing to even narrow that -- lower that

4  burden to just the independent claims, you know,

5  respectfully, we disagree with that positions (sic).  We

6  think they should be provided the non-infringement

7  contentions as soon as possible, ideally before January 6th,

8  in YMTC's perspective.  But if not, then certainly within a

9  week of the January 14th narrowing.

10          THE COURT:  Well, I think Micron's proposal for a

11  month after the January 14th narrowing is appropriate.

12  Micron needs time after it knows how the first hearing has

13  turned out to draft good responses to interrogatory 12.

14      So I do think it's appropriate for Micron to answer

15  interrogatory 12 for the 39 independent claims, so I am

16  going to order that.  But I will go with Micron's proposed

17  deadline of 30 days after January 14th for that response.  I

18  believe that addresses the discovery issues that the parties

19  have briefed.

20      But let me just turn to YMTC.  Are there any other

21  matters that you would like to raise at the hearing today?

22          MR. YEH:  No, your Honor.  Thank you very much.

23          THE COURT:  And now let me turn to Micron.  Are

24  there any other matters that you would like to raise at the

25  hearing today?

19

1          MR. LANG:  One question for you, your Honor.

2      We had actually considered filing a motion or a letter

3  brief relating to their infringement contentions, and we

4  were unclear from the precedent that we looked at whether

5  the proper form for that would be to submit that to you or

6  to file a motion with the Court.  And you had commented on

7  that, and I thought you might have an answer for us.

8          THE COURT:  I don't know that every judge has the

9  same practice, and so I do not know what Judge Lin's

10 preference would be.  I do not understand the current

11 discovery referral to encompass the disclosures that are

12 made under the Patent Local Rules.  That's -- I don't

13 believe those are currently in front of me.  She could refer

14 them to me, and then they would be in front of me.  I don't

15 understand them to be currently in front of me.

16         MR. LANG:  Okay.  Thank you, your Honor.

17         THE COURT:  All right.

18     And with that, the matter is submitted, and I will

19 issue a written order.

20         THE CLERK:  Thank you, everyone.  We're off the

21 record in this matter.  Court is in recess.

22     (Proceedings adjourned at 11:30 a.m.)

23

24

25

20

1                    CERTIFICATE OF TRANSCRIBER

2

3        I certify that the foregoing is a true and correct

4   transcript, to the best of my ability, of the above pages of

5   the official electronic sound recording provided to me by

6   the U.S. District Court, Northern District of California, of

7   the proceedings taken on the date and time previously stated

8   in the above matter.

9        I further certify that I am neither counsel for,

10  related to, nor employed by any of the parties to the action

11  in which this hearing was taken; and, further, that I am not

12  financially nor otherwise interested in the outcome of the

13  action.

14

15

16

17            Echo Reporting, Inc., Transcriber

18                Monday, December 23, 2024

19

20

21

22

23

24

25

*Echo Reporting, Inc.*

JARED BOBROW (STATE BAR NO. 133712)
jbobrow@orrick.com
JASON LANG (STATE BAR NO. 255642)
jlang@orrick.com
DIANA M. RUTOWSKI (STATE BAR NO. 233878)
drutowski@orrick.com
ORRICK, HERRINGTON & SUTCLIFFE LLP
1000 Marsh Road
Menlo Park, CA  94025-1015
Telephone:     +1 650 614 7400
Facsimile:      +1 650 614 7401

*Attorneys for Defendant and Counterclaim
Plaintiff Micron Technology, Inc., and Defendant
Micron Consumer Products Group, LLC*

## UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

## SAN FRANCISCO DIVISION

| | |
|---|---|
| YANGTZE MEMORY TECHNOLOGIES COMPANY, LTD., <br><br> Plaintiff, <br><br> v. <br><br> MICRON TECHNOLOGY, INC., et al., <br><br> Defendants. | Case No. 3:23-cv-05792-RFL <br><br> **MICRON'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE** <br><br><br> **DEMAND FOR JURY TRIAL** |
| MICRON TECHNOLOGY, INC., <br><br> Counterclaim Plaintiff, <br><br> v. <br><br> YANGTZE MEMORY TECHNOLOGIES COMPANY, LTD., and YANGTZE MEMORY TECHNOLOGIES, INC., <br><br> Counterclaim Defendants. | |

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

# **TABLE OF CONTENTS**

I.     BACKGROUND .................................................................................................. 1

II.    THE MAGISTRATE JUDGE'S ORDER IS CLEARLY ERRONEOUS. ........................ 3

III.   CONCLUSION ................................................................................................... 5

ORRICK, HERRINGTON
& SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

MICRON'S MOTION FOR RELIEF
CASE NO. 3:23-CV-05792-RFL

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*In re Deutsche Bank Tr. Co.*,
   605 F.3d 1373 (Fed. Cir. 2010)................................................................ 5

*In re Remington Arms Co., Inc.*,
   952 F.2d 1029 (8th Cir. 1991)................................................................. 5

*Synopsys, Inc. v. Atoptech, Inc*,
   No. 3:13-cv-02965-MMC (N.D. Cal. Sept. 16, 2016) .............................. 4


**Other Authorities**

15 C.F.R. 744.11 ........................................................................................... 1

15 C.F.R. 772.1 ............................................................................................. 1

83 Fed. Reg. 54,521 (Oct. 30, 2018)............................................................ 5

87 Fed. Reg. 77,506 (Dec. 19, 2022) ........................................................... 1

Fed. R. Civ. P. 72 ...................................................................................... 1, 3

https://www.bis.doc.gov/index.php/policy-guidance/faqs#faq_134;................ 1

http://www.justice.gov/opa/pr/taiwan-company-pleads-guilty-trade-secret-theft-
   criminal-case-involving-prc-state-owned ................................................. 5

USDC, N. Distr. of Cal. L.R. 72 .................................................................. 1

ORRICK, HERRINGTON
& SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- i -

MICRON'S MOTION FOR RELIEF
CASE NO. 3:23-CV-05792-RFL

Appx362

Pursuant to N.D. Cal. L.R. 72 and Fed. R. Civ. P. 72(a), Micron objects to the portion of Magistrate Judge Hixson's December 12, 2024 Discovery Order that directs Micron to provide YMTC with printouts of 73 pages of source code from a highly sensitive document called the "150 Series Traveler Presentation." Dkt. 186 at 1-3. In that portion, the Magistrate Judge clearly erred. Micron therefore requests that the Court set aside that portion of the Magistrate Judge's Order and limit Micron's production of printouts of the 150 Series Traveler Presentation to 15 pages.

## I. BACKGROUND

YMTC is a Chinese state-owned entity that was established in 2016 to develop 3D NAND memory. Dkt. 170 at 28-29. Soon thereafter, YMTC began hiring Micron engineers who worked on the development of Micron's 3D NAND, and it has hired 20 Micron engineers to date. *Id.* at 29.

On December 19, 2022, the U.S. government added YMTC to the Bureau of Industry and Security's ("BIS") Entity List for posing "a significant risk of becoming involved in activities contrary to the national security or foreign policy interests of the United States." 87 Fed. Reg. 77,506 (Dec. 19, 2022); *see also* 15 C.F.R. 744.11(b). The U.S. government prohibits the "export, reexport, and in-country transfer" of "any item" (i.e., "commodities, software, and technology") to YMTC, 15 C.F.R. 744.11(a), and to those "acting as an agent, front, or shell company" for YMTC, 15 C.F.R. 744.11(c)(2). It also requires others to "take *extra due diligence*" when transferring "items" to "affiliate[s] of" YMTC—which would include its outside counsel.[1] For these reasons, after YMTC filed cases against Micron in 2023 and 2024 that asserted 19 patents against a dozen products, Micron has exercised "extra due diligence" to comply with the regulations that attach to entities on the Entity List. Micron also has exercised caution in allowing YMTC and its agents to possess highly sensitive information outside of controlled environments.

On July 19, 2024, the Magistrate Judge entered a Protective Order ("PO") that sets forth, *inter alia*, the procedures for reviewing source code materials. Dkt. 81 ¶ 9. The parties can inspect the source code, take notes, and use those notes to develop positions, and the inspecting party may request "paper copies … of portions of the materials" that are "reasonably necessary to facilitate … preparation of court filings, pleadings, expert reports, or other papers, or for deposition or trial."

---

[1] *See* https://www.bis.doc.gov/index.php/policy-guidance/faqs#faq_134; 15 C.F.R. 772.1.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 1 -

MICRON'S MOTION FOR RELIEF
3:23-CV-05792-RFL

Appx363

*Id.* ¶ 9(j). According to the PO, however, the producing party can object "that the portions requested to be printed are excessive and/or not reasonably necessary to any case preparation," which Micron did here. *Id.* The requesting party has the burden of overcoming any objection. Dkt. 186 at 2.

Consistent with the PO, Micron has made a substantial amount of source code available for inspection in a controlled environment (e.g., on a secured computer at counsel's office), including recipes, layouts, circuit schematics, and documents called "Traveler Presentations." As Micron's Senior Director of Licensing & Litigation has explained, the Traveler Presentations are Micron's "crown jewel" technical material because they contain extremely sensitive and valuable information describing in detail the highly confidential fabrication processes used to manufacture each series of Micron's 3D NAND products, the technical reasons for employing those processes (and not others), and the physical arrangement of the fabricated elements. Ex. 1 (Declaration of David Westergard) ¶¶ 1-4. The Traveler Presentations contain everything needed to copy Micron's products. *Id.* For Micron's "150 Series" product, which is the most recent commercial series of its 3D NAND technology, Micron made available for secure inspection the 150 Series Traveler Presentation, which comprises 351 pages of comprehensive details on Micron's 3D NAND (other than CMOS) for the 150 Series.[2] *Id.* ¶¶ 5-7. Micron also made available a nearly identical version of the 150 Series Traveler Presentation that is split into 3 separate documents. *Id.* ¶ 8. Specifically, pages 4-155 of the collated document correspond to pages 4-155 in "Pt 2," pages 156-259 correspond to pages 4-107 in "Pt 3," and pages 260-351 correspond to pages 4-94 in "Pt 4." *Id.*

Micron applies its highest security level for confidential documents to these Traveler Presentations. *Id.* ¶ 10. For a given Traveler Presentation, Micron limits access of the entire document to fewer than 20 employees (excluding for legal purposes) out of the 50,000+ employees at Micron. *Id.* And for almost all of those individuals who have access, Micron has implemented automatic security measures that prevent these individuals from viewing Traveler Presentations outside of a special "secure browser," which prohibits any screen-sharing on virtual meetings,

---

[2] YMTC previously argued the 150 Series Traveler Presentation contains "1000+ page[s]." Dkt. 180 at 3. That is misleading. YMTC's count appears to include pages from the duplicate version discussed above and another source code document directed to a NAND CMOS device, from which YMTC has *not* requested any printouts. *See* Ex. 1 ¶¶ 5-9.

MICRON'S MOTION FOR RELIEF
3:23-CV-05792-RFL

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

copying-and-pasting text, printing, and downloading. *Id.* ¶ 11. Protecting these Traveler Presentations is critical to Micron's ongoing success in the semiconductor industry. *Id.* ¶¶ 12-14.

Over the last six months, YMTC has conducted numerous inspections of Micron's source code and, until now, has largely been reasonable in requesting "paper copies." After the first two inspections—in which ***its experts*** inspected the source code—YMTC requested 6 pages of layout images and 7 pages from 3 different Traveler Presentation Series. After the third expert-conducted inspection, YMTC requested 49 pages of layout images and 28 pages from 5 different Traveler Presentation Series. In short, in these expert-conducted inspections, YMTC made no request for more than 5 pages from a single Traveler Presentation Series. The last two inspections, however, were ***not*** conducted by an expert but by a Latham & Watkins employee (Shuai Yuan). Following those non-expert inspections, YMTC requested 73 pages from a single Traveler Presentation Series (150 Series), which amounts to 20% of the document and substantially more than any prior request. Indeed, if you exclude non-substantive pages, such as title, summary, background, and other irrelevant slides—which YMTC has no reason to use—that percentage jumps to roughly 87%.

Micron objected to YMTC's last request as excessive and not reasonably necessary to any case preparation because (a) taking paper copies of such a large portion of the 150 Series Traveler Presentation out of the controlled environment creates a substantial security risk to Micron and could compromise its competitive position and status as a leading-edge innovator (*id.* ¶¶ 13-14); and (b) an enormous disparity exists between this request for 73 pages of the 150 Series Traveler Presentation—based on YMTC's law firm's review of Micron's newest commercial technology— and YMTC's prior requests for no more than 5 pages per Traveler Presentation Series.

## II.     THE MAGISTRATE JUDGE'S ORDER IS CLEARLY ERRONEOUS.

A magistrate judge's nondispositive order should be modified or set aside if it is clearly erroneous. Fed. R. Civ. P. 72. Here, the Magistrate Judge found YMTC met its burden of persuasion in requesting 73 printed pages from the 150 Series Traveler Presentation when (1) "the volume of the requested source code … is within the presumptive limits of" ¶ 9(j); (2) "the care YMTC has taken to request pages that both sides agree are relevant" "tends to demonstrate [the] request … focused on materials needed for case preparation"; and (3) "strong protections in the [PO] … apply

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 3 -

MICRON'S MOTION FOR RELIEF
3:23-CV-05792-RFL

Appx365

to the print outs." Dkt. 186 at 1-3. These findings demonstrate clear error for three reasons.[3]

*First*, although the PO imposes "limits" on the number of total pages and consecutive pages across all requests in discovery, the PO requires that "the portions requested to be printed"—*for each individual request*—not be "excessive." Dkt. 81 ¶ 9(j). In other words, exceeding the total page or consecutive page "limit" would certainly be "excessive," but the inquiry does not stop there. The Magistrate Judge thus erred in rigidly linking the meaning of "excessive" to the PO's page "limits," without analyzing whether the request portions are "excessive." Here, as mentioned, YMTC's request covers roughly *87%* of the substantive portion of the 150 Series Traveler Presentation and is 14 times larger than any prior request for pages of other Traveler Presentation Series. This request is excessive and seeks to circumvent the PO's inspection procedures.

*Second*, contrary to what the Magistrate Judge found (Dkt. 186 at 3), the fact that YMTC limited its request to pages "that both sides agree are relevant" does *not* demonstrate that "the portions requested to be printed" are "reasonably necessary to [YMTC's] case preparation activity." Micron made the 150 Series Traveler Presentation available for inspection in a controlled environment because of its purported relevance, and the PO allows YMTC and its experts to review this source code material so that it can take notes and develop litigation positions. Indeed, Micron continues to allow YMTC to do so. Thus, while relevance matters for determining what material should be made available, the PO and the law require a greater showing to justify printing source code material for use outside the controlled environment. For example, in *Synopsys, Inc. v. Atoptech, Inc*, a court in this District found that the plaintiff failed to meet its burden of persuasion because it made "no effort to tether its broad request of source code to specific purposes allowed under the PO, nor [did the plaintiff] provide any explanation of why the amount of requested portions is 'reasonably necessary.'" Ex. 2 (No. 3:13-cv-02965-MMC, Dkt. 846 (N.D. Cal. Sept. 16, 2016) at 3). Similarly, here, YMTC argued that the requested pages are "relevant" and that Micron should produce them so they "can be cited in pleadings, expert reports, etc." Dkt. 180 at 4-5. But this vague and bald assertion—which the Magistrate Judge apparently credited—fails to provide a

---

[3] To the extent the Court disagrees, Micron requests the Court order the parties to confer regarding PO modifications, such as Traveler Presentation page limits and extra restrictions.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 4 -

MICRON'S MOTION FOR RELIEF
3:23-CV-05792-RFL

Appx366

1 specific purpose or explain why YMTC's request is "reasonably necessary," as the PO requires.

2     ***Third***, while the PO contains protections that apply to the requested pages, these protections

3 are not impregnable. YMTC's request that a large portion of the 150 Series Traveler Presentation

4 be produced in a non-secure format (paper) outside of the existing controlled environment is asking

5 Micron to bear a substantial risk. Ex. 1 ¶¶ 10-14. The Federal Circuit has recognized "there may be

6 circumstances in which even the most rigorous efforts of the recipient of such information to

7 preserve confidentiality in compliance with the provisions of such a protective order may not

8 prevent inadvertent compromise." *In re Deutsche Bank Tr. Co.*, 605 F.3d 1373, 1378 (Fed. Cir.

9 2010) (recognizing this when discussing prosecution bars). But rather than mere "inadvertent"

10 compromise, a ***real*** threat exists here of untoward actions. *In re Remington Arms Co., Inc.*, 952

11 F.2d 1029, 1033 (8th Cir. 1991) (finding POs can be ineffective since "once the information is

12 wrongfully released, the trade secret is lost forever"). For example, just a few years ago, United

13 Microelectronics Corp. ("UMC") pleaded guilty to criminal theft of the very kind of information at

14 issue here after it agreed to develop memory devices with a Chinese state-owned company and

15 recruited former Micron employees, who brought with them and used highly sensitive Micron

16 information to develop UMC's memory technology.[4] Notably, the U.S. government added the

17 Chinese state-owned company that worked with UMC to the same Entity List discussed above

18 because, like YMTC, it posed a national security concern. 83 Fed. Reg. 54,521 (Oct. 30, 2018).

19     Here, the Magistrate Judge failed to weigh these concerns, relying on the protections of the

20 PO ***without*** considering the real threat that exists and "extra due diligence" necessary. When

21 properly weighed, the significant and unnecessary security risk—and the risk of irreparable injury

22 to Micron—that printed copies of such an excessive portion of the 150 Series Traveler Presentation

23 may cause substantially outweighs YMTC's need. A far more reasonable number is 15 pages,

24 which is still triple the pages that YMTC has requested for any other Traveler Presentation Series.

25 **III.   CONCLUSION**

26     For the foregoing reasons, Micron respectfully requests that the Court grant its motion.

27

28 [4] *See* www.justice.gov/opa/pr/taiwan-company-pleads-guilty-trade-secret-theft-criminal-case-involving-prc-state-owned.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 5 -

MICRON'S MOTION FOR RELIEF
3:23-CV-05792-RFL

1    Dated:  December 24, 2024                          ORRICK, HERRINGTON & SUTCLIFFE LLP

2

3                                                       By:  _____
                                                                    */s/ Jared Bobrow*
4                                                                     Jared Bobrow
                                                        *Attorneys for Defendant and Counterclaim*
5                                                           *Plaintiff Micron Technology, Inc., and*
                                                           *Defendant Micron Consumer Products*
6                                                                       *Group, LLC*

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 6 -                                    MICRON'S MOTION FOR RELIEF
                                                        3:23-CV-05792-RFL

Appx368

# EXHIBIT 1

1   JARED BOBROW (STATE BAR NO. 133712)
    jbobrow@orrick.com
2   JASON LANG (STATE BAR NO. 255642)
    jlang@orrick.com
3   DIANA M. RUTOWSKI (STATE BAR NO. 233878)
    drutowski@orrick.com
4   ORRICK, HERRINGTON & SUTCLIFFE LLP
    1000 Marsh Road
5   Menlo Park, CA 94025-1015
    Telephone:  +1 650 614 7400
6   Facsimile:   +1 650 614 7401

7   *Attorneys for Defendant and Counterclaim Plaintiff*
    *Micron Technology, Inc., and Defendant*
8   *Micron Consumer Products Group, LLC*

9
                  UNITED STATES DISTRICT COURT
10
                 NORTHERN DISTRICT OF CALIFORNIA
11
                    SAN FRANCISCO DIVISION
12

13
    YANGTZE MEMORY TECHNOLOGIES          Case No. 3:23-cv-05792-RFL
14  COMPANY, LTD.,
                                          **DECLARATION OF W. DAVID**
15              Plaintiff,               **WESTERGARD IN SUPPORT OF**
                                          **MICRON'S MOTION FOR RELIEF**
16         v.                             **FROM NONDISPOSITIVE PRETRIAL**
                                          **ORDER OF MAGISTRATE JUDGE**
17  MICRON TECHNOLOGY, INC., et al.,

18              Defendants.

19  ────────────────────────────

20  MICRON TECHNOLOGY, INC.,

21              Counterclaim Plaintiff,

22

23         v.

24  YANGTZE MEMORY TECHNOLOGIES
    COMPANY, LTD., and YANGTZE
25  MEMORY TECHNOLOGIES, INC.,

26              Counterclaim Defendants.

27  ────────────────────────────

28

I, W. David Westergard, hereby declare:

1.     I am over 18 years of age and not a party to this action. I have personal knowledge of the facts stated in this declaration and, if called upon as a witness, would and could competently testify to them under oath.

2.     I have worked at Micron Technology, Inc. (Micron) for close to 30 years in various roles, including serving as Senior Director of Licensing and Litigation for the last 8 years. In this role, as the title suggests, I am generally responsible for licensing and litigation at Micron. I handle litigation matters that involve Micron, including working as the lead liaison with outside counsel. My role also includes general M&A and deal activity with third-parties. Through my time at Micron, I have become generally familiar with the security measures that Micron takes to protect its highly confidential information.

3.     Micron creates a number of confidential technical documents for each commercial series of its 3D NAND technology. One of these documents is called a "Traveler Presentation" (also known as a "Trainer" or "Traveler Trainer").

4.     The Traveler Presentations are Micron's "crown jewel" confidential technical documents. They contain extremely sensitive and valuable information that describe in detail the highly confidential fabrication processes used to manufacture each series of Micron's 3D NAND products, the technical reasons for employing those processes (and not others), and the physical arrangement of the fabricated elements. In other words, the Traveler Presentations contain everything needed to copy Micron's products.

5.     Micron's most recent commercial series of its 3D NAND technology is the "150 Series" products. Micron has a "150 Series Traveler Presentation" for this series.

6.     I understand that Micron has made available for inspection in this litigation the following documents concerning the 150 Series Traveler Presentation:

        a.   "…\NAND RG Traveler 150 Presentation Pt 1 en.pptx";

        b.   "…\NAND RG Traveler 150 Presentation Pt2 en.pptx";

        c.   "…\NAND RG Traveler 150 Presentation Pt3 en.pptx";

        d.   "…\NAND RG Traveler 150 Presentation Pt4 en.pptx"; and

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 2 -

DECL. OF W. DAVID WESTERGARD ISO MICRON'S
MOTION FOR RELIEF
CASE NO. 3:23-cv-05792-RFL

Appx371

e.   "…\NAND 3D CMOS 150 Presentation en.pptx."

7.   The document entitled "…\NAND RG Traveler 150 Presentation Pt 1 en.pptx" comprises 351 pages of comprehensive information on fabrication processes used to manufacture Micron's 150 series 3D NAND (other than CMOS), the technical reasons for employing those processes (and not others), and the physical arrangement of the fabricated elements.

8.   Micron has also split this 150 Series Traveler Presentation into 3 separate documents. In particular, pages 4-155 of the 150 Series Traveler Presentation ("…\NAND RG Traveler 150 Presentation Pt 1 en.pptx") are nearly identical and correspond to pages 4-155 in "…\NAND RG Traveler 150 Presentation Pt2 en.pptx"; pages 156-259 of the 150 Series Traveler Presentation ("…\NAND RG Traveler 150 Presentation Pt 1 en.pptx") are nearly identical and correspond to pages 4-107 in "…\NAND RG Traveler 150 Presentation Pt3 en.pptx"; and pages 260-351 of the 150 Series Traveler Presentation ("…\NAND RG Traveler 150 Presentation Pt 1 en.pptx") are nearly identical and correspond to pages 4-94 in "…\NAND RG Traveler 150 Presentation Pt4 en.pptx."

9.   The document entitled "…\NAND 3D CMOS 150 Presentation en.pptx" is directed to Micron's CMOS technology for the 150 Series.

10.   Micron applies its highest security level for confidential documents to its Traveler Presentations. In particular, for a given Traveler Presentation, Micron limits access of the entire document to fewer than 20 employees (excluding for legal purposes, such as in this litigation), out of the over 50,000 employees at Micron. Indeed, an even smaller number of employees—just 11— have access to *all* Traveler Presentation Series.

11.   For most of those employees who have access to sensitive traveler information, Micron has implemented automatic security measures that prevent them from viewing Traveler Presentation information outside of Micron's computer environment. These measures include requiring almost all Micron employees with access to the Traveler documentation to use a special "secure browser," which blocks any printing of Traveler Presentation information, blocks screen-sharing of Traveler Presentation information in a Zoom or Microsoft Teams meeting, blocks copying-and-pasting of text, and blocks saving/downloading.

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 3 -

DECL. OF W. DAVID WESTERGARD ISO MICRON'S
MOTION FOR RELIEF
CASE NO. 3:23-cv-05792-RFL

Appx372

12. Making this information available for inspection in this case created significant difficulty and required numerous escalation measures to secure waivers of Micron's no-access policy.

13. Protecting the information in the Traveler Presentations is critical to Micron's ongoing success in the semiconductor industry. A competitor or bad actor possessing this information would significantly harm Micron's competitive advantage and business. For example, they could make use of this information to make and sell products that compete with Micron products without having undertaken the substantial investments of time and resources that Micron has made to develop and bring to market innovative 3D NAND technology. This "shortcut" to market for such competitors would cause irreparable harm to Micron.

14. I understand that YMTC has requested paper copies of 73 pages of the 150 Series Traveler Presentation. Putting such a large portion of the 150 Series Traveler Presentation into a non-secure format, such as paper, that is viewable outside of a secured, controlled environment would create a substantial security risk to Micron, would compromise Micron's status as a leading-edge innovator, and create a significant risk to Micron's competitive position.

I declare under penalty of perjury that the foregoing is true and correct. Executed this 24th day of December, 2024 in Boise, Idaho.


 /s/ David Westergard
David Westergard

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 4 -

DECL. OF W. DAVID WESTERGARD ISO MICRON'S
MOTION FOR RELIEF
CASE NO. 3:23-CV-05792-RFL

Appx373

# CIVIL LOCAL RULE 5-1(i)(3) ATTESTATION

I, Jason Lang, am the ECF User whose ID and password are being used to file this DECLARATION OF W. DAVID WESTERGARD IN SUPPORT OF MICRON'S MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE. In compliance to Civil Local Rule 5-1(i), I hereby attest that I have obtained approval for the filing of this document from all the signatories for whom a signature is indicated by a "conformed" signature (/s/) within this e-filed document.

Dated: December 24, 2024                    ORRICK, HERRINGTON & SUTCLIFFE LLP


By: _____ /s/ Jason Lang _____
                          Jason Lang
        *Attorneys for Defendant and Counterclaim*
        *Plaintiff Micron Technology, Inc., and Defendant*
        *Micron Consumer Products Group LLC*

ORRICK, HERRINGTON &
SUTCLIFFE LLP
ATTORNEYS AT LAW
SILICON VALLEY

- 5 -

DECL. OF W. DAVID WESTERGARD ISO MICRON'S
MOTION FOR RELIEF
CASE NO. 3:23-cv-05792-RFL

Appx374

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| YANGTZE MEMORY TECHNOLOGIES COMPANY, LTD., <br><br> Plaintiff, <br><br> v. <br><br> MICRON TECHNOLOGY, INC.,, et al., <br><br> Defendants. | Case No.  23-cv-05792-RFL <br><br> **ORDER DENYING MOTION FOR RELIEF FROM NONDISPOSITIVE PRETRIAL ORDER OF MAGISTRATE JUDGE** <br><br> Re: Dkt. No. 191 |

Having reviewed Magistrate Judge Hixson's Discovery Order (Dkt. No. 186), the Motion for Relief from that Order (Dkt. No. 191), as well as the initial joint letter brief submitted about the discovery dispute (Dkt. No. 180), the Court finds that the Order is well-reasoned and is not clearly erroneous or contrary to law.  The protective order states that when the Receiving Party requests paper copies of portions of the source code material, the party shall not request more than 1500 pages total, including no more than 30 consecutive pages.  Here, Yangtze Memory Technologies Company ("YMTC") requested 73 pages total, and made no request for more than 30 consecutive pages.  The Court agrees with Magistrate Judge Hixson's order that this "tends to demonstrate that YMTC's request is thoughtful and focused on materials needed for case preparation."  (Dkt. No. 186 at 3.)  Moreover, the protective order includes sufficient procedures to prevent duplication or unauthorized access to the material.  Accordingly, the motion is denied.

**IT IS SO ORDERED.**

Dated: January 14, 2025

RITA F. LIN
United States District Judge

1

# CERTIFICATE OF SERVICE

I hereby certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Federal Circuit by using the appellate CM/ECF system on January 14, 2025.

A copy of the foregoing was served upon the following counsel of record and the district judge via email and FedEx:

> James R. Batchelder
> Andrew T. Radsch
> James F. Mack
> Nancy N. Attalla
> Daniel W. Richards
> ROPES & GRAY LLP
> 1900 University Avenue, 6th Floor
> East Palo Alto, CA 94303-2284
> Telephone: (650) 617-4000
> james.batchelder@ropesgray.com
> andrew.radsch@ropesgray.com
> james.mack@ropesgray.com
> nancy.attalla@ropesgray.com
> daniel.richards@ropesgray.com

Rachael Bacha
Hyun-Joong Kim
Alexander Middleton
ROPES & GRAY LLP
1211 Avenue of the America
New York, NY 10036
Telephone: (212) 596-9062
rachael.bacha@ropesgray.com
daniel.kim@ropesgray.com
alexander.middleton@ropesgray.com

Nicole S. L. Pobre
Allen S. Cross
ROPES & GRAY LLP
2099 Pennsylvania Avenue, N.W.
Washington, D.C. 20006
Telephone: (202) 508-4600
nicole.pobre@ropesgray.com
allen.cross@ropesgray.com

Kevin C. Wheeler
Richard Lowry
LATHAM & WATKINS LLP
555 11th Street NW, Suite 1000
Washington DC 20004-1327
Telephone: (202) 637-2200
kevin.wheeler@lw.com
richard.lowry@lw.com

Clement Naples
LATHAM & WATKINS LLP
1271 Avenue of the Americas
New York, NY 10020
Telephone: (212) 906-1200
clement.naples@lw.com

Brenda L. Danek
LATHAM & WATKINS LLP
330 North Wabash Avenue, Suite 2800
Chicago, IL 60611
Telephone: (312) 876-7700
brenda.danek@lw.com

Thomas W. Yeh
LATHAM & WATKINS LLP
355 South Grand Avenue, Suite 100
Los Angeles, CA 90071
Telephone: (213) 485-1234
thomas.yeh@lw.com

Brett M. Sandford
LATHAM & WATKINS LLP
505 Montgomery Street, Suite 2000
San Francisco, CA 94111
Telephone: (415) 391-0600
brett.sandford@lw.com

B. Thomas Watson
Elliot Greb
LATHAM & WATKINS LLP
12670 High Bluff Drive
San Diego, CA 92130
Telephone: (858) 523-5400
thomas.watson@lw.com
elliott.greb@lw.com

Benjamin J. Behrendt
LATHAM & WATKINS LLP
300 Colorado St, Suite 2400
Austin, TX 78701
Telephone: (737) 910-7300
benjamin.behrendt@lw.com

Hon. Rita F. Lin
United States District Court for the Northern District of
California
Office of the Clerk
450 Golden Gate Avenue, 16th Floor
San Francisco, CA 94102

ORRICK, HERRINGTON & SUTCLIFFE LLP

*/s/ Jared Bobrow*
Jared Bobrow
*Counsel for Petitioners*